David M. Friedman (DFriedman@kasowitz.com)
David S. Rosner (DRosner@kasowitz.com)
Andrew K. Glenn (AGlenn@kasowitz.com)
Jeffrey R. Gleit (JGleit@kasowitz.com)
KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
1633 Broadway
New York, New York 10019
Telephone: (212) 506-1700
Facsimile: (212) 506-1800

*Attorneys for Debtors*
*and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **In re** | **Chapter 11** |
| **BORDERS GROUP, INC.,** *et al.*,[1] | **Case No. 11-_____ (___)** |
| **Debtors.** | **(Joint Administration Pending)** |

**DECLARATION OF HOLLY FELDER ETLIN**
**IN SUPPORT OF STORE CLOSING SALE MOTION**

I, Holy Felder Etlin, being duly sworn, hereby depose and say:

1. I am over the age of 18 and competent to testify. I am a Managing Director of AP Services, LLC ("AP Services"), resident in AP Services' New York office, located at 40 West 57th St. 29th Fl., New York, NY 10019.

2. I have approximately 30 years of restructuring and turnaround experience, having begun my career in 1979 at the predecessor firm of Deloitte Consulting. During my career, I have worked on at least 24 transactions involving the sale or liquidation of retail merchandise by a bankrupt or distressed company.

---

[1] The debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Borders Group, Inc. (4588); Borders International Services, Inc. (5075); Borders, Inc. (4285); Borders Direct, LLC (0084); Borders Properties, Inc. (7978); Borders Online, Inc. (8425); Borders Online, LLC (8996); and BGP (UK) Limited.

3.      I submit this declaration (this "Declaration") in accordance with Rule 1007-2 of the Local Bankruptcy Rules for the Southern District of New York (the "Local Bankruptcy Rules") in support of the Debtors' Emergency Motion for Entry of Orders (I) Authorizing the Debtors to Sell Certain Assets Through Store Closing Sales and to Enter Into Agency Agreement with (A) Joint Venture Composed of Hilco Merchant Resources, LLC, SB Capital Group, LLC, and Tiger Capital Group, LLC or (B) Other Successful Bidder at The Auction, (II) Approving Stalking Horse Protections, (III) Authorizing Debtors To Abandon Unsold Property, (IV) Waiving Compliance With Contractual Store Closing Sale Restrictions, (V) Exempting (A) State and Local "Fast Pay" Laws and (B) Laws Restricting Store Closing Sales, and (VI) Granting Related Relief  (the "Motion"). [2]

4.      The facts set forth in this Declaration are based upon my personal knowledge, upon information and belief (where indicated), or upon client matter records kept in the ordinary course of business that were reviewed by me or other employees of AP Services under my supervision and direction.  If called and sworn as a witness, I could and would testify competently to the matters set forth herein.

5.      On February 9, 2011, Borders Group, Inc. and certain of its affiliates (the "Debtors") retained AP Services to provide restructuring advisory services.  Upon retaining AP Services, the Debtors asked AP Services to undertake various tasks with respect to the Debtors' preparation for bankruptcy filing and to assume certain tasks previously assigned to FTI Consulting, Inc. ("FTI").

6.      As a member of the AP Services team working on the Debtors' engagement, my primary responsibility has been and continues managing the process of soliciting and negotiating

---

[2]   Capitalized terms used but not defined herein are as defined in the Motion.

bids for the Debtors' store closing sales ("SCS"), which will initially encompass approximately 200 stores with up to another up to 75 of 136 stores potentially added at the Debtors' option (collectively, the "Closing Stores").

**A.     The Debtors' Decision to Conduct Immediate Store Closing Sales.**

7.     It is my understanding that in early 2011, the Debtors, in consultation with their advisors and key constituents, concluded that it was in the best interests of the Debtors and their stakeholders to close and liquidate the inventory at the Closing Stores because those stores could not sustain continued operations and were not saleable as going concerns. Based on my review to date of the Debtors' records, I concur with this analysis.

8.     It is also my understanding that the Debtors, with input from their then advisors at FTI, determined that store closing sales conducted by one or more experienced and reputable liquidator(s) would achieve the maximum values for the assets located in the Closing Stores and would minimize administrative expenses. Indeed, based on my own experience, I believe that given the breadth of the store closing sales, it would be impossible for the Debtors to self-administer the sales without outside liquidator assistance.

