David M. Friedman (DFriedman@kasowitz.com)
David S. Rosner (DRosner@kasowitz.com)
Andrew K. Glenn (AGlenn@kasowitz.com)
Jeffrey R. Gleit (JGleit@kasowitz.com)
KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
1633 Broadway
New York, New York 10019
Telephone:  (212) 506-1700
Facsimile:  (212) 506-1800

*Attorneys for Debtors
and Debtors-in-Possession*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **In re** | **Chapter 11** |
| **BORDERS GROUP, INC.,** *et al.*,[1] | **Case No. 11-_____ (___)** |
| **Debtors.** | **(Joint Administration Pending)** |

**DEBTORS' MOTION PURSUANT TO
11 U.S.C. §§ 105(a) AND 503(b)(1) FOR AUTHORIZATION TO
HONOR CERTAIN PREPETITION CUSTOMER PROGRAMS**

TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE:

Borders Group, Inc. ("BGI") and its affiliated debtors, as debtors and debtors in possession (collectively, the "Debtors"), submit this motion (the "Motion") and respectfully represent as follows:

**BACKGROUND**

1.   On the date hereof (the "Commencement Date"), each of the Debtors commenced a voluntary case under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").

---

[1]   The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are:  Borders Group, Inc. (4588); Borders International Services, Inc. (5075); Borders, Inc. (4285); Borders Direct, LLC (0084); Borders Properties, Inc. (7978); Borders Online, Inc. (8425); Borders Online, LLC (8996); and BGP (UK) Limited.

The Debtors are authorized to operate their business and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. Contemporaneously herewith, the Debtors filed a motion seeking joint administration of their chapter 11 cases pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

## DEBTORS' BUSINESS

**A.    Operations**

2.    The Debtors are a leading operator of book, music and movie superstores and mall-based bookstores. At January 29, 2011, the Debtors operated 642 stores, under the Borders, Waldenbooks, Borders Express and Borders Outlet names, as well as Borders-branded airport stores in the United States, of which 639 stores are located in the United States and 3 in Puerto Rico. Two of Borders' flagship stores (along with other less prominent stores) are located in Manhattan. In addition, the Debtors operate a proprietary e-commerce web site, www.Borders.com, launched in May 2008, which includes both in-store and online e-commerce components.

3.    As of February 11, 2011, the Debtors employed a total of approximately 6,100 full-time employees, approximately 11,400 part-time employees, and approximately 600 contingent employees (who are required to work one shift per month, and usually do so at special events), all of whom are located in the United States and Puerto Rico. The Debtors' employees are not subject to any collective bargaining agreements.

**B.    Financials**

4.    For the fiscal year ended January 29, 2011, the Debtors recorded net sales of approximately $2.3 billion. As of December 25, 2010, the Debtors had incurred net year-to-date losses of approximately $168.2 million.

2

5. Additional information regarding the Debtors' business, capital structure, and the circumstances leading to these chapter 11 cases is contained in the *Declaration of Scott Henry Pursuant to Local Bankruptcy Rule 1007-2 in Support of First Day Motions* (the "<u>First Day Declaration</u>") filed contemporaneously herewith.

## JURISDICTION

6. The Court has subject matter jurisdiction to consider and determine this matter pursuant to 28 U.S.C. § 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

## RELIEF REQUESTED

7. The Debtors, in the ordinary course of their business and as is common for retailers, engage in certain marketing and sales practices that are generally (i) targeted to develop and sustain positive reputations for their stores and merchandise in the marketplace, and (ii) designed to attract new customers to the Debtors' stores and to enhance store loyalty and sales among the Debtors' existing customer base. The Debtors request entry of an order, substantially in the form of <u>Exhibit A</u> annexed hereto, authorizing, but not directing, the Debtors to continue their Customer Programs (as defined herein) in the ordinary course of business and to perform and honor their prepetition obligations thereunder.[2]

## THE DEBTORS' CUSTOMER PROGRAMS

8. The Debtors' customer-targeted practices (collectively, the "<u>Customer Programs</u>") include, but are not limited to, those practices described in the following paragraphs.

---

[2] Nothing contained herein is intended or should be construed as an admission as to the validity of any claim against any of the Debtors, a waiver of the Debtors' rights to dispute any claim, or an approval or assumption of any executory contract or unexpired lease under section 365 of the Bankruptcy Code. Likewise, if this Court grants the relief sought herein, any payment made pursuant to the Court's order granting the relief requested in this Motion is not intended and should not be construed to be an admission as to the validity of any claim, or a waiver of the Debtors' right to subsequently dispute such claim.

