David M. Friedman (DFriedman@kasowitz.com)
Andrew K. Glenn (AGlenn@kasowitz.com)
Jeffrey R. Gleit (JGleit@kasowitz.com)
KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
1633 Broadway
New York, New York 10019
Telephone: (212) 506-1700
Facsimile: (212) 506-1800

*Attorneys for Debtors*
*and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re | Chapter 11 |
| **BORDERS GROUP, INC.,** *et al.*,[1] | **Case No. 11-10614 (MG)** |
| **Debtors.** | **(Jointly Administered)** |

**NOTICE OF HEARING ON DEBTORS' MOTION PURSUANT TO
SECTIONS 363(b), 365(a) AND 503(c) OF THE BANKRUPTCY CODE
AND FED R. BANKR. P. 6006 AND 9014 FOR AN ORDER AUTHORIZING
(I) IMPLEMENTATION OF (A) KEY EMPLOYEE INCENTIVE PLAN
AND (B) KEY EMPLOYEE RETENTION PLAN, AND (II)
ASSUMPTION OF CERTAIN EMPLOYMENT AGREEMENTS**

**PLEASE TAKE NOTICE** that a hearing to consider the relief requested in the Debtors'

Motion for an Order Authorizing (i) Implementation of (a) Key Employee Incentive Plan and (b)

Key Employee Retention Plan, and (ii) Assumption of Certain Employment Agreements (the

"Motion"), filed by Borders Group, Inc. ("BGI") and its debtor subsidiaries, as debtors and

debtors in possession (collectively, the "Debtors"), shall be held before the Honorable Martin

Glenn, United States Bankruptcy Judge, at the United States Bankruptcy Court for the Southern

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Borders Group, Inc. (4588); Borders International Services, Inc. (5075); Borders, Inc. (4285); Borders Direct, LLC (0084); Borders Properties, Inc. (7978); Borders Online, Inc. (8425); Borders Online, LLC (8996); and BGP (UK) Limited.

District of New York, Courtroom 501, One Bowling Green, New York, New York 10004 (the "Bankruptcy Court") on **April 14, 2011 at 3:00 p.m. (prevailing Eastern Time)**, or as soon thereafter as counsel may be heard.

PLEASE TAKE FURTHER NOTICE that objections, if any, to the Motion and the relief requested therein shall be made in writing, shall state with particularity the grounds therefor, shall conform to the Federal Rules of Bankruptcy Procedure and the Local Bankruptcy Rules for the Southern District of New York, and shall be filed with the Bankruptcy Court electronically in accordance with General Order M-399 (General Order M-399 and the User's Manual for the Electronic Case Filing System can be found at www.nysb.uscourts.gov, the official website for the Bankruptcy Court) by registered users of the Bankruptcy Court's case filing system, and by all other parties in interest, on a 3.5 inch disk or CD-ROM, preferably in Portable Document Format (PDF), WordPerfect or any other Windows-based word processing format (with a hard copy delivered directly to Chambers) and served in accordance with General Order M-399 or otherwise **so as to be actually received no later than April 7, 2011 at 4:00 p.m. (prevailing Eastern Time)** by: (i) Kasowitz, Benson, Torres & Friedman LLP, attorneys for the Debtors, 1633 Broadway, New York, New York 10019 (Attn: David M. Friedman, Esq., Andrew K. Glenn, Esq., and Jeffrey R. Gleit, Esq.); (ii) the Office of the United States Trustee for the Southern District of New York, 33 Whitehall Street, New York, New York 10004 (Attn: Tracy Davis, Esq. and Linda Riffkin, Esq.); (iii) Lowenstein Sandler PC, counsel for the official committee of unsecured creditors, 65 Livingston Avenue, Roseland, New Jersey 07068 (Attn: Bruce D. Buechler, Esq. and Paul Kizel, Esq.), and 1251 Avenue of the Americas, New York, New York 10020 (Attn: Bruce S. Nathan, Esq.); (iv) counsel for the DIP Agents: (a) Morgan, Lewis & Bockius LLP, 101 Park Avenue, New York, New York 10178-0060 (Attn: Wendy

Walker, Esq.), and 225 Franklin Street, 16th Floor, Boston, Massachusetts 02110-4104 (Attn: Sandra Vrejan, Esq.), counsel for the Working Capital Agent, and (b) Riemer & Braunstein LLP, Three Center Plaza, 6th Floor, Boston, Massachusetts 02108 (Attn: Donald E. Rothman, Esq.), counsel for GA Capital LLC; (v) Kelley Drye & Warren LLP, attorneys for certain landlords, 101 Park Avenue, New York, New York 10178 (Attn: James S. Carr, Esq., Robert L. LeHane, Esq., and Benjamin D. Feder, Esq.); and (vi) Bingham McCutchen LLP, attorneys for Bank of America, N.A., One Federal Street, Boston, Massachusetts 02110-1726 (Attn: Julia Frost-Davies, Esq. and Andrew Gallo, Esq.).

**PLEASE TAKE FURTHER NOTICE THAT** the relief requested in the Motion may be granted without a hearing if no objection is timely filed and served as set forth above and in accordance with the order, dated February 16, 2011, implementing certain notice and case management procedures in these cases [Docket No. 64] (the "Case Management Order").

Dated: March 24, 2011
     New York, New York

                        KASOWITZ, BENSON, TORRES
                         & FRIEDMAN LLP

                        By: /s/ David M. Friedman
                        David M. Friedman (DFriedman@kasowitz.com)
                        Andrew K. Glenn (AGlenn@kasowitz.com)
                        Jeffrey R. Gleit (JGleit@kasowitz.com)
                        1633 Broadway
                        New York, New York 10019
                        Telephone:  (212) 506-1700
                        Facsimile:  (212) 506-1800

                        *Attorneys for Debtors*
                        *and Debtors in Possession*

David M. Friedman (DFriedman@kasowitz.com)
Andrew K. Glenn (AGlenn@kasowitz.com)
Jeffrey R. Gleit (JGleit@kasowitz.com)
KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
1633 Broadway
New York, New York 10019
Telephone: (212) 506-1700
Facsimile: (212) 506-1800

*Attorneys for Debtors*
*and Debtor in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re | Chapter 11 |
| **BORDERS GROUP, INC.**, *et al.*,[1] | **Case No. 11-10614 (MG)** |
| **Debtors.** | **(Jointly Administered)** |

**DEBTORS' MOTION PURSUANT TO SECTIONS 363(b), 365(a) AND 503(c) OF THE BANKRUPTCY CODE AND FED R. BANKR. P. 6006 AND 9014 FOR AN ORDER AUTHORIZING (I) IMPLEMENTATION OF (A) KEY EMPLOYEE INCENTIVE PLAN AND (B) KEY EMPLOYEE RETENTION PLAN, AND (II) ASSUMPTION OF CERTAIN EMPLOYMENT AGREEMENTS**

TO THE HONORABLE MARTIN GLENN,
UNITED STATES BANKRUPTCY JUDGE:

Borders Group, Inc. ("BGI") and its affiliated debtors, as debtors and debtors in

possession (collectively, the "Debtors"), submit this motion (the "Motion"), pursuant to sections

363, 365 and 503 of title 11 of the United States Code (the "Bankruptcy Code"), and Rules 6006

and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), for entry of

an order, substantially in the form annexed hereto as Exhibit A, authorizing: (i) implementation

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Borders Group, Inc. (4588); Borders International Services, Inc. (5075); Borders, Inc. (4285); Borders Direct, LLC (0084); Borders Properties, Inc. (7978); Borders Online, Inc. (8425); Borders Online, LLC (8996); and BGP (UK) Limited.

of the Debtors' proposed (a) key employee incentive plan (the "KEIP"), and (b) key employee

retention plan (the "KERP," and together with the KEIP, the "Incentive and Retention Plans");

and (ii) assumption of four employment agreements (the "Employee Agreements")[2] entered into

with four of the Debtors' employees (the "Employees"), copies of which are annexed hereto as

Exhibits B, C, D, and E. In support of the Motion, the Debtors respectfully represent as follows:

## BACKGROUND

1.      On February 16, 2011 (the "Commencement Date"), each of the Debtors commenced

a voluntary case under Chapter 11 of the Bankruptcy Code. The Debtors are authorized to

operate their business and manage their properties as debtors in possession pursuant to sections

1107(a) and 1108 of the Bankruptcy Code. The Debtors' cases are being jointly administered

pursuant to Rule 1015(b) of the Bankruptcy Rules.

