UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re<br><br>**BORDERS GROUP, INC.,** *et al.*,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 11-10614 (MG)<br><br>(Jointly Administered) |

### DECLARATION OF JOHN DEMPSEY IN SUPPORT OF DEBTORS' MOTION PURSUANT TO SECTIONS 363(b), 365(a) AND 503(c) OF THE BANKRUPTCY CODE AND FED. R. BANKR. P. 6006 AND 9014 FOR AN ORDER AUTHORIZING (I) IMPLEMENTATION OF (A) KEY EMPLOYEE INCENTIVE PLAN AND (B) KEY EMPLOYEE RETENTION PLAN, AND (II) ASSUMPTION OF CERTAIN EMPLOYMENT AGREEMENTS

I, John Dempsey, hereby declare that the following is true and correct to the best of my knowledge, information and belief:

1. I am a partner at Mercer (US) Inc. ("Mercer"). My business address is 155 North Wacker Drive, Suite 1500, Chicago, Illinois 60606. Mercer is a global professional compensation services firm that was engaged by the above-captioned debtors and debtors in possession (the "Debtors").

2. I respectfully submit this declaration (the "Declaration") in support of the Debtors' *Motion Pursuant to Sections 363(b), 365(a) and 503(c) of the Bankruptcy Code and Fed. R. Bankr. P. 6006 and 9014 for an Order Authorizing (I) the Implementation of (a) Key Employee Incentive Plan and (b) Key Employee Retention Plan, and (II) the Assumption of Certain Employment Agreements*, filed contemporaneously herewith. The Debtors have duly authorized me to do so.

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Borders Group, Inc. (4588); Borders International Services, Inc. (5075); Borders, Inc. (4285); Borders Direct, LLC (0084); Borders Properties, Inc. (7978); Borders Online, Inc. (8425); Borders Online, LLC (8996); and BGP (UK) Limited.

A.  **Background Information and Qualifications**

3.  I joined Mercer following my graduation from Yale University, and have worked out of the firm's offices in Chicago, Cleveland and London. I received an MBA in 1992 from the Ohio State University.

4.  I have extensive experience advising organizations undergoing major financial transitions including bankruptcies, IPOs, LBOs, and acquisitions, on compensation issues, and with designing annual and multi-year incentive programs, change in control arrangements, and employment agreements. My recent bankruptcy-related engagements include Nortel Networks, Tribune Company, Aleris, Charter Communications, Masonite, CIT Group, Capmark, Fairpoint, Caraustar, Adelphia Communications (Creditors' Committee), R.H. Donnelley, Freedom Communications, Stallion, Dana, Owens Corning, Kaiser Aluminum, Solutia, Oglebay Norton, Citation, Intermet, Venture Holdings, Alterra, EaglePicher, Allied Holdings, Mesaba Aviation, and FLAG Telecom. I have also worked on restructuring issues with Georgia Gulf, ABN AMRO, US Foodservice, Barrick Gold, Manulife, CareMark Rx, Archipelago, and Sky Financial.

5.  Additionally, I published an article entitled *Bankruptcy Blues: Retaining Key Employees During a Financial Crisis* with Michael Siebenhaar in the February 2002 issue of Workspan, and an update, *The New Challenge of Chapter 11*, with Elizabeth Stephens in August 2008. I have been frequently quoted on issues relating to effective transitional compensation practices in such publications as HR Magazine, Cox News, and Atlanta Journal Constitution. In addition, I have been quoted in the Dallas Morning News, the Chicago Tribune, and the Milwaukee Journal Sentinel. I have also presented at the National Meeting of the Conference Board, the National Association of Stock Plan Professionals, and the National Center for Employee Ownership.

