UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re<br><br>BORDERS GROUP, INC., *et al.*,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 11-10614 (MG)<br><br>(Jointly Administered) |

**DECLARATION OF HOLLY FELDER ETLIN IN SUPPORT OF DEBTORS' MOTION PURSUANT TO SECTIONS 363(b), 365(a) AND 503(c) OF THE BANKRUPTCY CODE AND FED. R. BANKR. P. 6006 AND 9014 FOR AN ORDER AUTHORIZING (I) IMPLEMENTATION OF (A) KEY EMPLOYEE INCENTIVE PLAN AND (B) KEY EMPLOYEE RETENTION PLAN, AND (II) ASSUMPTION OF CERTAIN EMPLOYMENT AGREEMENTS**

I, Holly Felder Etlin, hereby declare that the following is true and correct to the best of my knowledge, information and belief:

1. I am a managing director of AlixPartners, LLP ("AlixPartners"). My business address is 40 West 57th Street, 29th Floor, New York, New York 10019. On February 18, 2011, I was appointed Senior Vice President – Restructuring ("SVPR") of Borders Group, Inc. as documented in an addendum dated as of February 23, 2011, to the engagement letter between AlixPartners' affiliate, AP Services, LLC, and Borders Group, Inc. dated as of February 9, 2011. On March 16, 2011, the Court entered an order authorizing the above-captioned debtors and debtors in possession (collectively, the "Debtors") to designate me as SVPR for the Debtors [Docket No. 397].

2. I respectfully submit this declaration (the "Declaration") in support of the Debtors' *Motion Pursuant to Sections 363(b), 365(a) and 503(c) of the Bankruptcy Code and Fed.*

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Borders Group, Inc. (4588); Borders International Services, Inc. (5075); Borders, Inc. (4285); Borders Direct, LLC (0084); Borders Properties, Inc. (7978); Borders Online, Inc. (8425); Borders Online, LLC (8996); and BGP (UK) Limited.

*R. Bankr. P. 6006 and 9014 for an Order Authorizing (I) the Implementation of (a) Key Employee Incentive Plan and (b) Key Employee Retention Plan, and (II) the Assumption of Certain Employment Agreements.* The Debtors have duly authorized me to do so.

A.  **Background Information and Qualifications**

3.  I earned my bachelor's degree from the University of California at Los Angeles, and am a Certified Insolvency and Restructuring Advisor and Certified Turnaround Professional. I have over thirty years of experience providing restructuring services to companies in the retail, distribution, and consumer products industries. Before joining AlixPartners, I was a Principal with XRoads Solutions Group in New York.

4.  I have worked with management of many specialty retailers during operational and financial restructurings, including Winn-Dixie Stores, Inc.; Forzani Ltd.; Lechters; SF Music Box; Museum Company; and multiple regional hardware and clothing chains. I have assisted the vendor creditors in multiple retail restructurings, including Barneys NY and Today's Man. I served as the Interim Chief Financial Officer of Freedom Communications, a $750 million media company, where I enhanced and accelerated cost reduction efforts in response to significant revenue decline. I also served as Chief Executive Officer and Chief Restructuring Officer of New Century Financial, a sub-prime mortgage lender which lost its ability to originate new loans in March 2007, and successfully negotiated a plan of reorganization for over $35 billion in claims in less than one year. Additionally, I was the Chief Restructuring Officer and acting Chief Executive Officer of Tanner & Haley, one of the largest luxury destination clubs in the United States, which was accused of major fraud and mismanagement. I stabilized the company and merged it with another destination club within six months.

5.  I have also served as the Chairman of the Turnaround Management Association, and am a member of American Bankruptcy Institute, Association of Insolvency & Restructuring

Advisors, and International Women's Insolvency & Restructuring Confederation. In 2007, the Turnaround Management Association recognized me with its Turnaround of the Year Award for the successful restructuring of Winn-Dixie.

**B.   The KEIP**

6.  The Key Employee Incentive Plan (the "KEIP") provides potential performance incentives for seventeen of the Debtors' key executives (collectively, the "Executives"), in the event they achieve specific reorganization and restructuring-related goals. Mercer (US) Inc. ("Mercer") assisted, advised and guided the Debtors with respect to development and creation of the KEIP.

7.  Assuming target performance, the KEIP will cost approximately $4.7 million, with a maximum cost of approximately $7.1 million. The size of KEIP awards would be determined upon the date of either (i) the filing of a chapter 11 plan of reorganization (provided that an order is entered confirming such plan in substantially the same form within 150 days of filing), or (ii) the date on which an order is entered by the Court approving a sale of all or substantially all of the Debtors' assets (or a business unit directly overseen by the Executive) as a going concern (each, an "Award Determination Event"). No amounts will be paid if the Debtors confirm a plan of liquidation or consummate a sale to liquidators.

