**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | **FOR PUBLICATION** |
| BORDERS GROUP, INC., *et al.*, | Chapter 11 |
| Debtors.[1] | Case No. 11-10614 (MG) |
| | (Jointly Administered) |

**MEMORANDUM OPINION GRANTING THE DEBTORS' MOTION FOR
AUTHORIZATION TO IMPLEMENT AN EMPLOYEE INCENTIVE PROGRAM AND
EMPLOYEE RETENTION PROGRAM**

*A P P E A R A N C E S:*

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
*Attorneys for Borders Group, Inc.*
1633 Broadway
New York, New York 10019
By:     Andrew Glenn, Esq.
        Jeffrey R. Gleit, Esq.
        Michele Angell, Esq.

LOWENSTEIN SANDLER PC
*Attorneys for the Official Committee of Unsecured Creditors*
65 Livingston Avenue
Roseland, New Jersey 07068
By:     Bruce Buechler, Esq.

TRACY HOPE DAVIS
*United States Trustee for Region 2*
22 Whitehall Street, 21st Floor
New York, New York 10004
By:     Paul Schwartzberg, Esq.
        Linda A. Riffkin, Esq.

---

[1]        The Debtors are: Borders Group, Inc.; Borders International Services, Inc.; Borders, Inc.; Borders Direct, LLC; Borders Properties, Inc.; Borders Online, Inc.; Borders Online, LLC; and BGP (UK) Limited.

**MARTIN GLENN**
**UNITED STATES BANKRUPTCY JUDGE**

Borders Group, Inc. and its affiliated debtors (collectively, the "Debtors") move for an order authorizing the implementation of a twice-revised key employee incentive plan (the "KEIP"), a key employee retention plan (the "KERP" and with the KEIP, the "Proposed Plans") and the assumption of certain employment agreements[2] (the "Motion").  (ECF Doc. # 457.)  In support of the Motion, the Debtors submitted the declarations of (i) John Dempsey, a partner at Mercer (US) Inc. and the Debtors' compensation consultant (the "Dempsey Declaration"), and (ii) Holly Felder Etlin, the Debtors' Senior Vice President – Restructuring (the "Etlin Declaration").  (ECF Doc. ## 458, 459, respectively.)  The Office of the United States Trustee (the "UST") filed an objection to the Motion (the "UST Objection").  (ECF Doc. # 561.)  In response to the UST Objection, the Debtors filed a reply (the "Reply") (ECF Doc. # 598) and the Supplemental Declaration of John Dempsey (the "Supplemental Dempsey Declaration").  (ECF Doc. # 601.)

On April 14, 2011, the parties appeared before the Court for a contested hearing.  As explained in greater detail below, the Debtors informed the Court that it had negotiated changes to the form of the KEIP with the Official Committee of Unsecured Creditors (the "Committee") in response to informal comments exchanged between the parties.  The Committee did not object to the structure of the KERP.  However, the UST was not satisfied that the negotiated changes sufficiently addressed the concerns raised in her objection.  Because the Motion raised a contested matter requiring the Court to hear evidence, *see* Local Bankruptcy Rule 9014-2, the Court adjourned the hearing until April 22, 2011.  After extensive negotiations between the parties, on April 21, 2011, the Debtors filed a proposed order (the "Proposed Order") with a term

---

[2]        In the Motion the Debtors originally sought to assume five individual employment contracts. Subsequently, that portion of the Motion was withdrawn.

sheet (the "Term Sheet") reflecting further revisions to the KEIP. (ECF Doc. # 687.) Pursuant

to the Proposed Order, the KERP was left unaltered. In conjunction with filing the Proposed

Order, the Debtors also submitted the Supplemental Declaration of Holly Felder Etlin (the

"Supplemental Etlin Declaration"). (ECF Doc. # 688.)

At the hearing on April 22, 2011, the four declarations were admitted in evidence in

support of the Motion. The UST stated that the changes to the KEIP embodied in the Proposed

Order, coupled with the additional information provided in the Supplemental Etlin Declaration,

were sufficient to satisfy the UST. Accordingly, the UST withdrew her objection to the Motion.

The Court approved the Proposed Order which was entered on the docket that day. (ECF Doc. #

697.) The Court stated at the April 22nd hearing that an opinion would be issued further

explaining the ruling.

## I.   BACKGROUND

The Debtors maintained an incentive and retention plan prior to filing for bankruptcy

protection. (Motion ¶ 7.) The plan applied to a wide range of employees—from administrative

staff to senior management—and consisted of annual performance bonuses tied to both

individual employee goals and overall performance of the Debtors' operations (the "Annual

Performance Bonus Plan"). (*Id.*) Due to the Debtors' poor financial condition, no bonuses were

paid for the 2010 performance period. (*Id.*) In addition to the Annual Performance Bonus Plan,

the Debtors incentivized employees via the grant of stock options and restricted shares. (*Id.*)

The Debtors seek approval of the Motion, as modified by the terms of the Proposed

Order, in an attempt to stem the postpetition exodus of important personnel. The Debtors submit

that the publicity surrounding its attempted prepetition restructuring, the bankruptcy filing, store

closing sales and workforce reductions have "raised substantial concerns" for the Debtors'

employees.  (*Id.* ¶ 8.)  Twenty-five (25) "significant corporate employees" have left between the petition date and the filing of the Motion, coming from various levels and salaries in the areas of Finance, Information Technology, Human Resources, Marketing, Merchandising and Operations departments.  (*Id.*; Etlin Decl. ¶ 19.)  Since the Motion was filed, twenty-two (22) additional corporate employees have voluntarily departed, bringing total senior corporate employee loss to forty-seven (47) since the petition date.  (Reply ¶ 2.)  According to Debtors' counsel, the Debtors employed approximately sixteen-thousand (16,000) full-time and part-time employees when the petitions were filed.  As a result of store closings and further attrition, the Debtors employed approximately eleven-thousand (11,000) full-time and part-time employees at the time of the hearings on the Motion.

