David M. Friedman (DFriedman@kasowitz.com)
Andrew K. Glenn (AGlenn@kasowitz.com)
Jeffrey R. Gleit (JGleit@kasowitz.com)
KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
1633 Broadway
New York, New York 10019
Telephone: (212) 506-1700
Facsimile: (212) 506-1800

*Attorneys for Debtors
and Debtor in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re<br><br>**BORDERS GROUP, INC.,** *et al.*,[1]<br><br>                           Debtors. | Chapter 11<br><br>Case No. 11-10614 (MG)<br><br>(Jointly Administered) |

**REPLY IN SUPPORT OF DEBTORS' MOTION FOR ORDER PURSUANT TO
11 U.S.C. § 1121(d) EXTENDING THEIR EXCLUSIVE PERIODS FOR FILING
AND SOLICITING ACCEPTANCES OF A CHAPTER 11 PLAN**

TO THE HONORABLE MARTIN GLENN,
UNITED STATES BANKRUPTCY JUDGE:

      Borders Group, Inc. and its affiliated debtors, as debtors and debtors in possession (collectively, the "Debtors"), by their undersigned counsel, respectfully submit this reply in response to the *Objection of the Official Committee of Unsecured Creditors to Debtors' Motion for Order Pursuant to 11 U.S.C. § 1121(d) Extending Their Exclusive Periods for Filing and Soliciting Acceptances of a Chapter 11 Plan* (the "Objection") [Docket No. 920] and in further support of the Debtors' motion (the "Motion") [Docket No. 864], pursuant to section 1121(d) of

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Borders Group, Inc. (4588); Borders International Services, Inc. (5075); Borders, Inc. (4285); Borders Direct, LLC (0084); Borders Properties, Inc. (7978); Borders Online, Inc. (8425); Borders Online, LLC (8996); and BGP (UK) Limited.

chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") for entry of an order extending the Debtors' exclusive periods within which to file and solicit acceptances of a chapter 11 plan (the "Exclusive Periods"). In support of their request for an extension of the Exclusive Periods, the Debtors respectfully represent as follows:

## PRELIMINARY STATEMENT[2]

The Debtors filed their chapter 11 petitions only three and a half months ago. Since the Commencement Date, the Debtors and their professionals have worked tirelessly to renegotiate leases and executory contracts, obtain section 365(d)(4) extensions at over 300 locations, obtain credit from their vendors, maintain employee morale and prepare and execute a transformative business plan. Most importantly -- *at the request of the Committee* -- the Debtors have pursued a dual-track process of a potential sale of all of the Debtors' assets and a stand-alone plan of reorganization.

Nonetheless, the Committee has now taken the extraordinary action of objecting to the Debtors' first request for an extension of the Exclusive Periods. The Committee claims that it should receive a special exclusion from any exclusivity extension or, if it does not receive the exclusion, exclusivity should be terminated. Notably, the Committee does not have its own plan proposal; nor does it claim to have done any preliminary work formulating its own plan. Instead, the Committee seeks to terminate exclusivity so that, at some indeterminate point, it can formulate and file its own plan, with or without the Debtors' support.

If the Committee has a plan that it wishes to pursue that maximizes value, the Debtors welcome the opportunity to review and negotiate it. Until then, however, the Court should

---

[2] All capitalized terms used but not defined herein shall have the meanings ascribed to them in the Motion.

continue exclusivity to maintain the Debtors' proper role as the gatekeeper in these cases. Indeed, the Debtors have vigorously pursued value-maximizing alternatives at the request and in conjunction with the Committee and its advisors. The sale process that the Committee demanded is now at its most sensitive stage. Terminating exclusivity will send the wrong message to buyers and create confusion in the process without any benefit to the estates.

The Court should grant an extension of exclusivity to enable the Debtors to complete the dual-track process for the benefit of all constituents.

## ARGUMENT

**A.     The Debtors' Cases Are Large and Complex.**

1.     The Debtors filed their Chapter 11 petitions on February 16, 2011 (the "Commencement Date"). These cases are just a few months old and this is the Debtors' first request for an extension of their Exclusive Periods. The Bankruptcy Code contemplates extensions of the Exclusive Filing Period and Solicitation Period of eighteen and twenty months from the Commencement Date for cause, respectively.

