David M. Friedman (DFriedman@kasowitz.com)
Andrew K. Glenn (AGlenn@kasowitz.com)
Jeffrey R. Gleit (JGleit@kasowitz.com)
KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
1633 Broadway
New York, New York 10019
Telephone:  (212) 506-1700
Facsimile:  (212) 506-1800

*Attorneys for Debtors*
*and Debtor in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **In re** | **Chapter 11** |
| **BORDERS GROUP, INC.,** *et al.*,[1] | **Case No. 11-10614 (MG)** |
| Debtors. | **(Jointly Administered)** |
| | **Related Docket Nos.: 868, 919, 923** |

**REPLY TO OBJECTIONS TO DEBTORS' MOTION PURSUANT TO
11 U.S.C. § 365(a) AND RULES 6006 AND 9014 OF THE FEDERAL
RULES OF BANKRUPTCY PROCEDURE TO REJECT MASTER
LICENSING AGREEMENT WITH SEATTLE'S BEST COFFEE, LLC**

TO THE HONORABLE MARTIN GLENN,
UNITED STATES BANKRUPTCY JUDGE:

Borders Group, Inc. and its affiliated debtors, as debtors and debtors in possession (collectively, the "Debtors"), respectfully submit this reply (the "Reply") to (i) the objection of Seattle's Best Coffee, LLC ("SBC") [Docket No. 923] (the "Objection") and (ii) the limited objection of Bunn-O-Matic Corporation ("Bunn-O-Matic") [Docket No. 919] (the "Limited Objection"), to the *Debtors' Motion Pursuant to 11 U.S.C. § 365(a) and Rules 6006 and 9014 of*

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are:  Borders Group, Inc. (4588); Borders International Services, Inc. (5075); Borders, Inc. (4285); Borders Direct, LLC (0084); Borders Properties, Inc. (7978); Borders Online, Inc. (8425); Borders Online, LLC (8996); and BGP (UK) Limited.

*the Federal Rules of Bankruptcy Procedure to Reject Master Licensing Agreement With Seattle's Best Coffee, LLC* [Docket No. 868] (the "Motion"),[2] and respectfully represent as follows:

## PRELIMINARY STATEMENT

1. SBC does not contest that the Debtors' decision to reject the Licensing Agreement should be approved as a valid exercise of the Debtors' business judgment. Instead, SBC argues that the Debtors should pay royalties and other amounts through the date that the Debtors complete the de-branding process. In the Motion, the Debtors had proposed that they complete the de-branding process within forty-five (45) days from the effective date of the rejection.

2. To address SBC's concerns, the Debtors have agreed to make the effective date of the rejection the date that the de-branding process is completed, which the Debtors estimate will occur by July 22, 2011. The Debtors will continue to make royalty payments in accordance with the Licensing Agreement on a location-by-location basis until the de-branding process is completed. Once de-branding is completed, the Debtors will file a notice with the Court advising parties that the Licensing Agreement's rejection is effective.

3. In its Objection, SBC argues, with no legal support, that the Debtors must adhere strictly to the de-branding provisions in the very contract they are seeking to reject. SBC is wrong. While the Debtors intend to complete the de-branding process in good faith to avoid any infringement of SBC's intellectual property rights, SBC's requested changes to the proposed order requiring strict compliance with the Licensing Agreement are contrary to the requirements of the Bankruptcy Code and should be denied. Further, SBC's purported request to pursue an injunction should be denied as procedurally improper.

---

[2] Capitalized terms used herein and not otherwise defined shall have the meanings ascribed to them in the Motion.

4. Finally, Bunn-O-Matic's Limited Objection contains nothing more than a misplaced request to litigate the claims administration process in the context of a motion to reject an executory contract. Nothing in the Motion or the proposed order approving the same prohibits Bunn-O-Matic from asserting an administrative expense claim at a later date.

