UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re:<br><br>BORDERS GROUP, INC., *et al.*,<br><br>Debtors.[1] | NOT FOR PUBLICATION<br><br>Chapter 11<br><br>Case No. 11-10614 (MG)<br><br>(Jointly Administered) |

**MEMORANDUM OPINION GRANTING THE DEBTORS' MOTION FOR AN
ORDER EXTENDING EXCLUSIVE PERIODS TO FILE A PLAN AND SOLICIT
ACCEPTANCES**

*A P P E A R A N C E S:*

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
*Attorneys for Borders Group, Inc.*
1633 Broadway
New York, New York 10019
By:   Andrew Glenn, Esq.
      Jeffrey R. Gleit, Esq.

LOWENSTEIN SANDLER PC
*Attorneys for the Official Committee of Unsecured Creditors*
65 Livingston Avenue
Roseland, New Jersey 07068
By:   Bruce Buechler, Esq.

**MARTIN GLENN
UNITED STATES BANKRUPTCY JUDGE**

Pending before the Court is a request of Borders Group, Inc. and its debtor subsidiaries, as debtors and debtors in possession (collectively, the "Debtors") for an extension of their exclusive periods pursuant to section 1121(d) of the Bankruptcy Code (the "Motion"). (ECF # 864.) The Debtors filed their chapter 11 bankruptcy petitions on February 16, 2011 (the

---

[1]   The Debtors are: Borders Group, Inc.; Borders International Services, Inc.; Borders, Inc.; Borders Direct, LLC; Borders Properties, Inc.; Borders Online, Inc.; Borders Online, LLC; and BGP (UK) Limited.

1

"Petition Date"). In support of the Motion, the Debtors filed the declaration of Holly Felder Etlin, the Debtors' Senior Vice President – Restructuring (the "Etlin Declaration"). (ECF Doc. # 865.) The Official Committee of Unsecured Creditors (the "Committee") filed an objection to the Motion (the "Objection"). (ECF Doc. # 920.) Subsequently, the Debtors filed their reply to the Objection (the "Reply"). (ECF Doc. # 944.)

The Debtors' exclusive period to file a plan currently expires on June 16, 2011 (the "Exclusive Filing Period") and the solicitation period expires on August 15, 2011 (the "Solicitation Period" and, together with the Exclusive Filing Period, the "Exclusive Periods"). Pursuant to section 1121(d) of the Bankruptcy Code, the Debtors seek entry of an order extending their Exclusive Periods by 120 days, until October 14, 2011 and December 13, 2011, respectively, without prejudice to their rights to seek further extensions. This is the Debtors' first request for extension of their Exclusive Periods. For the reasons explained below, the Committee's Objection is overruled and the Debtors' Motion is granted.

## DISCUSSION

The decision whether to grant an extension of a chapter 11 debtor's exclusivity requires a court to engage in a careful balancing of competing factors. *See In re Ames Dep't. Stores, Inc.*, No. 90-B-11233, 1991 U.S. Dist. LEXIS 17074, at *6 (S.D.N.Y. Nov. 25, 1991) ("The decision of whether to extend the exclusivity periods under 11 U.S.C. § 1121(d) involves a careful balancing of competing factors and a consideration of the interest of the many parties involved."). Although this is the Debtors' first request to extend their Exclusive Periods, that fact, by itself, does not constitute cause for an extension. *See In re General Bearing Corp.*, 136 B.R. 361, 367 (Bankr. S.D.N.Y. 1992). A court's decision to extend a debtor's exclusive periods

2

is a serious matter; extensions are not granted routinely or cavalierly. *In re McLean Indus., Inc.*, 87 B.R. 830, 834 (Bankr. S.D.N.Y. 1987).

### A. Overview of Section 1121(b)

The Bankruptcy Code grants a debtor the exclusive right to file a plan during the first 120 days after the order granting relief. 11 U.S.C. § 1121(b). Once the 120-day period expires or is terminated, any party in interest may file a plan of reorganization. 11 U.S.C. § 1121(c)(2). If, however, a debtor proposes a plan within the 120 day exclusive period, the debtor has a period of 180 days after the commencement of the case to obtain acceptances of such plan. 11 U.S.C. § 1121(c)(3). Events explicitly recognized by statute that end the exclusivity period include a failure to file a plan within 120 days of the order for relief, or a failure to obtain acceptance of the timely filed plan within 180 days by all impaired classes. *See* 11 U.S.C. § 1121(c).

