David M. Friedman (DFriedman@kasowitz.com)
Andrew K. Glenn (AGlenn@kasowitz.com)
Jeffrey R. Gleit (JGleit@kasowitz.com)
KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
1633 Broadway
New York, New York 10019
Telephone:  (212) 506-1700
Facsimile:  (212) 506-1800

*Attorneys for Debtors*
*and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re | Chapter 11 |
| **BORDERS GROUP, INC.**, *et al.*,[1] | Case No. 11-10614 (MG) |
| Debtors. | (Jointly Administered) |

**DEBTORS' MOTION FOR ENTRY OF ORDER (I) AUTHORIZING THE DEBTORS TO SELL CERTAIN ASSETS THROUGH STORE CLOSING SALES, (II) APPROVING BIDDING PROCEDURES TO SELECT LIQUIDATING AGENT TO CONDUCT STORE CLOSING SALES, (III) AUTHORIZING DEBTORS TO ABANDON UNSOLD PROPERTY, (IV) WAIVING COMPLIANCE WITH CONTRACTUAL STORE CLOSING SALE RESTRICTIONS, (V) EXEMPTING LAWS RESTRICTING STORE CLOSING SALES AND (VI) GRANTING RELATED RELIEF**

TO THE HONORABLE MARTIN GLENN,
UNITED STATES BANKRUPTCY JUDGE:

Borders Group, Inc. and its affiliated debtors, as debtors and debtors in possession

(collectively, the "Debtors"), by their undersigned counsel, respectfully submit this motion (the

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are:  Borders Group, Inc. (4588); Borders International Services, Inc. (5075); Borders, Inc. (4285); Borders Direct, LLC (0084); Borders Properties, Inc. (7978); Borders Online, Inc. (8425); Borders Online, LLC (8996); and BGP (UK) Limited.

"Motion") for an order (I) authorizing the Debtors to sell certain assets, consisting of merchandise (the "Merchandise") and owned furniture, fixtures and equipment ("Owned FF&E") located at up to 51 of their stores (the "Closing Stores") identified in Exhibit A[2], through store closing sales (the "SCSs"), free and clear of all liens, claims or encumbrances and to enter into an Agency Agreement in substantially the form annexed hereto as Exhibit B with the liquidator selected to conduct the SCSs (the "Liquidating Agent"), (II) approving bidding procedures to select the Liquidating Agent, (III) authorizing the Debtors to abandon unsold Merchandise and Owned FF&E after conclusion of the SCSs, (IV) waiving compliance with provisions in the Debtors' agreements restricting store closing sales (the "Contractual Restrictions"), (V) exempting the Debtors from state and local rules, statutes or ordinances restricting store closing sales (the "Applicable Law Restrictions"), and (VI) granting related relief. In support of this Motion, the Debtors respectfully represent as follows:

## PRELIMINARY STATEMENT[3]

For months, the Debtors and their advisors have worked diligently to obtain extensions of the September 14, 2011 deadline to assume or reject leases from their landlords. The Debtors' efforts have been fruitful; they have received extensions for nearly 365 or approximately 90% of their leases as of the date of this Motion. The Debtors continue their discussions with landlords and believe that, with additional time, they can obtain extensions at many of the remaining 51 locations. Nonetheless, the Debtors will not be able to obtain extensions for at least some of their locations.

---

[2]    As discussed *infra*, the Debtors will continue to negotiate extensions with landlords and, as such, the number of Closing Stores may decrease after filing this Motion and before the hearing thereon.

[3]    Capitalized terms used in this Preliminary Statement, but not defined, are ascribed the definitions contained elsewhere in this Motion.

Most of the stores for which the Debtors have not obtained extension stipulations are among the most profitable in the portfolio or have leases which are under market. The Debtors would assume these leases, but various creditor constituencies have indicated that they would oppose any such assumption outside of the context of a sale of the business as a going concern or confirmation of a plan of reorganization. As the Debtors recently informed the Court, the Debtors are actively negotiating a going concern sale with multiple potential buyers; these buyers have indicated that they also wish to purchase some of the stores that are subject to this Motion.

The Debtors believe in their business judgment that the stores to be liquidated pursuant to this Motion should not be liquidated under these circumstances. The liquidation of these stores may not maximize their value for the benefit of creditors and will result in a significant loss of jobs. Indeed, if this Motion is granted, the Debtors will not be able to sell the stores subject to this Motion to a going concern buyer because they likely will have liquidated pursuant to this Motion first. Unfortunately, the Debtors' DIP financing facility requires the Debtors to commence store closing sales within certain deadlines before the assumption/rejection deadline. This leaves the Debtors with a Hobson's choice: the Debtors can proceed with store closing sales at these stores under these unfortunate circumstances or, if they refuse to do so, risk being placed into default by DIP lenders.

The Debtors have requested a waiver of the requirement to liquidate these stores pending the proposed scheduling of a hearing to consider the sale of the entire business on or about July 21, 2011.[4] While the DIP lenders are considering the proposal, they have not provided such consent as of yet and good faith negotiations are ongoing. The Debtors hope to obtain such

---

[4] While previously the DIP Lenders offered the Debtors a one week extension to the deadlines in the DIP Facility, that extension clearly was insufficient to allow a going concern buyer time to complete due diligence and to consummate the transaction.

consent before the hearing on this Motion. The Debtors also expect to remove many stores from the store closing list once they receive agreements with additional landlords extending the assumption/rejection deadline. These negotiations are ongoing despite the filing of this Motion.

* * * * *

If the Debtors are forced to proceed with a hearing on this Motion, they respectfully submit that the Motion should be granted. Working within the confines of the DIP Facility, the Debtors have done their best to maximize the value they can recover through the SCSs. The Debtors modeled their solicitation process after the one undertaken in the first round store closing sales conducted in February ("Phase I SCSs"), which generated more than $182 million for the Debtors' estates through impressive results widely supported by the creditor constituencies. On June 1, 2011, the Debtors sent bid solicitation letters to each of the nationally-recognized liquidator firms to identify the highest and best bidder willing to serve as stalking horse and be subject to an auction. The Debtors are continuing to negotiate with the potential bidders and to evaluate their available options. In the upcoming days, the Debtors intend to select the stalking horse bid (and sign up an agreement that is subject to Court approval by the June 15, 2011 DIP Facility deadline) and to conduct an auction to solicit higher and better bids on June 16, 2011.

By this Motion, the Debtors ask the Court to authorize the Debtors to conduct the SCSs at the Closing Stores and to enter into the Agency Agreement with the stalking horse bidder or the successful bidder at the auction (the "Liquidating Agent"). The Debtors believe that it is critical to commence the SCSs by June 22, 2011[5] to avoid triggering a default under the DIP Facility. As is customarily granted where Debtors effectuate store closing sales, the Debtors also request

---

[5] The Debtors intend to file a motion to shorten notice and for an expedited hearing to have this Motion heard on or before June 21, 2011, so that the SCSs can commence by the DIP Facility's June 22, 2011 deadline.

certain related relief to obviate any contractual or state or local laws that could inhibit the SCSs. Finally, the Debtors ask the Court to approve the bidding procedures utilized by the Debtors in arriving at the Liquidating Agent's bid including appropriate bid protections requested by the stalking horse bidder.[6]

For the reasons set forth below, the Debtors should be authorized to engage in the SCSs as set forth herein.

