David M. Friedman (DFriedman@kasowitz.com)
Andrew K. Glenn (AGlenn@kasowitz.com)
Jeffrey R. Gleit (JGleit@kasowitz.com)
KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
1633 Broadway
New York, New York 10019
Telephone: (212) 506-1700
Facsimile: (212) 506-1800

*Attorneys for Debtors*
*and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **In re** | **Chapter 11** |
| **BORDERS GROUP, INC.,** *et al.*,[1] | **Case No. 11-10614 (MG)** |
| Debtors. | **(Jointly Administered)** |

**DECLARATION OF HOLLY FELDER ETLIN**
**IN SUPPORT OF SECOND STORE CLOSING SALE MOTION**

Pursuant to 28 U.S.C. § 1746, I, Holly Felder Etlin, hereby declare as follows:

1. I am a managing director of AlixPartners, LLP ("AlixPartners"). My business address is 40 West 57th Street, 29th Fl., New York, New York 10019. On February 18, 2011, I was appointed Senior Vice President – Restructuring ("SVPR") of Borders Group, Inc., as documented in an addendum dated as of February 23, 2011, to the engagement letter between AP Services, LLC ("APS") and Borders Group, Inc. dated as of February 9, 2011. On March 16, 2011, the Court entered an order authorizing the Debtors to designate me as SVPR for the Debtors [Docket No. 397].

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Borders Group, Inc. (4588); Borders International Services, Inc. (5075); Borders, Inc. (4285); Borders Direct, LLC (0084); Borders Properties, Inc. (7978); Borders Online, Inc. (8425); Borders Online, LLC (8996); and BGP (UK) Limited.

2. I submit this declaration (this "Declaration") in accordance with Rule 1007-2 of the Local Bankruptcy Rules for the Southern District of New York (the "Local Bankruptcy Rules") in support of the *Debtors' Motion for Entry of Order (I) Authorizing the Debtors to Sell Certain Assets Through Store Closing Sales, (II) Approving Bidding Procedures to Select Liquidating Agent to Conduct Store Closing Sales, (III) Authorizing Debtors To Abandon Unsold Property, (IV) Waiving Compliance With Contractual Store Closing Sale Restrictions, (V) Exempting Laws Restricting Store Closing Sales, and (VI) Granting Related Relief* (the "Motion"). [2]

3. The facts set forth in this Declaration are based upon my personal knowledge, upon information and belief (where indicated), or upon client matter records kept in the ordinary course of business that were reviewed by me or other employees of APS under my supervision and direction. If called and sworn as a witness, I could and would testify competently to the matters set forth herein.

### A. The Lease Rejection Date Extensions

4. Throughout these bankruptcy cases, the Debtors and their advisors have worked extensively to obtain landlord consents to extend the time to assume or reject leases (the "Lease Rejection Dates"). Through the date of this Declaration, the Debtors have succeeded in finalizing stipulations extending Lease Rejection Dates at nearly 365 or approximately 90% of their leased locations.

5. The Debtors are still negotiating with landlords at most of the 51 remaining locations to obtain extension stipulations. I believe that, with additional time, the Debtors can obtain extensions at many of the remaining 51 locations. Thus, the Debtors hope to shorten the

---

[2] Capitalized terms used but not defined herein are as defined in the Motion.

list of stores by the hearing on the Motion. In the meantime, however, due to the impending DIP Facility deadlines, the Debtors are preparing to include all 51 stores in the sales proposed in the Motion and have solicited bids on that basis.

6.       Most of the stores for which the Debtors have not obtained extension stipulations are among the most profitable in the portfolio or have leases which are under market. The Debtors would assume these leases, but various creditor constituencies have indicated that they would oppose any such assumption outside of the context of a sale of the business as a going concern or confirmation of a plan of reorganization.

**B.       Retaining Liquidators to Conduct the Store Closing Sales**

7.       I believe that the stores to be liquidated pursuant to the Motion should not be liquidated under the circumstances. The liquidation of these stores may not maximize their value for the benefit of creditors and will result in a significant loss of jobs. Indeed, if the Motion is granted, the Debtors will not be able to sell the stores subject to the Motion to a going concern buyer because they likely will have been liquidated pursuant to this Motion first. Unfortunately, it is my understanding that the Debtors' DIP financing facility requires the Debtors to commence store closing sales within certain deadlines before the assumption/rejection deadline, and the Debtors are committed to complying with all provisions of their DIP financing facilities including liquidating these stores.