**B.     The Bid Solicitation Process.**

9.     It is my understanding that on February 3, 2011, the Debtors through their then advisors at FTI began contacting the nation's largest liquidation firms to gauge interest in a process to solicit bids for store closing sales. It is my further understanding that at that time, the Debtors' advisors informally contacted representatives of each of those liquidation firms and learned shortly thereafter -- as is customary of transactions of this size -- that the nation's largest liquidator firms would form two groups for purposes of bidding on the store closing sales.

10. The two groups that participated in bidding for a stalking horse position consisted of: (1) Great American Group LLC and Gordon Brothers Retail Partners LLC (collectively, the "GB Group") and (2) Hilco Merchant Resources, LLC, Tiger Capital, and SB Capital Group (collectively, the "Hilco Group").

11. It is my understanding that on February 7, 2011, the Debtors through their then advisors at FTI transmitted bid solicitation packages (the "Bid Solicitation Packages") containing: (a) a form non-disclosure agreement, and (b) a bid solicitation letter (the "Bid Solicitation Letter") informing the parties of the Debtors' intentions to conduct store closing sales and setting forth clear procedures for parties to request more information and to submit bids. *See* **Ex. 1**. The Bid Solicitation Letter specifically instructed interested parties to complete the non-disclosure agreement, at which time the parties would be provided diligence materials and a draft form agency agreement.

12. The Bid Solicitation Packages were transmitted to the GB Group and the Hilco Group. Based on the small universe of liquidation firms that could handle a liquidation of this size and breadth and the limited time such firms require for diligence, I believe that this solicitation process ensured adequate notice to potential bidders.

13. It is my understanding that on February 8 and 9, 2011, the entities in the GB Group and the Hilco Group signed non-disclosure agreements. (While the Debtors were contacted by other potential bidders that executed confidentiality agreements, they never participated in the stalking horse bidding).

14. It is my understanding that also on February 8, 2011, the Debtors' advisors provided the GB Group and the Hilco Group copies of a draft form agency agreement (which is customary for transaction of this type) and began providing them diligence materials, including

(a) detailed information regarding the Closing Stores including, as to each Closing Store: (i) the address, (ii) a schedule of Occupancy Expenses to be paid by the liquidators, (iii) 2010 P&Ls, (iv) historical weekly sales by SKU, and (v) inventory by SKU; (b) a summary of the Debtors' perpetual inventory; (c) promotional calendars for the first and second quarters of 2011; (d) a detailed listing of certain inventory contained in the debtors distribution center to be included in the sale; and (e) employee manuals and benefits plan summary.

15. The Bid Solicitation Letter originally set February 10, 2011 as the deadline for parties to submit bids (consisting of a marked-up agency agreement reflecting proposed deal terms). On February 9, 2011, at the request of one of the groups, the Debtors' advisors informed the GB Group and the Hilco Group that the Debtors would extend the bid deadline to February 11, 2011.

16. On February 10, 2011, the FTI team began transitioning its work concerning the store closing sale process to my team at AP Services. Both teams, along with management (the same individuals of which have been involved with the process throughout) and counsel, held a call that day to provide an information download, identify tasks and responsible parties, and discuss outstanding diligence requests from potential bidders. I immediately thereafter established contact with the two potential bidder groups.

17. On February 11, 2011, the GB Group and the Hilco Group each submitted bids. I then contacted each group to discuss the terms of each bid and proceeded to engage in extensive negotiations as to specific terms related to their offers. In particular, I had numerous discussions with both groups regarding critical economic issues like the merchandise threshold, cost factor, and general economics of each bid. The Debtors also provided additional diligence to the bidders including with respect to the Debtors' roll forward inventory.

18. All day on Saturday, February 12 and in the morning of Sunday, February 13, 2011, I had frequent discussions with each group in an effort to improve the terms of the bids. I would estimate that I spoke to each bidder group at least four times during this period. The discussions were successful in improving both bids. For example, after extensive negotiations, the Hilco Group agreed to reduce its merchandise threshold requirement from $184 million to $180 million, and increased its guaranteed amount from 71% of cost to 73%. The GB group increased its bid from 66.5% of cost to 71% after extensive negotiation, and modified its merchandise threshold by over $25 million.