Continuance of the Customer Programs in the ordinary course is integral to the Debtors' seamless transition into chapter 11 and will facilitate a successful reorganization. The Debtors believe they must quickly assure customers that the goods and services they have come to expect under the Customer Programs will not be interrupted or otherwise changed as a result of the Debtors' restructuring efforts. By this Motion, the Debtors seek authority to continue the Customer Programs in the ordinary course of business, but also reserve the right to alter, amend and/or revoke such programs in their sole discretion and in the ordinary course of business.

9. The following are general descriptions of the Debtors' principal Customer Programs:

A. **Debtors' Rewards Program**

10. As part of their efforts to build customer, store and brand loyalty, the Debtors have established a rewards program ("Borders Rewards"), which allows holders of the Debtors' rewards club cards to earn points or rewards for each qualifying purchase. Membership in Borders Rewards is free, and approximately 42 million members were enrolled as of the Commencement Date. Borders Rewards cardholders receive five dollars of merchandise credit ("Borders Bucks") for each $150 spent on qualifying purchases in each calendar year, or for each $100 spent after the first reward in a calendar year has been earned. Borders Rewards members have the entire calendar year to earn Borders Bucks. For example, a member can spend $75 in one month, $50 in another, and the final $25 in December, and would then earn $5 in Borders Bucks. Borders Bucks are credited to the Borders Rewards member's account, and issued the first week of each month if the member has accrued at least $150 or $100 in qualifying purchases, as applicable, during the previous month. Subject to certain limitations, Borders Bucks may be redeemed on future purchases at the Debtors' retail locations or online. Borders Bucks expire on the last day of the month in which they are issued.

4

11. In addition, in the ordinary course of business, the Debtors provide Borders Rewards members with: (i) coupons for reduced charges for merchandise such as books, movies and music sold in the Debtors' retail stores; (ii) a personal shopping day during which members that have already earned their first Borders Bucks in a calendar year save an additional 10% off essentially everything in the Debtors' stores; (iii) 30% off the list price of hard cover bestsellers; (iv) free standard shipping on online orders of $25 or more, subject to some exclusions; (v) a free café beverage at the Debtors' in-store cafés for every five beverages purchased, subject to some exclusions, (vi) a gift on the member's birthday; and (vii) priority access to certain in-store events.[3]

12. January 2011 Borders Bucks were issued on or around January 1, 2011, for purchases made through December 31, 2010. Although, as discussed above, Borders Rewards members have the entire calendar year to earn Borders Bucks, on January 1, 2011, Borders Rewards members' purchase amounts not reaching the $150 or $100 thresholds were reset to zero, due to year-end. Purchases made commencing on January 1, 2011 started the accrual of 2011 Borders Bucks. In January 2011, approximately $7,959,000 in Borders Bucks were issued (*i.e.*, 1,591,800 five-dollar Borders Bucks). Approximately $5,253,384 were not redeemed and expired at the end of the day on January 31, 2011. On average, approximately 40% to 50% of the Borders Bucks issued in any given month are redeemed, though the percentage in any given month may fluctuate widely. Approximately $2,817,440 in Borders Bucks were issued on or around February 1, 2011, for customers who had by that time spent amounts in 2011 totaling the $150 or $100 thresholds.

---

[3] Additionally, Borders Rewards members have the option to donate eligible Borders Bucks to teachers enrolled in Borders Rewards or Borders Rewards Plus (as defined herein) and the classroom discount program (as discussed herein), who sign up to receive such donations.

5

13.     Additionally, the Debtors introduced the "Borders Rewards Plus" program early in 2010 ("Borders Rewards Plus"). Borders Rewards Plus is a paid membership program that offers, in exchange for a $20 membership fee for each rolling twelve months (366 days) of membership, in addition to all of the Borders Rewards benefits discussed above: a 40% discount on hard cover best sellers (off list price); a 20% discount on select hard covers (off list price); 10% off essentially all other merchandise (off sell price); and free shipping for Borders.com purchases. The Debtors refund Borders Rewards Plus membership fees upon customer request within 30 days of joining, consistent with return policies discussed herein. As of the Commencement Date, approximately 1.2 million customers (who also are Borders Rewards members) had paid for membership in Borders Rewards Plus. Since January 31, 2009, Borders Rewards and Borders Rewards Plus have collectively added approximately 12 million new members.