## JURISDICTION

2.      The Court has subject matter jurisdiction to consider and determine this matter

pursuant to 28 U.S.C. § 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue

is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

## THE DEBTORS' BUSINESS

A.      **Operations**

3.      The Debtors are a leading operator of book, music and movie superstores and

mall-based bookstores. At January 29, 2011, the Debtors operated 642 stores, under the Borders,

Waldenbooks, Borders Express and Borders Outlet names, as well as Borders-branded airport

stores in the United States, of which 639 stores are located in the United States and 3 in Puerto

---

2       The Court granted authorization, pursuant to Bankruptcy Rule 6006(e)(3), for the Debtors to move for
        assumption of the four Employee Agreements in this Motion.

Rico.  In addition, the Debtors operate a proprietary e-commerce web site, www.Borders.com, launched in May 2008, which includes both in-store and online e-commerce components.

4.　　　As of February 11, 2011, the Debtors employed a total of approximately 6,100 full-time employees, approximately 11,400 part-time employees, and approximately 600 contingent employees (who are required to work one shift per month, and usually do so at special events), all of whom are located in the United States and Puerto Rico.  The Debtors' employees are not subject to any collective bargaining agreements.

**B.**　　　**Financials**

5.　　　For the fiscal year ended January 29, 2011, the Debtors recorded net sales of approximately $2.3 billion.  As of December 25, 2010, the Debtors had incurred net year-to-date losses of approximately $168.2 million.

6.　　　Additional information regarding the Debtors' business, capital structure, and the circumstances leading to these Chapter 11 cases is contained in the *Declaration of Scott Henry Pursuant to Local Bankruptcy Rule 1007-2 in Support of First Day Motions* [Docket No. 20] (the "First Day Declaration").

**THE DEBTORS' INCENTIVE AND RETENTION PLANS**

7.　　　The Debtors have historically offered an annual performance bonus plan (the "Annual Performance Bonus Plan") to their employees, ranging from professional and administrative staff to senior management.  Employees receiving bonuses under the Annual Performance Bonus Plan were traditionally paid, at year-end, a percentage of their salary, which varied depending on the employee's level and position.  Such bonuses were awarded based upon both individual employee goals and overall performance of the Debtors' operations.  Due to the Debtors' declining financial performance, the Debtors determined that no payments should be made on account of the Annual Performance Bonus Plan for the 2010 performance period.  *See*

*Declaration of John Dempsey in Support of Motion*, filed contemporaneously herewith ("Dempsey Decl."), at ¶ 9; *Declaration of Holly Felder Etlin in Support of Motion*, filed contemporaneously herewith ("Etlin Decl."), at ¶ 8. In addition, the Debtors have historically granted long-term incentives in the form of stock options and restricted shares. These long-term incentive opportunities provide a major part of the incentive opportunity that the Debtors offer employees. These long-term incentives are not available during the bankruptcy. *See* Dempsey Decl. at ¶9.

8.      In recent months, the Debtors have had significant difficulties incentivizing and retaining employees. The publicity surrounding the Debtors' prepetition restructuring negotiations, the commencement of these cases, and the Debtors' store closing sales[3] and attendant workforce reductions have raised substantial concerns for the Debtors' employees and exacerbated these difficulties. Indeed, approximately twenty-five (25) significant corporate employees have voluntarily departed from the Debtors since the Commencement Date (this amounts to the alarming rate of approximately five employees per week). The resignations have been across various levels and salaries, and come from a range of crucial corporate departments such as Finance, Information Technology, Human Resources, Marketing, Merchandising, and Operations. The Debtors have already reduced corporate headcount by over 55% in the last two years, and during that same period, over eighty-five (85) director-level employees and officers exited the company. *See* Etlin Decl. at ¶¶ 6-7.

9.      Recognizing that further employee losses will damage the Debtors' estates, the Debtors have formulated new management bonus and incentive programs to ensure that the

---

[3]    The Debtors are closing approximately 202 of their retail store locations pursuant to the Court's February 18, 2011 *Order Approving Agency Agreement, Store Closing Sales and Related Relief* [Docket No. 91].

management team is appropriately incentivized to maximize the Debtors' opportunity to reorganize for the benefit of all stakeholders.

**A.**     **The KEIP**

10.     The Debtors seek authorization to implement the KEIP for seventeen (17) of their key executives (collectively, the "Executives"), who are critical to the Debtors' restructuring and reorganization efforts.  The Debtors formulated the KEIP based on advice from Mercer (US) Inc. ("Mercer"), a leading global compensation consulting firm.  *See generally* Dempsey Decl.; *see* Etlin Decl. at ¶ 6.

11.     Target award opportunities are designed to bring total compensation closer to the market median.  For the five highest-level Executives, target award opportunities range from 90% to 150% of base salary and have an average award size of $623,000.  For the other twelve Executives, target award opportunities range from 60% to 90% of base salary and have an average award size of $135,000.  KEIP awards are set at 150% of historic annual incentive targets, and payout opportunities range from 0% to 150% of target (*i.e.*, maximum payout of 225% of historic annual target opportunity).  The size of KEIP awards will be determined upon the date of either (i) the filing of a chapter 11 plan of reorganization (provided that an order is entered confirming such plan in substantially the same form within 150 days of filing), or (ii) the date on which an order is entered by the Court approving a sale of all or substantially all of the Debtors' assets (or a business unit directly overseen by the Executive) as a going concern (each, an "Award Determination Event").  No amounts will be earned or paid if the Debtors confirm a plan of liquidation or consummate a sale to liquidators.  *See* Dempsey Decl. at ¶¶ 8, 10, 18; Etlin Decl. at ¶¶ 7, 9.

12. The possible payouts for Executives under the KEIP are set forth below:

| Position Title | Number of Executives | KEIP Target Range | KEIP Maximum Range |
|---|---|---|---|
| Chief Executive Officer | 1 | $1,125,000 | $1,688,000 |
| Executive Vice Presidents | 3 | $420,00 - $720,000 | $630,000 - $1,080,000 |
| Senior Vice President, Human Resources | 1 | $248,000 | $371,000 |
| Other Key Executives (Senior Vice President and Vice Presidents) | 12 | Aggregate: $1,623,000 | Aggregate: $2,435,000 |
| **Total** | | **$4,736,000** | **$7,104,000** |

*See* Dempsey Decl. at ¶ 12; Etlin Decl. at ¶ 11.

13. The Executives' awards under the KEIP are based on the timing of an Award Determination Event. The sooner an Award Determination Event occurs, the greater the KEIP awards will be. For the Executives to obtain maximum KEIP awards, an Award Determination Event must occur within six (6) months from the Commencement Date, or by August 16, 2011. To obtain target KEIP awards, an Award Determination Event would have to occur by nine (9) months from the Commencement Date, or by November 16, 2011. Awards would be interpolated for Award Determination Events occurring between August 17, 2011 and November 15, 2011. No awards are available under the KEIP if an Award Determination Event occurs later than nine (9) months from the Commencement Date.[4] *See* Dempsey Decl. at ¶ 11; Etlin Decl. at ¶ 10.

14. Payment of the KEIP awards will occur on the date that is thirty (30) days after either (i) the effective date of a plan of reorganization, or (ii) the closing of a going concern sale.

---

[4] The Debtors reserve the right to formulate a new incentive program assuming Award Determination Event occurs after November 16, 2011.

Payout is contingent on the Executive being actively employed on the date of payment. If a participant is involuntarily terminated without cause prior to (i) the effective date of a plan of reorganization, or (ii) the closing of a going concern sale ("Consummation"), but after the Award Determination Event, the Compensation Committee of the Debtors' Board of Directors shall retain discretion as to whether and to what extent the participant may retain his or her rights to an award after termination. If a participant is involuntarily terminated without cause after Consummation, the award will be paid as scheduled as if the participant continued as an employee. *See* Dempsey Decl. at ¶ 13; Etlin Decl. at ¶ 12.