6. I testified as an expert in connection with (i) a renewal of the KERP of Owens Corning on September 8, 2004, (ii) the approval of Citation Corporation's KERP on November 4, 2004, (iii) the approval of Intermet Corporation's KERP on December 22, 2004, (iv) the approval of Venture Industries' KERP on March 10, 2005, (v) the approval of Allied Holdings' KERP on October 11, 2005, (vi) Nortel Networks' KEIP & KERP on February 5, 2009, and (vii) Tribune, in connection with their Management Incentive Plan, on September 25, 2009. In addition, my testimony was proffered and accepted in connection with (i) the approval of EaglePicher's KERP on August 9, 2005, (ii) the approval of Dana's director compensation program in 2006, (iii) the approval of the continuation of Mesaba's Incentive and Severance plans in 2006, and (iv) the approval of Olgebay Norton's KERP in 2004. In 2010, my testimony was proffered and accepted in connection with the approval of Nortel's "Special Incentive Plan" and Tribune's 2010 Management Incentive Plan. On March 11, 2011, my testimony was proffered and accepted during Tribune's confirmation hearing.

**B.  The KEIP**

7. The Key Employee Incentive Plan (the "KEIP") provides potential performance incentives for seventeen of the Debtors' key executives (collectively, the "Executives"), in the event they achieve specific reorganization and restructuring-related goals. Mercer assisted, advised and guided the Debtors with respect to development and creation of the KEIP.

8. Assuming target performance, the KEIP will cost approximately $4.7 million, with a maximum cost of approximately $7.1 million. The size of KEIP awards would be determined upon the date of either (i) the filing of a chapter 11 plan of reorganization (provided that an order is entered confirming such plan in substantially the same form within 150 days of filing), or (ii) the date on which an order is entered by the Court approving a sale of all or substantially all of the Debtors' assets (or a business unit directly overseen by the Executive) as a

3

going concern (each, an "Award Determination Event"). No amounts will be paid if the Debtors confirm a plan of liquidation or consummate a sale to liquidators.

9. The Debtors have historically offered an annual performance bonus plan (the "Annual Performance Bonus Plan") to their employees, ranging from professional and administrative staff to senior management. Employees receiving bonuses under the Annual Performance Bonus Plan were traditionally paid, at year end, a percentage of their salary, which varied widely depending on the Employee's level and position. Such bonuses were awarded based upon both individual Employee goals and overall performance of the Debtors' operations. Due to the Debtors' declining financial performance, the Debtors determined that no payments should be made on account of the Annual Performance Bonus Plan for the 2010 performance period. In addition, the Debtors have historically granted long-term incentives in the form of stock options and restricted shares. These long-term incentive opportunities provide a major part of the incentive opportunity that the Debtors offer employees. These long-term incentives are not available during the bankruptcy. In the absence of these incentives, the Executives will be compensated at only 38% of market median total direct compensation.

10. Target award opportunities are designed to bring total compensation closer to the market median. KEIP awards are set at 150% of historic annual incentive targets, and payout opportunities range from 0% to 150% of target (*i.e.*, a maximum payout of 225% of historical annual target opportunity), based upon timing of an Award Determination Event. For the Debtors' five highest-level Executives, target award opportunities range from 90% to 150% of base salary and have an average award size of $623,000. For the other Executives, target award opportunities range from 60% to 90% of base salary and have an average award size of $135,000.

11. As time spent within Chapter 11 increases, KEIP award opportunities for participants decrease, and no awards are available under the KEIP if an Award Determination Event occurs later than nine (9) months from the Commencement Date, or after November 16, 2011. For the Executives to obtain maximum KEIP awards, an Award Determination Event must occur within six (6) months from the Commencement Date, or by August 16, 2011. To obtain target KEIP awards, an Award Determination Event would have to occur by nine (9) months from the Commencement Date, or by November 16, 2011. Awards would be interpolated for Award Determination Events occurring between August 17, 2011 and November 15, 2011.