8.  The Debtors have historically offered an annual performance bonus plan (the "Annual Performance Bonus Plan") to their employees, ranging from professional and administrative staff to senior management. Employees receiving bonuses under the Annual Performance Bonus Plan were traditionally paid, at year end, a percentage of their salary, which varied widely depending on the employee's level and position. Such bonuses were awarded based upon both individual employee goals and overall performance of the Debtors' operations. Due to the Debtors' declining financial performance, the Debtors determined that no payments

3

should be made on account of the Annual Performance Bonus Plan for the 2010 performance period.

9. Target award opportunities under the KEIP are set at 150% of historic levels, and payout opportunities range from 0% to 150% of target (*i.e.*, a maximum payout of 225% of historical annual target opportunity), based upon timing of an Award Determination Event. For the Debtors' five highest-level Executives, target award opportunities range from 90% to 150% of base salary and have an average award size of $623,000. For the other Executives, target award opportunities range from 60% to 90% of base salary and have an average award size of $135,000.

10. As time spent within Chapter 11 increases, KEIP award opportunities for participants decrease, and no awards are available under the KEIP if an Award Determination Event occurs later than nine (9) months from the Commencement Date, or after November 16, 2011. For the Executives to obtain maximum KEIP awards, an Award Determination Event must occur within six (6) months from the Commencement Date, or by August 16, 2011. To obtain target KEIP awards, an Award Determination Event would have to occur by nine (9) months from the Commencement Date, or by November 16, 2011. Awards would be interpolated for Award Determination Events occurring between August 17, 2011 and November 15, 2011.

11. The possible payouts for Executives under the KEIP are set forth below:

| Position Title | Number of Executives | KEIP Target Range | KEIP Maximum Range |
|---|---|---|---|
| Chief Executive Officer | 1 | $1,125,000 | $1,688,000 |
| Executive Vice Presidents | 3 | $420,00 - $720,000 | $630,000 - $1,080,000 |
| Senior Vice President, Human Resources | 1 | $248,000 | $371,000 |
| Other Key Executives (Senior Vice President and Vice Presidents) | 12 | Aggregate: $1,623,000 | Aggregate: $2,435,000 |
| Total | | $4,736,000 | $7,104,000 |

12. Payment of the KEIP awards will occur on the date that is thirty (30) days after either (i) the effective date of a plan of reorganization, or (ii) the closing of a going concern sale. Payout is contingent upon the Executive being actively employed on the date of payment. If a participant is involuntarily terminated without cause prior to (i) the effective date of a plan of reorganization, or (ii) the closing of a going concern sale, ("Consummation") but after the Award Determination Event, the Compensation Committee of the Debtors' Board of Directors shall retain discretion as to whether and to what extent the participant may retain his or her rights to an award after termination. If a participant is involuntarily terminated without cause after Consummation, the award will be paid as scheduled as if the participant continued as an employee.

C. **The KERP**

13. The KERP provides performance and retention incentives for approximately twenty-five (25) of the Debtors' director-level employees who occupy non-insider positions[2] that

---

[2] The Debtors' corporate level employees referred to as director-level employees are non-executive managers at the "director" level. These employees are not "directors" or "officers" within the meaning of section 101(31) of the Bankruptcy Code; one director-level employee also serves as Corporate Secretary for the Debtors.

are critical to the Debtors' reorganization and to ongoing business (the "Critical Employees"), and who are of high talent and would be difficult, if not impossible, to re-recruit in the current market, given the Debtors' current circumstances. Additionally, a small number of other key employees (the "Discretionary Employees, and together with the Critical Employees, the "KERP Employees") would participate in a discretionary pool under the KERP (the "Discretionary Pool"), based upon the judgment of the Debtors' Executive Committee, comprised of the Debtors' five highest-level Executives.

14. Mercer assisted, advised and guided the Debtors with respect to development and creation of the KERP. The Debtors estimate that the total aggregate payout under the KERP will be approximately $1.2 million, consisting of approximately $933,000 for the Critical Employees and $300,000 for the Discretionary Employees. This amount, added to the KEIP's maximum cost, totals approximately $8.3 million, which represents .36% of the Debtors' 2010 revenue. This falls well below the average (.39%) for comparable programs identified by Mercer.