## A.  The KEIP

The Debtors seek to implement the KEIP for fifteen (15) key executives believed to be critical to the Debtors' restructuring efforts.  The KEIP is a two-tiered program that provides different bonus opportunities based on an executive's position in the company and the achievement of bankruptcy and business goals within a specified timeframe.  For the five highest-level executives, including the Debtors' Chief Executive Office, Executive Vice Presidents and the Senior Vice President, Human Resources (the "Senior Management Participants"), the award payout will range from 55% to 75% of base salary and is tied to the date when one of the following occurs: either (i) the confirmation of a chapter 11 reorganization plan resulting in the ongoing business of substantially all of the Debtors' current stores or (ii) a section 363 sale of the business as a going concern (each, a "Qualifying Transaction").  (Term Sheet ¶¶ 1, 2.)  If the Qualifying Transaction occurs by August 15, 2011, then the Senior Management Participants will receive 75% of their base salary.  (*Id.* ¶ 2(A)(1)(a).)  However,

this percentage slides down to 55% of base salary if the Qualifying Transaction occurs after August 15, 2011 through November 16, 2011.  (*Id.* ¶ 2(A)(1)(b).)  No incentive payments will be made if a Qualifying Transaction transpires post-November 16, 2011.  (*Id.* ¶¶ 1, 2.)

In addition to the achievement of a Qualifying Transaction, the KEIP also requires the Debtors to meet specific financial benchmarks (the "Incentives"), which include (i) the Debtors entering into real estate lease amendments after the petition date and before May 31, 2011 that provide at least $10 million of annualized rent reductions for each of 2011 and 2012, or (ii) the Debtors implement non-headcount annualized cost reductions associated with either contract rejections or renegotiations (excluding real estate lease amendments and any rejections of contracts or leases associated with any closing stores) of $10 million by June 30, 2011.  (*Id.*)

Each Senior Management Participant will also be eligible to receive an additional KEIP bonus payment tied to distributions made to unsecured creditors.  The threshold distribution amount is $73 million, and as the distribution size increases, the bonus payment likewise rises.  (*Id.* ¶ 2(A)(2).)

The KEIP also provides incentive payments to ten lower-level executives (the "Management Participants" and with the Senior Management Participants, the "Executives").  The KEIP structure for Management Participants is identical to the program for Senior Management Participants except that the bonus is 40% of base compensation and the Management Participants will not be entitled to an additional bonus based on distributions to general unsecured creditors.  (*Id.* ¶ 1.)  The same financial benchmarks (Incentives) apply before the Management Participants are entitled to any bonus.

In the case of either tier of Executives, "[n]o payments will be made under the KEIP for any liquidation or any going out of business sales at the majority of the Debtor's stores, or any

plan confirmation by cram down or otherwise, or approval of a sale, over the objection of the Committee." (*Id.* ¶ 4.)

According to the representations made to the Court by counsel for the Debtors and the Committee, the maximum cost of the KEIP will be $2.7 million exclusive of any additional payments made to the Senior Management Participants on account of distributions made to general unsecured creditors. This version of the KEIP is the third iteration of the program proposed by the Debtors. Initially, the Debtors sought approval of a KEIP that was tied only to the achievement of plan confirmation or a section 363 going concern sale within certain time parameters (the "Initial KEIP"). Prior to the April 14th hearing, the Debtors and the Committee negotiated a revised version of the KEIP that substantially mirrored the current structure of the KEIP (the "First Revised KEIP"). Specifically, the First Revised KEIP provided for a bonus (as a percentage of base salary) based on the timing of a Qualifying Transaction, as well as an additional bonus to senior management if certain distributions were made to general unsecured creditors. The First Revised KEIP, however, did not contain the Incentives.

The only metric contained in the First Revised KEIP was the distribution amount to general unsecured creditors. However, the Debtors were never *required* to distribute funds to general unsecured creditors as a condition of paying KEIP bonuses—it was merely an *additional* bonus paid to senior management. After the April 14th hearing, the First Revised KEIP was further amended through negotiations between the Debtors, the Committee and the UST to include the Incentives which must be met before any Executive is entitled to receive a bonus.

## B. The KERP

In conjunction with the KEIP, the Debtors also seek to implement a KERP for two sets of employees. The first group consists of twenty-five (25) "director-level" employees believed to

be critical to the Debtors' business and reorganization (the "Critical Employees").  According to

the Motion, although the Critical Employees are titled "directors," they are "non-executive

managers."[3]  (*Id.* ¶ 15 n. 5.)  One Critical Employee also serves as Corporate Secretary for the

Debtors.  (*Id.*)  The estimated payout to Critical Employees pursuant to the KERP is $933,000.

(*Id.*; Dempsey Decl. ¶ 15; Etlin Decl. ¶ 14.)  In addition, the Debtors request that a "small

number of other employees" (the "Discretionary Employees," and together with the Critical

Employees, the "KERP Employees") participate in a discretionary pool of $300,000 where

awards will be paid on the judgment of the Debtors' Executive Committee.  (Motion ¶¶ 15, 16;

Dempsey Decl. ¶ 15; Etlin Decl. ¶ 14.)  Therefore, the maximum cost of the KERP is slightly in

excess of $1.2 million.