2.     One of the most common grounds justifying an extension of a debtor's exclusive periods is the size and complexity of the debtor's chapter 11 case. *See*, *e.g.*, *Express One Int'l*, 194 B.R. at 100; *In re Texaco, Inc.*, 76 B.R. 322, 326 (Bankr. S.D.N.Y. 1987) (sheer size of case constituted "cause" to extend exclusivity); *In re Manville Forest Prods. Corp.*, 31 B.R. 991, 995 (S.D.N.Y. 1983) ("[T]he sheer mass, weight, volume and complications of the Manville filings undoubtedly justify a shakedown period"). Indeed, Congress expressly recognized that courts would need to extend the exclusive periods if a debtor's case is unusually large or complex. *See* H.R. Rep. No. 95-595, at 231, 232, 406 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6191, 6362 ("[I]f an unusually large company were to seek reorganization under Chapter 11, the Court

3

would probably need to extend the time in order to allow the debtor to reach an agreement"). The Debtors' cases are undoubtedly large and complex, by any standard, and the Committee's assertions to the contrary are meritless.

3. The Committee claims that these cases are not complex and states pejoratively that the Debtors have retained "a veritable army" of professionals. Objection ¶ 21. The volume of the Debtors' professional retentions is consistent with that in many large chapter 11 cases; moreover, many of the retentions have been critical to fill the void caused by employee losses in human resources, accounting and other departments.

4. Further, with respect to the GOB sales, in the Objection the Committee incorrectly states that the sales were not complex because they were "exclusively handled by the retained professional liquidators pursuant to the Agency Agreement requiring no additional time and effort of anyone else on the Debtors' management team." Objection ¶ 21. While it is true the liquidators handled the actual store closing sales, all tax, employee and real estate issues at these locations continued to be dealt with by the Debtors and their management.

5. The Committee consistently has recognized that the Debtors need to rationalize their operational footprint and reduce their substantial rent obligations as a predicate to any going concern sale or reorganization. Since the Commencement Date, the Debtors have negotiated stipulations extending the Debtors' time to assume or reject leases and modifying the terms of the Debtors' current leases. As of May 27, 2011, the Debtors filed 241 stipulations extending the time for Debtors to assume or reject leases in connection with approximately 314 of the Debtors' stores beyond the September 14, 2011 deadline. The Debtors also have negotiated and entered into approximately 100 lease modification agreements, which will result in significant savings

for the Debtors in the coming years. The Debtors and DJM Realty Services, LLC ("DJM") continue to aggressively pursue cost-saving lease modifications with the remaining landlords.

6. Yet now the Committee blithely ignores this massive undertaking and the success of this process, dismissively stating that "although still large, the overall size of the Debtors' chain has decreased dramatically from 642 stores on the Petition Date to 405 stores on the date the Motion was filed." Objection ¶ 21. This reduction did not occur by happenstance, but as part of a carefully orchestrated process and as a result of the significant time and resources that the Debtors' internal real estate team, DJM and Debtors' counsel have devoted to addressing real estate issues in these cases and maximizing the Debtors' retail footprint. Not surprisingly, the Committee has hired a team of BDO's real estate restructuring advisors to monitor the Debtors' efforts. The Debtors' professionals have conducted multiple conference calls with the Committee's professionals every week over the past two months to ensure the free flow of information and a coordinated strategy. Obviously this process is nuanced, complex and requires significant estate resources.

7. The Committee's allegations that these cases are neither large nor complex are clearly wrong. The operational restructuring undertaken by the Debtors during the first months of these cases and the dual-track pursuit of a going concern plan and sale have been exceedingly complex and crucial to any restructuring of the Debtors' business.

8. The complexity of these cases alone justifies the extension of the Exclusive Periods.

**B. The Debtors Need Additional Time to Formulate And Effectuate A Successful Restructuring And To Address Unresolved Contingencies.**

9. There is no reason to terminate exclusivity, and the Committee identifies none. While the Debtors have made great progress, many unresolved contingencies remain and there is still much to be done before *any* party can possibly file a viable and fully informed plan. The outcome of the Debtors' ongoing sale process will have a significant impact on the restructuring options in these cases. Further, the June 1, 2011 bar date has not yet passed.