5. For all of the reasons set forth herein, the Objections should be overruled and the Motion should be granted.

## ARGUMENT

### I. SBC's Objection Should be Overruled.

6. As SBC acknowledges, the Debtors are permitted to reject the Licensing Agreement as a matter of their business judgment. *See* Objection ¶ 1 ("SBC understands that Borders can, in the exercise of its business judgment and subject to Court approval, reject the [Licensing Agreement]"); ¶ 27 ("SBC recognizes that Borders may, with Court approval, reject the [Licensing Agreement] pursuant to section 365 of the Bankruptcy Code."). SBC's arguments focus instead on the legal effect of rejection, the parties' obligations pending rejection and the timing of completion of the de-branding process. For the reasons set forth below, the Court should reject SBC's arguments and grant the Motion, as modified herein.

### A. The Debtors Require a Reasonable Period of Time to De-Brand.

7. The Debtors propose to modify the date of rejection of the Licensing Agreement until the date that de-branding is completed, which should occur by July 22, 2011. During this period, the Debtors will continue to make royalty payments at locations that have not been de-branded. More specifically, assuming entry of an order authorizing rejection on June 2, 2011, the Debtors will commence the process of changing out proprietary controller chips from their coffee brewing and espresso machines immediately, on June 3, and believe that they can complete this process by the end of June. The Debtors will remove all menu boards with SBC

3

branding and external neon SBC signs, and will repaint the resulting uncovered wall space. The Debtors believe, after consulting with their sign vendors, electricians and painters, that they can complete this task in approximately fifty to sixty (50-60) stores per week, taking approximately three (3) days per store, for an estimated de-branding completion date of July 22, 2011.

8. Once de-branding is completed, the Debtors will file a notice of the effective date of the rejection of the Licensing Agreement. If there are any issues with respect to de-branding, the Debtors and SBC will retain the right to have them addressed by the Court.

**B.  The Debtors Are Not Required to Adhere to the
Terms of the Licensing Agreement They Are Rejecting.**

9. In the Motion the Debtors sought, in their reasoned business judgment, to reject the *entire* Licensing Agreement, certain provisions of which the Objection seemingly requests to have the Debtors adhere to despite their burdensome nature.

10. Case law is clear that "[a]n executory contract cannot be rejected in part, and assumed in part . . . . The contract must be rejected in its entirety, or not at all." *In re TSW Stores of Nanuet*, 34 B.R. 299, 304 (Bankr. S.D.N.Y. 1983) (internal quotation omitted). "It would frustrate the entire purpose of rejection if, in order to reject and thereby be relieved of a burdensome executory contract, the debtor were required, as a condition to doing so, to comply with one of the very aspects of the agreement that is burdensome." *In re Ames Dep't Stores, Inc.*, 306 B.R. 43, 52 (Bankr. S.D.N.Y. 2004). Indeed, "[t]he benefit of rejection of a contract is that performance by the debtor . . . is no longer required." *Mirant Corp. v. Potomac Elec. Power Co. (In re Mirant Corp.)*, No. 03-46590-DML-11, Adv. Pro. No. 03-4342, 403-cv-944-A, 2003 Bankr. LEXIS 1232, at *54 (Bankr. N.D. Tex. Sept. 29, 2003). Thus, requiring the Debtors to adhere to the precise, burdensome de-branding terms of the very contract they are seeking to reject – which SBC explicitly acknowledges in the Objection they are entitled to reject – would

4

contravene the Bankruptcy Code's and Congress's purpose and policy behind permitting rejections of executory contracts in the first place.

11. SBC makes much of the fact that in certain, readily distinguishable situations, covenants not to compete have been held not dischargeable and enforced after rejection of the underlying contract. SBC then tries to analogize the de-branding process here. However, SBC omits one vital distinction as to why courts have so found, which its own cited cases make apparent – "violating a covenant not to compete does not qualify as a 'claim' dischargeable . . . *since no expenditure of money is required to comply*." *R.J. Carbone Co. v. Nyren (In re Nyren)*, 187 B.R. 424, 425 (Bankr. D. Conn. 1995) (emphasis added). While a covenant not to compete may not cost anything for future compliance, de-branding the SBC cafés does. Moreover, if SBC has a damages claim from the Debtors' alleged failure to de-brand, SBC can assert this in its general unsecured claim against the estates.