The Bankruptcy Code allows the court, for cause, on request of any party in interest, to reduce or increase the exclusivity periods. 11 U.S.C. § 1121(d)(1). The burden of proving cause to reduce or increase exclusivity is on the moving party, in this case the Debtors. *See In re R.G. Pharm., Inc.*, 374 B.R. 484, 487 (Bankr. D. Conn. 2007) (stating debtor has burden in motion to extend); *In re Texaco, Inc.*, 76 B.R. 322, 326 (Bankr. S.D.N.Y. 1987) (finding that party seeking either an extension or a termination of exclusivity bears the burden of proving cause). For the moving party to meet its burden it must produce affirmative evidence to support a finding of cause. *See In re Parker St. Florist & Garden Ctr., Inc.*, 31 B.R. 206, 207 (Bankr. D. Mass. 1983) (concluding that debtor's assertion that it did not want the interference of competing plans was insufficient to make an affirmative showing of cause). Any request for an extension must be made before the exclusivity period has expired. *In re Perkins*, 71 B.R. 294, 297 (W.D. Tenn. 1987). There can be no extension after the period has expired. *Id.*

### B. Cause Pursuant to Section 1121(d)

The determination of cause under section 1121(d) is a fact-specific inquiry and the court has broad discretion in extending or terminating exclusivity. *See In re Adelphia Commc'ns Corp.*, 352 B.R. 578, 586 (Bankr. S.D.N.Y. 2006) ("A decision to extend or terminate exclusivity for cause is within the discretion of the bankruptcy court, and is fact-specific."); *see also In re Lehigh Valley Prof'l Sports Club, Inc.*, No. 00-11296DWS, 2000 WL 290187, at *2 (Bankr. E.D. Pa. Mar. 14, 2000) (relief under section 1121(d) is committed to the sound discretion of the bankruptcy judge); *In re Sharon Steel Corp.*, 78 B.R. 762, 763 (Bankr. W.D. Pa. 1987) ("The decision of whether or not to extend the debtor's period of exclusivity rests with the discretion of the Court.").

Judge Gerber in *Adelphia* outlined the factors a court should consider in deciding whether to grant an extension of exclusivity: (a) the size and complexity of the case; (b) the necessity for sufficient time to permit the debtor to negotiate a plan of reorganization and prepare adequate information; (c) the existence of good faith progress toward reorganization; (d) the fact that the debtor is paying its bills as they become due; (e) whether the debtor has demonstrated reasonable prospects for filing a viable plan; (f) whether the debtor has made progress in negotiations with its creditors; (g) the amount of time which has elapsed in the case; (h) whether the debtor is seeking an extension of exclusivity in order to pressure creditors to submit to the debtor's reorganization demands; and (i) whether an unresolved contingency exists. 352 B.R. at 587.

### C. The Committee's Objection

In this case, the Committee has objected to the Debtors' request for an additional 120 day extension of exclusivity. The Committee proposed (i) that the Debtors and the Committee

should *both* have the exclusive right to file a plan within the extended period, or in the alternative, (ii) that cause does not exist to warrant a 120 day extension. To support the latter contention, the Committee claims that the Debtors' case is not overly complex; the prospect of reorganizing is remote; and the Debtors have failed to make good faith progress towards reorganization, demonstrate reasonable prospects for filing a viable plan, or make progress in negotiations with creditors. (Objection ¶¶ 16-25.) Although mere "dislike" of the Debtors' proposals is, by itself, not considered a factor analyzed when considering an extension of the Debtors' Exclusive Periods, *see Adelphia*, 352 B.R. at 587, the Committee is "concerned that granting the Debtors an additional four months of untethered exclusivity will (i) create opportunities for the Debtors to pursue strategies inconsistent with their current mandate and working agreement with the Committee to go forward with a sale process; (ii) handcuff the Committee; and (iii) ultimately prove harmful and expensive to the estates if the Debtors were to file a plan of reorganization without Committee approval." (Objection ¶ 13.)