## Jurisdiction

1.     This Court has subject matter jurisdiction to consider and determine this matter pursuant to 28 U.S.C. § 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

## Relief Requested

2.     By this Motion, the Debtors seek entry of an order pursuant to sections 105(a), 363(b) and 554(a) of the Bankruptcy Code in substantially the form annexed hereto as Exhibit C (the "Proposed Order") (i) authorizing the Debtors to sell the Merchandise and Owned FF&E at the Closing Stores through the SCSs free and clear of all liens, claims and encumbrances and to enter into the Agency Agreement with the Liquidating Agent, (ii) approving bidding procedures to select the Liquidating Agent including bid protections for the stalking horse bid to be identified prior to the hearing, (iii) authorizing the Debtors to abandon unsold Merchandise or Owned FF&E at the Closing Stores following conclusion of the SCSs, (iv) waiving compliance with Contractual Restrictions, (v) exempting Applicable Laws Restrictions, and (vii) granting related relief.

---

[6]     Given the timing constraints imposed by the DIP Facility, the terms and protections for a stalking horse bid are not known at this time.  Through a supplemental filing, the Debtors will provide notice of such terms and protections, as well as continuing to consult with the UCC and DIP Lenders, in real time.

## BACKGROUND

3.     On February 16, 2011 (the "Petition Date"), each of the Debtors commenced a voluntary case under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). The Debtors are authorized to operate their business and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. The Debtors' cases (the "Bankruptcy Cases") are being jointly administered pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

## DEBTORS' BUSINESS

### A.     Operations

4.     The Debtors are a leading operator of book, music and movie superstores and mall-based bookstores. At January 29, 2011, the Debtors operated 642 stores, under the Borders, Waldenbooks, Borders Express and Borders Outlet names, as well as Borders-branded airport stores in the United States, of which 639 stores are located in the United States and three in Puerto Rico. Pursuant to the Court's *Order Approving Agency Agreement, Store Closing Sales and Related Relief* [Docket No. 91] (the "Phase I SCSs Order") entered on February 18, 2011, the Debtors closed and liquidated the inventory at 226 of their retail locations. *See* Section C, *infra*. In addition, the Debtors operate a proprietary e-commerce web site, www.Borders.com, launched in May 2008, which includes both in-store and online e-commerce components.

5.     The Debtors currently employ approximately 3,792 full-time employees and approximately 7,244 part-time employees, located throughout the United States and Puerto Rico. The Debtors' employees are not subject to any collective bargaining agreements.

### B.     Financials

6.     For the fiscal year ended January 29, 2011, the Debtors recorded net sales of approximately $2.3 billion. As of December 25, 2010, the Debtors had incurred net year-to-date

losses of approximately $168.2 million. The Debtors' Schedules list $1,649,799,850 of assets and $2,626,757,691 of liabilities. *See* Debtors' Schedules [Docket Nos. 491, 493, 495, 497, 499, 501, 503, 505, each at 2].

7. Additional information regarding the Debtors' business, capital structure, and the circumstances leading to these chapter 11 cases is contained in the *Declaration of Scott Henry Pursuant to Local Bankruptcy Rule 1007-2 in Support of First Day Motions* [Docket No. 20].

**C.** **Previous Store Closing Sales Conducted In These Cases**

8. Prior to the Petition Date, the Debtors, in consultation with their advisors and their key constituents, concluded that it was in the best interests of the Debtors and their stakeholders to close and liquidate the inventory at 200 stores and another up to 75 additional "put option" stores. The Debtors' process for soliciting bids for the Phase I SCSs is detailed in the *Declaration of Holly Felder Etlin in Support of Store Closing Sale Motion* [Docket No. 10] (the "Phase I Etlin Decl.").

9. The Debtors through their advisors transmitted to the nation's largest liquidation firms bid solicitation packages containing: (a) a form non-disclosure agreement, and (b) a bid solicitation letter informing the parties of the Debtors' intentions to conduct Phase I SCSs and setting forth procedures for parties to request more information and to submit bids. Phase I Etlin Decl. ¶ 11. The Debtors' advisors also provided each of those parties copies of a draft form agency agreement and began providing them diligence materials, including, among other items, (a) detailed information regarding the closing stores including, as to each store: (i) the address, (ii) a schedule of Occupancy Expenses (as defined in the Agency Agreement) to be paid by the liquidators, (iii) 2010 P&Ls, (iv) historical weekly sales by SKU, and (v) inventory by SKU; (b) a summary of the Debtors' perpetual inventory; (c) promotional calendars for the first and second quarters of 2011; (d) a detailed listing of certain inventory contained in the debtors

distribution center to be included in the sale; and (e) employee manuals and benefits plan summary. *Id.* ¶ 14.

10.     Two bidding groups, one consisting of Great American Group LLC and Gordon Brothers Retail Partners LLC, and the other consisting of Hilco Merchant Resources, LLC, Tiger Capital, and SB Capital Group submitted bids. *Id.* ¶ 17. Following extensive discussions with the Debtors' advisors each bidding group improved its bid. *Id.* ¶ 18. The group consisting of Hilco Merchant Resources, LLC, Tiger Capital, and SB Capital Group emerged as the party with the higher and better bid and agreed to have their bid subject to an auction on the condition it be afforded a break-up fee if its bid was not the winning bid at an auction.

11.     On the Petition Date, the Debtors filed *Debtors' Emergency Motion for Entry of Orders (I) Authorizing the Debtors to Sell Certain Assets Through Store Closing Sales and to Enter Into Agency Agreement with (A) Joint Venture Composed of Hilco Merchant Resources, LLC, SB Capital Group, LLC, and Tiger Capital Group, LLC or (B) Other Successful Bidder at The Auction, (II) Approving Stalking Horse Protections, (III) Authorizing Debtors To Abandon Unsold Property, (IV) Waiving Compliance With Contractual Store Closing Sale Restrictions, (V) Exempting (A) State and Local "Fast Pay" Laws and (B) Laws Restricting Store Closing Sales, and (VI) Granting Related Relief* [Docket No. 7] (the "Phase I SCSs Motion"), requesting authority to conduct the Phase I SCSs.

12.     Also on the Petition Date, the Debtors conducted an auction to identify the highest and best bid for the Phase I SCSs. After approximately 15 rounds of bidding over more than 10 hours, a joint bid by Hilco Merchant Resources, LLC, Tiger Capital, SB Capital Group and Gordon Brothers Retail Partners, LLC (collectively, the "Phase I Liquidating Agent") emerged

as the highest and best bid and provided an 85.75% guaranteed amount of the cost value of Merchandise (up from 73% in the stalking horse bid).

13. On February 17, 2011, the Court held a hearing on the Phase I SCSs Motion at which the Court heard arguments by several parties and testimony from Ms. Etlin. On February 18, 2011, the Court entered the Phase I SCSs Order approving the Phase I SCSs.