8.       If the Debtors must liquidate the stores, however, engaging liquidators will provide the Debtors with several benefits. First, allowing a professional liquidator to liquidate the assets will enable the Debtors to maximize sale proceeds while minimizing distraction from the restructuring effort. Second, it is more cost effective for the Debtors to allow liquidators to conduct the SCSs than to conduct such sales on their own because, among other reasons,

liquidators will reimburse the Debtors for expenses of the SCSs.  Moreover, liquidators generally have extensive knowledge, expertise and experience in conducting store closing sales.

**C.     The Bid Solicitation Process**

9.      As required by the DIP Facility, on June 1, 2011, the Debtors sent a bid solicitation letter (the "June 1 Bid Solicitation Letter") to each of the nationally recognized liquidation firms, which are the same entities involved with or expressing interest in the Phase I SCSs.  The June 1 Bid Solicitation Letter, a copy of which is attached hereto as Exhibit 1, is substantially similar to the bid solicitation letter transmitted in connection with the Phase I SCSs.

10.     The June 1 Bid Solicitation Letter informed recipients that the Debtors were seeking proposals to select a liquidating agent that, subject to Court approval, would conduct the SCSs at the Closing Stores.  The letter enclosed a copy of a form agency agreement and offered due diligence materials for the Closing Stores to all parties subject to a confidentiality agreement.  The letter contained the following dates and deadlines:  (a) Monday, June 6, 2011 as the deadline for submitting bids, consisting of a proposal and a marked-up agency agreement, (b) Tuesday, June 7, 2011 as the Debtors' deadline for selecting a stalking horse bidder among the bids timely received, (c) Thursday, June 16, 2011 as the auction and (d) Wednesday, June 22, 2011 as the last date that, subject to Court approval, the SCSs could begin (a date imposed by the DIP Facility).

11.     The Debtors received no bids by the bidding deadline in the June 1 Bid Solicitation Letter.  However, prior the bidding deadline, the Debtors received a letter from a joint venture of liquidators, which indicated that "[t]he Joint Venture is very interested in the potential transaction outlined in the [Bid Solicitation Letter] and any other transaction that may develop in connection with the liquidation of assets of the Debtors."  The letter further indicated

that the joint venture was "not presenting a proposal or a bid at this time" citing a provision in the June 1 Bid Solicitation Letter requiring the Debtors to approve any joint bids and to Paragraph P of the Phase I SCSs Order which provides as follows: "Hilco Merchant Resources, LLC, SB Capital Group, LLC, Tiger Capital Group, LLC, on the one hand, and Gordon Brothers Retail Partners, LLC, on the other, each agree that neither party shall submit any joint bid at any future auction of Borders Group, Inc. and its affiliate Debtors without the prior consent of the Debtors and the agent for the Debtors' debtor-in-possession lenders."

12. The Debtors are currently considering the joint venture's request, and will consult with the DIP Lenders and the Committee on this issue.

13. I believe that the Motion should be heard on an expedited basis so that the SCSs can begin no later than the June 22, 2011 deadline in the DIP Facility. Based on my experience with such transactions, I believe that going forward on an expedited basis will in no way impair recoveries because (a) all of the nationally-recognized potential liquidators (the only parties that can effectuate a transaction of this magnitude) have been directly involved in the process, (b) those parties were provided all necessary diligence and have expertise in quickly formulating and executing such bids, (c) the solicitation process run by the Debtors' advisors was routine for such situations, consistent with the process for the Phase I SCSs, (d) the form of agency agreement used is nearly identical to the form previously approved by the Court and acceptable to bidders and to the Debtors' constituents in connection with the Phase I SCSs, and (e) the DIP Agent as well as representatives of the UCC have been kept apprised of the process.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

[SIGNATURE PAGE FOR DECLARATION OF HOLLY FELDER ETLIN
IN SUPPORT OF SECOND STORE CLOSING SALE MOTION]

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Dated: June 8, 2011

Respectfully submitted,

*/s/ Holly Felder Etlin*

Holly Felder Etlin
Senior Vice President - Restructuring