19. By mid-day on Sunday, February 13, 2011, the Hilco Group emerged as the party with the higher and better bid. Compared to the GB Group's bid, the Hilco Group's bid provides a guaranty percentage that is 2% higher, which equates to almost $4 million more in proceeds for the Debtors. In addition, the Hilco Group's terms on inventory thresholds, cost-to-retail adjustments and expense reimbursement are more favorable to the Debtors, decreasing the Debtors' potential exposure to excess expenses or inventory adjustments. The Debtors thus selected the Hilco Group's bid as the Stalking Horse Bid. The Hilco Group agreed to have their bid subject to an auction on the condition they be afforded a break-up fee if their bid was not the winning bid at the Auction.

20. The Stalking Horse Bid would pay the Debtors (i) a guaranteed amount of 73% of the cost value of all merchandise located at the Closing Stores and which the Debtors estimate will bring at least $131 million and as much as $148 million into the estates, plus (ii) a 50% share of any proceeds received during the SCSs after a 5% fee and recovery of expenses.

21. On February 14, 2011, the Debtors informed the GB Group that the Hilco Group's bid was selected as the Stalking Horse Bid. The Debtors' advisors then worked with the

Hilco Group and its professionals to revise the draft form agency agreement, which resulted in the Agency Agreement (the "Agency Agreement") executed by the Debtors on February 15, 2011 and which is subject to Court approval.

22. The Agency Agreement has been shared with the Debtors' key constituencies including (a) certain large publishers holding a substantial portion of the Debtors' trade debts that individually decided to jointly retain the same professionals at Lowenstein Sandler and Alvarez & Marsal, and (b) the Debtors' two proposed DIP Facility Agents. Each group provided comments to the agreement, which the Debtors and their advisors considered carefully and, where acceptable, revised the agreement to reflect. Moreover, each of those constituencies has been fully informed of the Debtors' solicitation efforts and the economics of the agency agreement and, indeed, representatives of each constituency expressed satisfaction with the amount of consideration the Debtors and their bankruptcy estates will receive under the agency agreement and its terms. Finally, counsel representing many of the Debtors' most significant landlords was also consulted regarding landlord specific issues reflected in the sale guidelines.

C. **The Stalking Horse Protections.**

23. The Agency Agreement contemplates that if the Stalking Horse Bidder is not the successful bidder at the Auction, then in consideration of the Stalking Horse Agent conducting its due diligence, entering into the Agency Agreement, and agreeing to subject its Stalking Horse Bid to the Auction, the Stalking Horse Bidder will receive a break-up fee of $1,000,000 (the "Break-Up Fee"). The Stalking Horse Bidder has agreed that it will not be permitted to apply the Break-Up Fee to offset amounts it is required to bid pursuant to set bidding increments.

24. I believe that the Break-Up Fee is reasonable and appropriate under the circumstances. It is the result of good faith, arms-length negotiations, and provides a price floor and bidding structure for potential competing bids. I believe the Break-Up Fee will incentivize

competitive bidding thereby maximizing recovery to the Debtors and their estates in the SCSs. Indeed, the Break-Up Fee – which equates to approximately less than 1% of the consideration guaranteed by the Stalking Horse Bidder – will not be paid unless the Auction results in approximately $940,000 more in consideration to the Debtors, net of the Break-Up Fee.

25. I extensively negotiated the inclusion of the Break-Up Fee and its amount with the Hilco Group, which negotiations resulted in the Hilco Group's agreement to reduce the fee to its current level by $950,000. In exchange for this break-up fee, the Debtors were able to negotiate certain other valuable provisions including the sale of the periodicals inventory, cost to retail factors and a broader merchandise threshold. Based on those discussions, I believe that the Stalking Horse Bidder would not proceed with the sale without the Break-Up Fee. (Indeed, GB Group, the competing bidder, also requested a break-up fee).

26. Given that the Stalking Horse Bidder has come forward with a fair and reasonable proposal to conduct the SCSs, that would benefit the Debtors and their constituencies, and considering that the Stalking Horse Bid sets the floor for other bidders to improve the value received by the Debtors, and taking in account the size of the transaction involved, I believe that the Stalking Horse Bidder should be entitled to the Break-Up Fee.