**B.    Debtors' Gift Cards**

14.    The Debtors issue Borders gift cards in a variety of denominations (collectively, the "Gift Cards"). Gift Cards typically are issued in exchange for cash, and are redeemable by purchasers or recipients in exchange for the Debtors' merchandise (with a limited number of restrictions). The Gift Cards are not subject to service fees or expiration dates. As of the Debtors' fiscal year-end on January 29, 2011, the aggregate amount on Gift Cards outstanding was approximately $275,045,213. However, taking breakage into account (*i.e.*, the amount of traditionally unredeemed Gift Cards), the Debtors estimate that only approximately $113,141,505 of this amount will be redeemed.

**C.    Return Policies**

15.    Consistent with industry practices, the Debtors traditionally have maintained merchandise return, refund, replace and exchange policies. Merchandise purchased from the

6

Debtors' stores generally may be returned to the Debtors' stores for a full refund, issued in the same form as the original purchase, within thirty days of purchase when accompanied by an original sales receipt. The Debtors' return policy is different, however, when the returned merchandise is accompanied by a gift receipt. In this circumstance, the Debtors allow their customers sixty days to return merchandise to their stores, but the Debtors issue the refund in the form of a Gift Card. Likewise, customers that return merchandise to the Debtors' stores with no receipt receive merchandise credit.[4] The Debtors also allow their customers to exchange (for the identical item of merchandise) opened audio books, music, videos, video games, software and electronics purchased in the Debtors' stores, subject to the same time and receipt requirements set forth above.

16. The Debtors' return policies differ slightly when a customer purchases merchandise from the Debtors' online store. The Debtors give their online customers thirty days to return merchandise. If a customer returns merchandise purchased online directly to the Debtors' online store (and includes the original packing slip), the customer will receive a full refund in the form of the original payment method. If a customer returns merchandise ordered online to one of the Debtors' retail outlets, however, the Debtors will issue the refund in the form of a Gift Card. Finally, when a customer receives merchandise that was purchased online as a gift, the customer may either: (i) return the merchandise to the Debtors' online store, whereby the original purchaser of the merchandise will receive a full refund in the same form as the original purchase; or (ii) return the merchandise at one of the Debtors' retail outlets and either exchange the merchandise or receive a store credit for the merchandise's value.

---

[4] However, customers that purchase merchandise in the Debtors' retail stores pursuant to "store closing sales" (per the Debtors' motion filed contemporaneously herewith), will not be permitted to return such merchandise, with or without receipts.

7

17. These policies provide the Debtors' customers with comfort that they will be able to return merchandise if, for example, the merchandise purchased is damaged or defective, etc. Certain items, including out-of-print items, magazines, and items marked "final sale" or "non-returnable item" are not subject to the refund policies discussed above.

**D.     Credit Card Processing Agreements**

18. The Debtors are party to processing agreements (collectively, the "Processing Agreements") with four (4) merchants (collectively, the "Merchant Processors") that enable the Debtors to accept credit cards as payment for their merchandise. These Processing Agreements are essential to the Debtors' business, as they allow the Debtors' customers the flexibility to purchase merchandise on credit. This flexibility is essentially taken for granted by modern retail customers, and its loss would significantly impair the Debtors' ability to serve, attract and retain those customers. Additionally, the Debtors utilize the services of two (2) processors which facilitate credit card payments by means of front end fraud detection before the payments are accepted (the "Facilitating Processors, and, together with the Merchant Processors, the "Processors").

19. The Merchant Processors net their fees from daily settlements, as discussed in more detail below, whereas the Facilitating Processors are paid monthly. The Debtors estimate that as of the Commencement Date, approximately $300,000 in fees to the Processors are accrued and unpaid, most of which are to be paid within two to three days after the Commencement Date. Because credit card sales account for approximately 70% of the Debtors' total sales, it is critical that there be no disruptions in these payments. The Debtors seek authority from the Court to pay all prepetition accrued but unpaid fees due to the Processors, and to continue such payments to Processors in the ordinary course of the Debtors' business.

8

20.     Under the Processing Agreements, upon the return to the Debtors of merchandise purchased using a credit card, the Debtors are obligated to refund to the Merchant Processors the purchase price of the returned merchandise plus certain adjustments (collectively, the "Chargebacks").  Generally, the Debtors' Chargeback obligations to the Merchant Processors are satisfied by a reduction of payments currently owing to the Debtors under the Processing Agreements (collectively, the "Processor Payments") in the amount of the outstanding Chargebacks.