**B.    The KERP**

15.    By this Motion, the Debtors also seek approval of the KERP for approximately twenty-five (25) of the Debtors' director-level employees[5] that the Debtors have determined are critical to the Debtors' business and reorganization (the "Critical Employees").[6] The Debtors have concluded that the Critical Employees are highly talented and that it would be difficult, if not impossible, to replace them given the Debtors' present circumstances. Additionally, a small number of other key employees (the "Discretionary Employees," and together with the Critical Employees, the "KERP Employees") would participate in a discretionary pool under the KERP (the "Discretionary Pool"), based upon the judgment of the Debtors' Executive Committee, comprised of the Debtors' five highest-level Executives. The KERP Employees are particularly

---

[5]    The Debtors' corporate level employees referred to as director-level employees are non-executive managers at the "director" level; one director-level employee also serves as Corporate Secretary for the Debtors.

[6]    Each of the Critical Employees' positions fall into one of the following descriptions: Associate General Counsel; Digital Merchandising; Product Systems; Merchandise Planning and Replenishment; Merchandising Trade Books; Purchasing and Building Services; e-commerce Systems; Real Estate Attorney; Assistant Controller, Device Merchandising; Marketing Systems; Merchandising Operations; AP/AR; Creative; LP and Internal Audit; Tax Director; Store and Customer Service; Payroll and Benefits; Human Resources; Operations; Risk Management; Visual Presentation and Marketing; and Merchandising, Bargain/Fiction.

critical: they lead and execute the Debtors' day-to-day business operations. *See* Dempsey Decl. at ¶ 14; Etlin Decl. at ¶¶ 13, 25.

16.     Like the KEIP, the Debtors formulated the KERP based on Mercer's advice, experience and guidance. *See generally* Dempsey Decl.; *see* Etlin Decl. at ¶ 14. The Debtors estimate that the total aggregate payout under the KERP will be approximately $1.2 million, consisting of approximately $933,000 for the Critical Employees and $300,000 for the Discretionary Employees. This amount, added to the KEIP's maximum cost, totals approximately $8.3 million, which represents .36% of the Debtors' 2010 revenue. This falls below the average (.39%) for comparable programs identified by Mercer. *See* Dempsey Decl. at ¶ 15; Etlin Decl. at ¶ 14.

17.     The KERP has been tailored to provide incentives to the Critical Employees and Discretionary Employees to remain with the Debtors, and, like the KEIP, to achieve a successful emergence from Chapter 11. Lump sum award payments are equal to approximately 30% of each Critical Employee's base salary, commensurate with the historical Annual Performance Bonus Plan, and, as with the KEIP, would be made on the date that is thirty (30) days after either (i) the effective date of a plan of reorganization, or (ii) the closing of a going concern sale (although the KERP is not tied to the timing of an Award Determination Event as is the KEIP). KERP payments would also be made upon an involuntary termination of Critical Employees without cause, but offset by any severance otherwise paid to such terminated Critical Employees. Proposed individual award amounts to Critical Employees have been pre-determined, and range from $28,000 to $53,000, depending on the particular Critical Employee's position, responsibilities and other business considerations. The average award size is $37,000. Individual awards to Discretionary Employees from the Discretionary Pool would not exceed

$20,000 per Discretionary Employee, and would likewise be made at the same time as payments to Critical Employees. *See* Dempsey Decl. at ¶¶ 16-17; Etlin Decl. at ¶¶ 15-16.

**C.**      <u>The Incentive and Retention Plans Are Necessary</u>

18.      The Executives and KERP Employees perform a variety of critical functions, including, but not limited to, management, customer service, inventory control, accounting and tax services, human resource and payroll services, operations, marketing, merchandising, purchasing and sales, legal services, and technical services. The employees' skills and their knowledge and understanding of the Debtors' operations, customer and supplier relationships, and infrastructure are essential to maintaining the Debtors' business and to the success of their Chapter 11 reorganization efforts. Without these employees' continued commitment, the Debtors' ability to achieve a successful reorganization would be severely compromised. Moreover, the leadership group currently in place has been carefully selected to be the team that will manage the Debtors and their ongoing business throughout the restructuring process, and it would be extremely difficult, it not impossible, to replace management during these bankruptcy proceedings, leaving significant functional leadership and talent gaps. *See* Etlin Decl. at ¶ 20.

19.      Without implementation of the KEIP, compensation for the Debtors' Executives will remain significantly below market. If the Executives continue to receive only their base salaries, their total direct compensation will be at only approximately 38% of the market median.[7] Likewise, the Debtors have not raised their corporate employees' salaries in close to four years. Moreover, the Debtors' decision to discontinue certain of their historical incentive and benefit programs, including and especially the Annual Performance Bonus Plan, has significantly reduced the previously competitive compensation the Debtors can pay their

---

[7]      This analysis excludes the Deferred Compensation and Prepetition Deferred Compensation with respect to the Employees, each as defined below, discussed *supra*.

employees. If this persists, employee morale will continue to suffer – especially for individuals with a relatively short tenure with the Debtors that have eschewed other career opportunities to join the Debtors. Indeed, 70% of the seventeen recommended KEIP participants have less than eighteen months of service with the Debtors. Of that 70%, 50% have less than one year of service. Because of the short tenure, these leaders have been unable to earn any incentive compensation for the risks taken in working for a company with significant operational and market obstacles. The KEIP will bridge that gap, and provide incentive for the Executives to facilitate a successful exit from Chapter 11. *See* Dempsey Decl. at ¶¶ 23-25; Etlin Decl. at ¶¶ 22-24.

20. The Debtors cannot afford any further attrition. In many cases, the Debtors may not be able to find suitable candidates in the aggressive timeframe the Debtors have set for emergence through a plan or a going concern sale. Thus, it is crucial that the Debtors, in short order, create and maintain market competitive pay opportunities, reflecting practices in the markets in which they compete for talent, and bring compensation closer to market competitive levels for their most critical employees.

21. Based on analyses performed by Mercer, assuming target KEIP payouts, the Executives' total direct compensation would be at 73% of the market median (with total direct compensation for the five highest-level Executives at 62% of the market median, and total direct compensation for the other twelve Executives falling at 95% of the market median).[8] Assuming maximum KEIP payouts, the total direct compensation for participating Executives would be 91% of the market median. *See* Dempsey Decl. at ¶ 26; Etlin Decl. at ¶ 22.

---

[8]    This analysis excludes the Deferred Compensation and Prepetition Deferred Compensation with respect to the Employees, discussed *supra*.

22.      The Incentive and Retention Plans are designed to create an incentive for

Executives and KERP Employees to successfully restructure rapidly through a plan of

reorganization or a going concern sale.  Accordingly, the Incentive and Retention Plans do not

reward for liquidation or a protracted bankruptcy.  *See* Dempsey Decl. at ¶ 18; Etlin Decl. at ¶ 7.

## THE EMPLOYEE AGREEMENTS

23.      Before the Commencement Date, the Debtors entered into the Employee

Agreements with certain executive employees.  The Employee Agreements address salary,

incentive compensation (the "<u>Deferred Compensation</u>" or "<u>Prepetition Deferred Compensation</u>,"

as applicable, each as further defined below), benefits, and certain other agreements, summarized

as follows:

**A.      <u>Scott Henry</u>**

24.      Scott Henry is the Debtors' Executive Vice President and Chief Financial Officer.

His Employee Agreement, dated October 11, 2010, is annexed hereto as <u>Exhibit B</u> (the "<u>Henry</u>

<u>Agreement</u>").  Mr. Henry is responsible for all financial aspects of the Debtors' business, and he

was intimately involved in the pre-petition restructuring negotiations.  It would be nearly

impossible for the Debtors to replace Mr. Henry as Chief Financial Officer within the timeframe

necessary to complete the Debtors' restructuring goals, and his employment is thus indispensable

to the Debtors' business and reorganization.  *See* Etlin Decl. at ¶ 26.