12. The possible payouts for Executives under the KEIP are set forth below:

| Position Title | Number of Executives | KEIP Target Range | KEIP Maximum Range |
|---|---|---|---|
| Chief Executive Officer | 1 | $1,125,000 | $1,688,000 |
| Executive Vice Presidents | 3 | $420,00 - $720,000 | $630,000 - $1,080,000 |
| Senior Vice President, Human Resources | 1 | $248,000 | $371,000 |
| Other Key Executives (Senior Vice President and Vice Presidents) | 12 | Aggregate: $1,623,000 | Aggregate: $2,435,000 |
| **Total** | | **$4,736,000** | **$7,104,000** |

13. Payment of the KEIP awards will occur on the date that is thirty (30) days after either (i) the effective date of a plan of reorganization, or (ii) the closing of a going concern sale. Payout is contingent upon the Executive being actively employed on the date of payment. If a participant is involuntarily terminated without cause prior to (i) the effective date of a plan of reorganization, or (ii) the closing of a going concern sale, ("<u>Consummation</u>") but after the Award Determination Event, the Compensation Committee of the Debtors' Board of Directors shall

5

retain discretion as to whether and to what extent the participant in the KEIP may retain his or her rights to an award after termination. If a participant is involuntarily terminated without cause after Consummation, the award will be paid as scheduled as if the participant continued as an employee.

C. **The KERP**

14. The KERP provides performance and retention incentives for approximately twenty-five (25) of the Debtors' director-level employees who occupy non-insider positions[2] that are critical to the Debtors' reorganization and to ongoing business (the "Critical Employees"), and who are of high talent and would be difficult, if not impossible, to re-recruit in the current market, given the Debtors' current circumstances. Additionally, a small number of other key employees (the "Discretionary Employees, and together with the Critical Employees, the "KERP Employees") would participate in a discretionary pool under the KERP (the "Discretionary Pool"), based upon the judgment of the Debtors' Executive Committee, comprised of the Debtors' five highest-level Executives.

15. Mercer assisted, advised and guided the Debtors with respect to development and creation of the KERP. The Debtors estimate that the total aggregate payout under the KERP will be approximately $1.2 million, consisting of approximately $933,000 for the Critical Employees and $300,000 for the Discretionary Employees. This amount, added to the KEIP's maximum cost, totals approximately $8.3 million, which represents .36% of the Debtors' 2010 revenue. This falls slightly below the average (.39%) for comparable programs identified by Mercer.

16. The KERP has been tailored to provide incentives to the Critical Employees and Discretionary Employees to remain with the Debtors, and, like the KEIP, to achieve a successful

---

[2] The Debtors' corporate level employees referred to as director-level employees are non-executive managers at the "director" level. These employees are not "directors" or "officers" within the meaning of section 101(31) of the Bankruptcy Code; one director-level employee also serves as Corporate Secretary for the Debtors.

6

emergence from Chapter 11. Lump sum award payments are equal to approximately 30% of each Critical Employee's base salary, commensurate with the historical Annual Performance Bonus Plan, and, as with the KEIP, would be made on the date that is thirty (30) days after either (i) the effective date of a plan of reorganization, or (ii) the closing of a going concern sale (although the KERP is not tied to the timing of an Award Determination Event as is the KEIP). KERP payments would also be made upon involuntary termination of Critical Employees without cause, but offset by any severance otherwise paid to such terminated Critical Employees.

17. Proposed individual award amounts to Critical Employees have been pre-determined, and range from $28,000 to $53,000, depending upon the particular Critical Employee's position, responsibilities and other business considerations. The average award size is $37,000. Individual awards to Discretionary Employees from the Discretionary Pool would not exceed $20,000 per Discretionary Employee, and would likewise be made at the same time as payments to Critical Employees.

### D. Mercer's Development and Analysis of the KEIP and KERP

18. The Debtors engaged Mercer to assist, advise, and guide them in connection with developing a key employee incentive plan and key non-insider employee retention plan that would create an incentive for Executives and KERP Employees to successfully restructure rapidly through a plan of reorganization or a going concern sale. Accordingly, the Incentive and Retention Plans do not reward for liquidation or a protracted bankruptcy.

19. In accordance therewith, Mercer participated in multiple meetings and discussions with the Debtors' management team and restructuring advisors, AlixPartners LLP, to develop and refine Mercer's understanding of the Debtors' business, operational history, restructuring goals, existing base salaries, and annual and long-term incentive compensation programs. This

enabled Mercer to develop and evaluate the KEIP and KERP with appropriate consideration of the Debtors' specific and reasonable goals and objectives.