15. The KERP has been tailored to provide incentives to the Critical Employees and Discretionary Employees to remain with the Debtors, and, like the KEIP, to achieve a successful emergence from Chapter 11. Lump sum award payments are equal to approximately 30% of each Critical Employee's base salary, commensurate with the historical Annual Performance Bonus Plan, and, as with the KEIP, would be made on the date that is thirty (30) days after either (i) the effective date of a plan of reorganization, or (ii) the closing of a going concern sale (although the KERP is not tied to the timing of an Award Determination Event as is the KEIP). KERP payments would also be made upon involuntary termination of Critical Employees without cause, but offset by any severance otherwise paid to such terminated Critical Employees.

16. Proposed individual award amounts to Critical Employees have been pre-determined, and range from $28,000 to $53,000, depending upon the particular Critical Employee's position, responsibilities and other business considerations. The average award size is $37,000. Individual awards to Discretionary Employees from the Discretionary Pool would not exceed $20,000 per Discretionary Employee, and would likewise be made at the same time as payments to Critical Employees.

**D.    The Debtors' Objectives in Seeking to Implement the KEIP and KERP**

17. In connection with my role as SVPR of the Debtors, I engaged in numerous discussions with the Debtors' management and Mercer regarding the Debtors' objectives in seeking to implement the KEIP and KERP. Achieving an effective plan of reorganization or a section 363 going concern sale on an aggressive timeline is the ultimate goal of a Chapter 11 proceeding. However, virtually every recent major debtor retailer has liquidated; thus, for a retailer such as the Debtors, maintaining the Debtors' status as a viable going concern is anything but certain and will require enormous commitments by management. Indeed, although the KEIP does not delineate specific business milestones, such business goals are all subsumed in the Award Determination Event. Moreover, expeditious emergence from Chapter 11 via a plan of reorganization or a going concern sale serves the salutary purpose of minimizing the expenses of administering the cases. Expedited emergence as a going concern will maximize value for all stakeholders, and also will minimize cost.

18. In recent months, the Debtors have had significant difficulties incentivizing and retaining employees. The publicity surrounding the Debtors' pre-petition restructuring negotiations, the commencement of these cases, and the Debtors' store closing sales and attendant workforce reductions have raised substantial concerns for the Debtors' employees and exacerbated these difficulties.

19. Approximately twenty-five (25) significant corporate employees, including a director-level employee, have voluntarily departed from the Debtors since the Commencement Date (this amounts to the alarming rate of approximately five employees per week). The resignations have been across various levels and salaries, and come from a range of crucial corporate departments such as Finance, Information Technology, Human Resources, Marketing, Merchandising, and Operations. The Debtors have already reduced corporate headcount by over 55% in the last two years, and during that same period, over eighty-five (85) director-level employees and officers exited the company.

20. The Executives and KERP Employees perform a variety of critical functions, including, but not limited to, management, customer service, inventory control, accounting and tax services, human resource and payroll services, operations, marketing, merchandising, purchasing and sales, legal services, and technical services. The employees' skills and their knowledge and understanding of the Debtors' operations, customer and supplier relationships, and infrastructure are essential to maintaining the Debtors' business and to the success of their Chapter 11 reorganization efforts. Without these employees' continued commitment, the Debtors' ability to achieve a successful reorganization would be severely compromised.

21. The leadership group currently in place at the Debtors has been carefully selected to be the team that will manage the Debtors and their ongoing business throughout the restructuring process. Should any of this team choose to leave, it would be extremely difficult, it not impossible, to replace them during these bankruptcy proceedings, leaving significant functional leadership and talent gaps.

22. Without implementation of the KEIP, compensation for the Debtors' Executives will remain significantly below market rates. My understanding, based on Mercer's analyses, is

that if the Executives continue to receive nothing besides their base salaries, their total direct compensation will be at only approximately 38% of the market median. My understanding, also based on analyses performed by Mercer, is that assuming target KEIP payouts, the Executives' total direct compensation would be at 73% of the market median (with total direct compensation for their five highest-level Executives at 62% of the market median and total direct compensation for the other Executives at 95% of the market median). Assuming maximum KEIP payouts, the total direct compensation for Executives would be 91% of the market median.[3]

23. Likewise, the Debtors have not raised their corporate employees' salaries in close to four years. Moreover, the Debtors' decision to discontinue certain of their historical incentive and benefit programs, including and especially the Annual Performance Bonus Plan, has significantly reduced the previously competitive compensation the Debtors can pay their employees. Essential employees may not be motivated to perform when they perceive that their compensation levels do not make it worth their while to do so, especially where, as here, such employees have assumed *increased* workloads, as a result of substantial recent workforce reductions.