Each Critical Employee will receive a lump sum payment approximating 30% of base

salary that is commensurate with the prepetition Annual Performance Bonus Plan.  (Motion ¶

17.)  These amounts have already been determined and range from $28,000 to $53,000 and vary

based on the Critical Employee's position, responsibilities and other factors.  (*Id.*)  The KERP

award for each Discretionary Employee will vary based on the Executive Committee's

determination, but no Discretionary Employee will earn more than $20,000. (Dempsey Decl. ¶

17.)

## II.    DISCUSSION

An analysis of the relief sought in the Motion necessarily requires the Court to first

determine whether any payment recipient is an "insider" under applicable bankruptcy law.  Once

---

[3]    The Debtors submit that each Critical Employee falls into one of the following job titles/descriptions:
Associate General Counsel; Digital Merchandising; Product Systems; Merchandise Planning and Replenishment;
Merchandising Trade Books; Purchasing and Building Services; e-commerce Systems; Real Estate Attorney;
Assistant Controller; Device Merchandising; Marketing Systems; Merchandise Operations; AP/AR; Creative; LP
and Internal Audit; Tax Director; Store and Customer Service; Payroll and Benefits; Human Resources; Operations;
Risk Management; Visual Presentation and Marketing; and Merchandising, Bargain/Fiction.  (Motion ¶ 15 n. 6.)

that issue is resolved, the Court must decide whether the KEIP and KERP comply with section

503(c) of the Bankruptcy Code.

## A.    Insider Status

As an initial matter, the Court must determine whether each eligible employee is an

"insider" within the meaning of section 101(31).  Insider status is important because it may

potentially bar an employee from participating in the KERP or the KEIP (assuming the program

is found to be primarily retentive).  If the Court determines that an employee is an insider, then

the Debtors must meet the strict requirements of section 503(c)(1).  That section prohibits any

transfer

> made to, or an obligation incurred for the benefit of, an insider of the debtor for
> the purpose of inducing such person to remain with the debtor's business,
> absent a finding by the court based on evidence in the record that—
>
> > (A) the transfer or obligation is essential to retention of the person
> > because the individual has a bona fide job offer from another business
> > at the same or greater rate of compensation;
> >
> > (B) the services provided by the person are essential to the survival of
> > the business; and
> >
> > (C) either—
> >
> > > (i) the amount of the transfer made to, or obligation incurred for
> > > the benefit of, the person is not greater than an amount equal to
> > > 10 times the amount of the mean transfer or obligation of a
> > > similar kind given to nonmanagement employees for any
> > > purpose during the calendar year in which the transfer is made
> > > or the obligation is incurred; or
> > >
> > > (ii) if no such similar transfers were made to, or obligations
> > > were incurred for the benefit of, such nonmanagement
> > > employees during such calendar year, the amount of the transfer
> > > or obligation is not greater than an amount equal to 25 percent
> > > of the amount of any similar transfer or obligation made to or
> > > incurred for the benefit of such insider for any purpose during
> > > the calendar year before the year in which such transfer is made
> > > or obligation is incurred;

11 U.S.C. § 503(c)(1).

Section 101(31)(B) defines "insider" in the context of a corporation.  The term *includes* a

> (i)      director of the debtor;
>
> (ii)     officer of the debtor;
>
> (iii)    person in control of the debtor;
>
> (iv)     partnership in which the debtor is a general partner;
>
> (v)      general partner of the debtor; or
>
> (vi)     relative of a general partner, director, officer, or person in control of the debtor.

11 U.S.C. § 101(31)(B).

The Debtors contend that the KERP Employees are not "directors" or "officers" within the meaning of section 101(31).  (Dempsey Decl. ¶ 14 n. 2; Etlin Decl. ¶ 13 n. 2.).  Once an individual is considered to be a director or officer under section 101(31)(B), they are automatically considered insiders and the Court need not engage in further inquiry.  *See Smith v. Ruby (In re Public Access Technology.com, Inc.)*, 307 B.R. 500, 505 (Bankr. E.D. Va. 2004) ("A defendant's status as a director or an officer is alone sufficient to establish that he is an insider.").

The term "director" is not defined in the Code.  Although courts have not provided a precise definition, it appears that with respect to section 101(31)(B)(i), "director" means an individual who sits on the board of directors of a corporation.  *See Rupp v. United Security Bank (In re Kunz)*, 489 F.3d 1072, 1077 (10th Cir. 2007).  In *Kunz*, the Tenth Circuit stated that "[w]hen the term 'director' is used in reference to a corporation . . . the term plainly means a person who is a member of the governing board of the corporation and participates in corporate governance."  *Id.* (*citing* WEBSTER'S THIRD NEW INTERNAT'L DICTIONARY 641 (1993); BLACK'S LAW DICTIONARY 472-73 (7th ed.1999)).

The term "officer" is likewise not defined by the Code.  However, courts have looked to Black's Law Dictionary as a source of authority.  *See Office of the U.S. Trustee v. Fieldstone Mortgage Co.*, No. 08-755, 2008 WL 4826291, at *3 n. 12 (D. Md. Nov. 5, 2008); *Public Access Techn.*, 307 B.R. at 506.  According to Black's, an "officer" is defined as a "person elected or appointed by the board of directors to manage the daily operations of a corporation, such as the CEO, president, secretary, or treasurer."  BLACK'S LAW DICTIONARY 1193 (9th ed. 2009).  Courts have also looked to state corporate law (including the Delaware Code) for additional guidance.  *See, e.g.*, *Fieldstone Mortgage Co.*, 2008 WL 4826291, at *3.  In *Fieldstone Mortgage Co.*, the court examined different laws—both state and federal—and concluded that "board appointment or election is frequently identified as distinguishing 'officer' positions from other titled positions within a corporation" and that "if that feature is present . . . the titled position ordinarily is an 'officer' position as a matter of law. . . .  [T]he definition of 'officer' [need not] require additional 'traditional elements, like decision-making . . . .'"  *Id.* at *13-14.