10. Notably, the Committee has not made any progress towards proposing its own plan. This is a crucial difference from the unique facts in *In re Young Broadcasting, Inc., et al.*, Case No. 09-10645 (AJG) (Bankr. S.D.N.Y.), the case cited by the Committee in opposition to exclusivity. The *Young Broadcasting* creditors committee apparently had already drafted and solicited support for its own plan, which was originally drafted in concert with the debtors, and which the debtors admitted was a "viable alternative" to their proposed sale. *In re Young Broadcasting, Inc., et al.*, Case No. 09-10645 (AJG) (Bankr. S.D.N.Y. August 7, 2009) [Docket No. 546] (the "Young Broadcasting Objection") ¶¶ 3, 13-16, 25. The *Young Broadcasting* committee was not -- as the Committee is here -- prematurely requesting a termination of exclusivity so that at some point in the future, the committee could formulate, draft and file a plan of its own without then moving to terminate exclusivity. Also, in *Young Broadcasting*, the debtors' cases were significantly smaller and less complex than the Debtors' cases -- the *Young Broadcasting* debtors owned ten broadcast stations, had a simple capital structure and relatively few classes of creditors. Id. ¶ 24. The debtors in *Young Broadcasting*, also unlike the Debtors here, had six months during which to engage in a sale process and draft a plan, and the committee's objection was to the debtors' *second* request to extend their exclusive periods. Finally, while the committee was ultimately carved out of the exclusivity order in *Young*

6

*Broadcasting*, the exclusion of the committee from continued exclusivity *was a consensual resolution between the debtors and the committee*, and this resolution was reached based on facts that even the Committee admits are different from those relevant here. Objection ¶ 11.[3]

11. The Committee has conspicuously failed to cite a single initiative that the Debtors have failed to pursue to maximize value. Nor can the Committee reasonably contend that the Debtors should have filed a plan of reorganization before the Debtors filed their Motion. Viewed in this light, the Committee's opposition to continuing exclusivity stems from unfounded and irrational concerns about the process. If the Committee wants the Debtors to pursue a particular plan proposal, the Debtors would gladly review, and even endorse such a plan if appropriate. But the Committee has not yet proposed a plan to the Debtors, nor has it promised to do so within any definitive timeframe.

12. The Committee's complaints about the Debtors' refusal to share draft plans of reorganization with the Committee at this time are meaningless. The Debtors have prepared skeletons of plans of reorganization depending on the outcome of the sale process. The Debtors have solicited Committee feedback at every critical juncture of these cases. Once the Debtors have made further progress in formulating their plan and the sale process has run its course, the Debtors intend to provide the Committee with a copy of their plan, and welcome the Committee's feedback and support.

**C.** **"Dislike" Of A Debtor's Plan Proposals Is Not A Basis To Terminate Exclusivity.**

13. Even if the Committee is unhappy with the Debtors' proposed business plan or any of the Debtors' other proposals in these cases, dislike of a debtor's proposals, with or

---

[3] A copy of the Young Broadcasting Objection is attached hereto as <u>Exhibit A</u>.

without a formal plan on file, is not one of the enumerated factors analyzed when considering an extension of a debtor's exclusive periods. *In re Adelphia Commc'ns. Corp.*, 352 B.R. 578, 587 (Bankr. S.D.N.Y. 2006) ("displeasure with a plan on file is not one of the enumerated factors, and is not a basis for terminating exclusivity. Nor, without more, is creditor constituency unhappiness with a debtor's plan proposals, with or without a formal plan on file"). The Committee fails to articulate any valid reason for why the Debtors' requested extension of their Exclusive Periods should be denied or why, if granted such an extension, exclusivity should be terminated with respect to the Committee. Their purported concerns are that granting the Debtors an additional four months of exclusivity will:

> (i) create opportunities for the Debtors to pursue strategies inconsistent with their current mandate and working agreement with the Committee to go forward with a sales process; (ii) handcuff the Committee; and (iii) ultimately prove harmful and expensive to the estates if the Debtors were to file a plan of reorganization without Committee approval.

Objection ¶ 13.

14. These concerns are gratuitous and wholly unfounded. The Debtors have no intention of abandoning the sale process. To the contrary, the Debtors plan to aggressively pursue the current bidders and to seek other potential bidders until a sale is finalized. The Debtors also have no intention of filing a plan without creditor support -- they are simply requesting more time to continue negotiations with landlords and vendors and progress with currently unresolved contingencies described herein and in the Motion so that when they do propose a plan, it will be one that is fully informed and maximizes recoveries to *all* creditor constituencies.