12. All of SBC's cases cited for the proposition that "non-competition provisions . . . remain enforceable after rejection" involve covenants not to compete. *See* Objection ¶ 42. *See Fellerman & Cohen Realty Corp. v. Clinical Plus, Inc.*, 156 B.R. 379, 382 (Bankr. E.D.N.Y. 1993) (covenant of doctor not to practice within six-block radius of dismissed premises)[3]; *Sir Speedy Inc. v. Morse*, 256 B.R. 657, 658 (D. Mass. 2000) (upon termination of franchise, chapter 7 debtor/franchisee was not to be associated with any business competitive of franchisor's within a five mile radius for one year); *In re Annabel*, 263 B.R. 19, 21, 23 (Bankr. N.D.N.Y. 2001) (chapter 7 case where covenant of chiropractor not to practice within twenty mile radius for two

---

[3] *Fellerman & Cohen Realty v. Clinical Plus* still falls short of finding that a non-competition clause survives rejection of a contract, however, because "there [were] no remaining obligations owed by the parties save for . . . compliance with the covenant not to compete . . . . Thus, the non-compete clause is not an executory contract which may be rejected," and is further distinguishable because it was "abundantly clear" to the court that the debtor was abusing the Bankruptcy Code by improperly seeking extensions to assume or reject the lease when he knew he would never assume merely "to allow the Debtor to continue practicing at the Complex during what the Debtor perceived as the life of the non-compete clause." 156 B.R. at 389.

years *did not* survive rejection of the contract); *Nyren*, 187 B.R. 424 (chapter 7 debtor had covenanted for a period of one year after termination of his employment not to render services as a floral products sales representative in a certain geographic area). However, the de-branding of cafés is very different from a non-compete provision.

13. Moreover, in *Annabel*, where the Court authorized the "limited relief from the discharge injunction in order to pursue injunctive relief [on the non-compete covenant]," the court was also quick to caution that its decision was "limited to the issues and facts as they arose in this chapter 7 case. *The applicability of this narrow holding should not be misconstrued as encompassing the concerns present in a chapter 11 . . . where the Court would be required to consider the effect of the covenant not to compete on a debtor's ability to reorganize.*" 263 B.R. at 28 (emphasis added). *See In re JRT, Inc.*, 121 B.R. 314, 323 (Bankr. W.D. Mich. 1990) (chapter 11 case; "[a]fter reviewing the executory franchise agreement [with TCBY] as a whole, this court finds that the parties intended the covenant not to compete to be an obligation which should be considered together with the other terms and provisions. The covenant not to compete is an integral, non-divisible part of the executory franchise agreement; therefore, the court holds that the entire franchise agreement, including the covenant not to compete clause, may be rejected."); *In re Rovine Corp.*, 5 B.R. 402, 404 (Bankr. W.D. Tenn. 1980) (chapter 11 case; "[t]he effect of the rejection [of Burger King franchise agreement] was to relieve the defendant and its estate of the obligations imposed via the covenant not to compete.").

14. In the Objection, SBC creatively lumps the de-branding provisions in with other clauses of the Licensing Agreement into a category it calls, collectively, the "Non-Competition Provisions," presumably hoping to analogize the de-branding provisions to the foregoing cases (which are distinguishable at any rate). *See* Objection ¶¶ 18-21. However, just because SBC

chooses to label the de-branding provisions as "non-competition provisions" for purposes of the Objection does not make them so. Clearly, an affirmative obligation to put extensive amounts of labor into removing indicia of SBC's presence from hundreds of cafés is not the same as a covenant to refrain from competing with another, and the cases which SBC cites thus do not apply. Indeed, the Licensing Agreement contains an actual noncompetition subsection, which does not include the de-branding provisions. The Debtors are more than willing to embark on a good faith, reasonable de-branding process, as set forth in the Motion and as modified herein, to avoid infringement of SBC's intellectual property rights, but this is qualitatively different than strict compliance with SBC's contractual rights to compel de-branding. Any damages that SBC suffers as a result of the rejection of the Licensing Agreement should be included in its pre-petition general unsecured claim.