The Committee failed to support its Objection with any evidence. The Debtors, on the other hand, have provided evidence of the substantial efforts Debtors have been making to stabilize their business and develop a viable exit strategy. While the Committee raises valid concerns, the Committee's Objection is premature at this early stage of this very large case. A review of the docket reveals the large amount of activity by the Debtors, seeking to down-size and right-size their business, through store closings and lease modifications resulting in substantial reductions in rent, and other cost reduction efforts. Additionally, the Committee acknowledges that Debtors agreed early in this case to pursue parallel tracks for an exit from bankruptcy—through a section 363 sale or a stand-alone chapter 11 reorganization plan. As explained further below, the Court concludes, in the exercise of its discretion, that the Debtors

5

have established cause for the extension of exclusivity.  Of course, if significant adverse developments occur in this case during Debtors' exclusivity period, the Committee may move to reduce the exclusive periods for cause.  Clearly, however, at this stage of the case, the Committee's and Debtors' time is better spent working cooperatively to develop an appropriate exit strategy.

### D.    Analysis of the *Adelphia* Factors

In the following sections, the Court evaluates the *Adelphia* factors, to the extent applicable here.  That evaluation leads the Court to grant the Motion to extend exclusivity.

#### 1.  Size and Complexity of the Debtors' Cases

The Committee acknowledges that the Debtors cases are large, but believes that they are not sufficiently complex to justify extending exclusivity.  The Court disagrees.  The Committee argues that there are no pre-petition secured creditors and no bondholders—just the Debtors' DIP financer and unsecured creditors.  (Objection ¶ 21.)  The Committee also argues that the Debtors' management has not had to deal with many bankruptcy issues because the Debtors have retained numerous professionals to assist in their day-to-day and bankruptcy obligations.  (*Id.*)  When this case started, the Debtors had over 600 retail stores, now reduced to approximately 400 stores.  The Debtors' schedules list over $1.6 billion in assets and over $2.6 billion in liabilities.  (Motion ¶ 13.)  The bar date passed on June 1, 2011 (for non-governmental units) and the number of creditors is in the thousands.  *See Gaines v. Perkins (In re Perkins)*, 71 B.R. 294, 296 (W.D. Tenn. 1987) (finding that a debtor's case was large and complex when the debtor had 100 creditors holding approximately 225 claims against the estate in the amount of roughly $10 million; the estate was valued at $13 million and was compised of mainly improved and unimproved real property); *see also In re Texaco, Inc.*, 76 B.R. at 326 ("The large size of the

debtor and the consequent difficulty in formulating a plan of reorganization for a huge debtor with a complex financial structure are important factors which generally constitute cause for extending the exclusivity periods.") (citing cases). To date, over 960 docket entries have been recorded. Numerous motions and stipulations have been heard or presented. *See McLean Indus.*, 87 B.R. at 831 (discussing the complexities of the debtors' cases and taking judicial notice of the docket which contained 845 numbered entries). As a result of cooperation between the Debtors' counsel and Committee's counsel (as well as counsel for other parties), most objections have been resolved consensually.

The Debtors still employ over 11,000 employees. (Motion ¶14.) Since the Debtors operate in the retail industry, they are parties to hundreds of leases with landlords throughout the country as well as numerous trade vendors. Specifically, as of the petition date, the Debtors were parties to approximately 1,493 contracts and 684 non-residential real property leases. (*Id.* ¶ 19.) Making business decisions whether to assume or reject executory contracts and leases, or negotiate modifications, if appropriate, requires the Debtors' management and advisors to develop a sustainable business plan, and simultaneously respond to inquiries raised by landlords and contract counterparties. (Etlin Decl. ¶ 5.) The Debtors' illiquid assets (*i.e.*, its leasehold agreements) makes it is difficult to market and sell them within the first 120 days of these cases. *See McLean Indus.*, 87 B.R. at 835.

The Court is familiar with the various pleadings that have been brought before the Court, including the approval of: (i) an extension of the Debtors' statutory deadline to assume or reject unexpired leases, (ii) lease rejection procedures, (iii) procedures for entering into lease modification agreements, (iv) debtor-in-possession financing, (v) employee incentive and retention plans, (vi) the retention of various professionals and (vii) store closings and going out

7

of business sales. Since the Petition Date, the Debtors have filed 241 stipulations extending their time to assume or reject leases and have negotiated and entered into approximately 100 lease modification agreements. (Reply ¶ 5.) Collectively, these filings illustrate the complexities inherent in the Debtors' cases. Since "[a] reasonable time in light of the bankruptcy case in its entirety is the root consideration," *see McLean Indus.*, 87 B.R. at 834, these complexities favor an extension. *See also* H.R. Rep. No. 95-595, at 231 (1978) ("[I]f an unusually large company were to seek reorganization under Chapter 11, the court would probably need to extend time in order to allow the debtor to reach an agreement [with its creditors].").