14. The Phase I SCSs commenced at 200 of the Debtors' retail locations on February 19, 2011. On March 24, 2011, pursuant to the Phase I SCSs Order, the Debtors executed a agency agreement with the Phase I Liquidating Agent governing the liquidation of 26 additional store locations, referred to as the "put stores." Liquidation sales at the put stores commenced on March 24, 2011. As of the date hereof, the liquidation sales at all 226 locations have ended and the Debtors and the Phase I Liquidating Agent have reconciled all amounts due under the two agency agreements.

**D.      The DIP Credit Agreement[7]**

15. On the Petition Date, the Debtors filed the *Debtors' Motion for Entry of Interim and Final Orders Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364 and 507 (1) Approving Postpetition Financing, (2) Authorizing Use of Cash Collateral, (3) Granting Liens and Providing Superpriority Administrative Expense Status, (4) Granting Adequate Protection, and (5) Modifying Automatic Stay* [Docket No. 27] (the "DIP Motion").

16. On March 16, 2011, the Court entered the *Final Order Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364 and 507 (1) Approving Postpetition Financing, (2) Authorizing Use of Cash Collateral, (3) Granting Liens and Providing Superpriority Administrative Expense Status,*

---

[7]      All capitalized terms used in this Section of the Motion but not defined shall have the meanings ascribed to them in the Final DIP Order and DIP Credit Agreement.

*(4) Granting Adequate Protection, and (5) Modifying Automatic Stay* [Docket No. 404] (the

"Final DIP Order").

17.     Pursuant to the Final DIP Order, the Debtors have been authorized to obtain

senior secured, superpriority, postpetition financing in the form of a first lien new money

superpriority priming credit facility with a maximum outstanding principal amount of up to

$505,000,000 (the "DIP Loan") pursuant to the terms and conditions of that certain Senior

Secured, Super-Priority Debtor-in-Possession Credit Agreement (as the same may be amended,

supplemented, restated, or otherwise modified from time to time, the "DIP Facility").

18.     Article VII of the DIP Facility outlines certain events of default.  To avoid an

event of default under the DIP Facility, Section 7.1(m)(ii)-(v) requires that the Debtors take

certain actions within a specified time frame prior to the Lease Rejection Date (defined below).

Specifically, Section 7.1(m)(ii)-(v) states that any of the following occurrences shall constitute

an event of default:

> (ii)     on or before fifteen (15) weeks prior to the Lease Rejection
> Date, the Credit Parties have not distributed bid packages to solicit
> bids (with separate bids as to furniture, fixtures and equipment,
> which bids may be included as part of any bid submitted for the
> Inventory and which may be on a commission basis) from
> Approved Liquidators with respect to assets located on the
> properties that are subject to leases to be rejected on the Lease
> Rejection Date;
>
> (iii)    on or before fourteen (14) weeks prior to the Lease
> Rejection Date, the Credit Parties have not filed a motion or series
> of motions seeking authority to establish bidding procedures and to
> engage an Approved Liquidator to conduct the Affected Asset Sale
> as the so called "stalking horse", which bidding procedures shall be
> reasonably acceptable to the Agents;
>
> (iv)    on or before thirteen (13) weeks prior to the Lease
> Rejection Date, the Credit Parties have not entered into a stalking
> horse bid with an Approved Liquidator pursuant to an Approved
> Liquidation Agreement with respect to the Affected Asset Sale;

(v)  on or before twelve (12) weeks prior to the Lease Rejection Date, the Credit Parties have not (i) received Bankruptcy Court approval of the Affected Asset Sale or (ii) commenced the Affected Asset Sale . . .

19.  Under the DIP Facility (and herein) "Lease Rejection Date" means the last day of the 120-day lease rejection/assumption period, as such period may be extended or shortened by the Court.  The period was extended for all of the Debtors' leases through September 14, 2011 by order of the Court dated March 15, 2011 [Docket No. 383].

20.  Pursuant to section 365(d)(4)(B) of the Bankruptcy Code, the September 14, 2011 Lease Rejection Date cannot be further extended absent landlord consent.  Thus, at all locations where landlord consent has not been given, the Debtors must do the following to avoid triggering an event of default:  (1) transmit bid solicitation packages by no later than June 1, 2011, (2) file an approval motion by June 8, 2011, (3) enter into a stalking horse agency agreement by June 15, 2011 and (4) obtain Court approval and begin SCSs by June 22, 2011.

**E.  The Lease Rejection Date Extensions**

21.  Throughout these cases, the Debtors and their advisors have worked to obtain landlord consents to extend Lease Rejection Dates.  *See Declaration of Holy Felder Etlin In Support Of Second Store Closing Sale Motion* (the "Etlin Decl.") ¶ 4, filed simultaneously herewith.  Through the date of this Motion, the Debtors have succeeded in finalizing stipulations extending deadlines at nearly 365 or approximately 90% of their leased locations.  *Id*.  The Debtors are still negotiating with most of the 51 remaining locations (herein, the Closing Stores) to obtain extension stipulations.  *Id*. ¶ 5.  Thus, the Debtors hope to shorten the Closing Stores list by the hearing on the Motion.  *Id*.  In the meantime, however, due to the impending DIP Facility deadlines, the Debtors are preparing to include all Closing Stores in the SCSs and have solicited bids on that basis.  *Id*.

**F.      The Solicitation Process And Proposed Bidding Procedures**

22.      As required by the DIP Facility, on June 1, 2011, the Debtors sent a bid solicitation letter (the "June 1 Bid Solicitation Letter") to each of the nationally recognized liquidation firms, which are the same entities involved with or expressing interest in the Phase I SCSs.  *Id.* ¶ 9.  The June 1 Bid Solicitation Letter, a copy of which is attached to the Etlin Decl. at Exhibit 1, is substantially similar to the bid solicitation letter transmitted in connection with the Phase I SCSs.  *Id.*

23.      The June 1 Bid Solicitation Letter informed recipients that the Debtors were seeking proposals to select a liquidating agent that, subject to Court approval, would conduct the SCSs at the Closing Stores.  *Id.* ¶ 10.  The letter enclosed a copy of a form agency agreement and offered due diligence materials for the Closing Stores to all parties subject to a confidentiality agreement.  *Id.*   The letter contained the following dates and deadlines:  (a) Monday, June 6, 2011 as the deadline for submitting bids, consisting of a proposal and a marked-up agency agreement, (b) Tuesday, June 7, 2011 as the Debtors' deadline for selecting a stalking horse bidder among the bids timely received, (c) Thursday, June 16, 2011 as the auction and (d) Wednesday, June 22, 2011 as the last date that, subject to Court approval, the SCSs could begin (a date imposed by the DIP Facility).  *Id.*

24.      The Debtors received no bids by the bidding deadline in the June 1 Bid Solicitation Letter.  *Id.* ¶ 11.  However, prior the bidding deadline, the Debtors received a letter from a joint venture of liquidators, which indicated that "[t]he Joint Venture is very interested in the potential transaction outlined in the [Bid Solicitation Letter] and any other transaction that may develop in connection with the liquidation of assets of the Debtors."  *Id.*  The letter further indicated that the joint venture was "not presenting a proposal or a bid at this time" citing a provision in the June 1 Bid Solicitation Letter requiring the Debtors to approve any joint bids and

to Paragraph P of the Phase I SCSs Order which provides as follows: "Hilco Merchant Resources, LLC, SB Capital Group, LLC, Tiger Capital Group, LLC, on the one hand, and Gordon Brothers Retail Partners, LLC, on the other, each agree that neither party shall submit any joint bid at any future auction of Borders Group, Inc. and its affiliate Debtors without the prior consent of the Debtors and the agent for the Debtors' debtor-in-possession lenders." *Id.*

25.     The Debtors are currently considering the joint venture's request, and will consult with the DIP Lenders and the Committee on this issue. *Id.* ¶ 12.