**D.    Need for Immediate Relief.**

27. I believe that it is critical to commence the store closing sales as soon as possible for several important reasons including the following:

- First, the Closing Stores are operating at a significant loss and represent a drain on the Debtors' liquidity. Indeed, I estimate that each week the Closing Stores remain open causes the Debtors to suffer approximately $2 million of losses. Thus, the sooner the Debtors can liquidate the assets at the Closing Stores and reject the corresponding leases, the sooner and better the Debtors can mitigate the strain on their liquidity.

- Second, the Debtors have ceased supplying the Closing Stores, and delays in the liquidation process could cause portions of the Closing Store's inventory to become less

valuable, not only due to lack of replenishment, but due to changes in the quality of the inventory mix due to ongoing sales, thus, of diminished value.

- <u>Third</u>, the guaranteed amount liquidators are willing to pay to conduct the store closing sales would drop substantially if the sales cannot commence during Presidents' Day weekend. That is because of the aforementioned lack of replenishment and resulting decrease in the quality of inventory available in the stores. Accordingly, the Stalking Horse Bidder has made its agreement contingent upon commencing the sales on Saturday, February 19, 2011. Indeed, based on discussions with liquidators, I believe that delaying the sales until after Presidents' Day weekend will lower the sale price by as much as 1-2% of the Guaranty Percentage, resulting in approximately $2 million to $4 million less in proceeds.

- <u>Fourth</u>, continuing to operate the Closing Stores would distract the Debtors' management team from properly focusing their attention and resource on operating the Chapter 11 cases and restructuring around a core group of profitable stores.

28. Based on my experience with such transactions, I believe that going forward on an expedited basis will in no way impair recoveries because (a) all of the nationally-recognized potential liquidators (the only parties that can effectuate a transaction of this magnitude) have been directly involved in the process, (b) those parties were provided all necessary diligence and have expertise in quickly formulating and executing such bids, (c) the solicitation process I supervised was routine for such situations and the form of agency agreement used is mostly customary, and (d) the Debtors' proposed DIP Facility Agent as well as representatives of unsecured creditor constituencies have had direct input in the process.

29. Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

[SIGNATURE PAGE FOR DECLARATION OF HOLLY FELDER ETLIN
IN SUPPORT OF STORE CLOSING SALE MOTION]

Dated: February 15, 2011
      New York, New York

*[signature]*

Holly Felder Etlin
Managing Director, AP Services LLC

**EXHIBIT 1 FOLLOWS**
**BID SOLICITATION LETTER**

**CONFIDENTIAL<br>
REQUEST FOR PROPOSALS TO CONDUCT<br>
<u>STORE CLOSING SALES</u>**

I. <u>**Introduction**</u>

As you may be aware, FTI Consulting, Inc. has been retained as financial advisor ("Financial Advisors") and Kasowitz, Benson, Torres & Friedman LLP has been retained as counsel ("Counsel") by Borders Group, Inc. and its affiliates (the "Company") to assist the Company, in connection with its solicitation of bids and conduct of an auction process for purposes of selecting an agent, on an exclusive basis, to assist the Company in the liquidation of inventory and associated assets, including certain furniture, fixtures and other store equipment ("FF&E"), located at certain retail store locations (collectively, the "Closing Locations") through the conduct of "store closing" or similar themed sales (the "Sale") at the Closing Locations.

Under separate cover, the Company shall be delivering to each potential bidder who has executed and returned the required Confidentiality Agreement certain select financial information concerning the Closing Locations and the merchandise inventories located at each such location, as well as a form of Agency Agreement.