21.     It is possible that certain Chargebacks incurred by the Debtors immediately prior to the Commencement Date may not have been fully netted out against Processor Payments the Debtors received prior to the Commencement Date.  Moreover, although the Debtors believe that any Chargebacks arising after the Commencement Date would be postpetition obligations of the Debtors, it may be argued that Chargebacks arising after the Commencement Date nevertheless would be prepetition obligations where the merchandise returned was purchased from the Debtors prior to the Commencement Date.  In such circumstances, to the extent that the netting of the parties' obligations would not constitute recoupment, the setoff of Chargebacks against Processor Payments arguably may be foreclosed by the automatic stay imposed by section 362(a) of the Bankruptcy Code.  By this Motion, the Debtors seek authority to pay all Chargebacks obligations, and to continue to pay Chargebacks in the ordinary course of business.

E.     **Employee and Airport Discounts**

22.     Pursuant to the Debtors' policies, a 33% shopping discount on most store and kiosk items, and for most orders placed at Borders.com, is granted to all employees that are classified as having regular status employment.  Additionally, the Debtors provide all of their employees that complete Borders Rewards program training with membership in Borders Rewards Plus, which effectively raises the employee discount to 40% for such employees.

9

23.     With respect to the Debtors' Borders-branded airport stores, all such stores offer 10% discounts to airport employees (following standard company exclusion policies).[5] Most of these discounts are contractually required by the airport stores' leases. Additionally, airports provide an everyday 10% discount for military personnel.

**F.     Quantity Discount Program**

24.     All customers of the Debtors are eligible for quantity discounts on the purchase of ten or more copies of the same item, based on the following schedule: 10% off for ten to nineteen copies of a single paperback title; 15% off for ten to nineteen copies of a single hard cover title; 15% off for twenty to twenty-nine copies of a single title; 20% off for thirty or more copies of a single title.

**G.     Educator Discount Program**

25.     Teachers, librarians, or homeschoolers for students in preschool through 12th grade who can show proof of employment are eligible for a 25% Educator Discount Card applicable on purchases of books and music for use in the classroom or for classroom preparation. Several times a year, the Debtors extend the discount to Educator Discount Card holders' personal purchases. Approximately 510,000 educators held Educator Discount Cards as of the Commencement Date.

**H.     Business and Educator Services Discount**

26.     The Debtors maintain a discount program specifically for business or educational purchasers. Individuals may apply through their organization for either a (i) deferred billing account card, or (ii) discount card. Either card permits the member organization to receive a discount of up to 25% towards the purchase of books and music at any of the Debtors' Borders

---

[5] The Debtors may offer a higher discount without exclusions in John F. Kennedy International Airport, in accordance with their lease.

10

branded outlets. As of the Commencement Date, there were approximately 5,400 individual and organizational members of the Business and Educator Services Program with deferred billing accounts.[6]

## I. Debtors' Coupons and Promotional Codes

27. In the ordinary course of their businesses, the Debtors commonly offer discount coupons, promotional codes and various rebate promotions (the "Debtors' Coupons"). The failure of the Debtors to honor the Debtors' Coupons could result in a loss of goodwill and jeopardize customer loyalty. As such, it is essential that the Debtors maintain the ability to honor coupons that the Debtors issued prior to the Commencement Date.

## BASIS FOR RELIEF

### A. Ample Support Exists to Authorize Continuation of the Customer Programs

28. As stated, the Debtors seek authorization, pursuant to sections 105(a) and 503(b)(1) of the Bankruptcy Code, to maintain and continue their Customer Programs, and to honor their undisputed prepetition obligations in respect thereof, in the ordinary course of business without interruption in accordance with prepetition practices.

29. Sections 1107(a) and 1108 of the Bankruptcy Code authorize a debtor in possession to continue to operate its business. *See* 11 U.S.C. §§ 1107(a), 1108. Pursuant to section 503(b)(1) of the Bankruptcy Code, a debtor may incur, and the Court, after notice and a hearing, shall allow as administrative expenses, among other things, "the actual, necessary costs and expenses of preserving the estate." *Id.* § 503(b)(1). The Debtors believe the use of estate funds to continue the Customer Programs is permitted by section 503(b)(1) as necessary costs of preserving the Debtors' estates. Honoring the Customer Programs is critical to the Debtors'

---

[6] The Debtors do not track the number of accounts that receive a discount card.