25.      The Henry Agreement provides Mr. Henry with certain incentive compensation

(the "<u>Deferred Compensation</u>") set forth as a varying percentage of his regular compensation,

based on targets set by the Debtors' Board of Directors, but with guaranteed Deferred

Compensation of $200,000 for Fiscal Year 2010 ("<u>Guaranteed Deferred Compensation</u>").

Pursuant to the Henry Agreement, 50%, or $100,000, of Mr. Henry's Guaranteed Deferred

Compensation is payable by April 1, 2011, and the remainder is to be paid on the first

anniversary of his employment with the Debtors. Under the Borders Group, Inc. 2004 Long-Term Incentive Plan, subject to the approval of the Compensation Committee of the Board of Directors, the Henry Agreement also provides Mr. Henry with a stock option grant for 300,000 shares, which vest 100% after three years, and a restricted stock grant of 200,000 shares, which vest one-third per year over the next three years.

**B.      Michele Cloutier**

26.      Michele Cloutier is the Debtors' Executive Vice President and Chief Merchandising Officer. Her Employee Agreement, dated August 12, 2010, is annexed hereto as Exhibit C (the "Cloutier Agreement"). Ms. Cloutier's experience with the Debtors' vendors is critical to the Debtors' survival because the vendors are critical to the Debtors' survival. It would be extremely difficult, if not impossible, for the Debtors to replace Ms. Cloutier as Chief Merchandising Officer in the time necessary to reorganize the Debtors' business, and her employment is thus indispensable to the Debtors' business and reorganization efforts. *See* Etlin Decl. at ¶ 27.

27.      Like the Henry Agreement, the Cloutier Agreement provides Ms. Cloutier with Deferred Compensation opportunities as a percentage of her regular compensation based on targets set by the Debtors' Board of Directors, but with Guaranteed Deferred Compensation of $200,000 for Fiscal Year 2010. The Cloutier Agreement provides for 50%, or $100,000, of Ms. Cloutier's Guaranteed Deferred Compensation to be paid to her by April 1, 2011, and for the remainder to be paid on the first anniversary of her employment with the Debtors. Under the Borders Group, Inc. 2004 Long-Term Incentive Plan, the Cloutier Agreement gives Ms. Cloutier a stock option grant for 300,000 shares subject to the approval of the Compensation Committee of the Board of Directors. These options vest 100% after three years.

**C.**   **Glen Tomaszewski**

28.     Glen Tomaszewski is the Debtors' Vice President, Chief Accounting Officer and Controller.  His Employee Agreement, dated October 26, 2010, is annexed hereto as <u>Exhibit D</u> (the "<u>Tomaszewski Agreement</u>").  Mr. Tomaszewski has been employed by the Debtors since 1998 in various planning and financial reporting roles.

29.     Mr. Tomaszewski's experience with the Debtors is critical to ensure the smooth operations of accounting and cash management systems through these complex cases.  It would be extremely difficult, if not impossible, for the Debtors to replace Mr. Tomaszewski as Chief Accounting Officer.  His substantial experience with the Debtors is critical given the turnover at the Debtors and Mr. Henry's relatively recent arrival at the Debtors.  Moreover, upon bringing Mr. Henry on board, the Debtors expressly contemplated that Mr. Henry, Mr. Tomaszewski, and Mr. Cline (discussed below) would work as a team.  Mr. Tomaszewski's employment is thus indispensable to the Debtors' business and reorganization efforts.  *See* Etlin Decl. at ¶ 28.

30.     The Tomaszewski Agreement provides for, among other things, certain deferred compensation he earned in respect of prepetition services provided (the "<u>Prepetition Deferred Compensation</u>"), which was payable on February 18, 2011, of $100,000, and an additional stock option grant of 10,000 shares.

**D.**   **Jason Cline**

31.     Jason Cline is the Debtors' Vice President of Financial Planning and Analysis. His Employee Agreement, dated October 26, 2010, is annexed hereto as <u>Exhibit E</u> (the "<u>Cline Agreement</u>").  Mr. Cline has been employed with the Debtors since 2004, in various financial analyst roles.

32.     Mr. Cline's experience with the Debtors is critical to a successful restructuring.  It would be extremely difficult, if not impossible, for the Debtors to replace Mr. Cline as Vice

President of Financial Planning and Analysis, especially for the reasons set forth above regarding Mr. Henry's very recent tenure with the Debtors, and the Debtors' intention for Mr. Henry, Mr. Tomaszewski, and Mr. Cline to operate as a team. Mr. Cline's employment is thus indispensable to the Debtors' business and reorganization. *See* Etlin Decl. at ¶ 29.

33. The Cline Agreement provides for Mr. Cline to receive, among other things, Prepetition Deferred Compensation of $75,000, so long as he remains in his position until at least February 18, 2011, and an additional stock option grant of 10,000 shares.

## RELIEF REQUESTED

34. The Debtors request, pursuant to sections 363, 365 and 503 of the Bankruptcy Code, and Bankruptcy Rules 6006 and 9014, that the Court enter an order authorizing the Debtors to (i) implement the Incentive and Retention Plans, *i.e.*, the KEIP and KERP, and (ii) assume the Employee Agreements.

35. The Debtors seek authorization to implement the Incentive and Retention Plans to motivate the Debtors' most vital employees and offer suitable and competitive compensation while encouraging rapid emergence from Chapter 11 (through a plan of reorganization or a going concern sale) at a relatively minimal cost to the Debtors. Indeed, the Debtors believe that the Incentive and Retention Plans align the interests of the Debtors, their key employees and their financial stakeholders.

36. The Debtors additionally seek authorization to assume the Employee Agreements because they have determined in their business judgment that it is essential to both their ongoing business operations and reorganization process to do so.

**A.     The Incentive and Retention Plans**

>     **1.     The KEIP and KERP are Proper Exercises of the Debtors'**
>     **Business Judgment Under Section 363(b) of the Bankruptcy Code**

37.     Section 363(b) of the Bankruptcy Code provides, in relevant part, that a debtor in possession, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate."  11 U.S.C. § 363(b).  The decision to use assets outside the ordinary course of business is entrusted to the sound business judgment of the debtor.  *See*, *e.g.*, *In re Dana Corp.*, 358 B.R. 567, 581 n.20 (Bankr. S.D.N.Y. 2006) ("*Dana II*") ("Under applicable case law, in this and other circuits, courts should authorize business transactions outside the ordinary course of business if the Debtors have exercised sound business judgment.") (citing *Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1070 (2d Cir. 1983)).  Indeed, the business judgment rule is "a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company."  *Official Comm. of Sub. Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.)*, 147 B.R. 650, 656 (S.D.N.Y. 1992) (citations, quotation and internal quotation marks omitted).  "Courts are loath to interfere with corporate decisions absent a showing of bad faith, self-interest, or gross negligence."  *Id.* (citations omitted).  Therefore, courts "uphold the board's decisions as long as they are attributable to any rational business purpose."  *Id.* (citation omitted).  "Parties opposing the proposed exercise of a debtor's business judgment have the burden of rebutting the presumption of validity."  *Id.* (citation omitted); *see also Comm. of Asbestos-Related Litigants v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986) ("Where the debtor articulates a reasonable basis for its business decisions (as distinct from a decision

made arbitrarily or capriciously), courts will generally not entertain objections to debtors' conduct").