20. In assessing the reasonableness of the Incentive and Retention Plans, Mercer conducted three (3) primary analyses: (i) an analysis of KEIP cost comparison in chapter 11 comparator groups; (ii) an analysis of non-insider retention bonus plans in chapter 11 comparator groups; and (iii) an analysis of market compensation data with respect to the Executives' base salaries.

21. With respect to the first analysis, Mercer examined a group of twenty (20) companies that filed for chapter 11 on or after January 1, 2009 (the "Comparator Companies"), with each Comparator Company having a supplemental incentive plan approved by courts. All revenue sizes of Comparator Companies ranged from approximately $350 million to $50 billion, while all asset sizes ranged from approximately $500 million to $30 billion. The Debtors' current revenues fall between the median and average of the Comparator Companies. The Debtors' projected revenues upon emergence from chapter 11 fall below the median and average of the Comparator Companies. On average, Comparator Companies saw an 18% decline in annual revenue, when revenue for the year of emergence was compared to revenue in the latest fiscal year-end prior to the petition date. As a result, the maximum plan costs as a percentage of revenue increased overall. Median maximum plan costs as a percentage of annual revenue in the year of emergence for the Comparator Companies are .47%. Assuming the Debtors' projected emergence revenues of $1.5 billion, projected maximum KEIP costs are slightly above market median, at .56%.

22. With respect to the second analysis, Mercer examined four non-insider retention bonus plans approved by courts for companies that filed for bankruptcy after January 1, 2009:

8

Lyondell Chemical Company, Nortel Networks, Spansion, and Crusader Energy Group. The KERP's cost is approximately equal to the cost of Crusader Energy Group's KERP, which was promulgated for twenty-seven employees. The KERP's cost is less than any of these other companies' non-insider retention bonus plans, which were created for ranges of 101 to 880 employees in those cases.

23. Finally, concerning the third analysis, Mercer developed a peer group from the population of specialty retailers, based on revenue size and scope (*i.e.*, non-luxury, non-internet-only businesses). The Debtors' compensation was compared to the following market data: base salary, target annual incentive, target total cash compensation, equity and long-term incentives, and total direct compensation. Mercer found that if the KEIP is not approved, and the Executives continue to receive base salary only, they will be compensated at only 38% of market median total direct compensation overall.

24. Likewise, the Debtors have not raised their corporate employees' salaries in close to four years. Moreover, the Debtors' decision to discontinue certain of the Debtors' historical incentive and benefit programs, including and especially the Annual Performance Bonus Plan, has significantly reduced the previously competitive compensation the Debtors can pay their employees.

25. Based on my knowledge and experience, such low pay creates a risk of disengagement – especially for individuals with a relatively short tenure with the Debtors that have eschewed other career opportunities to join the Debtors. Indeed, 70% of the seventeen recommended KEIP participants have less than eighteen months of service with the Debtors. Of that 70%, 50% have less than one year of service. Because of the short tenure, these leaders

have been unable to earn any incentive compensation for the risks taken in working for a company with significant operational and market obstacles.

26. If the KEIP is approved, assuming target KEIP payout, total direct compensation for the Executives would fall at 73% of the market median, with total direct compensation for the Debtors' five highest-level Executives falling at 62% of the market median, and total direct compensation for the other Executives falling at 95% of the market median. Assuming maximum KEIP payout, total direct compensation for the Executives would fall at 91% of the market median.

27. Based upon my analysis, knowledge, and experience, I believe that the design and structure of the KEIP and KERP, and proposed payouts to be made thereunder, are generally in line with market standards and practice.

28. Based upon my analysis, knowledge, and experience, I believe that the KEIP and KERP would serve to align the interests of the Debtors, their key employees and their financial stakeholders, in order to best achieve the Debtors' specific restructuring-related goal: emerging from Chapter 11 through an Award Determination Event expeditiously.

29. I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed on the 24th day of March, 2011.

*John Dempsey*

John Dempsey