24. If this persists, employee morale will continue to suffer – especially for individuals with a relatively short tenure with the Debtors that have eschewed other career opportunities to join the Debtors. Indeed, 70% of the seventeen recommended KEIP participants have less than eighteen months of service with the Debtors. Of that 70%, 50% have less than one year of service. Because of the short tenure, these leaders have been unable to earn any incentive compensation for the risks taken in working for a company with significant operational

---

[3] These analyses exclude the Deferred Compensation and Prepetition Deferred Compensation with respect to the Employees, each as defined in the Motion.

9

and market obstacles. The KEIP will bridge that gap, and provide incentive for the Executives to facilitate a successful exit from Chapter 11.

25. Moreover, if the KERP is not implemented, the Debtors fear that many of the KERP Employees very well may seek alternative career opportunities, which would impede the Debtors' ability to execute on critical business and restructuring initiatives. Put simply, the Debtors cannot afford to lose their most talented and valuable director-level corporate employees during this crucial time. Because of the Debtors' reductions in workforce over the past two years, many of the KERP Employees are literally the only individuals performing certain tasks at the Debtors, and possess unique and vital institutional knowledge that is critical to executing day-to-day business operations. If the KERP Employees were to resign, the value and benefits of these directors' experience will be lost. Relying on newly hired employees to perform the KERP Employees' crucial functions would severely hinder the Debtors' operations; training and utilizing new employees would also come at a huge expense, in terms of both literal monetary cost and unquantifiable damage to the Debtors' business.

### E. The Employment Agreements

26. Scott Henry is the Debtors' Executive Vice President and Chief Financial Officer. Mr. Henry is responsible for all financial aspects of the Debtors' business, and he was intimately involved in the pre-petition restructuring negotiations. It would be nearly impossible for the Debtors to replace Mr. Henry as Chief Financial Officer within the timeframe necessary to complete the Debtor's restructuring goals, and his employment is thus indispensable to the Debtors' business and reorganization.

27. Michele Cloutier is the Debtors' Executive Vice President and Chief Merchandising Officer. Ms. Cloutier's experience with the Debtors' vendors is critical to the Debtors' survival because the vendors are critical to the Debtors' survival. It would be

extremely difficult, if not impossible, for the Debtors to replace Ms. Cloutier as Chief Merchandising Officer in the time necessary to reorganize the Debtors' business, and her employment is thus indispensable to the Debtors' business and reorganization efforts.

28. Glen Tomaszewski is the Debtors' Vice President, Chief Accounting Officer and Controller. Mr. Tomaszewski's experience with the Debtors is critical to ensure the smooth operations of accounting and cash management systems through these complex cases. It would be extremely difficult, if not impossible, for the Debtors to replace Mr. Tomaszewski as Chief Accounting Officer. His substantial experience with the Debtors is critical given the turnover at the Debtors and Mr. Henry's relatively recent arrival at the Debtors. Moreover, upon bringing Mr. Henry on board, the Debtors expressly contemplated that Mr. Henry, Mr. Tomaszewski, and Mr. Cline (discussed below) would work as a team. Mr. Tomaszewski's employment is thus indispensable to the Debtors' business and reorganization efforts.

29. Jason Cline is the Debtors' Vice President of Financial Planning and Analysis. Mr. Cline has been employed with the Debtors since 2004, in various financial analyst roles. Mr. Cline's experience with the Debtors is critical to a successful restructuring. It would be extremely difficult, if not impossible, for the Debtors to replace Mr. Cline as Vice President of Financial Planning and Analysis, especially for the reasons set forth above regarding Mr. Henry's very recent tenure with the Debtors, and the Debtors' intention for Mr. Henry, Mr. Tomaszewski, and Mr. Cline to operate as a team. Mr. Cline's employment is thus indispensable to the Debtors' business and reorganization.

30. The Deferred Compensation and Prepetition Deferred Compensation, each as defined in the Motion, are designed to reward these four employees for their efforts on behalf of the Debtors, and are merely a component of the employees' salaries, but are paid on a deferred

basis. The amount of the Deferred Compensation and Prepetition Deferred Compensation is reasonable in light of the countless hours sacrificed and the extraordinary efforts put forth by these four employees on behalf of the Debtors. Moreover, the proposed payments are reasonable in comparison to the results achieved to date. Ms. Cloutier and Messrs. Henry, Tomaszewski and Cline were indispensable to the Debtors' pre-petition negotiations and preparation, and are equally critical going forward with respect to restructuring negotiations and the Debtors' ongoing business.

31. I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed on the 24th day of March, 2011.

                                                                                             Holly Felder Etlin