An individual's title, by itself, is insufficient to establish that an individual is a director or officer.  *See, e.g.*, *In re Longview Aluminum, LLC*, 419 B.R. 351, 355 (Bankr. N.D. Ill. 2009) ("[I]t is not simply the title 'director' or 'officer' that renders an individual an insider; rather it is the set of legal rights that a typical corporate director or officer holds."); *NMI Sys. V. Pillard (In re NMI Sys.)*, 179 B.R. 357, 370 (Bankr. D.D.C. 1995).  In *Public Access Techn.*, for example, the court found that an executive vice president was not an officer of the debtor because there was no evidence such as affidavits, articles of incorporation, corporate minutes, resolutions or any other document proving that the executive vice president was an officer under section 101(31)(B).  307 B.R. at 506.

At the same time, courts have acknowledged that an insider, in the context of a corporation, can encompass more than just the six categories enumerated in section 101(31)(B). *See, e.g. Matter of Krehl*, 86 F.3d 737, 741 (7th Cir. 1996) (noting that "the . . . definition [of insider] is intended to be illustrative rather than exhaustive") (citation omitted); *Boyd v. Petrie (In re Tompkins)*, 430 B.R. 453, 459 (Bankr. W.D. Mich. 2010) ("By using the word 'includes' in the statute, the definition of 'insider' is illustrative and not limiting . . . .") (citation omitted).

Insider status can also be determined on a case-by-case basis based on the totality of the circumstances, including the degree of an individual's involvement in a debtor's affairs. *See CPY Company v. Ameriscribe Corp. (In re Chas. P. Young Company)*, 145 B.R. 131, 136 (Bankr. S.D.N.Y. 1992). In such cases, insiders must have "at least a controlling interest in the debtor or . . . exercise sufficient authority over the debtor so as to unqualifiably dictate corporate policy and the disposition of corporate assets." *In re Babcock Dairy Co.*, 70 B.R. 657, 661, (Bankr. N.D. Ohio 1986) (citations omitted); *see also In re 9281 Shore Road Owners Corp.*, 187 B.R. 837, 853 (E.D.N.Y. 1995).

In this case, the Court is satisfied that although the Critical Employees are referred to as "director-level" employees, none of them, including the Corporate Secretary, are insiders for purposes of section 101(31). Initially, the UST raised concerns that neither the Motion nor its accompanying declarations clearly established that the KERP Employees were not insiders because the Motion did not list the Debtors' employees' names, job descriptions or reporting requirements. (UST Objection at 2.) The UST also contended that "[g]enerally speaking, 'director level' executives tend to be senior management of a company, or insiders, as defined in section 101(31) of the Bankruptcy Code." (*Id.* at 12.)

In response to the UST Objection, the Debtors provided a list of each Critical Employee's position and reporting requirements.  (Reply ¶ 10.)  The Debtors have also sufficiently shown that the Critical Employees—although termed "director-level" employees—are not "executives," who are typically considered insiders under the Bankruptcy Code.  Companies often give employees the title "director" or "director-level," but do not give them decision-making authority akin to an executive.  (Supp. Dempsey Decl. ¶ 18.)  Although the Critical Employees are important to the Debtors' business, none of them has the authority to implement company policies.  (Supp. Etlin Decl. ¶ 8.)  Instead, they are responsible for running the Debtors' day-to-day operations.  (Dempsey Decl. ¶ 14; Etlin Decl. ¶¶ 13, 25.)  These individuals do not report to the board of directors and each is subordinate to and required to report to an officer, or to another director-level employee who, in turn, reports to an officer.[4]  (Reply ¶¶ 10-11.)  For these same reasons, the Court also finds that the lower-level Discretionary Employees are not insiders under the Bankruptcy Code.

## B.  Section 503(c) Generally

Section 503(c) does not "foreclose a chapter 11 debtor from *reasonably* compensating employees, including 'insiders,' for their contribution to the debtors' reorganization."  *In re Dana Corp.*, 358 B.R. 567, 575 (Bankr. S.D.N.Y. 2007) (citation committed) ("*Dana II*").  A transfer to an insider to induce the insider to remain with the debtor's business must satisfy the requirements under subdivisions (A), (B), and (C) of section 503(c)(1) in order to be subject to this subdivision's exception.  4 COLLIER ON BANKRUPTCY ¶ 503.17 (15th ed. rev. 2007); *see also Dana II*, 358 B.R. at 575 (summarizing the requirements under 503(c)(1)).

---

[4]        In her objection, the UST expressed particular concern that the Debtors' Corporate Secretary may be an insider.  However, the UST and the Court are now satisfied that the Corporate Secretary is not an insider because the position is purely ministerial (*i.e.*, taking the minutes of board of directors' meetings and maintaining corporate records).  (Supp. Etlin Decl. ¶ 9.)

Attempts to characterize what are essentially prohibited retention programs as "incentive" programs in order to bypass the requirements of section 503(c)(1) are looked upon with disfavor, as the courts consider the circumstances under which particular proposals are made, along with the structure of the compensation packages, when determining whether the compensation programs are subject to section 503(c)(1). *See, e.g.*, *In re Dana Corp.*, 351 B.R. 96, 102 (Bankr. S.D.N.Y. 2006) ("*Dana I*") (stating that if a bonus proposal "walks like a duck (KERP), and quacks like a duck (KERP), it's a duck (KERP).").