15. In the Objection, the Committee repeatedly points to the Debtors' reported losses as a reason for terminating exclusivity. *See* Objection ¶¶ 1, 24-25. The Debtors' reported losses

8

are not a valid reason to terminate the Exclusive Periods. For example, in *In re Amko Plastics*, 197 B.R. 74, 77 (Bankr. S.D. Ohio 1996), the creditors committee objected to the debtor's first request to extend its exclusivity because of purported losses. The committee failed to offer a plan of its own in connection with its objection, and did not state in its objection or at the hearing what specific initiatives it would undertake if exclusivity were terminated. *Id.* at 77-78 ("[t]he UCC has not offered a plan in connection with its opposition to the present motion, nor shared with the court what initiatives it would undertake if exclusivity were terminated. It would seem that the only other course than the one being pursued by the debtor would be liquidation"). The debtor had engaged a restructuring expert and was working with the expert to initiate and implement substantial and significant turn-around efforts which were in progress at the time of the debtor's first request for an extension of exclusivity. *Id*. at 76. In granting the extension, the court found that the operational restructuring of the debtor's business at the time had not been completed, so the Court and parties in interest could not determine its success. *Id.* The Court stated that:

> [i]t is clear that it is too early to make a judgment about what the outcome of the turn-around efforts will be, and from this it follows that the debtor presently simply is in no position to propose a plan to its creditors, and will not be in a position to do so until the results of the turn-around manifest themselves.

*Id*. at 77.

16. Similar to the *Amko Plastics* committee, the Committee derides the Debtors' reorganization progress to date and points to the losses reflected in the Debtors' first two monthly operating reports. Objection ¶¶ 1, 24-25. This is largely irrelevant. The Debtors, like most retailers, historically suffer losses in each of the nine months leading up to the holiday season. It is not atypical in a large retail debtor case for a debtor to report seemingly high losses during the first few months of the case. Further, the April operating report reflects significant

*one-time* costs, such as those associated with the closure of the GOB locations and the rejection of the associated leases. While the Debtors have retained AP Services, LLC and embarked on many cost-saving initiatives, it takes several months for cost reductions to have an impact, and the chapter 11 filing itself is always disruptive. The first two operating reports do not reflect the impact of the Debtors' substantial cost reductions, which began positively affecting losses in May. The Debtors believe that the positive impact of their restructuring efforts to date will manifest during the requested extension period. Importantly, the Debtors have been paying all administrative obligations as they become due, over $85 million is still available on their DIP financing facility, and the Debtors consistently have performed at or above their DIP financing budget.

17. The Debtors losses are not unusual, nor were they unexpected by either the Debtors or the Committee. Accordingly, they should not be used to deny continuing exclusivity.

### D. **Terminating Exclusivity for any Party Would be Disruptive.**

18. While all *Adelphia* factors weigh heavily in the Debtors' favor, "[i]t has been held that the primary consideration for the court in determining whether to terminate the debtor's exclusivity is whether its termination will move the case forward." *In re Adelphia Commc'ns. Corp.*, 352 B.R. 578 at 590 (holding that termination of exclusivity a few weeks before the Debtors might be in a position to confirm a plan would be at odds with moving the case forward and could be "disastrous"). Here, termination with respect to any party will not move the cases forward -- in fact, termination will chill the progress made thus far, and be highly disruptive to the ongoing sale process.

19. The Committee mischaracterizes the carve-out as a "middle ground" proposal. Objection ¶ 4. Terminating exclusivity for one party introduces the same level of uncertainty

10

into these cases as would terminating exclusivity altogether -- the point of the Exclusive Periods is to maintain a debtor's *exclusive* right to file a plan. In *In re Friedman's, Inc.*, 336 B.R. 884 (Bankr. S.D. Ga. 2005), the United States Trustee was in the process of determining whether to appoint an equity committee when the debtor moved to extend exclusivity. Because that committee would be appointed in the future, the United States Trustee objected and, much like the Committee is doing here, sought a limitation in the exclusivity order to enable the equity security holders' committee, if appointed, to seek to shorten the exclusive periods. *Id*. The court denied the request; it held that such a limitation "would interject the very uncertainty back into the process" that exclusivity was designed to avoid. *Id*. at 890. Here, terminating exclusivity or terminating exclusivity solely with respect to the Committee will not only fail to move these cases forward, but will interject uncertainty into these cases that will only serve to hinder the Debtors' progress in their reorganization efforts and potentially disturb the sale process and scare away current interested bidders and future potential bidders.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

## **CONCLUSION**

WHEREFORE the Debtors respectfully request that the Court overrule the Objection and grant the relief requested in the Motion and such other and further relief as it deems just and proper.

Dated: May 31, 2011
      New York, New York

      KASOWITZ, BENSON, TORRES
       & FRIEDMAN LLP

      By: /s/ Andrew K. Glenn
      David M. Friedman (DFriedman@kasowitz.com)
      Andrew K. Glenn (AGlenn@kasowitz.com)
      Jeffrey R. Gleit (JGleit@kasowitz.com)
      1633 Broadway
      New York, New York 10019
      Telephone: (212) 506-1700
      Facsimile: (212) 506-1800

      *Attorneys for Debtors*
      *and Debtors in Possession*