C. **SBC is Not Entitled to Relief From the Automatic Stay.**

15. The Court should not grant SBC relief from the automatic stay with respect to SBC's purported hypothetical, future intellectual property enforcement suit, as SBC requests in the Objection. *See* Objection ¶¶ 46-49. The relief SBC seeks is premature and improper because no infringement has occurred, nor does SBC allege that any has. Instead, SBC is asking the Court to issue an order declaring that the automatic stay, the most fundamental protection available to debtors under the Bankruptcy Code, does not apply to something SBC posits *might* happen.

16. To the extent SBC is seeking a lift of the automatic stay, Objection ¶ 49, such request is procedurally improper. "Bankruptcy Rule 4001(a) provides that a motion for relief from an automatic stay imposed under 11 U.S.C. § 362 must be made in accordance with Bankruptcy Rule 9014, which provides that in contested matters under the Bankruptcy Code, relief shall be requested by motion." *In re Stanton*, 121 B.R. 438, 440 (Bankr. S.D.N.Y. 1990).

7

*See also Reischel v. Mfrs. & Traders Trust Co.*, No. 06-3301, 2007 U.S. App. LEXIS 7796, at *4 (7th Cir. 2007) ("Relief from the automatic stay *must* be requested by motion and the debtor *must* be afforded reasonable notice and opportunity for a hearing.") (citing Fed. R. Bankr. P. 4001(a)(1); 9014(a)) (quotation marks omitted) (emphasis added). The Objection is not a motion, five days (three of which were over a holiday weekend) are not "reasonable notice," especially in light of the complexity of these cases and issues at hand, and SBC has not even attempted to notice its halfhearted automatic stay request for a hearing. If SBC (incorrectly) believes it is entitled to relief from the automatic stay for any reason, it should request such relief in a motion noticed for hearing in accordance with the Bankruptcy Rules.

17. Finally, SBC's request is moot in any event because the Debtors have agreed to pay pro-rated royalties through the completion of the de-branding process.

**II. Bunn-O-Matic's Limited Objection Should be Overruled.**

18. Like SBC, Bunn-O-Matic acknowledges that the Debtors may reject the Licensing Agreement as an exercise of their business judgment. *See* Limited Objection ¶ 5 ("it is within the Debtor's [sic] business judgment to elect to reject the Licensing Agreement[.]"). Bunn-O-Matic argues, however, in the improper context of the Motion that any order authorizing rejection should contain "an acknowledgment by the Debtor [sic] of its [sic] obligation to pay Bunn, as an administrative expense priority, for any postpetition services already provided or to be provided by Bunn to the Debtor [sic]" and "language requiring the Debtor [sic] to pay such amounts as they come due." *Id.* at 4.

19. If Bunn-O-Matic believes it has a claim against the Debtors' estates, nothing in the Motion is precluding it from pursuing the claim under the Bankruptcy Code. If, after reviewing Bunn-O-Matic's claim, the Debtors agree, they will pay the claim; if not, they will

object.  Not surprisingly, Bunn-O-Matic cites no authority requiring such language in a rejection order, particularly to a contract to which it is not even a party.

WHEREFORE the Debtors respectfully request that the Court overrule the Objection, grant the Motion, and grant such other and further relief as it deems just and proper.

Dated: May 31, 2011
      New York, New York

                                KASOWITZ, BENSON, TORRES
                                  &amp; FRIEDMAN LLP

                                By: /s/ Andrew K. Glenn
                                David M. Friedman (DFriedman@kasowitz.com)
                                Andrew K. Glenn (AGlenn@kasowitz.com)
                                Jeffrey R. Gleit (JGleit@kasowitz.com)
                                1633 Broadway
                                New York, New York 10019
                                Telephone:  (212) 506-1700
                                Facsimile:   (212) 506-1800

                                *Attorneys for Debtors and Debtors in Possession*