### 2. Filing a Viable Plan

The Committee also argues that the Debtors' exclusivity should not be extended because a viable plan of reorganization is unlikely. (Objection ¶ 22.) The Committee contends that within the next 30-60 days, the Debtors' assets will likely be sold to one or more buyers and that the Committee believes that a section 363 sale—as opposed to a reorganization plan—will derive the greatest value for creditors. (*Id.*) But if the Committee favors a section 363 sale, an option the Debtors are currently actively pursuing, the exclusivity period becomes less important. The Committee has certainly not shown that the Debtors are "dragging their heels" in pursuing a sale option. The sale process is likely to proceed most efficiently if the Debtors retain exclusivity and can manage the sale process.

Any section 363 sale of substantially all of the Debtors' business as a going concern is likely to be followed by a chapter 11 liquidation plan, usually not a time-consuming process to develop. Nor has the Committee explained why such a plan would not be "viable." Additionally, the Court cannot conclude, at this early stage, that a stand-alone reorganization plan would not be viable. While the Debtors' operating losses to date have been substantial, the

8

Debtors have offered evidence that their early cost-cutting efforts are bearing fruit.  According to the Debtors, their cost-cutting initiatives only started to show results beginning in May and they still have access to over $85 million under their DIP facility.  (Reply ¶ 16.)  It is certainly premature to write-off the Debtors' efforts to stabilize their business and implement a sustainable business model.  Of course, these very substantial efforts and progress by the Debtors need to be measured against the substantial continuing operating losses Debtors continue to incur as reflected in their operating reports.

In determining whether an exclusivity extension is warranted, courts have considered the likelihood of success of a debtor's reorganization activities.  *See, e.g.*, *Perkins*, 71 B.R. at 298.  In *In re Amko Plastics*, 197 B.R. 74 (Bankr. S.D. Ohio 1996), the official committee of unsecured creditors argued, in opposition to the debtor's first motion to extend exclusivity, that the debtor's efforts to reorganize had only produced losses and that terminating exclusivity may assist the achievement of a consensual plan.  *Id.* at 77.  The court rejected these arguments.  Based on the testimony from the debtor's turnaround professionals, the court found that losses are not inconsistent with an ultimately successful turn-around effort.  *Id.*  The *Amko Plastics* court also noted that the debtor was in the process of undertaking its turn-around efforts, and that at such an early stage of the case, it was "too early to make a judgment about what the outcome of the turn-around efforts [would] be."  *Id.*

During the initial 120 day "exclusive" period, bankruptcy courts have applied a lesser standard in determining whether the burden of showing "a reasonable possibility of a successful reorganization within a reasonable time" has been satisfied.  *See Am. Network Leasing v. Apex Pharms., Inc. (In re Apex Pharms., Inc.)*, 203 B.R. 432, 442 (N.D. Ind. 1996) (citing cases); *see also* 7 COLLIER ON BANKRUPTCY ¶ 1121.06[2] (16th ed. rev. 2011).

On balance, the Court believes this factor favors extending exclusivity.

### 3. Progress In Negotiations With The Committee and Good Faith Progress Towards Reorganization

The Committee also asserts that the Debtors have not openly shared information regarding a reorganization plan despite counsel billing the estate $58,000 for time spent drafting and revising a plan and disclosure statement, and having conversations with management and shareholders about such a plan. (Objection ¶ 23.)  Because of this purported lack of information sharing, combined with postpetition operating losses, the Committee contends that the Debtors have not proceeded in good faith.  (*Id.* ¶ 24.)  In light of the Debtors' $180 million loss over the first two and one-half months of the case, it is understandable that the creditors feel they should not be "handcuffed" by the Debtors as losses continue to accumulate.  *See In re Timbers of Inwood Forest Assocs., Ltd.*, 808 F.2d 363, 372 (5th Cir. 1987), *aff'd*, 484 U.S. 365 (1988) ("Section 1121 was designed, and should be faithfully interpreted, to limit the delay that makes creditors the hostages of Chapter 11 debtors.").  The Committee acknowledges that the Debtors have been cooperating with the Committee with respect to a proposed section 363 sale, but the Committee complains that the Debtors "have not engaged in any negotiations with the Committee regarding a plan."  (Objection ¶ 24.)