## BASIS FOR RELIEF

26.     Section 363(b) of the Bankruptcy Code provides, in relevant part, that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate . . ." *See* 11 U.S.C. § 363(b)(1); *see also In re Ames Dept. Stores, Inc.* (Ames I)*,* 136 B.R. 357, 359 (Bankr. S.D.N.Y. 1992) (noting that "going-out-of-business" sales are governed by section 363(b)); Fed. R. Bankr. P. 6004(f)(1) ("All sales not in the ordinary course of business may be by private sale or by public auction."). Moreover, section 105(a) of the Bankruptcy Code provides that "[t]he Court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a).

27.     The decision to sell assets outside the ordinary course of business is based upon the sound business judgment of the debtor. *See*, *e.g.*, *In re Chateaugay Corp.*, 973 F.2d 141, 145 (2d Cir. 1992); *Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1071 (2d Cir. 1983) ("The rule we adopt requires that a judge determining a § 363(b) application expressly find from the evidence presented before him at the hearing a good business reason to grant such an application."); *see also Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.)*, 147 B.R. 650, 656 (S.D.N.Y. 1992) (stating

"the business judgment rule is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action was in the best interests of the company," and has continued applicability in bankruptcy ) (quoting *Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del. 1985)), *appeal dismissed*, 3 F.3d 49 (2d Cir. 1993).

## I. <u>AUTHORITY TO SELL ASSETS THROUGH STORE CLOSING SALES</u>

28.     Due to the deadlines imposed by the DIP Facility, the Debtors, in consultation with their advisors, have determined that it is in the best interests of their estates and creditors to conduct SCSs at the Closing Stores as required by the DIP Facility.  Based on applicable precedent, the Court should authorize the Debtors to do so as set forth herein to avoid the disastrous result that should befall them upon a DIP Facility default.

### A.     <u>Approval of Store Closing Sales Under Section 363 is Warranted</u>

29.     Store closing or liquidation sales are a routine occurrence in chapter 11 cases involving retail debtors.  *See Ames Dept. Stores, Inc.* (Ames I), 136 B.R. at 359) (holding that "going-out-of-business" sales are an important part of "overriding federal policy requiring [a] Debtor to maximize estate assets"); *see also In re Ames Dept. Stores, Inc.* (Ames II), Ch 11 Case No. 01-42217 (REG) (Bankr. S.D.N.Y. Aug. 20, 2001) (approving store closing sales and agency agreement on first day).  Bankruptcy Courts have approved similar requests by debtors to conduct store closing sales, finding the debtors' requested relief consistent with applicable provisions of the Bankruptcy Code.  *See*, *e.g.*, *In re Blockbuster Inc.,* Ch. 11 Case No. 10-14997 (BRL) (Bankr. S.D.N.Y. Jan. 20, 2011) [Docket No. 864] (authorizing debtors to continue self-administered going out of business sales).

30.     The Debtors have concluded that defaulting on their DIP Facility would have dire consequences to these Bankruptcy Cases and to their constituents.  Upon a DIP Facility default,

the Debtors would lose the ability to borrow funds and use cash collateral, which would force a full liquidation.

**B.** **To the Extent Applicable, Assets Should Be Sold**
**Free and Clear of Liens, Claims and Encumbrances.**

31.     The Debtors request approval to sell assets subject to the Agency Agreement on a final "as is" basis, free and clear of any and all liens, claims and encumbrances in accordance with section 363(f) of the Bankruptcy Code.  A debtor in possession may sell property under sections 363(b) and 363(f) "free and clear of any interest in such property of an entity other than the estate" if anyone of the following conditions is satisfied:

- applicable non-bankruptcy law permits sale of such property free and clear of such interest;

- such entity consents;

- such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

- such interest is a *bona fide* dispute; or

- such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f)(1)-(5); *Citicorp Homeowners Servs., Inc. v. Elliot (In re Elliot)*, 94 B.R. 343, 345 (E.D. Pa. 1988) (noting that since Section 363(f) is written in the disjunctive, the court may approve a sale free and clear if anyone subsection is met).

32.     The DIP Lenders consented to nearly identical treatment of their liens and claims in connection with the Phase I SCSs.  Indeed, the Agency Agreement and the Proposed Order incorporate extensive comments provided by the DIP Lenders in connection with the Phase I SCSs agency agreement and the subsequent "put stores" agency agreement.  The DIP Lenders received the form agency agreement delivered to potential bidders with the June 1 Bid Solicitation Letter and provided minimal comments, each of which was incorporated into the

Agency Agreement. Thus, these sales are not only occurring because of the DIP Lenders' consent, they are happening at the DIP Lenders' insistence.

33. With respect to any other party asserting a lien, claim, or encumbrance against the assets to be sold pursuant to the Agency Agreement, the Debtors anticipate that they will be able to satisfy one or more of the conditions set forth in section 363(f). In connection with the sale of the assets pursuant to the terms and conditions of the Agency Agreement, the Debtors propose that any liens, claims, and encumbrances asserted against sold assets be transferred to and attach to the amounts payable to the Debtors under the Agency Agreement, in the same order of priority and subject to the rights, claims, defenses, and objections, if any, of all parties with respect thereto. The Court granted such relief in the Phase I SCSs Order and the Debtors propose substantially similar language for the Proposed Order.[8]

34. Accordingly, the Debtors submit that, to the extent applicable, the Court should authorize the Debtors to sell the Merchandise and other SCSs assets free and clear of any liens, claims, encumbrances, or other interests that may exist, with any of the same to be transferred

---

[8] The Phase I SCSs Order provides:

> Except as otherwise provided in the Agency Agreement, pursuant to section 363(f) of the Bankruptcy Code, upon payment of the Guaranteed Amount Deposit and delivery of the Letter of Credit, the Agent shall be authorized to sell all Assets pursuant to the Agency Agreement free and clear of any and all mortgages, security interests, conditional sales or title retention agreements, pledges, hypothecations, liens, judgments, encumbrances or claims of any kind or nature (including, without limitation, any and all "claims" as defined in section 101(5) of the Bankruptcy Code), including, without limitation, the liens and security interests of GECC and GA, as agents for Lenders under the DIP Facility, as the same may have been amended from Time to time, and the Debtors' prepetition lenders whether arising by agreement, any statute or otherwise and whether arising before, on or after the date on which this chapter 11 case was commenced (collectively, the "Liens"), with any presently existing liens encumbering all or any portion of the Assets or the Proceeds thereof attaching only to the Guaranteed Amount, or other amounts payable to the Debtors under the Agency Agreement (collectively, the "Transaction Proceeds") with the same validity, force and effect as the same had with respect to the assets at issue, subject to any and all defenses, claims and/or counterclaims or setoffs that may exist.

Phase I SCSs Order ¶ 5.

and attached to the net proceeds of the sale, with the same validity and priority that such liens, claims, encumbrances, or interests had against the assets.