**EACH BIDDER MAY MAKE ARRANGEMENTS WITH THE COMPANY TO VISIT ANY CLOSING LOCATION AND TO CONDUCT SUCH OTHER DUE DILIGENCE AS THE BIDDER AND THE COMPANY DEEM APPROPRIATE. ANY SITE VISIT MUST BE ARRANGED IN ADVANCE WITH THE COMPANY BY CONTACTING JIM FRERING (CONTACT INFORMATION BELOW). REQUESTS FOR ADDITIONAL INFORMATION SHOULD BE DIRECTED TO JON NIGHSWANDER OF FTI CONSULTING, INC. (CONTACT INFORMATION BELOW).**

II. <u>**Request For Proposals**</u>

1. The Company desires to receive proposals which contemplate a bid for approximately 200 stores plus certain inventory in the distribution center. In addition, the Company desires to "put" up to 75 additional stores into the Sale within 30 days of the sale commencement date. Each Bidder shall also include as part of its proposal an offer to assist the Company in its disposition of the FF&E located in the Closing Locations and owned by the Company. Each bidder should also indicate whether it intends to continue operations of the café and newsstand portion of the Closing Stores and specifically address the economics of their bid relative to those operations.

2. All proposals to be considered must be received, in writing, **no later than 4:00 PM (EST) on Thursday, February 10th** (the "Proposal Deadline") and must be submitted using the form of Agency Agreement, redlined to show proposed changes from the original. Electronic copies of the Agency Agreement may be obtained from the Financial Advisors. Joint venture proposals will not be considered unless previously approved by the Company. The Company anticipates selecting, in consultation with the Financial Advisors and Counsel, the highest and best proposal that arrives on or before the Proposal Deadline, and which conforms to the terms and provisions of this proposal solicitation, to serve as stalking horse **not later than 12:00 Noon (EST) on Sunday, February 13th**.

3.      The Company anticipates conducting a final auction and to select the agent to conduct store closing sales beginning at **10:00 AM (EST) on Thursday, February 17th** at Counsel's offices (address below).  In advance of the auction, the Company will inform each bidder submitting a conforming bid of the material terms of the stalking horse proposal and the stalking horse proposal will be the opening bid at the auction.  It is Company's intention to enter into a definitive Agency Agreement with the successful bidder(s) -- who will be determined by the Company in consultation with the Financial Advisors and Counsel -- which Agreement shall reflect the terms and conditions of the successful bid(s).  The successful bidder(s) will be given undisturbed possession of the Closing Locations on the sale commencement date, which the Company presently expects will be on or about **Saturday, February 19, 2011**.  Sales completed between the sale commencement date and the completion of the Inventory Taking (as defined in the Agency Agreement) at each particular Closing Location shall be recorded and accounted for under the "gross rings" method.

4.      Proposals must be marked as **"Strictly Confidential"** and delivered by email, overnight courier, or by fax, simultaneously to each of the following on or before the Proposal Deadline:

> FTI Consulting, Inc.
> Bob Duffy
> Steve Coulombe
> Jon Nighswander
> 200 State Street
> Boston, MA 02110
> Fax:    (617) 897 1510
> Email:  bob.duffy@fticonsulting.com
>             steve.coulombe@fticonsulting.com
>             jonathan.nighswander@fticonsulting.com
>
> Kasowitz, Benson, Torres & Friedman LLP
> 1633 Broadway
> New York, New York 10019
> David M. Friedman
> Adam L. Shiff
> Daniel A. Fliman
> Fax:    (212) 506-1800
> Email:  dfriedman@kasowitz.com
>             ashiff@kasowitz.com
>             dfliman@kasowitz.com
>
> Borders Group, Inc.
> Jim Frering
> Senior vice president, Store Operations
> 100 Phoenix Dr. - Ann Arbor, MI 48108
> Phone:  (734) 477-1194
> jfrering@bordersgroupinc.com

**THE COMPANY RESERVES THE RIGHT TO MODIFY ANY PROCEDURES HEREIN, TO REJECT ANY OR ALL PROPOSALS SUBMITTED IN RESPONSE TO THIS REQUEST FOR PROPOSALS AND/OR TO WITHDRAW ANY OR ALL OF THE CLOSING LOCATIONS AT ANY TIME BEFORE, DURING OR AFTER THE AUCTION, IN ITS SOLE AND ABSOLUTE DISCRETION.**

The description of Sale terms in this letter are for illustrative purposes only. The terms of any Sale will be in all respects governed by the terms of the Agency Agreement executed between the Company and successful bidder(s).

Any requests for additional information or clarification of the matters addressed herein shall be directed to the person identified below. No other contact with any representative of the Company shall be made without the express prior consent of the Company.

Sincerely,


Jon Nighswander
FTI Consulting, Inc.