11

ability to retain valuable relationships which, in turn, will help strengthen and preserve the Debtors' business and maintain their brand value.

30.     Additionally, section 507(a)(7) of the Bankruptcy Code establishes a priority for "unsecured claims of individuals, to the extent of $2,600 for each such individual, arising from the deposit, before the commencement of the case, of money in connection with the purchase, lease, or rental of property, or the purchase of services, for the personal, family, or household use of such individuals, that were not delivered or provided." *Id.* § 507(a)(7). The Debtors submit that the holders of certain Gift Cards issued prepetition may be entitled to priority claims under section 507(a)(7) of the Bankruptcy Code if the Court does not authorize the Debtors to honor such Gift Cards. *See In re WW Warehouse, Inc.*, 313 B.R. 588, 594 (Bankr. D. Del. 2004) (finding that gift certificate holders are entitled to priority status). As priority claimholders, holders of these Gift Cards would be paid in full before any general unsecured obligations of the Debtors are satisfied. Accordingly, the relief requested may affect only the timing of the Debtors' performance of their obligations to honor these Gift Cards and will not prejudice the rights of general unsecured creditors or other parties in interest.

31.     Furthermore, to supplement the explicit powers described above, section 105(a) of the Bankruptcy Code empowers the Court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). A Bankruptcy Court's use of its equitable powers to "authorize the payment of pre-petition debt when such payment is needed to facilitate the rehabilitation of the debtor is not a novel concept." *In re Ionosphere Clubs, Inc.*, 98 B.R. 174, 175 (Bankr. S.D.N.Y. 1989). The Debtors submit that the continuation of the Customer Programs without interruption is imperative to their effective reorganization and to maximizing value.

32.     In a long line of well-established cases, federal courts have consistently permitted postpetition payment of prepetition obligations where necessary to preserve or enhance the value of a debtor's estate for the benefit of all creditors. *See*, *e.g.*, *Miltenberger v. Logansport, C. & S.W. Ry. Co.*, 106 U.S. 286, 311-12 (1882) (payment of pre-receivership claim prior to reorganization permitted to prevent "stoppage of the continuance of such [crucial] business relations"); *Dudley v. Mealey*, 147 F.2d 268, 271 (2d Cir. 1945), *cert. denied* 325 U.S. 873 (1945) (extending doctrine for payment of prepetition claims beyond railroad reorganization cases); *Mich. Bureau of Workers' Disability Comp. v. Chateaugay Corp. (In re Chateaugay Corp.)*, 80 B.R. 279, 285-86 (S.D.N.Y. 1987) (approving lower court order authorizing payment of prepetition wages, salaries, expenses, and benefits).

33.     The "doctrine of necessity" functions in chapter 11 cases as a mechanism by which the Bankruptcy Court can exercise its equitable power to allow payment of critical prepetition claims not explicitly authorized by the Bankruptcy Code. *See In re Boston & Me. Corp.*, 634 F.2d 1359, 1382 (1st Cir. 1980) (recognizing the existence of a judicial power to authorize trustees to pay claims for goods and services that are indispensably necessary to the debtors' continued operation). The doctrine is frequently invoked early in chapter 11 cases, particularly in connection with the payment of prepetition claims, and the rationale for the doctrine of necessity rule is consistent with the paramount goal of chapter 11—"facilitating the continued operation and rehabilitation of the debtor." *Ionosphere Clubs*, 98 B.R. at 176. Accordingly, pursuant to section 105(a) of the Bankruptcy Code, this Court is empowered to grant the relief requested herein.

34.     The continuity, viability, and revitalization of the Debtors' business as well as their brand as one of the leading retail providers of media merchandise are dependent upon the

13

development and maintenance of the loyalty of their customers. It is essential that the Debtors be permitted to continue their Customer Programs and honor their prepetition obligations thereunder. If the Debtors are unable to do so, their operations and brand will be irreparably harmed by the loss of certain of their customers and such customers' loyalty, to competitors. Certain competitors maintain customer programs that are similar, if not identical, to certain of those offered by the Debtors. Therefore, the Debtors' inability to honor their Customer Programs would place them at a severe disadvantage relative to these competitors and would be severely detrimental to the Debtors' reorganization efforts.