38.     This Court has recognized that implementation of an incentive plan can be an appropriate and valid business decision. *See In re Mesa Air Group, Inc.*, No. 10-10018 (MG), 2010 Bankr. LEXIS 3334, at *11-12, *13 (Bankr. S.D.N.Y. Sept. 24, 2010) (approving debtors' incentive payments tied to performance goals such as "maintenance of flight schedules, efficient return of aircraft, securing aircraft equipment at reduced rates and negotiation of reduced rates for aircraft of the Debtors that were no longer in service" as "within the 'sound business judgment' of the Debtors" even "[a]ssuming that these payments are not ordinary course payments under section 363.") (quoting *Dana II*, 358 B.R. at 576-77). Other courts are in accord. *See*, *e.g.*, *Dana II*, 358 B.R. at 584 (finding long-term incentive plan "fair and reasonable and well within the Debtors' business judgment" pursuant to, *inter alia*, section 363(b)); *In re Adelphia Commc'ns Corp.*, Case No. 02-41729 (REG), 2003 Bankr. LEXIS 1281, at *115-116 (Bankr. S.D.N.Y. Mar. 4, 2003) (approving certain employee compensation programs, including incentive bonuses, as within the sound business judgment of the debtor); *In re Am. West Airlines, Inc.*, 171 B.R. 674, 678 (Bankr. D. Ariz. 1994) ("It is a proper use of a Debtors' business judgment to propose bonuses for employees who helped propel the Debtor successfully through the confirmation process.") (citation omitted); *In re Interco Inc.*, 128 B.R. 229, 232-34 (Bankr. E. D. Mo. 1991) (debtors' business judgment review governed incentive plan that included "confirmation awards" that were reduced each month the debtors failed to emerge from chapter 11 after a certain date). Indeed, courts have acknowledged that they "must exercise great deference in reviewing a corporation's decision to pay its employees." *In re Crystal Apparel*, 207 B.R. 406, 410 (S.D.N.Y. 1997).

39.     The Debtors have made a valid business decision to adopt the Incentive and Retention Plans to enhance and maximize the value of their estates, through expedited emergence and minimization of administrative cost.  The scope of the Incentive and Retention Plans is fair, reasonable and narrowly tailored to those employees who are deemed to be the most critical to the achievement of an Award Determination Event, plus a small number of additional Discretionary Employees selected by the Debtors' Executive Committee.  These employees are vital to the Debtors' successful emergence from Chapter 11 as a result of their talent and invaluable institutional knowledge of the Debtors' business.

40.     Incentive and/or retention programs for debtors' employees tied to the completion of transactions or other milestone events have been approved by numerous courts in this and other districts.[9]  *See, e.g.*, *In re BearingPoint, Inc.*, Ch. 11 Case No. 09-10691 (REG) (Bankr. S.D.N.Y. July 24, 2009) [Docket No. 1128] (approving (i) incentive payments of $1.8 million to five "insiders," payable as soon as practicable following the sale of certain business units, (ii) up to $5 million to "non-insiders" necessary for completion of estate transition and wind down, and (iii) additional amounts based upon prepetition creditor recovery to all "insider and non-insider employees deemed by the Debtors to make a special contribution to achieving Recoveries," subject to reasonable creditors committee consent regarding payments over $500,000 to any individual);[10] *In re Musicland Holding Corp.*, Ch. 11 Case No. 06-10064 (SMB) (Bankr.

---

[9]     Because of the voluminous nature of the unreported orders cited herein, such orders are not annexed to the Motion.  Copies of these orders (and, where cited material comes from the motions and/or transcripts associated with such orders, copies of the motions and/or transcripts) are being delivered to Chambers with Chambers copies of this Motion (per the Court's instruction at the Hearing held on March 15, 2011), and will be made available to other parties in interest upon request to Debtors' counsel.

[10]    *See Debtors' Motion Pursuant to Section 363(b) of the Bankruptcy Code For Authorization to Implement a Revised Key Employee Incentive Plan*, Case No. 09-10691 (REG) (Bankr. S.D.N.Y. May 15, 2009) [Docket No. 699], at ¶ 8, for further description of transactions concerning incentive payments.  An objection and corrected objection to the debtors' original motion [Docket No. 273] were filed by the Official Committee of Unsecured Creditors [Docket Nos. 482 and 506], and an objection was filed by the United States Trustee [Docket No. 488].  The debtors filed a revised motion [Docket No. 699], and Wells Fargo Bank, N.A. as Agent for Secured

S.D.N.Y. Aug. 11, 2006) [Docket No. 1099] (approving "success payments" for five senior management employees, including chief executive officer, chief financial officer, and chief merchandising officer, and additional management employees based on CEO's discretion, to be paid on the earlier of sale of substantially all assets or consummation of a chapter 11 plan);[11] *In re Calpine Corp.*, Ch. 11 Case No. 05-60200 (BRL) (Bankr. S.D.N.Y. May 15, 2006) [Docket No. 1580] (approving four separate incentive programs, including (i) "cash awards payable at emergence to selected senior employees . . . . primarily executive vice presidents and a select group of senior vice presidents" beginning with a pool earned for the successful consummation of a plan and a certain threshold plan adjusted enterprise value, (ii) a supplemental bonus plan for non-insiders "identified by Debtors as performing a critical function and being at significant risk of being hired away," and (iii) a discretionary pool of $500,000 per year for employees at director-level and below in accordance with CEO discretion );[12] *In re Nortel Networks Inc.*, Ch. 11 Case No. 09-10138 (KG) (Bankr. D. Del. Mar. 5 and 20, 2009) [Docket Nos. 436 and 511] (approving (i) key executive incentive plan with respect to executives not members of the debtors' "senior leadership team" with payments tied to "Milestones" such as confirmation of a plan, (ii) key employee retention plan "tailored to provide incentives to the Debtors' critical employees to remain with Nortel and to strive for a speedy achievement of the Milestones," and

---

Lenders, and the Official Committee of Unsecured Creditors, objected thereto [Docket Nos. 728 and 734, respectively]. The status of objection resolution is not apparent from a review of the order and docket, and the hearing transcript is sealed.

[11] *See Motion for Order Approving Debtors' Supplemental Incentive Plan, In re Musicland Holding Corp.*, Case No. 06-10064 (SMB) (Bankr. S.D.N.Y. Jan. 25, 2006) [Docket No. 265], at ¶ 8, for a description of the plan approved by the order. A limited objection was filed by the Official Committee of Unsecured Creditors [Docket No. 369], and per the order, was withdrawn based on proposed modifications.

[12] An objection was filed by an individual shareholder of Calpine Corp. [Docket No. 1311]. The public record (order, docket, hearing transcript) does not indicate any negotiated resolution.

(ii) key executive incentive plan with respect to eight executive members of the debtors' "senior leadership team," and increasing maximum amount to $14.7 million).[13]

41.     The Debtors' employees may not be motivated to perform when they perceive that their compensation levels do not make it worth their while to do so, especially where, as here, such employees have assumed *increased* workloads, as a result of substantial recent workforce reductions.  The Incentive and Retention Plans seek to prevent any further employee attrition and to restore morale by providing appropriate incentives sufficient to motivate the Debtors' key employees.

42.     For the foregoing reasons, the Debtors have determined, in their business judgment, that the proposed Incentive and Retention Plans are necessary, appropriate, and of reasonable cost, and will motivate employees to work diligently towards the Debtors' speedy emergence from bankruptcy, maximizing value to the Debtors' stakeholders by emerging as a going concern and minimizing administrative costs.  The approval of the Incentive and Retention Plans is therefore in the best interest of the Debtors, their estates, and their financial stakeholders, and constitutes a sound exercise of the Debtors' business judgment.

## 2.     <u>Section 503(c) Does Not Preclude The KEIP</u>

43.     Section 503(c) of the Bankruptcy Code restricts a debtor's abilities to make payments to insiders for retention or severance, and also restricts payments that are outside of the

---

[13]     *See Debtors' Motion for an Order Seeking Approval of Key Employee Retention Plan and Key Executive Incentive Plan and Certain Other Related Relief, In re Nortel Networks Inc.*, Case No. 09-10138 (KG) (Bankr. D. Del. Feb. 27, 2009) [Docket No. 389], at ¶¶ 15, 18, 20, for a description of the plans approved by the order and participants.  An objection [Docket No. 482] and a letter in opposition [Docket No. 480] were filed on March 17, 2009 by former employees.  The court's discussion on the record at the hearing held on March 20, 2009 indicates that such objections were overruled.  *See* Hr'g Tr. Mar. 20, 2009, at 25:21-27:8 [Docket No. 545].

ordinary course and not justified by the facts and circumstances of the debtor's case. Here, neither section 503(c)(1) nor 503(c)(3) bars implementation of the KEIP.[14]

### a. The KEIP's Purpose is to Incentivize the Executives to Push Towards a Rapid Emergence From Chapter 11

44.     Section 503(c)(1) of the Bankruptcy Code prohibits payments to "insiders" to the extent such payments are made "for the purpose of inducing such person to remain with the debtor's business." 11 U.S.C. § 503(c)(1). However, section 503(c)(1) of the Bankruptcy Code applies *only* to pure "pay to stay" plans, which are earned if the employee remains with the debtor at the time of payment. *Dana II*, 358 B.R. at 584.