Section 503(c)(3) also prohibits "other transfers or obligations that are outside the ordinary course of business and not justified by the facts and circumstances of the case, including transfers made to, or obligations incurred for the benefit of, officers, managers, or consultants hired after the date of the filing of the petition." 11 U.S.C. § 503(c)(3).

Section 503(c) was added to the Bankruptcy Code as one of the BAPCPA amendments in 2005, to "eradicate the notion that executives were entitled to bonuses simply for staying with the Company through the bankruptcy process." *In re Global Home Prods.*, *LLC*, 369 B.R. 778, 783-84 (Bankr. D. Del. 2007). The intent of section 503(c) is to "limit the scope of 'key employee retention plans' and other programs providing incentives to management of the debtor as a means of inducing management to remain employed by the debtor." 4 COLLIER ON BANKRUPTCY ¶ 503.17 (15th ed. rev. 2007). In addition to limiting payments to insiders for retention purposes, section 503 also limits severance payments to insiders and any transaction outside the ordinary course of business that would benefit "officers, managers, and consultants hired after the date of the filing of the petition." *Id.* The effect of section 503(c) was to put in place "a set of challenging standards" and "high hurdles" for debtors to overcome before retention bonuses could be paid. *Global Home*, 369 B.R. at 784-85. To the extent that either

section 503(c)(1) or (c)(2)[5] apply, the transfer cannot be justified solely on the debtor's business

judgment. *Dana I*, 351 B.R. at 100-01.

An alternative method for approving these transactions is as an "ordinary course"

transaction under section 363. *See In re Mesa Air Group*, No. 10-10018, 2010 WL 3810899, at

*3 (Bankr. S.D.N.Y. Sept. 24, 2010). However, in the Motion, the Debtors do *not* contend that

implementation of the KEIP or the KERP is an ordinary course transaction. Therefore, in order

for the Proposed Plans to pass muster, the Court must assess: (1) whether the KEIP is truly a

retention program and (2) whether the requirements of section 503(c)(3) have been satisfied with

respect to both the KEIP and the KERP.

### C.    The KEIP Is Incentivizing And Not Primarily Retentive

Section 503(c)(1) limits payments to insiders for the purpose of retention. 11 U.S.C. §

503(c)(1). Based on the Motion, it appears that some (if not all) of the Executives subject to the

KEIP are insiders. Therefore, if the Court concludes that the KEIP is essentially a retention plan,

then such payments must comply with section 503(c)(1).

Section 503(c)(1) "applies to those employee retention provisions that are essentially

'pay to stay' key employee retention programs." *Dana II*, 358 B.R. at 571. Although a

purported KEIP may contain some retentive effect, that "does not mean that the plan, overall, is

retentive rather than incentivizing in nature." *Id.*; *see also Global Home*, 369 B.R. at 785 ("The

---

[5]     Section 503(c)(2) prohibits severance payments made by a debtor to insiders, unless:

> (A) the payment is part of a program that is generally applicable to all full-time employees; and

> (B) the amount of the payment is not greater than 10 times the amount of the mean severance pay given to nonmanagement employees during the calendar year in which the payment is made

11 U.S.C. § 503(c)(2). Since neither the KEIP nor the KERP contemplate severance payments, this subsection is not applicable.

entire analysis changes if a bonus plan is not *primarily* motivated to retain personnel or is not in the nature of severance.") (emphasis added); *In re Nellson Nutraceutical, Inc.*, 369 B.R. 787, 802 (Bankr. D. Del. 2007) (reading section 503(c)(1) to mean "a transfer made to . . . an insider of the debtor for the *[primary]* purpose of inducing such person to remain with the debtor's business" because *any* payment made to an employee, including regular wages, has at least a partial retentive effect).

In *Dana II*, Judge Lifland held that "[b]y presenting an executive compensation package that properly incentivizes [management] to produce and increase the value of the estate, the Debtors have established that section 503(c)(1) does not apply." 358 B.R. at 584. However, prior to *Dana II*, Judge Lifland found that "without tying [a] portion of [a] bonus to anything other than staying with the company until the Effective Date, this Court cannot categorize a bonus of this . . . form as an incentive bonus." *Dana I*, 351 B.R. at 102. In *Mesa Air Group*, this Court held that the debtors' incentive bonus program was not a retention bonus because it was designed to "motivate the employees to achieve performance goals." *Mesa Air Group*, 2010 WL 3810899, at *4 (citation omitted). In that case, incentive bonuses were tied to certain performance goals, such as maintenance of flight schedules, efficient return of aircraft, securing aircraft equipment at reduced rates and negotiating reduced rates for aircraft no longer in service. *Id.*

The Court finds that the Debtors have met their burden of establishing that the KEIP is incentivizing, thereby alleviating the need for a section 503(c)(1) analysis. With the addition of the Incentives, the Debtors have tied the KEIP bonus trigger to the achievement of particular financial milestones along with the accomplishment of a Qualifying Transaction. Unlike the Initial KEIP and the First Revised KEIP that permitted the Executives to receive an incentive

15

bonus that was merely predicated on exiting bankruptcy in a timely manner without regard to the financial state of the business, the KEIP approved by the Court requires the Debtors to achieve annualized rent reductions or non-headcount annualized cost reductions, and if the Debtors exit bankruptcy via a reorganization plan, the Debtors' business must include substantially all of its current remaining stores. The Senior Management Participants will also receive an additional bonus based on the size of the distribution made to general unsecured creditors. Accordingly, the Court is satisfied that through the use of the Incentives, the KEIP conforms to prevailing practices in this district and others. *See In re BearingPoint, Inc.*, Case No. 09-10691 (REG) (Bankr. S.D.N.Y. July 24, 2009) [Docket No. 1128] (incentives based on (i) the sale of business units, (ii) employees working on estate transition and wind-down activities and (iii) percentage of creditor recoveries); *In re Calpine Corp.*, Case No. 05-60200 (BRL) (Bankr. S.D.N.Y. May 15, 2006) [Docket No. 1580] (size of incentive pool tied to the debtor's market adjusted enterprise value and plan adjusted enterprise value); *In re Nortel Networks, Inc.*, Case No. 09-10138 (KG) (Bankr. D. Del. Mar. 5 and 20, 2009) [Docket Nos. 436 and 511] (incentive plan based on the achievement of separate milestones, including a cost reduction plan, "certain parameters . . . that will result in a leaner and more focused organization" and plan confirmation).