First, as the Court earlier observed, from numerous hearings in this case so far, the Committee's and Debtors' professionals have proceeded cooperatively and resolved almost all disputes—inevitable in a case of this magnitude—between them without Court intervention.  For this reason, the Committee's Objection to an extension of exclusivity comes as a surprise to the Court.  The Etlin Declaration contends that, since the Petition Date, the Debtors have been working cooperatively with publishers, landlords and vendors to facilitate an operational restructuring.  (Etlin Decl. ¶ 8.)  Ms. Etlin further submits that the Debtors' "dual-path" sale

10

process has produced "promising offers" that are being diligently pursued. (*Id.* ¶ 9.) In the Reply, the Debtors also note that their "professionals have conducted multiple conference calls with the Committee's professionals every week over the past two months to ensure the free flow of information and a coordinated strategy." (Reply ¶ 6.) The Court expects cooperation, but that does not mean that the Debtors, or the Committee for that matter, are expected to "share" incomplete plans with other constituencies.

If problems develop with information sharing, the Court can and will deal with it. The Committee does not point to any specific operational information that it has been denied. *See In re Texaco, Inc.*, 76 B.R. at 327 (noting the importance that the unsecured creditors committee have "an opportunity to review and negotiate an acceptable plan"); *see also In re Lexington Precision Corp.*, No. 08-11153 (Bankr. S.D.N.Y. Oct. 31, 2008) [Docket No. 457], at p. 8-9 (While granting the debtor's exclusive periods for a second time, this Court noted that it expected "the parties to continue to negotiate in good faith with a view towards agreeing on a viable plan for reorganization."). The Debtors appear willing to work with the Committee and share draft plan proposals once the Debtors know the outcome of the sale process and the Debtors have made further progress in formulating their business plan. (Reply ¶ 12.) The Debtors reaffirmed this intention at the hearing.

On balance, the Court concludes that this factor favors extending exclusivity.

### 4. Paying Administrative Expenses as They Become Due

The Debtors submit that they have made and will continue to make all post-petition administrative obligations. The Committee did not contend otherwise in the Objection.

### 5. The Amount of Time That Has Elapsed; Time Needed to Negotiate a Plan and to Prepare Adequate Information; and Unresolved Contingencies

As explained above, it is premature to conclude that the Debtors are unlikely to submit a viable plan. The June 1, 2001 bar date is important so that the Debtors can understand the number, nature and amount of valid claims against the estate. The Debtors need a reasonable amount of time to review and evaluate these claims. *In re Federated Dept. Stores*, 1990 Bankr. LEXIS 711, at *11 (Bankr. S.D. Ohio Apr. 13, 1990). Without this information, it is difficult for the Debtors to prepare adequate information. *See McLean Indus.*, 87 B.R. at 835 ("If there is anything that falls under the rubric of 'adequate information' required by § 1125(a) of the Bankruptcy Code to be contained in a disclosure statement, it is an approximation of the dividend payable to each unsecured creditor.") The Etlin Declaration also explained that the Debtors continue to refine their business plan after an early April meeting with the Committee and to negotiate trade terms with publishers (after having reached agreements with many of the smaller ones already). (Etlin Decl. ¶ 8.)

Since the Petition Date, the Debtors submit that they have been busy satisfying the general requirements of a chapter 11 case, such as preparing and filing retention applications, monthly operating reports and other administrative tasks. The Debtors have also been reviewing over one thousand executory contracts and unexpired leases, deciding which ones to assume and reject. As the Debtors continue to pare down these contracts and leases, negotiate lease modifications and new trade terms, the Debtors should be able to present creditors with a more refined business model and projections for future operations—all of which are necessary for filing both a disclosure statement and plan.

E.  **"Shared" Exclusivity**

The Committee contends that the Exclusive Periods should jointly apply to the Committee and the Debtors. In support of the Committee's proposal to "share" exclusivity with the Debtors, the Committee cites to an order in the *Young Broadcasting, Inc.*[2] case where such as arrangement was approved. (Objection ¶ 10.) But the circumstances in *Young Broadcasting* were considerably different than they are in this case. Indeed, the Committee acknowledges that "[a]fter negotiations, the debtors agreed to include a specific exclusion in the order approving their motion to extend exclusivity, which would allow the committee to file and solicit its plan." (Objection ¶ 11.) Additionally, the *Young Broadcasting* committee had already drafted and solicited support for its plan, and the debtor conceded that the committee's plan was a "viable alternative." *See In re Young Broad., Inc.*, No. 09-10645 (AJG) (Bankr. S.D.N.Y. Aug. 7, 2009) [Docket No. 546], at ¶ 3. An order entered in one case cannot be transported or translated to another case, with very different circumstances, not the least of which were that the debtor agreed to the procedure and the *Young Broadcasting* court had previously extended exclusivity. *Id.* at ¶ 9.[3]