###### C.     The Auction Process

35.     The Debtors have determined, in an exercise of their business judgment that conducting a final auction to select the Liquidating Agent for the SCSs is in the best interests of their estates. As such, the Debtors will conduct the Auction on Thursday, June 16, 2011 beginning at 10:00 AM (EST) at the offices of Kasowitz, Benson, Torres & Friedman LLP, 1633 Broadway, New York, New York, 10019. The Debtors are providing notice of the Auction to all key constituencies. The Debtors and their advisors, in consultation with their key constituents, will establish the terms and conditions of the auction and the successful bidder at the auction will be deemed the Liquidating Agent.

36.     The Debtors submit that the forgoing procedures are fair, transparent and will derive the highest and best bids for the Closing Store assets. The Debtors also believe that going forward on an expedited basis will in no way impair recoveries because (a) all of the nationally-recognized potential liquidators (the only parties that can effectuate a transaction of this magnitude) have been directly involved in the process, (b) those parties were provided all necessary diligence and have expertise in quickly formulating and executing such bids, (c) the solicitation process run by the Debtors' advisors was routine for such situations, consistent with the process for the Phase I SCSs, (d) the form of agency agreement used is nearly identical to the form previously approved by the Court and acceptable to bidders and to the Debtors' constituents in connection with the Phase I SCSs, and (e) the DIP Agent as well as representatives of the UCC have been kept apprised of the process. *See* Etlin Decl. ¶ 13.

## II.     AUTHORITY TO RETAIN THE STALKING HORSE BIDDER OR THE SUCCESSFUL BIDDER AT THE AUCTION AS LIQUIDATING AGENT

## A.    Need to Retain a Liquidator

37.    The Debtors seek authority to dispose of the assets under the terms of the Agency Agreement with the Liquidating Agent selected at the auction.

38.    The DIP Facility requires the Debtors to engage an "Approved Liquidator," defined as "a nationally recognized liquidator of recognized standing approved by Agents" to conduct "Affected Asset Sales," defined as "a liquidation in one or a series of related transactions of the assets located on the property that are subject to leases rejected on the Lease Rejection Date."  (Page 116-18); *see also* provision quoted in Paragraph 18, *supra*.  Accordingly, the Debtors are obligated to retain a liquidating agent rather than conducting SCSs themselves.

39.    Moreover, engaging the Liquidating Agent will provide the Debtors with several benefits.  First, allowing a professional liquidator to liquidate the assets will enable the Debtors to maximize sale proceeds while minimizing distraction from the restructuring effort.  *See* Etlin Decl. ¶ 8.  Second, it is more cost effective for the Debtors to allow a Liquidation Agent to conduct the SCSs than to conduct such sales on their own because, among other reasons, the Liquidating Agent will reimburse the Debtors for expenses of the SCSs.  *Id.*  Moreover, liquidation agents generally have extensive knowledge, expertise and experience in conducting store closing sales.  *Id.*  Therefore, the Debtors' decision to retain a liquidating agent to conduct the SCSs is an exercise of sound business judgment.

40.    The Debtors submit, and will demonstrate at the hearing on this Motion, that any such prevailing bidder is entitled to the protections of section 363(m) of the Bankruptcy Code, as the Agency Agreement is the product of a good faith, arm's-length transaction.

41.     Pursuant to the arrangement proposed herein, the Liquidating Agent will have the right to use the Closing Stores and the Debtors' related services, FF&E and other assets located

in the Closing Stores in conducting the SCSs.  In addition, pursuant to the Agency Agreement, the Liquidating Agent will also have a right to establish and implement advertising, signage and promotional programs consistent with "store closing" or similar theme (but not "going out business" or any similar theme).

42.     The Liquidating Agent will conduct the SCSs pursuant to the same sale guidelines previously approved by the Court in connection with the Phase I SCSs.  *See* Agency Agreement § 8.1; Proposed Order ¶ 3.  The Debtors prepared those sale guidelines in consultation with counsel representing many of the Debtors' most significant landlords.  Moreover, all landlords will be provided an opportunity *after* approval of the SCSs to seek relief from the Sale Guidelines, using the same procedures approved by the Court in connection with the Phase I SCSs.  *See* Section II.A., *infra.*

43.     This Court – in approving the Phase I SCSs and in other cases -- as well as other courts, in numerous highly-publicized chapter 11 cases, have approved the similar use of a liquidator to conduct store closing sales.

**B.     The Agency Agreement**

44.     The Debtors respectfully request authority to enter into an agency agreement with the Liquidating Agent containing materially the same provisions as the Agency Agreement annexed here.  The Agency Agreement is nearly identical to the agreement utilized in, and approved by the Court, in the Phase I SCSs.

45.     Although the Debtors respectfully refer the Court to the Agency Agreement in its entirety, certain of the material terms are set forth below[9]:

---

[9]     Capitalized terms used in this summary shall have the meanings ascribed to them in the Agency Agreement. This summary of the Agency Agreement is for summary purposes only and is qualified in its entirety by the terms and provision of the Agency Agreement.

- <u>Assets</u>.  All Merchandise at the Closing Stores as of the Sale Commencement Date and, subject to agreement on economic terms among the parties with constituent input, Merchandise located at the distribution centers.  The Closing Stores will consist of up to 51 stores identified in <u>Exhibit A</u> hereto.

- <u>Guaranteed Amount</u>.  As a guaranty of the Liquidating Agent's performance under the Agency Agreement, the Liquidating Agent will guarantee the Debtors' receipt of a certain percentage of the Cost Value of the Merchandise included in the sale (the "<u>Guaranty Percentage</u>").

- <u>Sale of Owned FF&E, Newsstand Inventory and Café/Candy Inventory</u>.  The Liquidating Agent will sell the FF&E, Newsstand Inventory and Café/Candy Inventory located at the Closing Stores (except excluded items identified by the Debtors, with lender consent), in exchange for a fee of 20% of the net proceeds from such sales.

- <u>Payment Timing</u>.  On the Sale Commencement Date, the Liquidating Agent will wire to the Debtors 80% as payment of a portion of the Guaranteed Amount (the "<u>Guaranteed Amount Deposit</u>").  The Liquidating Agent will pay the remaining Guaranteed Amount and all other amounts due to the Debtors, pursuant to the timing in the Agency Agreement, as and when the parties reconcile the Guaranteed Amount.

- <u>Expenses of Sale</u>.  From the Sale Commencement Date through and including the Sale Termination Date, the Liquidating Agent will be unconditionally responsible for all Expenses enumerated in Section 4.1 of the Agency Agreement (including, without limitation, Occupancy Expenses, Payroll, benefits for Retained Employees, Agent's on-site supervision related costs, signs and banners, promotional costs, Sale supplies, telephone, postage/overnight or delivery/courier charges, utility charges, credit card and bank fees, costs related to moving, transferring or consolidating merchandise between Closing Stores, insurance costs, trash removal and cleaning costs, security and building alarm costs, cost of capital and letter of credit fees, and any Retention Bonuses for Retained Employees and an agreed percentage of the costs of the physical inventory taking), incurred in conducting the Sale during the Sale Term, which Expenses may be funded and paid from Proceeds of the Sale to the extent available, or directly by the Liquidating Agent.