35.     The continuation of Customer Programs, which have proven beneficial, is necessary to reassure customers, preserve goodwill, and maintain critical business relationships. The Debtors submit that the resulting benefit of continued customer satisfaction and loyalty during the pendency of these chapter 11 cases will far exceed the costs associated therewith. Considering the potential for loss of competitiveness absent the relief requested herein, and the resulting impact on the Debtors' business, the Debtors submit that authorization to continue the Customer Programs in the ordinary course of business and to perform and honor the Debtors' prepetition obligations thereunder, as deemed appropriate in the Debtors' business judgment, is in the best interest of all parties in interest in these cases, and should be approved in all respects.

36.     Courts in this district and others have granted relief similar to that requested herein in chapter 11 cases where retaining the loyalty and patronage of customers was critical to a successful reorganization.[7] *See*, *e.g.*, *In re The Great Atl. & Pac. Tea Co.*, Ch. 11 Case No. 10-24549 (RDD) (Bankr. S.D.N.Y. Jan. 13, 2011) [Docket No. 498]; *In re Blockbuster Inc.*, Case No. 10-14997 (BRL) (Bankr. S.D.N.Y. Sept. 23, 2010) [Docket No. 39]; *In re Finlay Enters.,*

---

[7] Because of the voluminous nature of the unreported orders cited herein, such orders are not annexed to the Motion. Copies of these orders are available upon request of Debtors' counsel.

14

*Inc.*, Ch. 11 Case No. 09-14873 (JMP) (Bankr. S.D.N.Y. Sept. 3, 2009) [Docket No. 196]; *In re Extended Stay Inc.*, Ch. 11 Case No. 09-13764 (JMP) (Bankr. S.D.N.Y. July 17, 2009) [Docket No. 178]; *In re General Motors Corp.*, Ch. 11 Case No. 09-50026 (REG) (Bankr. S.D.N.Y. June 1, 2009) [Docket No. 167]; *In re Lenox Sales, Inc.*, Ch. 11 Case No. 08-14679 (ALG) (Bankr. S.D.N.Y. Dec. 16, 2008) [Docket No. 124]; *In re Stone Barn Manhattan, LLC (Steve & Barry's I)*, Ch. 11 Case No. 08-12579 (ALG) (Bankr. S.D.N.Y. July 30, 2008) [Docket No. 287]; *In re Lexington Precision Corp.*, Ch. 11 Case No. 08-11153 (MG) (Bankr. S.D.N.Y. Apr. 22, 2008) [Docket. No. 78]; *In re New York Racing Assoc., Inc.*, Ch. 11 Case No. 06-12618 (JMP) (Bankr. S.D.N.Y. Nov. 3, 2006) [Docket No. 19]; *In re Silicon Graphics, Inc.*, Ch. 11 Case No. 06-10977 (BRL) (Bankr. S.D.N.Y. May 10, 2006) [Docket No. 44]; *In re Atkins Nutritionals, Inc.*, Ch. 11 Case No. 05-15913 (ALG) (Bankr. S.D.N.Y. Aug. 1, 2005) [Docket No. 35]; *In re Movie Gallery, Inc.*, Ch. 11 Case No. 10-30696 (DOT) (Bankr. E.D. Va. Feb. 8, 2010) [Docket. No. 123]; *In re Movie Gallery, Inc.*, Ch. 11 Case No. 07-33849 (DOT) (Bankr. E.D. Va. Oct. 18, 2007) [Docket No. 120].

37. Based on the foregoing, the Debtors submit that the relief requested is necessary and appropriate, in the best interests of all stakeholders in these chapter 11 cases, and should be granted in all respects.

**B.    Request for Authority for Banks to Honor and Pay Checks Issued and Electronic Funds Transfers Requested With Respect to Prepetition Customer Programs Obligations**

38. As part of their cash management system, the Debtors maintain disbursement accounts (collectively, the "Disbursement Accounts")[8] at various banks and other financial institutions (collectively, the "Banks"). The Debtors draw upon funds in these Disbursement

---

[8] The Debtors' cash management system is described in the cash management motion filed contemporaneously herewith.

15

Accounts to satisfy obligations arising from Customer Programs. The Debtors request that the Court authorize and direct the Banks and any other applicable financial institutions to receive, process, honor, and pay any and all checks drawn or electronic funds transferred to pay obligations arising under the Customer Programs, whether such checks were presented prior to or after the Commencement Date. The Debtors also seek authority to issue new postpetition checks, or affect new electronic funds transfers, on account of such claims to replace any prepetition checks or electronic funds transfer requests that may be dishonored or rejected as a result of the commencement of these chapter 11 cases.