45.     Courts have cautioned that section 503(c) is "not intended to foreclose a chapter 11 debtor from reasonably compensating employees, including 'insiders,' *for their contribution to the debtors' reorganization*." *Id.* at 575 (citing *In re Nobex Corp.*, Case No. 05-20050 (MFW), 2006 Bankr. LEXIS 417 (Bankr. D. Del. Jan. 19, 2006)) (emphasis added). "[C]ontribution to the debtors' reorganization" is *precisely* what the Debtors seek to incentivize and compensate pursuant to the KEIP. If an Award Determination Event does not occur within the specified timeframe, the Executives will not receive a KEIP payment. Thus, the KEIP is not a retention plan, but rather incentive in nature. *Cf. In re Dana Corp.*, 351 B.R. 96, 99, 102 (Bankr. S.D.N.Y. 2006) ("*Dana I*") (holding that incentive payments were actually for retention when "[t]he Completion Bonus includes an amount payable to the Executives upon the Debtors' emergence from chapter 11, *regardless of the outcome of these cases*. Without tying this portion of the bonus to *anything other than staying with the company until the Effective Date*, this Court cannot categorize a bonus of this size [\$3.1 million for CEO and \$400,000 to \$560,000 for other

---

[14]     Section 503(c)(2) of the Bankruptcy Code places restrictions on "severance payment[s]" to "insider[s]." 11 U.S.C. § 503(c)(2). Section 503(c)(2) of the Bankruptcy Code is not applicable to the KEIP because the proposed incentive awards under the KEIP are not "severance payments."

executives] and form as an incentive bonus.") (emphasis added). In other words, in *Dana I*, the "completion bonuses" did not incentivize the potential recipients to *do* anything. They were "awarded *without regard to performance* or creditor recovery." *Id.* at 99. The company could have lingered in chapter 11 for years, draining estate resources, and executives would still receive a bonus. Here, by contrast, the Executives will be incentivized by the KEIP to *act* in a certain way – they must cause an Award Determination Event to occur within an *extremely* ambitious timeframe, for the benefit of their stakeholders, to receive a payout.

46. Consummating a plan of reorganization or a section 363 going concern sale on an aggressive timeline is the ultimate goal of a Chapter 11 proceeding, and should be a proper incentive under Section 503(c)(1). *See*, *e.g.*, *In re Hagerstown Fiber Ltd. Pshp.*, 226 B.R. 353, 356 (Bankr. S.D.N.Y. 1998) ("The goal of a business reorganization case . . . is to restructure the business's finances so that it may continue to operate") (internal quotations and marks omitted); *In re C-TC 9th Ave. Ptnr.*, 193 B.R. 650, 653 (Bankr. N.D.N.Y. 1995) (same) (internal quotation and marks omitted); *In re Crowthers McCall Pattern, Inc.*, 114 B.R. 877, 882 n.7 (Bankr. S.D.N.Y. 1990) (listing "reorganizing the business" as a chapter 11 goal); *In re Ionosphere Clubs, Inc.*, 98 B.R. 174, 177 (Bankr. S.D.N.Y. 1989) (listing "restructuring of a business' finances to enable it to operate productively" as a purpose of chapter 11) (internal quotation and marks omitted). Virtually every recent major retailer-debtor has liquidated; thus, for a retailer such as the Debtors, maintaining the Debtors' status as a viable going concern is anything but certain and will require enormous commitments by management. Indeed, although the KEIP does not delineate specific business milestones as was the case in, for example, *Mesa*, such business goals are all *subsumed* in the Award Determination Event. Moreover, the Debtors submit that expeditious emergence from Chapter 11 via a plan of reorganization or a going

concern sale serves the salutary purpose of minimizing the expenses of administering the cases. Expedited emergence as a going concern will maximize value for all stakeholders, and also will minimize cost. *See* Etlin Decl. at ¶ 17. Accordingly, the occurrence of an Award Determination Event within nine months of the Commencement Date is an appropriate incentive towards which the Debtors may incentivize the Executives to perform.

47. To the extent the KEIP does have an incidental effect of encouraging the Executives to remain with the Debtors, this does not change the analysis. *See Dana II*, 358 B.R. at 571 ("[M]erely because a plan has some retentive effect does not mean that the plan, overall, is retentive rather than incentivizing in nature."); *In re Nellson Nutraceutical, Inc.*, 369 B.R. 787, 802 (Bankr. D. Del. 2007) ("Any payment to an employee . . . has at least a partial purpose of retaining the employee . . . . although the . . . bonus program has some retentive effect, it is for the primary purpose of motivating employees and, thus, the limitations of section 503(c)(1) are not applicable."); *In re Global Home Prods., LLC*, 369 B.R. 778, 786 (Bankr. D. Del. 2007) ("All companies seek to retain employees they value by fairly compensating them.").

48. There is no guaranty that the goals set forth by the KEIP will *ever* be achieved and thus, there is no guaranty that Executives remaining with the Debtors upon an Award Determination Event will ever receive a KEIP payment. Accordingly, section 503(c)(1) does not apply to the KEIP, even to the extent certain Executives are "insiders" within the meaning of the Bankruptcy Code.

### b.   Section 503(c)(3) Does Not Prohibit The KEIP

49. Section 503(c)(3) of the Bankruptcy Code proscribes "transfers or obligations that are outside the ordinary course of business and not justified by the facts and circumstances of the case." 11 U.S.C. § 503(c)(3). The proposed KEIP payments may be seen as "outside the ordinary course of business;" however, they are an exercise of the Debtors' sound business

judgment and thus "justified by the facts and circumstances" of these cases, and satisfy section 503(c)(3).

50.     Section 503(c)(3) incorporates a substantially similar standard to that imposed by section 363(b): a transaction is "'justified by the facts and circumstances of the case'" under section 503(c)(3) if it falls within the debtor's "'sound business judgment.'"  *Mesa Air*, 2010 Bankr. LEXIS 3334, at \*13 (quoting *Dana II*, 358 B.R. at 576-77).  A debtor's "business judgment" is "sound" where the debtor has undertaken an informed decision to pursue an arm's length transaction in pursuit of a legitimate business goal.  *See Integrated Res.*, 147 B.R. at 656. Incentivizing employee performance is recognized to constitute such a goal.  *See*, *e.g.*, *Mesa Air*, 2010 LEXIS 3334, at \*10, \*11-13 (finding that incentive payments tied to performance goals pertaining to the aircraft industry were justified by the facts and circumstances of the case and were within the debtors' sound business judgment, and discussing how payments were "consistent with past practices" of the debtors, and how the "Debtors assert that their standard compensation policy involves a lower than market base salary combined with additional compensation in the form of quarterly incentive payments and the Incentive Program supplements their below-market base salary so that their total compensation is commensurate with the services they are actually providing.") (quoting *Dana II*, 358 B.R. at 576-77) (internal quotations to debtors' motion and marks omitted); *Nellson Nutraceutical*, 369 B.R. at 804.  *See Dana II*, 358 B.R. at 576-77 (acknowledging the sound business judgment test as the standard of review for key employee incentive programs).

51.     Courts look to a number of factors in determining whether incentive plans satisfy section 503(c)(3) of the Bankruptcy Code, namely:

- whether there is a reasonable relationship between the plan proposed and the results to be obtained, *i.e.*, whether the

key employee will stay for as long as it takes for the debtor to reorganize or market its assets, or whether the plan is calculated to achieve the desired performance;

- whether the cost of the plan is reasonable within the context of the debtor's assets, liabilities, and earning potential;

- whether the scope of the plan is fair and reasonable, *i.e.*, whether it applies to all employees or discriminates unfairly;

- whether the plan is consistent with industry standards;

- whether the debtor engaged in due diligence related to the need for the plan, the employees that needed to be incentivized, and what types of plans are generally applicable in a particular industry; and

- whether the debtor received independent counsel in performing due diligence and in creating and authorizing the incentive compensation.