The KEIP also encourages the Executives to increase their pre-bankruptcy job responsibilities to achieve the bonus requirements. Under the KEIP, the Executives are required to *do more* to meet the wide-scale goals outlined in the KEIP as they must address concerns and issues that are unique to the bankruptcy proceeding. Specifically, the Management Participants will need to work expeditiously to meet the targets outlined in the KEIP. To achieve these goals, the Management Participants will need to be involved in the negotiation and documentation of

substantial rent concessions on approximately 400 leases, the cancellation of some 700 high cost contracts and achievement of greater operational efficiencies and working capital.  (Supp. Etlin Decl. *¶¶* 5-6.)  These tasks were not part of the Management Participants' job descriptions pre-bankruptcy.  (*Id.* ¶ 6.)  The Senior Management Participants will need to formulate and execute a new business strategy and forge new strategic relationships to reposition the business during the pendency of the Debtors' case.   (*Id.* ¶ 7.)  Like the Management Participants, none of these tasks were part of the Senior Management Participants' prepetition job responsibilities.  (*Id.*)

On this point, Ms. Etlin contends that, based on her experience, achieving a Qualifying Transaction under the timeline set out in the KEIP will be challenging and "require enormous commitments by management."  (Etlin Decl. ¶ 17.)  Ms. Etlin also asserts that "[a]chievement of the incentives contemplated by the KEIP is far from certain in light of the facts and circumstances of these cases, and will require very diligent efforts on the part of each and every [Executive]."  (Supp. Etlin Decl. ¶¶ 6, 7.)  Since the ultimate fate of many recent retailer debtors has been liquidation, meeting these goals will no doubt be challenging and therefore incentivizing.  *See Dana II*, 358 B.R. at 583 (noting that the financial benchmarks set for debtor's incentive plan are difficult targets to achieve and are therefore incentivizing); Webster's Ninth New Collegiate Dictionary 608 (9th ed. 1984) (defining "incentive" to mean "something that incites or has a tendency to incite to determination or action").

As further evidence that the KEIP is primarily incentivizing, the size of the KEIP award is dependent on *how quickly* the Debtors emerge from bankruptcy.  As the time spent in chapter 11 increases, KEIP bonus opportunities decrease.  Thus, in addition to meeting the Incentives, payments are also keyed to meeting fairly aggressive time-based goals.

The KEIP's goals are also consistent with the policies underlying chapter 11. While an expeditious emergence from bankruptcy via a confirmed reorganization plan is the ultimate objective of most chapter 11 debtors, a section 363 going concern sale also achieves the chapter 11 goal of preserving businesses. *See Bank of Am. Nat'l Trust & Sav. Ass'n. v. 203 N. LaSalle St. P'ship*, 506 U.S. 434, 453 (1999) (noting that the two basic purposes of chapter 11 are to preserve going concerns and maximize property available to satisfy the claims of creditors). Meeting these benchmarks is also beneficial to the estate because an expedited emergence will minimize administrative costs, thereby helping to maximize stakeholder value.

### D.   The Debtors Have Exercised Sound Business Judgment

The Debtors move for relief based on section 363(b)(1). Section 363(b)(1) of the Bankruptcy Code provides that debtors "may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). In approving a transaction conducted pursuant to section 363(b)(1), courts consider whether the debtor exercised sound business judgment. *See In re Chateaugay Corp.*, 973 F.2d 141, 144-45 (2d Cir. 1992) (finding that section 363(b) was applicable because sound business judgment supported the sale of assets); *Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1072 (2d Cir. 1983) (holding that the application of section 363(b) must be supported by "some articulated business justification, other than appeasement of major creditors" and that "a judge determining a § 363(b) application [must] expressly find from the evidence presented before him at the hearing a good business reason to grant such an application"); *In re Global Crossing Ltd.*, 295 B.R. 726, 743 (Bankr. S.D.N.Y. 2003) (citing *Lionel Corp*, 722 F.3d at 1071) (emphasizing the business judgment standard).

18

Although the Court is satisfied that the KERP Employees are *not* insiders under section 101(31), the KERP must still be analyzed under section 503(c)(3) because it is not an ordinary course transaction. *See Nellson Nutraceutical*, 369 B.R. at 803-04. Likewise, since the KEIP is not an ordinary course transaction and relates to compensation, it must also meet section 503(c)(3)'s standards.

Section 503(c)(3) limits payments made to the Debtors' employees outside of the ordinary course unless such payments are justified by "the facts and circumstances of the case." 11 U.S.C. § 503(c)(3). Courts have held that the "facts and circumstances" language of section 503(c)(3) creates a standard no different than the business judgment standard under section 363(b). *See Dana II*, 358 B.R. at 576; *Global Home Products*, 369 B.R. at 783 ("If [the proposed plans are] intended to incentivize management, the analysis utilizes the more liberal business judgment review under § 363."); *Mesa Air Group*, 2010 WL 3810899 at * 4; *In re Nobex Corp.*, No. 05-20050, 2006 WL 4063024, at *2 (Bankr. D. Del. Jan. 19, 2006). In *Dana II*, Judge Lifland listed several factors that courts consider when determining if the structure of a compensation proposal and the process for its development meet the business judgment test:

- Is there a reasonable relationship between the plan proposed and the results to be obtained, i.e., will the key employee stay for as long as it takes for the debtor to reorganize or market its assets, or, in the case of a performance incentive, *is the plan calculated to achieve the desired performance?*

- Is the cost of the plan reasonable in the context of the debtor's assets, liabilities and earning potential?