F.  **Practical Considerations Warrant an Extension of the Exclusive Periods**

In *Adelphia*, Judge Gerber acknowledged that "the caselaw factors might not, in every case, by themselves be determinative." 352 B.R. at 590. For example, in *In re Dow Corning Corp.*, 208 B.R. 661, 670 (Bankr. E.D. Mich. 1997), the court noted that "[w]hen the Court is

---

[2]  *See In re Young Broad., Inc.*, No. 09-10645 (AJG) (Bankr. S.D.N.Y. Aug. 12, 2009) [Docket No. 549].

[3]  The Committee did not cite any case law supporting its position for shared exclusivity with the Debtors. But the court in *In re United Press Intern., Inc.*, 60 B.R. 265, 271 n.12 (Bankr. D. Col. 1986), adopted a "middle approach" providing the committee and the debtor with the exclusive right to file a plan. The court noted that "[t]he statute does not expressly prohibit this eminently sensible middle course, and I can perceive no reason to find any such prohibition by implication." *Id.* However, like *Young Broadcasting*, the factual context in *United Press* was very different. Shared exclusivity was initially proposed by the committee and the debtor. *United Press*, 60 B.R. at 271 n.12.

13

determining whether to terminate a debtor's exclusivity, the primary consideration should be whether or not doing so would facilitate moving the case forward. And that is a practical call that can override a mere toting up of the factors." *Id.*; *see also Adelphia*, 352 B.R. at 590 (agreeing with the above-cited language from *Dow Corning*, but noting that "the test is better expressed as determining whether terminating exclusivity would move the case forward materially, to a degree that wouldn't otherwise be the case").

Here, it is important for the Court to consider the terms of the Debtors' debtor-in-possession loan (the "DIP Loan"). According to the Etlin Declaration, a termination of exclusivity will cause the Debtors to default under the terms of the DIP Loan. (Etlin Decl. ¶ 11.) DIP Loan § 7.1(m)(8) states that an event of default will occur when there is "the entry of an order terminating [the Debtors'] exclusive right to file a plan of reorganization." Such a result would lead to disastrous consequences for the Debtors and their creditors. Furthermore, the Committee acknowledges that, at the present time, it does not intend to file its own proposed plan; it just wants to be able to do so without having first to make a motion to reduce Debtors' exclusivity period. Quite frankly, the Court finds it hard to take the Committee's position seriously in light of its stated intention not to file a plan at this time.

Terminating exclusivity at this time would also create a situation where the estates could be saddled with multiple and competing plans. In a case involving several thousand creditors, the *United Press* court warned:

> "Opening the floodgates" to allow each and every one of [the debtor's creditors] to file a plan, no matter how poorly conceived or supported, would not serve "to secure the expeditious and economical administration of" this case nor "to carry out the provisions of" the Bankruptcy Code.

60 B.R. at 271 n. 12 (internal citations omitted).

### G. Restrictions on Time Extensions

Section 1121(d) also imposes restrictions on a court's ability to grant time extensions for a debtor's exclusive periods. Specifically, the section provides that the 120-day period cannot be extended beyond a date that is 18 months after the date of the order for relief and that the 180-day period cannot be extended beyond a date that is 20 months after the order for relief. 11 U.S.C. §§ 1121(d)(2)(A), (B). These outside time limitations were changes made to the Bankruptcy Code as a result of the 2005 Amendments. *See* 7 COLLIER ON BANKRUPTCY 1121.11[4]. Here, based on the Petition Date, the Debtors' requested extension *does not* violate sections 1121(d)(2)(A) and (B).

### H. Creditors Will Not Be Prejudiced by Extending Debtors' Exclusivity

Extending Debtors' exclusivity will not impede the Committee from negotiating with the Debtors with respect to the Committee's desired outcome—stated for now as a section 363 sale. Whether that would be the best outcome for this case is not clear at this stage.

## CONCLUSION

For the reasons explained above, the Court concludes, in the exercise of its discretion, that the Debtors have established cause to extend exclusivity as requested in the Motion. Granting the Motion now, however, does not mean that developments in the case—for better or worse—might justify reducing or increasing the Exclusive Periods in the future.

A separate Order will be entered granting the Motion.

Dated: June 2, 2011
      New York, New York

                                                            /s/Martin Glenn
                                                            MARTIN GLENN
                                          United States Bankruptcy Judge