- <u>Employees</u>.  The Liquidating Agent shall have the right to use the Debtors' store-level employees during the Sale Term and will reimburse the Debtors for actual payroll, and Employee Benefits up to an agreed upon cap based upon a percentage of the aggregate base payroll.  The Liquidating Agent may also elect to pay, as an expense, a retention bonus to certain retained employees.  The employees will remain the Debtors' employees at all times.

- <u>Cost Value / Inventory Taking</u>.  The Cost Value of Merchandise is the average landed actual cost for an item of Merchandise, as reflected in the Debtors'

perpetual inventory file as of the Sale Commencement Date. The Debtors and Liquidating Agent will jointly conduct a physical inventory taking at each of the Closing Stores, for purposes of testing the Cost Value of the Merchandise in the Closing Stores. The Agency Agreement provides a procedure for adjusting the Cost Value used in the sale, based on results of the inventory taking.

- Sale Term. The Liquidating Agent will have the right to conduct the Store Closing Sales commencing the day after entry of the Order approving the SCSs (which the Debtors request to occur on or before June 22, 2011 to comply with the DIP Facility deadlines). The SCSs will continue until August 31, 2011; provided, however, that under certain circumstances, the Liquidating Agent may terminate the sales at certain Closing Stores prior to such date.

- Sale Guidelines. The SCSs shall be conducted in accordance with the sale guidelines approved by the Court in connection with the Phase I SCSs.

- Merchandise Returns/Gift Cards/Other Programs. Although sales of all items of Merchandise sold during the Sale Term shall be a "final sale", the Liquidating Agent will accept returns of Merchandise sold prior to the Sale Commencement Date provided that such return is accompanied by the original Store register receipt and is otherwise in compliance with Debtors' return and price adjustment policy in effect as of the date such item was purchased. During the Sale Term, the Liquidating Agent will accept the Debtors' gift cards, Borders Rewards Plus Loyalty Program discounts, and Merchandise credits issued by the Debtors prior to the Sale Commencement Date, but solely to the extent that the Court previously authorized the Debtors to honor such items in connection with the Debtors' customer programs motion. The Debtors shall reimburse the Liquidation Agent for such amounts during the weekly sale reconciliation. The Liquidating Agent shall not honor any employee discounts.

- Letter of Credit / Security Interests. To secure its obligations under the Agency Agreement, the Liquidating Agent will post a letter of credit for the benefit of the Debtors. The Liquidating Agent will be granted, upon issuance of the Letter of Credit and effective as of the Payment Date, a valid and perfected first priority security interest in and lien upon (x) the Merchandise, (y) proceeds realized from the disposition of the Agent Sale FF&E up to the amount of the Agent's disposition commission related to Agent Sale FF&E, and (z) the Proceeds, to secure all obligations of Merchant to Agent. Such security interest shall remain junior and subordinate in all respects to the Agent's Payment Obligations, and the liens, security interests and claims of the GECC and the Lenders, to the extent of the unpaid portion of Agent's Payment Obligations. Upon entry of the Approval Order, and payment of the Guaranteed Amount Deposit, and the issuance of the Letter of Credit, the security interest granted to the Agent will be deemed properly perfected without the necessity of filing financing statements or other documentation.

### C. The SCSs Do Not Require Appointment of A Consumer Privacy Ombudsman

46.     Section 363(b)(1) of the Bankruptcy Code provides that a debtor may not sell or lease personally identifiable information unless such sale or lease is consistent with its policies or upon appointment of a consumer privacy ombudsman pursuant to section 332 of the Bankruptcy Code.

47.     Pursuant to the Agency Agreement, the Liquidating Agent will _not_ have access to the Debtors' customer lists and the Debtors will not disclose any personally identifiable information regarding the Debtors' customers. Therefore, appointment of a consumer privacy ombudsman is unnecessary.

### D. Stalking Horse Bid / Bid Protections

48.     In the upcoming days, the Debtors will continue to discuss potential bids with bidders to identify the highest and best bid to serve as stalking horse bidder. The DIP Facility requires the Debtors to enter into an agreement with a stalking horse bidder by June 15, 2011. As of the date hereof, the Debtors do not yet know what terms a stalking horse bid will contain or what bid protections the stalking horse will require. The Debtors will consult with the DIP Lenders and the Committee with respect to any such protections and concerning bidding procedures for the auction. Moreover, the Debtors plan to supplement this Motion with the agreement executed with the stalking horse bidder to provide notice of the bid protections and to supplement the Etlin Decl. regarding same.[10]

---

[10]     Courts in the Second Circuit analyze the appropriateness of bidding incentives such as bid protections under the "business judgment rule" standard, and it is well established in this district that courts consider whether (a) the relationship of the parties who negotiated the break-up fee is devoid of taint by self-dealing or manipulation, (b) the fee encourages, rather than hampers, bidding, and (c) the amount of the fee is reasonable relative to the proposed purchase price. *See Integrated Res.*, 147 B.R. at 657-8 (to evaluate bid protections, courts should employ the business judgment rule, which proscribes judicial second-guessing of the corporate debtor's actions taken in good faith, absent self-dealing, and in the exercise of honest judgment); *see also In re Metaldyne Corp.*, 409 B.R. 661, 670 (Bankr. S.D.N.Y. 2009) (approving bid protections because, among other factors, "the

49. The Debtors believe that the terms of the Agency Agreement are typical, customary and reasonable under the circumstances in the exercise of their prudent business judgment. They are substantially similar to the terms approved by the Court in connection with the Phase I SCSs. Accordingly, the Debtors respectfully request that the Court authorize the Debtors to enter into an agency agreement substantially similar to the Agency Agreement with the Liquidating Agent.

## III. WAIVER OF CONTRACTUAL RESTRICTIONS AND EXEMPTION OF LAWS RESTRICTING STORE CLOSING SALES

50. The Debtors respectfully request waiver of certain contractual or applicable law restrictions that could otherwise inhibit or prevent the Debtors' ability to maximize recovery through the SCSs, and which are customarily waived in sales such as these.

### A. Waiver of Contractual Restrictions

51. The Debtors request that the Court override or invalidate any Contractual Restrictions that may impair the Debtors' ability to close stores and conduct the SCSs. The stores subject to the SCSs are located on properties that are leased by the Debtors. In certain cases, the contemplated SCSs may be inconsistent with certain provisions of such leases, subleases, or other documents with respect to any such leased premises, including (without limitation) reciprocal easement agreements, agreements containing covenants, conditions and restrictions (including, without limitation, "go-dark" provisions and landlord recapture rights), or other similar documents or provisions.

---

stalking horse bid brings value to the estate by setting a floor on the price and providing a structure for potential competing bids . . . [and] would provide comfort to the Debtors' employees and customers that the company was entering the auction with a locked-in bid.").