C.      **Deemed Compliance With and/or Waiver of Applicable Bankruptcy Rules**

        1.      **The Requested Relief Satisfies Bankruptcy Rule 6003(b)**

39.     Bankruptcy Rule 6003 provides that, except to the extent the relief requested is necessary to avoid immediate and irreparable harm to the debtor's estate, the court shall not, within twenty-one (21) days after the filing of the petition, grant relief regarding a motion to use, sell, lease, or otherwise incur an obligation regarding property of the estate, including a motion to pay all or part of a claim that arose before the filing of the petition. While the Debtors do not believe Bankruptcy Rule 6003 is applicable to the relief requested herein, out of an abundance of caution, the Debtors submit that, as detailed above and as set forth in the First Day Declaration, such relief is necessary to avoid immediate and irreparable harm to the Debtors and their estates. Accordingly, Bankruptcy Rule 6003, to the extent applicable, is satisfied.

        2.      **Waiver of Bankruptcy Rules 6004(a) and (h)**

40.     Unless the Court orders otherwise, Bankruptcy Rule 6004(a) requires the Debtors to provide twenty-one (21) days notice to all creditors and certain other parties in interest of the use of property outside the ordinary course of business. Moreover, unless the Court orders otherwise, Bankruptcy Rule 6004(h) automatically stays for fourteen (14) days any order

granting such relief. While the Debtors do not believe Bankruptcy Rules 6004(a) and (h) are applicable to the relief requested herein, out of an abundance of caution, the Debtors submit that, as described above and in the First Day Declaration, the relief requested in this Motion is necessary to avoid immediate and irreparable harm to the Debtors that would otherwise be caused by a delay in granting the relief requested herein. Therefore, to the extent applicable, the Debtors request the Court waive (i) the notice requirements under Bankruptcy Rule 6004(a) and (ii) the stay of the order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h).

## NOTICE

41. No trustee or examiner has been appointed in these chapter 11 cases. The Debtors have served notice of this Motion on: (i) the Office of the United States Trustee for the Southern District of New York (Attn: Tracy Davis, Esq. and Linda Riffkin, Esq.); (ii) those creditors holding the thirty largest unsecured claims against the Debtors' estates; (iii) counsel for the DIP Agents: (x) Morgan, Lewis & Bockius LLP (Attn: Wendy Walker, Esq. and Sandra Vrejan, Esq.), counsel for the Working Capital Agent, (y) Riemer & Braunstein LLP (Attn: Donald E. Rothman, Esq.), counsel for GA Capital LLC; (iv) Kelley Drye & Warren LLP, attorneys for certain landlords (Attn: James S. Carr, Esq., Robert L. LeHane, Esq., and Benjamin D. Feder, Esq.); (v) Lowenstein Sandler PC, attorneys for certain trade vendors (Attn: Kenneth A. Rosen, Esq., Bruce D. Buechler, Esq., Bruce S. Nathan, Esq., and Paul Kizel, Esq.); (vi) Fried, Frank, Harris, Shriver & Jacobson LLP, attorneys for General Growth Properties, Inc. (Attn: Brad Eric Scheler, Esq.); and (vii) Bingham McCutchen LLP, attorneys for Bank of America, N.A. (Attn: Julia Frost-Davies, Esq. and Andrew Gallo, Esq.) (collectively, the "Notice Parties"). The Debtors submit that no other or further notice need be provided.

17

42. No previous request for the relief sought herein has been made by the Debtors to this or any other court.

WHEREFORE the Debtors respectfully request that the Court grant the relief requested herein and such other and further relief as it deems just and proper.

Dated: February 16, 2011
New York, New York

          KASOWITZ, BENSON, TORRES
           & FRIEDMAN LLP

          By: /s/ David M. Friedman
          David M. Friedman (DFriedman@kasowitz.com)
          David S. Rosner (DRosner@kasowitz.com)
          Andrew K. Glenn (AGlenn@kasowitz.com)
          Jeffrey R. Gleit (JGleit@kasowitz.com)
          1633 Broadway
          New York, New York 10019
          Telephone: (212) 506-1700
          Facsimile: (212) 506-1800

*Attorneys for Debtors
and Debtors-in-Possession*