*See Dana II*, 358 B.R. at 576-77 (collected citations omitted); *see also Global Home Prods.*, 369 B.R. at 786 (applying *Dana II* factors).  The KEIP passes this test.

52.     *First*, the KEIP is calculated to achieve the desired performance – emergence from Chapter 11 on an expedited basis, which is critical to the company.  KEIP payments will only be made if the Debtors' reorganization goals are achieved, and the targets are extremely demanding.  Earning KEIP payouts will require diligent work, long hours and performance to the absolute best of the Executives' abilities. Executives who voluntarily terminate employment with the Debtors will forfeit payouts under the KEIP.

53.     *Second*, the KEIP's cost is reasonable in the context of the Debtors' assets, liabilities, and earning potential.  As noted above, the total maximum cost of the KEIP and KERP together, approximately $8.3 million, represents just .36% of the Debtors' 2010 revenue, which falls below the average for comparable programs, .39%.  *See* Dempsey Decl. at ¶ 15; Etlin Decl. at ¶ 14.

54.     *Third,* the scope of the KEIP is fair and reasonable, as it applies to the seventeen Executives the Debtors have identified as having the most control over the Debtors and their reorganization process, and thus that are the most critical to the Debtors in achieving their objective to emerge from Chapter 11 on an expedited timeframe.

55.     *Fourth*, the KEIP is essentially a modification of, and would serve as a substitute for, the Debtors' prepetition Annual Performance Bonus Plan, but tailored to meet the Debtors' specific needs and goals with respect to the current circumstances of Chapter 11. With Mercer's guidance, the Debtors designed a compensation structure that is within market standards for the industry, as well as for companies in Chapter 11.

56.     *Fifth*, the KEIP has been carefully formulated after extensive due diligence. The Compensation Committee of the Debtors' Board of Directors engaged Mercer to design the KEIP. The Debtors and their professional advisors carefully reviewed and considered incentive plans instituted by comparable companies, as well as incentive based programs implemented in other complex Chapter 11 cases. The Debtors and their professionals likewise performed considerable diligence on the amounts of their Executives' compensation, and analyzed market comparables. The KEIP was thus approved only after extensive and careful analyses.

57.     *Sixth*, the Debtors actively sought input from their restructuring advisors, AlixPartners LLP, during the KEIP development process, in addition to Mercer's specific compensation-related expertise.

58.     By bringing compensation closer to the market norm for select, vital employees of the Debtors, the KEIP will boost employee morale and motivate the Executives to focus on and work rapidly towards achieving an Award Determination Event, for the benefit of the Debtors'

stakeholders.  Accordingly, the KEIP is not prohibited by section 503(c)(3) of the Bankruptcy Code.

### 3.     The KERP Is Not Prohibited By Section 503(c) of the Bankruptcy Code

59.     Because the KERP applies only to non-insiders of the Debtors, the only section 503 inquiry for the Court is simply whether the KERP satisfies section 503(c)(3) of the Bankruptcy Code.[15]  Here, the facts and circumstances of these cases justify the KERP, which constitutes a sound exercise of the Debtors' business judgment, and satisfies each of the *Dana II* factors for all the applicable reasons set forth above with respect to the KEIP,[16] as well as those set forth below, and therefore satisfies section 503(c)(3) of the Bankruptcy Code.

60.     The KERP is aimed at retaining the KERP Employees by providing them with job security and appropriate compensation commensurate with the Debtors' historical practices (tailored to apply to the Debtors' current circumstances and objectives), thus preventing attrition before an Award Determination Event and aligning the KERP Employees' interests with those of the Debtors' stakeholders.  Without the KERP, the Debtors fear that many of the KERP Employees very well may seek alternative career opportunities, which would impede the Debtors' ability to execute on critical business and restructuring initiatives.  Put simply, the Debtors cannot afford to lose their most talented and valuable director-level corporate employees during this crucial time.  Because of the Debtors' reductions in workforce over the past two years, many of the KERP Employees are literally the only individuals performing certain tasks at the Debtors, and possess unique and vital institutional knowledge that is critical to executing day-to-day business operations.  If the KERP Employees were to resign, the value and benefits

---

[15]    Sections 503(c)(1) and (c)(2) of the Bankruptcy Code are inapplicable to non-insider retention payments.  Thus, neither section 503(c)(1) nor 503(c)(2) apply to the KERP, because only non-insider employees are covered by the KERP.

[16]    The Debtors' Board of Directors is aware of the KERP, but is not involved with compensation issues below the officer level.

of these directors' experience will be lost. Relying on newly hired employees to perform the KERP Employees' crucial functions would severely hinder the Debtors' operations; training and utilizing new employees would also come at a huge expense, in terms of both actual cost and unquantifiable damage to the Debtors' business. *See* Etlin Decl. at ¶ 25.

61.     The scope of the KERP is reasonable and appropriate, as it applies only to the most vital of the Debtors' non-insider employees serving a wide range of functions. Furthermore, the KERP's expense is eminently reasonable in light of the size of the Debtors' business, the KERP employees' base salaries, and the historical Annual Performance Bonus Plan which has been discontinued.

62.     For the foregoing reasons, the Debtors respectfully submit that the KERP is an exercise of their sound business judgment, and that implementation of the KERP would be in the best interests of the Debtors, their estates, employees, and stakeholders, in consideration of the facts and circumstances of these cases.

**B.      The Employee Agreements**

63.     Finally, assumption of the Employee Agreements is a reasonable exercise of the Debtors' business judgment under sections 363(b), 365(a), and 503(c)(3) of the Bankruptcy Code, and is not barred by any sub-provision of section 503(c).

**1.      Section 365(a) Authorizes Assumption of the Employee Agreements**

64.     Section 365(a) of the Bankruptcy Code provides that a debtor, "subject to the court's approval, may assume or reject any executory contract or unexpired lease." 11 U.S.C. § 365(a). Thus, section 365 allows a debtor in possession to maximize the value of its estate by assuming executory contracts and unexpired leases that benefit the estate, and by rejecting those that are burdensome to the estate. *See COR Route 5 Co., LLC v. Penn Traffic Co. (In re Penn Traffic Co.)*, 524 F. 3d 373, 382 (2d Cir. 2008); *see also Orion Pictures Corp. v. Showtime*

*Networks, Inc. (In re Orion Pictures Corp.)*, 4 F.3d 1095, 1098 (2d Cir. 1993), *cert. denied*, 511 U.S. 1026 (1994)).

65.    An employment agreement is an executory contract that may be assumed within the meaning of section 365(a).  *See Dana II*, 358 B.R. at 584 (approving assumption of executive employment agreements under section 365(a)); *In re Enron Corp.*, 300 B.R. 201, 213 (Bankr. S.D.N.Y. 2003) (presuming that prepetition employment contracts were executory contracts; "[c]laimant could have moved for an order requiring the Company to make an early election to assume or reject the Employment Agreement . . ."); *Interco*, 128 B.R. at 233 (stating that employment agreements are "'executory contracts' within the meaning of § 365(a) of the Bankruptcy Code and are thus subject to assumption, with court approval").

66.    In reviewing a debtor's decision to assume or reject an executory contract such as an executive employment agreement, courts employ the business judgment standard of review. As the court in *Dana II* explained, where the debtor sought to assume executive employment agreements, "[a] court may approve motions to assume . . . executory contracts upon a showing that the debtor's decision to take such action will benefit the debtor's estate and is an exercise of sound business judgment."  358 B.R. at 581 n.20 (citing *Orion Pictures*, 4 F.3d at 1098).  *See also Dana II*, 358 B.R. at 579 (debtors "exercised fair and reasonable business judgment in determining to assume the Employment Agreements of the CEO and Senior Executives."); *Interco*, 128 B.R. at 233 (finding that decision of debtors to assume critical executives' employment agreements was "in the exercise of their sound business judgment" and "necessary" to, *inter alia*, successfully reorganize); *Official Comm. for Unsecured Creditors v. Aust (In re Network Access Solutions, Corp.)*, 330 B.R. 67, 76 (Bankr. D. Del. 2005) ("The Court has

already determined that the assumption of . . . employment agreements was within [debtor's] sound business judgment.").