- Is the scope of the plan fair and reasonable; does it apply to all employees; does it discriminate unfairly?

- Is the plan or proposal consistent with industry standards?

- What were the due diligence efforts of the debtor in investigating the need for a plan; analyzing which key employees need to be incentivized; what is available; what is generally applicable in a particular industry?;

- Did the debtor receive independent counsel in performing due diligence and in creating and authorizing the incentive compensation?

358 B.R. at 576-77 (emphasis in original). *See also Global Home Prods.*, 369 B.R. at 786 (evaluating an incentive plan under the business judgment standard of section 363 by applying the factors listed above); *but see In re Pilgrim's Pride Corp.*, 401 B.R. 229, 236-37 (Bankr. N.D. Tex. 2009) (standard for approval under section 503(c)(3) is higher than the business judgment test; if payments to employees outside the ordinary course were only subject to the business judgment test, then the language of section 503(c)(3) would ostensibly be rendered meaningless).

Since the legal standard under section 363(b) is no different than section 503(c)(3), the following analysis is equally applicable to both statutory provisions. Applying the *Dana II* factors, the Court finds that the Debtors have exercised sound business judgment.

### 1. Relationship Between the Plans Proposed and the Results Obtained

A reasonable relationship exists between the plans proposed and the results to be obtained. In this case, the KEIP is keyed to the achievement of the Incentives, distributions to unsecured creditors and either a section 363 going concern sale or the filing of a reorganization plan in short order. These challenging objectives, if met, will help minimize expenses, maximize estate value and justify the bonuses awarded. *See Dana II*, 358 B.R. at 583. The use of financial metrics also makes it easier for the Court and parties-in-interest to ascertain the relationship between compensation paid and incentivized performance. Therefore, the Court finds that the KEIP is narrowly tailored and predicated on the achievement of reasonable business and bankruptcy goals.

The KERP is also appropriately constructed to retain non-insiders that the Debtors believe are critical to continued operations. Given the circumstances of these cases, it would be very difficult for the Debtors to recruit and train individuals in a timely manner with a minimal

disruption of business operations.  (Etlin Decl. ¶ 13.)  The necessity for retaining and

incentivizing important employees is especially pressing given the recent and numerically

significant exodus of corporate employees.  At the April 14th hearing, Debtors' counsel indicated

that the continuous departure of key employees has forced the Debtors to fill vacancies with

personnel from Alix Partners (the Debtors' restructuring advisors) at costly rates.  Hr'g Tr. 25,

Apr. 14, 2011.

      The Court is also mindful that the wellbeing of all of the Debtors' employees is

predicated on the success of the Debtors during the pendency of these cases.  The Debtors

currently employ approximately eleven-thousand (11,000) full-time or part-time employees.

Those jobs depend on the Debtors stabilizing their business and exiting chapter 11 as a going

concern, an objective that will be much more difficult to achieve without an experienced and

committed workforce.  The Court believes that the Proposed Plans contain targets that, if met,

will best preserve the Debtors' business as a going concern.

### 2. The Proposed Plans Are Reasonable

      The Proposed Plans are also reasonable in light of the Debtors' financial situation.  The

maximum total cost of the KEIP and the KERP is approximately $3.9 million,[6] representing only

0.17% of the Debtors' revenue for 2010[7] and 0.26% of the Debtors' projected revenue in its year

of emergence from bankruptcy.[8]  When compared to similar programs identified by Mercer, this

percentage falls far below the average of 0.39%.  (Dempsey Decl. ¶ 15.)  Without the KEIP in

place, Executives will be compensated at only 38% of the market median.  (*Id.* ¶ 26.)

---

[6]      This amount represents the aggregate of the maximum KEIP and KERP payouts.  It does not, however, include any additional payments made to the Senior Management Participants on account of distributions to general unsecured creditors.  This figure will be subsequently used to compare the Proposed Plans to industry standards.

[7]      The Debtors' revenue for 2010 was approximately $2.3 billion.  (Supp. Dempsey Decl. Ex. 1, at p. 12.)

[8]      The Supplemental Dempsey Declaration projects that the Debtors' revenue will be approximately $1.5 billion in the year it emerges from chapter 11.  (*Id.*)

Furthermore, a determination of reasonableness of the Proposed Plans includes more than just the Debtors' 2010 revenue stream. *See Dana II*, 358 B.R. at 571 (noting that "courts take a *holistic* view" of measuring the propriety of compensation packages) (emphasis added). In this case, the Proposed Plans were vetted by the Committee and the UST. The current version of the KEIP is the second revision to the incentive plan and was the product of extensive negotiations between the parties. Other than the UST, no other party opposed the Motion and the UST is now satisfied with the structure of the Proposed Plans.

### 3.  The Proposed Plans Do Not Discriminate Unfairly

The Debtors have also shown that the Proposed Plans do not discriminate unfairly. In *In re EaglePicher Holdings, Inc.*, No. 05-12601, 2005 WL 4030132, at *4 (Bankr. S.D. Ohio Aug. 25, 2005), the court found that the debtors' proposed retention plan did not unfairly discriminate against its employees. There, the plan only covered a "small minority of employees," however, it was broad enough so that it did not include only senior management. *Id.* A union objected to the retention plan, in part, because it did not include union members working at one of the debtors' plants. *Id.* The court overruled the union's objection and held that the retention plan was permissible. *Id.* The court observed that a small group of employees could benefit from the retention plan—to the exclusion of others—because not every employee is "similarly situated in terms of their employment to the reorganization process." *Id.* (citation and internal quotations omitted).