52. Store closing or liquidation sales are a routine part of chapter 11 cases involving retail debtors. Such sales are consistently approved by courts despite provisions of recorded documents or agreements purporting to forbid such sales. Indeed, other such restrictive provisions in contracts have been deemed unenforceable in other chapter 11 cases as impermissible restraints on a debtor's ability to maximize the value of its assets under section 363 of the Bankruptcy Code. *See In re Blockbuster Inc.,* Ch. 11 Case No. 10-14997 (BRL) (Bankr. S.D.N.Y. Jan. 20, 2011) [Docket No. 864] at ¶¶ 7, 8; *In re Bradlees Stores, Inc.*, Case No. 00-16035 (BRL) (Bankr. S.D.N.Y. Jan. 4, 2001) (authorizing Debtors to conduct GOB sales notwithstanding state rules or statutes governing closing, liquidation, or "going-out-of-business" sales and notwithstanding provision in leases restricting Debtor's ability to conduct such sales); *In re R.H. Macy & Co.*, 170 B.R. 69, 77 (Bankr. S.D.N.Y. 1994) (holding restrictive lease provision unenforceable against debtor that sought to conduct going-out-of-business sale "because it conflicts with the Debtor's fiduciary duty to maximize estate assets"); *Ames Dep't Stores, Inc.* (Ames I), 136 B.R. at 359 (finding that "to enforce the anti-GOB sale clause of the [l]ease would contravene overriding federal policy requiring Debtors to maximize estate assets by imposing additional constraints never envisioned by Congress").

53. In connection with the Phase I SCSs, the Court approved sale guidelines, which govern certain rights of landlords during the sales. The Debtors propose that those same guidelines also govern the SCSs. *See* Proposed Order ¶ 30. Similarly, the Phase I SCSs Order contains a procedure for landlords to challenge the sale guidelines, which the Debtors propose also exist with respect to the SCSs.[11] *Id.*

---

[11]    The Phase I SCSs Order provides as follows:

> Any landlord seeking relief from the Sales Guidelines approved in this Order (the "Sales Guidelines Relief") must follow the procedures set forth in this Paragraph for seeking such relief.

54.     Based on well-established precedent, and given the additional protections that the Debtors will afford landlords similar to the same procedures utilized in the Phase I SCSs, the Court should ensure that no Contractual Restriction is an impediment to the SCSs, closures of Closing Stores, or the activities in connection therewith.  To the extent such Contractual Restrictions exist, they should not be permitted to interfere with, or otherwise restrict the Debtors from conducting the SCSs or the closing of any Closing Stores.

### B.     Exemption From Applicable Law Restrictions

55.     Certain states in which the Closing Stores are located have or may have licensing and other requirements governing the conduct of store closing, liquidation, or other inventory clearance sales, including (but not limited to) state, and local laws, statutes, rules, regulations, and ordinances related to store closing and liquidation sales, establishing licensing, permitting, or bonding requirements, waiting periods, time limits, bulk sale restrictions, augmentation limitations that would otherwise apply to the SCSs, or consumer fraud laws, with the exception of deceptive advertising laws (the "Liquidation Sale Laws").  Typical statutes and regulations provide that if a liquidation or bankruptcy sale is court authorized, however, then a company need not comply with these Liquidation Sale Laws.

---

At any time before the fifth (5th) business day following entry of this Order, or with respect to any Put Option Store before the fifth (5th) business day following service of a notice that any such store has been selected as a Put Option Store, any landlord (other than a landlord that is a party to a Side Letter with respect to the Store(s) at issue) may seek Sales Guidelines Relief . . . If the Debtors, the Agent and the landlord are unable to resolve the landlord's request for Sales Guidelines Relief within five (5) days of service of a notice of Sales Guidelines Relief, the landlord may file an objection with the Court seeking the Sales Guidelines Relief (a "Sales Guidelines Relief Objection") to be heard by the Court on an expedited basis subject to the Court's availability. Any issues relating to any Sales Guidelines Relief shall not affect the finality of this Order or limit or interfere with the conduct of the Sales prior to any ruling by this Court on the Sales Guidelines Relief Objection.

Phase I Order at ¶ 32.

56.     The Debtors, therefore, request that the Court authorize the Debtors to conduct the SCSs without the necessity of, and the delay associated with, complying with the Liquidation Sale Laws.  Because the Debtors and their assets are subject to this Court's jurisdiction, *see* 28 U.S.C. § 1334, this Court will be able to supervise the SCSs.  The SCSs are legitimate methods by which the Debtors can maximize the return from the sale of assets for the benefit of their estates and creditors.  Moreover, creditors and the public interest are adequately protected by the jurisdiction and supervision of this Court.

57.     Even if a state or local law does not expressly except bankruptcy sales from its ambit, the Debtors submit that, to the extent that such state or local law conflicts with federal bankruptcy laws, it is preempted by the Supremacy Clause of the United States Constitution.  To hold otherwise would severely impair the relief otherwise available under section 363 of the Bankruptcy Code.  In concert with this premise, bankruptcy courts have consistently recognized that federal bankruptcy law preempts state and local laws that contravene the underlying policies of the Bankruptcy Code.  *See, e.g.*, *Aloe v. Shenango Inc. (In re Shenango Group, Inc.)*, 186 B.R. 623, 628 (Bankr. W.D. Pa. 1995) ("Trustees and debtors-in-possession have unique fiduciary and legal obligations pursuant to the bankruptcy code. . . . [A] state statute [ ] cannot place burdens on them where the result would contradict the priorities established by the federal bankruptcy code.").  While preemption of state law is not always appropriate, as when the protection of public health and safety is involved, *see Baker & Drake, Inc. v. Pub. Serv. Comm'n of Nev. (In re Baker &Drake, Inc.)*, 35 F.3d 1348, 1353-54 (9th Cir. 1994) (finding no preemption when state law prohibiting taxicab leasing was promulgated in part as a public safety measure), it is appropriate when, as here, the only state laws involved concern economic regulation.  *Id.* at 1353 (finding that "federal bankruptcy preemption is more likely . . . where a state statute is concerned

with economic regulation rather than with protecting the public health and safety"). Moreover, pursuant to section 105 of the Bankruptcy Code, the Court has the authority to permit the SCSs to proceed notwithstanding contrary Liquidation Sale Laws. *See* 11 U .S.C. § 105(a).

58. Here, section 363 of the Bankruptcy Code, which requires the Debtors to operate their businesses in a way that maximizes recoveries for creditors, will be undermined if the Court does not provide for the waiver of the Liquidation Sale Laws because the Liquidation Sale Laws constrain the Debtors' ability to marshal and maximize assets for the benefit of creditors. Similar relief has been granted by courts in this jurisdictions. *See, e.g.*, *In re Blockbuster Inc.,* Ch. 11 Case No. 10-14997 (BRL) [Docket No. 864] (Bankr. S.D.N.Y. Jan. 20, 2011) at ¶¶ 9, 10; *In re Finlay Enters., Inc.*, Ch. 11 Case No. 09-14873 (JMP) [Docket No. 262] (Bankr. S.D.N.Y. Sept. 25, 2009) at ¶ 11; *In re Steve & Barry's Manhattan LLC,* Ch 11 Case No. 08-12579 (ALG) [Docket No. 628] (Bankr. S.D.N.Y. Aug. 22, 2008) at ¶ 36.

59. Importantly, given the supervision of this Court, the requested waiver will not unduly undermine state and local requirements that would otherwise apply to the SCSs. The Debtors only request that this Court authorize the Debtors to conduct the SCSs without the necessity of, and the delay associated with, obtaining various state licenses or permits, observing state and local waiting periods or time limits, and/or satisfying any additional requirements with respect to advertising, conducting the SCSs as store closings or similar type sales, or transferring merchandise from the distribution centers to the Closing Stores. The Debtors fully intend to be bound by and comply with remaining statutes and regulations, such as health and safety laws.