67.     Courts generally refuse to second-guess a debtor's business judgment concerning section 365(a).  In fact, "[a] debtor's decision to assume or reject an executory contract based on its business judgment will not be altered absent a showing of bad faith or an abuse of discretion." *In re Teligent, Inc.*, 303 B.R. 728, 733 (Bankr. S.D.N.Y. 2004) (citing *In re G Survivor Corp.*, 171 B.R. 755, 757-58 (Bankr. S.D.N.Y. 1994)).  *See also In re Helm*, 335 B.R. 528, 538 (Bankr. S.D.N.Y. 2006) ("The decision to assume or reject an executory contract is within the sound business judgment of the debtor-in-possession . . . and in reviewing such a decision the bankruptcy court merely 'review[s] the . . . debtor's decision to adhere to or reject a particular contract in the course of the swift administration of the bankruptcy estate.'") (quoting *Orion Pictures*, 4 F.3d at 1095); *Phar-Mor, Inc. v. Strouss Bldg. Assocs.*, 204 B.R. 948, 951-52 (Bankr. N.D. Ohio 1997) ("Whether an executory contract is 'favorable' or 'unfavorable' is left to the sound business judgment of the debtor . . . .  Courts should generally defer to a debtor's decision whether to reject an executory contract.").

68.     With respect to section 365(a), the "business judgment" test simply means that assumption or rejection benefits the estate.  *Dana II*, 358 B.R. at 581 n.20 (citing *Orion Pictures*, 4 F.3d at 1098).  *See also Helm*, 335 B.R. at 538 ("To meet the business judgment test, the debtor in possession must establish that rejection will benefit the estate."); *see also Penn Traffic Co.*, 524 F. 3d at 383 ("[The business judgment] standard rather obviously presupposes that the estate will assume a contract only where doing so will be to its economic advantage.…").  In ruling on a motion under section 365(a), courts consider the totality of the circumstances.  *Regen Capital I, Inc. v. Halperin (In re U. S. Wireless Data, Inc.)*, 547 F.3d 484, 488 (2d Cir. 2008).

69.     Section 365(b) of the Bankruptcy Code requires the debtor, upon assumption, to cure any defaults under the executory contract or unexpired lease, or to provide adequate assurance that it will promptly cure any defaults through payment of a cure amount. 11 U.S.C. § 365(b). If there has been a default, the debtor must also provide adequate assurance of future performance under the contract. *Id.*

70.     The Debtors submit that the assumption of the Employee Agreements is an appropriate exercise of their business judgment. The Henry Agreement and Cloutier Agreement detail the amounts and components of salary and benefits, including but not limited to the Deferred Compensation, for which Mr. Henry and Ms. Cloutier negotiated when they were recently hired by the Debtors, and reflect the risk these highly qualified individuals took in joining a financially troubled company.

71.     The Tomaszewski Agreement and Cline Agreement award well-earned prepetition compensation – for Mr. Cline, including the Prepetition Deferred Compensation, and for Mr. Tomaszewski, consisting solely of the Prepetition Deferred Compensation – to two of the Debtors' longstanding and valuable financial employees, in recognition of the increased responsibilities they were asked to take on upon Mr. Henry's arrival. With the exception of a mere two days (February 16-17, 2011), the Prepetition Deferred Compensation is solely in respect of services performed prepetition.

72.     There are no defaults under the Employee Agreements requiring cure or adequate assurance, other than payment of the Prepetition Deferred Compensation that came due and payable on February 18, 2011, which the Debtors would pay upon approval of this Motion.

73.     Upon careful analysis, and with the input of their professionals, the Debtors have determined that assumption of the Employee Agreements will be beneficial to the Debtors, their

estates, and their stakeholders.  The services provided by the Employees are critical to the operation and restructuring of the Debtors' business, and to continuation of the Debtors' business relationships.  Moreover, the Debtors have considered the available alternatives to assumption of the Employee Agreements, and they believe that the requested course of relief is most likely to maximize the value of their estates.  Therefore, assumption of the Employee Agreements is a proper – and indeed critical – exercise of the Debtors' business judgment.  *See* Etlin Decl. at ¶¶ 26-30.

> **2.**     **Section 503(c) Does Not Bar Assumption of the Employee Agreements**

74.     The Deferred Compensation and Prepetition Deferred Compensation in the Employee Agreements do not conflict with section 503(c)(1) of the Bankruptcy Code.  As set forth above, section 503(c)(1) of the Bankruptcy Code restricts a debtor's abilities to make payments primarily for retention to insiders.  Here, the Deferred Compensation and Prepetition Deferred Compensation are merely a form and component of the Employees' salaries, and are not intended to "induce" them to remain with the Debtors.  Instead, the Deferred Compensation, negotiated prepetition and without a filing in mind, was intended to motivate Mr. Henry and Ms. Cloutier to achieve performance goals to maximize the value of the company's assets, and guaranteed an amount of Deferred Compensation for the first year in recognition of the reality that a turnaround would take time to execute.

75.     Section 503(c)(2) limits the amount of severance a debtor can pay to insiders.  To the extent the Employees are insiders of the Debtors, and notwithstanding anything to the contrary set forth in the Employee Agreements, the Debtors are not seeking approval of severance payments in excess of the section 503(c)(2) limits.

76.     Likewise, the Employee Agreements do not violate section 503(c)(3) of the Bankruptcy Code, in accordance with the same legal standards set forth above with respect to the

Incentive and Retention Plans. *See also Dana II*, 358 B.R. at 579 (court finding that the debtors "exercised fair and reasonable business judgment in determining to assume the Employment Agreements of the CEO and Senior Executives" where "[t]he Board came to the conclusion that this CEO and the Senior Executive team that he had assembled *was the 'right team' to run the company.*") (emphasis added).

77.     The Deferred Compensation and Prepetition Deferred Compensation are designed to reward the Employees for their efforts on behalf of the Debtors, and are merely a component of the Employees' salaries, but are paid on a deferred basis. The amount of the Deferred Compensation and Prepetition Deferred Compensation is reasonable in light of the countless hours sacrificed and the extraordinary efforts put forth by the Employees on behalf of the Debtors. The Employees were indispensable to the Debtors' prepetition negotiations and preparations, and are equally critical going forward with respect to restructuring negotiations and the Debtors' ongoing business. *See* Etlin Decl. at ¶ 30.

78.     Based on the foregoing, the Debtors submit that assuming the Employee Agreements is a proper exercise of the Debtors' business judgment and is justified by the facts and circumstances of the Chapter 11 cases, and therefore that payments made thereunder are not proscribed by section 503(c)(3) of the Bankruptcy Code.

## NOTICE

79.     No trustee or examiner has been appointed in these Chapter 11 cases. Notice of this Motion has been given in accordance with this Court's order, dated February 16, 2011, implementing certain notice and case management procedures [Docket No. 64] (the "Case Management Order"). In light of the nature of the relief requested, the Debtors submit that no other or further notice need be provided.

80.     No previous request for the relief sought herein has been made by the Debtors to this or any other court.

WHEREFORE the Debtors respectfully request that the Court grant the relief requested herein and such other and further relief as it deems just and proper.

Dated: March 24, 2011
        New York, New York

KASOWITZ, BENSON, TORRES
 & FRIEDMAN LLP

By: /s/ David M. Friedman
David M. Friedman (DFriedman@kasowitz.com)
Andrew K. Glenn (AGlenn@kasowitz.com)
Jeffrey R. Gleit (JGleit@kasowitz.com)
1633 Broadway
New York, New York 10019
Telephone:  (212) 506-1700
Facsimile:   (212) 506-1800

*Attorneys for Debtors and Debtors in Possession*