In this case, the record is clear that all fifteen Executives have been identified by the Debtors as having the most control over the Debtors, and therefore, influence over the reorganization process. (Motion ¶ 54; Reply ¶ 19.) Since the Executives are the ones that will effectively guide the Debtors through bankruptcy, it is reasonable that they should receive

additional compensation if they are ultimately successful.  With respect to the KERP, the Motion

and the Etlin Declaration explain that the KERP Employees all perform a variety of critical

functions that are of paramount importance to the Debtors' reorganization effort.  (Motion ¶ 15;

Etlin Decl. ¶ 20.)  In sum, the Debtors have, in their discretion, carefully selected a leadership

team that will manage the Debtors and their ongoing business during the pendency of the

restructuring process.

### 4. The Proposed Plans Comport with Industry Standards

The Proposed Plans comport with industry standards.  During the formulation of the

Proposed Plans, Mercer found that the KERP is less costly than several other non-insider

retention bonus plans approved by bankruptcy courts beginning in 2009.  (Dempsey Decl. ¶ 22.)

Mercer also surveyed twenty (20) comparator companies that filed for bankruptcy after January

1, 2009 and found that the median maximum KEIP costs as a percentage of annual revenue in the

year of emergence from bankruptcy was 0.47%.  (Supp. Dempsey Decl. Ex. 1, at p. 12.)

Assuming Debtors' projected revenue in the year of emergence will be $1.5 billion, the

maximum cost of the KEIP will be 0.18% of revenue (or 0.26% when including the cost of the

KERP).  The comparator companies identified by Mercer spanned many different industrial

sectors, had revenue sizes that ranged from $350 million to $50 billion and had total asset sizes

that ranged from $500 million to $30 billion.[9]

The Court is also satisfied that the Proposed Plans are structured in a manner that is

consistent with other incentive and retention plans implemented by other corporate chapter 11

debtors.  For the reasons previously explained, the Court finds that the negotiated revisions to the

---

[9]        According to the Supplemental Dempsey Declaration, the Debtors' assets are currently valued at
approximately $1.45 billion.  (*Id.*)

KEIP have made the plan truly incentivizing.  Moreover, the KERP is necessary given attrition in the ranks, reasonable in amount and scope and only applies to non-insiders.

### 5. The Debtors Have Exercised Proper Diligence

The Debtors have exercised proper due diligence when formulating the Proposed Plans. In *In re Brooklyn Hosp. Center*, 341 B.R. 405, 412 (Bankr. E.D.N.Y. 2006), the court found that due care was exhibited by the debtor in the formulation of a KERP because, among other things, "[t]he board consulted with its counsel and financial advisors, formulated several proposals, reduced the amount to be paid pursuant to the KERP, and after negotiations with the Committee, broadened the scope of employees. *See also In re Allied Holdings, Inc.*, 337 B.R. 716, 723 (Bankr. N.D. Ga. 2005) (KERP formulated by considering a number of different factors, including the opinions of supervisors, the risk that the employee will resign and overall historical low pay and benefits).

In this case, the Debtors, at the suggestion of the Compensation Committee, engaged and retained Mercer to provide independent compensation advice.  Mercer has a reputation for formulating compensation plans for employees of distressed companies.  Mr. Dempsey has personally worked with bankrupt companies on numerous occasions.  The report annexed as Exhibit 1 to the Dempsey Supplemental Declaration evidences that the Proposed Plans were the product of diligent effort and investigation.  The Debtors and their professional advisors reviewed plans implemented by comparable companies and executive compensation data before choosing the Proposed Plans.  (Motion ¶ 56.)  Furthermore, the KEIP was revised twice to incorporate the comments of both the Committee and the UST.

### 6. The Debtors Have Received Sufficient Counsel

Lastly, while the Debtors have not shown that they received independent *legal* counsel during the formulation process of the Proposed Plans, that deficiency is not fatal. In *Global Home Prods.*, 369 B.R. at 786, the court approved a compensation program although independent counsel was not retained. The court did not find the absence of independent counsel to be an impediment because the compensation plans were nearly identical to plans previously adopted by the debtor's compensation committee and were considered to be formulated and implemented in the ordinary course of the debtor's business. *Id.* The *Global Home Prods.* court noted that the plans "satisfied the independent 'test of time.'" *Id.*

Here, while the Proposed Plans are not ordinary course transactions, the KERP payments are commensurate with the Debtors' pre-bankruptcy Annual Performance Bonus Plan payments. (Motion ¶ 17.) The Debtors have also received independent compensation advice from Mercer and have sought the input of Alix Partners. (Reply ¶ 23.) Additionally, since Debtors' counsel significantly participated in negotiating changes to the KEIP, the Court is satisfied that Debtors' interests were sufficiently protected.

### III.    CONCLUSION

For the reasons explained above, the Court finds that the Proposed Plans are the product

of the Debtors' proper exercise of business judgment.  The KEIP is reasonably intended to

incentivize management to achieve specific financial and bankruptcy goals in a stated timeframe.

Furthermore, given the departure of important personnel, the KERP is necessary to retain non-

insiders during the pendency of the Debtors' chapter 11 cases.

DATED: April 27, 2011
New York, New York

                                        **/s/Martin Glenn**
                                        MARTIN GLENN
                                United States Bankruptcy Judge