60. The Debtors also request that no other person or entity, including (but not limited to) any lessor or federal, state, or local agency, department, or governmental authority, be allowed to take any action to prevent, interfere with, or otherwise hinder consummation of the

SCSs, or the advertising and promotion (including through the posting of signs) of SCSs, in the manner set forth in the Proposed Order.

61.     The Debtors are entitled to the foregoing relief, which is routinely granted in connection with store closing sales.  Indeed, the Court granted such relief in connection with the Phase I SCSs.  *See* Phase I SCSs Order ¶ 9.  The Debtors propose granting governmental authorities an opportunity to dispute the sale *after* entry of an order granting this Motion, which parallels the protections in the Phase I SCSs Order.[12]  See Proposed Order ¶¶ 7, 8.

## IV.     AUTHORITY TO ABANDON UNSOLD PROPERTY FOLLOWING STORE CLOSING SALES

62.     Section 554(a) of the Bankruptcy Code provides that after notice and a hearing, the trustee, and therefore the debtor in possession, "may abandon any property of the estate that is burdensome to the estate or that is of inconsequential value and benefit to the estate."  *See Hanover Ins. Co. v. Tyco Indus., Inc.*, 500 F.2d 654, 657 (3d Cir. 1974) (a trustee "may abandon his claim to any asset, including a cause of action, he deems less valuable than the cost of asserting that claim"); *In re Grossinger's Assoc.*, 184 B.R. 429, 432 (Bankr. S.D.N.Y. 1995). *See also Midlantic Nat'l Bank v. New Jersey Dep't of Envtl. Protection*, 474 U.S. 494, 507, n.9 (1986) ("[A] trustee [in bankruptcy] may not abandon property in contravention of a state statute

---

[12]    The Phase I SCSs Order provides as follows:

> To the extent there is a dispute arising from or relating to the Sales, this Order, the Agency Agreement, or the Sale Guidelines, which dispute relates to any GOB Laws or Liquidation Laws (a "Reserved Dispute"), the Court shall retain exclusive jurisdiction to resolve the Reserved Dispute. Any time within fifteen (15) days following service of this Order, any Governmental Unit may assert that a Reserved Dispute exists by serving written notice of such Reserved Dispute to counsel for the Debtors and counsel for the Agent at the addresses set forth in the Agency Agreement so as to ensure delivery thereof within one (1) business day thereafter.  If the Debtors, the Agent and the Governmental Unit are unable to resolve the Reserved Dispute within fifteen (15) days of service of the notice, the aggrieved party may file a motion with this Court requesting that this Court resolve the Reserved Dispute (a "Dispute Resolution Motion").

Phase I SCSs Order ¶ 9(c).

or regulation that is reasonably designed to protect the public health or safety from identified hazards . . . This exception to the abandonment power . . . is a narrow one."); *In re Bryson*, 53 B.R. 3, 4-5 (Bankr. M.D. Tenn. 1985) ("The effect of the abandonment is to remove the asset from the jurisdiction of the bankruptcy court.").

63.     Under the Agency Agreement, any Merchandise remaining at the Closing Stores following the SCSs can be sold by the Liquidating Agent, with the proceeds thereof treated as Proceeds for purposes of compensation computation.  To the extent, however, that the Liquidating Agent does not sell any Merchandise, Owned FF&E, Newsstand Inventory or Café/Candy Inventory, the Debtors request that they be authorized upon the conclusion of the SCSs to abandon same without incurring liability to any person or entity.  The Debtors submit that if they are unable to sell or dispose of any such assets following the SCSs, it would be costly and burdensome to the estate to retain them.

64.     Notwithstanding the foregoing, the Debtors and the Liquidating Agent will utilize all commercially reasonable efforts to remove or cause to be removed any confidential or personal identifying information (which means information which alone or in conjunction with other information identifies an individual, including, but not limited to, an individual's name, social security number, date of birth, government-issued identification number, account number, and .credit or debit card number) in any of the Debtors' hardware, software, computers or cash registers or similar equipment that are to be sold or abandoned.

65.     This Court granted the foregoing relief in connection with the Phase I SCSs.  *See* Phase I SCSs Order ¶ 27.  Consistent therewith, the Debtors request that in event of an abandonment, the applicable landlord be authorized to dispose of property without any liability to any individual or entity that may claim an interest in such abandoned property and that such

abandonment be without prejudice to any landlord's right to assert any claims based on such abandonment and without prejudice to the Debtors or other party-in-interest to object thereto. *See* Proposed Order ¶ 25.

## VI. WAIVER OF STAY UNDER BANKRUPTCY RULES 6004(h) AND 6006(d)

66.     Pursuant to Bankruptcy Rule 6004(h), unless a court orders otherwise, all orders authorizing the sale of property pursuant to section 363 of the Bankruptcy Code are automatically stayed for 14 days after entry of the order.  Fed. R. Bankr. P. 6004(h).  The purpose of Bankruptcy Rule 6004(h) is to provide sufficient time for an objecting party to appeal before the order is implemented.  *See* Fed. R. Bankr. P. 6004(h) advisory committee note.

67.     In order to avoid a default under the DIP Facility, the Debtors request that any order approving the Motion be effective immediately by providing that the 14-day stay under Bankruptcy Rules 6004(h) is waived.

## VII. COMPLIANCE WITH LOCAL RULE 6004-1

68.     The Debtors submit that, given the description of the SCSs provided herein, the requirements of Rule 6004-1 of the Local Bankruptcy Rules for the Southern District of New York (the "Local Bankruptcy Rules") have been satisfied.  Alternatively, to the extent the Court finds that the Debtors have not met any applicable provisions of Local Bankruptcy Rule 6004-1, the Debtors respectfully request that the Court waive such requirements with respect to this Motion.

### NOTICE

69.     No trustee or examiner has been appointed in these chapter 11 cases.  Notice of this Motion has been given in accordance with this Court's order, dated February 16, 2011, implementing certain notice and case management procedures [Docket No. 64] (the "Case Management Order"), which includes the offices of the attorneys general and the consumer

protection agencies for each state in which the Debtors operate a Closing Store, the applicable county consumer protection agencies, the landlords for the Closing Stores and the municipalities in which the Closing Stores are located. The Debtors submit that no other or further notice need be provided.

70.     No previous request for the relief sought herein has been made by the Debtors to this or any other court.

WHEREFORE the Debtors respectfully request that the Court grant the relief requested herein and such other and further relief as it deems just and proper.

Dated: June 8, 2011
     New York, New York

KASOWITZ, BENSON, TORRES
 & FRIEDMAN LLP

By: /s/ Andrew K. Glenn
David M. Friedman (DFriedman@kasowitz.com)
Andrew K. Glenn (AGlenn@kasowitz.com)
Jeffrey R. Gleit (JGleit@kasowitz.com)
1633 Broadway
New York, New York 10019
Telephone:  (212) 506-1700
Facsimile:   (212) 506-1800

*Attorneys for Debtors*
*and Debtors in Possession*