David M. Friedman (DFriedman@kasowitz.com)
Andrew K. Glenn (AGlenn@kasowitz.com)
Jeffrey R. Gleit (JGleit@kasowitz.com)
KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
1633 Broadway
New York, New York 10019
Telephone: (212) 506-1700
Facsimile: (212) 506-1800

*Attorneys for Debtors*
*and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **In re** | Chapter 11 |
| **BORDERS GROUP, INC., *et al.*,**[1] | Case No. 11-10614 (MG) |
| Debtors. | (Jointly Administered) |

**DEBTORS' MOTION FOR AN ORDER PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363, 364 AND 507 AUTHORIZING DEBTORS TO ENTER INTO SECOND AMENDMENT TO DEBTOR IN POSSESSION CREDIT AGREEMENT**

TO THE HONORABLE MARTIN GLENN,
UNITED STATES BANKRUPTCY JUDGE:

Borders Group, Inc. and its affiliated debtors, as debtors and debtors in possession (collectively, the "Debtors"), by their undersigned counsel, respectfully submit this motion (the "Motion") for entry of an order approving the second amendment and waiver to the Debtors' debtor-in-possession credit agreement as approved by the *Final Order Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364 and 507 (1) Approving Postpetition Financing, (2) Authorizing Use of*

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Borders Group, Inc. (4588); Borders International Services, Inc. (5075); Borders, Inc. (4285); Borders Direct, LLC (0084); Borders Properties, Inc. (7978); Borders Online, Inc. (8425); Borders Online, LLC (8996); and BGP (UK) Limited.

*Cash Collateral, (3) Granting Liens and Providing Superpriority Administrative Expense Status, (4) Granting Adequate Protection, and (5) Modifying Automatic Stay* [Docket No. 404] (the "Final DIP Order"). In support of this Motion, the Debtors submit the *Declaration of Holly Felder Etlin* (the "Etlin Declaration"), attached hereto as Exhibit C. In further support of this Motion, the Debtors respectfully state as follows:

## PRELIMINARY STATEMENT[2]

The DIP Credit Facility includes various deadlines relating to the commencement and consummation of store closing sales before the expiration of the Debtors' deadline to assume or reject leases covering their stores. Because of these deadlines, the Debtors recently filed a motion seeking authorization to close 51 stores for which the Debtors were unable to obtain extensions from landlords (as more fully described herein, the "Second Store Closing Motion"). The Debtors did not want to proceed with these sales for the reasons cited therein.

However, after extensive good faith negotiations between the Debtors, the DIP Agents and the Committee, the Debtors and the DIP Agents have reached an agreement on the terms of the Second Amendment to the DIP Credit Agreement[3], which addresses all of the Debtors' concerns about the sale contemplated by the Second Store Closing Motion. The Second Amendment will enable the Debtors to commence and consummate a coordinated dual-track sale process for the sale of their businesses by the end of July. If the Debtors are unable to consummate a going concern sale of the business that maximizes value, they will proceed with a sale to liquidators. However, as previously disclosed in this Court, the going concern sale process has gained significant momentum in recent weeks, and the Debtors are encouraged that

---

[2] Capitalized terms used in this Preliminary Statement but not defined, shall have the meanings ascribed to them elsewhere in this Motion.

[3] The Second Amendment requires the approval of the Required Lenders and the Term B Lenders (each as defined in the DIP Credit Agreement) which has not yet been obtained.

2

one of the parties presently negotiating with the Debtors will emerge as the successful buyer on a going concern basis, which the Debtors believe would be the best outcome for all constituencies.

As a result of the Second Amendment, the Debtors have withdrawn the Second Store Closing Motion. Instead, the Debtors, DIP Agents and the Committee have agreed, subject to the Court's approval, on the following schedule for the sale of substantially all of their assets:

- *Designation of Stalking Horse Bidder/Bidding Procedures.* The Debtors shall file a motion on or before July 1, 2011 for approval of a stalking horse bidder that shall pay the DIP Lenders in full in cash and for the approval of related bidding procedures.

- *Order Approving Stalking Horse Bidder/Bidding Procedures*. Required to be entered on or before July 15, 2011.

- *Auction*. To be held on July 19, 2011.

- *Sale Hearing*. To be held on or before July 22, 2011.

- *Closing*. To occur on or before July 29, 2011.

The Second Amendment also limits the DIP Lenders' rights to impose additional reserves on inventory for stores with forthcoming lease rejection deadlines and enables the Debtors to liquidate up to ten small format stores if the landlords for such locations terminate any such leases at will in accordance with their terms. In exchange for these substantial benefits to the estates, the DIP Lenders have increased the Debtors' minimum availability requirements from $25 million to $30 million, and will receive a fee of $1 million.

The Debtors respectfully submit that the Second Amendment is a valid exercise of their business judgment and is in the best interests of the Debtors' estates. The Second Amendment paves the way for a sale of substantially all of the Debtors' assets through a process that will maximize value for the benefit of parties in interest while protecting the DIP Lenders' interests. If the Second Amendment is not approved, the Debtors will default under the DIP Credit

Agreement and lose access to critical funds to run their business. Such a default would force the Debtors to halt operations and liquidate on an expedited basis, with the attendant loss of value to the estates, recoveries to unsecured creditors and thousands of jobs.

Accordingly, for the reasons set forth herein, the Second Amendment should be approved.

## JURISDICTION

1. This Court has subject matter jurisdiction to consider and determine this matter pursuant to 28 U.S.C. § 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

## RELIEF REQUESTED

2. By this Motion, the Debtors seek entry of an order pursuant to sections 105, 361, 362, 363, 364, and 507 of chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in substantially the form annexed hereto as Exhibit A (the "Proposed Order") approving and authorizing the Debtors to enter into the Second Amendment and Waiver (the "Second Amendment"), in substantially the form annexed hereto as Exhibit B.

## BACKGROUND

3. On February 16, 2011 (the "Petition Date"), each of the Debtors commenced a voluntary case under chapter 11 of title 11 of the Bankruptcy Code. The Debtors are authorized to operate their business and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. The Debtors' cases (the "Bankruptcy Cases") are being jointly administered pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

# DEBTORS' BUSINESS

**A.     Operations**

4.     The Debtors are a leading operator of book, music and movie superstores and mall-based bookstores.  At January 29, 2011, the Debtors operated 642 stores, under the Borders, Waldenbooks, Borders Express and Borders Outlet names, as well as Borders-branded airport stores in the United States, of which 639 stores are located in the United States and three in Puerto Rico.  In addition, the Debtors operate a proprietary e-commerce web site, www.Borders.com, launched in May 2008, which includes both in-store and online e-commerce components.  Pursuant to the Court's *Order Approving Agency Agreement, Store Closing Sales and Related Relief* [Docket No. 91] entered on February 18, 2011, the Debtors closed and liquidated the inventory at 226 of their retail locations.

5.     The Debtors currently employ approximately 3,792 full-time employees and approximately 7,244 part-time employees, located throughout the United States and Puerto Rico.  The Debtors' employees are not subject to any collective bargaining agreements.

**B.     Financials**

6.     For the fiscal year ended January 29, 2011, the Debtors recorded net sales of approximately $2.3 billion.  As of December 25, 2010, the Debtors had incurred net year-to-date losses of approximately $168.2 million.  The Debtors' Schedules list $1,649,799,850 of assets and $2,626,757,691 of liabilities.  *See* Debtors' Schedules [Docket Nos. 491, 493, 495, 497, 499, 501, 503, 505, each at 2].

7.     Additional information regarding the Debtors' business, capital structure, and the circumstances leading to these chapter 11 cases is contained in the *Declaration of Scott Henry Pursuant to Local Bankruptcy Rule 1007-2 in Support of First Day Motions* [Docket No. 20].

C.     **The DIP Credit Agreement**[4]

8.     On the Petition Date, the Debtors filed the *Debtors' Motion for Entry of Interim and Final Orders Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364 and 507 (1) Approving Postpetition Financing, (2) Authorizing Use of Cash Collateral, (3) Granting Liens and Providing Superpriority Administrative Expense Status, (4) Granting Adequate Protection, and (5) Modifying Automatic Stay* [Docket No. 27] (the "DIP Motion").

9.     On March 10, 2011, the Debtors filed the *First Amendment and Waiver to Debtor-In-Possession Credit Agreement* [Docket No. 349] (the "First Amendment"). Certain changed pages to the First Amendment were filed with this Court on March 11, 2011. [Docket No. 356].

10.     On March 16, 2011, the Court entered the *Final Order Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364 and 507 (1) Approving Postpetition Financing, (2) Authorizing Use of Cash Collateral, (3) Granting Liens and Providing Superpriority Administrative Expense Status, (4) Granting Adequate Protection, and (5) Modifying Automatic Stay* [Docket No. 404] (the "Final DIP Order").

11.     Pursuant to the Final DIP Order, the Debtors were authorized to obtain senior secured, superpriority, postpetition financing in the form of a first lien new money superpriority priming credit facility with a maximum outstanding principal amount of up to $505,000,000 (the "DIP Loan"), pursuant to the terms and conditions of that certain Senior Secured, Super-Priority Debtor-in-Possession Credit Agreement (as the same may be amended, supplemented, restated, or otherwise modified from time to time, the "DIP Credit Agreement").

---

[4]     Capitalized terms used in this Section of the Motion but not defined shall have the meanings ascribed to them in the Final DIP Order and DIP Credit Agreement.

12. Article VII of the DIP Credit Agreement outlines certain events of default. To avoid an event of default under the DIP Credit Agreement, Section 7.1(m)(ii)-(v) requires that the Debtors take certain actions within a specified time frame prior to the Lease Rejection Date (defined below). Specifically, Section 7.1(m)(ii)-(v) states that any of the following occurrences shall constitute an event of default:

> (ii) on or before fifteen (15) weeks prior to the Lease Rejection Date, the Credit Parties have not distributed bid packages to solicit bids (with separate bids as to furniture, fixtures and equipment, which bids may be included as part of any bid submitted for the Inventory and which may be on a commission basis) from Approved Liquidators with respect to assets located on the properties that are subject to leases to be rejected on the Lease Rejection Date;
>
> (iii) on or before fourteen (14) weeks prior to the Lease Rejection Date, the Credit Parties have not filed a motion or series of motions seeking authority to establish bidding procedures and to engage an Approved Liquidator to conduct the Affected Asset Sale as the so called "stalking horse", which bidding procedures shall be reasonably acceptable to the Agents;
>
> (iv) on or before thirteen (13) weeks prior to the Lease Rejection Date, the Credit Parties have not entered into a stalking horse bid with an Approved Liquidator pursuant to an Approved Liquidation Agreement with respect to the Affected Asset Sale;
>
> (v) on or before twelve (12) weeks prior to the Lease Rejection Date, the Credit Parties have not (i) received Bankruptcy Court approval of the Affected Asset Sale or (ii) commenced the Affected Asset Sale . . . .

13. Under the DIP Credit Agreement (and herein) "Lease Rejection Date" means the last day of the 120-day lease rejection/assumption period, as such period may be extended or shortened by the Court. The period was extended for all of the Debtors' leases through September 14, 2011 by order of the Court dated March 15, 2011 [Docket No. 383].

14. Pursuant to section 365(d)(4)(B) of the Bankruptcy Code, the September 14, 2011 Lease Rejection Date cannot be further extended absent landlord consent. Thus, absent the

Second Amendment, an event of default would occur under the DIP Credit Agreement unless the Debtors, at any location where a landlord did not consent to a further extension: (1) transmitted bid solicitation packages to liquidate such stores by no later than June 1, 2011; (2) filed an approval motion by June 8, 2011; (3) entered into a stalking horse agency agreement by June 15, 2011; and (4) obtained Court approval and began store closings by June 22, 2011.

15. On June 9, 2011[5], the Debtors filed the *Debtors' Motion For Entry of Order (I) Authorizing The Debtors To Sell Certain Assets Through Store Closing Sales, (II) Approving Bidding Procedures to Select Liquidating Agent to Conduct Store Closing Sales, (III) Authorizing Debtors to Abandon Unsold Property, (IV) Waiving Compliance With Contractual Store Closing Sale Restrictions, (V) Exempting Laws Restricting Store Closing Sales and (VI) Granting Related Relief* [Docket No. 999] (the "Second Store Closing Motion"). On the date the Debtors filed the Second Store Closing Motion, the Debtors had obtained extensions of the Lease Rejection Date at a significant number of their store locations but had not obtained further extensions at 51 of their locations. As of the date hereof, the Debtors have received at least 10 additional stipulations and filed notices withdrawing such stores from the Closing Stores list. *See* Docket Nos. 1016 and 1048. On June 15, 2011, the Debtors filed their notice cancelling the auction for the Additional Closing Stores. *See* Docket No. 1053. As a result of the agreement in principle with respect to the Second Amendment, the Debtors have withdrawn the Second Store Closing Motion.

## BASIS FOR RELIEF

16. The Debtors, in consultation with the Committee, did not wish to proceed with a sale of the stores contemplated by the Second Store Closing Motion. Indeed, since that filing, the Debtors have worked diligently to obtain additional extensions from landlords to the

---

[5] The DIP Lenders consented to a one day extension of the deadline to file the Second Store Closing Motion.

8

Debtors' deadline to assume or reject leases. Thus several, but not all, of the applicable stores have been removed from the Store Closing Motion.

17. As this Court is aware, the Debtors are actively engaged in a marketing and sales process for their business in an effort to maximize value for all stakeholders. The Debtors have been in talks with a number of parties that have shown significant interest in acquiring a substantial amount of the Debtors assets on a going concern basis, including stores subject to the Store Closing Motion. Accordingly, in May 2011 the Debtors initiated discussions with the DIP Lenders to modify the DIP Credit Agreement to allow the Debtors to conduct a sale of all or substantially all of their business. These negotiations culminated in the Second Amendment.

18. The Second Amendment provides for, among other things, the following primary changes to the DIP credit agreement (the "DIP Credit Agreement"):[6]

>  (a) Amendment Fee. $1,000,000.[7]
>
>  (b) Permitted Dispositions. Section 5.2 of the DIP Credit Agreement shall be amended to permit (i) dispositions in connection with 10 Small-Format Store Liquidations if landlords elect to terminate any lease with kick-out rights, and (ii) dispositions in connection with a Sale Transaction (x) in the case of a Full Chain Liquidation, commencing not later than July 22, 2011, or (y) in the case of a GC Sale, consummated not later than July 29, 2011 as to the GC Sale portion of the Sale Transaction, with any related Remainder Chain Liquidation commencing not later than July 22, 2011, and in either case resulting in the repayment in full in cash at the closing of such Sale Transactions of all Obligations (including the cash collateralization of all L/C Reimbursement Obligations and the funding of the

---

[6] The description of the terms of the Second Amendment is intended solely to provide the Court and interested parties with a brief overview of the significant terms thereof. For a complete description of the terms and conditions of the Second Amendment, reference should be made to the Second Amendment. This summary is qualified in its entirety by reference to the provisions of the Second Amendment. In the event of any conflict or inconsistency between the provisions of this Motion and the Second Amendment, the Second Amendment shall control in all respects. Capitalized terms used in this section of the Motion and not otherwise defined herein or in the Amended DIP Order shall have the meanings ascribed to such terms in the Second Amendment.

[7] The Debtors have provided or will provide copies of the confidential fee letter to the U.S. Trustee, to the Court, and to the Committee. The Debtors request that this fee letter and its contents be kept confidential pursuant to Bankruptcy Rule 9018, and be limited to the parties listed above (including being limited to only the professionals for the Committee), to protect the sensitive commercial information of the DIP Agents and the DIP Lenders contained therein.

9

Working Capital Indemnity Account and Term B Indemnity Account). Second Amendment § 2(a).

(c)     Budget and Availability Compliance. Section 5.21 of the DIP Credit Agreement will be amended to increase the Availability covenant from $25 million to $30 million. Second Amendment § 2(b).

(d)     Events of Default. Section 7.1(m)(ii)-(iv) of the DIP Credit Agreement, will be amended to reflect the following amended events of default:

>   (ii)     On or before June 17, 2011 the Credit Parties shall have failed to distribute to all interested parties informational packages and solicitations for bids in connection with a Full Chain Liquidation (other than as to the Credit Parties' intellectual property and interest in leases), and any informational packages sent for solicitations of bids for a Full Chain Liquidation shall fail to contain such supporting due diligence documentation as necessary to enable the solicitation of bids for the liquidation of Inventory on an equity basis, and as to furniture, fixtures and equipment, on an equity or commission basis;
>
>   (iii)    (I) On or before July 1, 2011, (x) the Credit Parties shall have failed to file a motion, in form and substance reasonably acceptable to Agents, seeking approval of bidding procedures, in form and substance reasonably acceptable to Agents, including bid protections (the "Sales Procedure Motion"), for one or more binding stalking horse bids (collectively, the "Stalking Horse Bid") and seeking approval of the related stalking horse bidder (the "Stalking Horse Bidder"), or (y) the Credit Parties shall fail to have received and accepted (subject only to Bankruptcy Court approval), after consultation with the Agents, a Stalking Horse Bid that is reasonably acceptable to Agents. Without limiting the requirement that a Stalking Horse Bid be reasonably acceptable to Agents, in the event the Stalking Horse Bid is a bid for a GC Sale, such Stalking Horse Bid shall either: (A)(1) contain no conditions other than approval of the GC Sale by the Bankruptcy Court and such other conditions reasonably acceptable to Agents, (2) include a good faith deposit in an amount reasonably acceptable to Agents, and (3) if the Stalking Horse Bid for a GC Sale on a stand alone basis is in an amount insufficient to effect at the closing of such GC Sale the repayment in full in cash of all Obligations (including the cash collateralization of all L/C Reimbursement Obligations and the funding of the Working Capital Indemnity Account and Term B Indemnity Account) in accordance with Section 1.10(c)(ii) and (iii), it shall be combined with a Stalking Horse Bid for a Remainder Chain Liquidation such that, on a combined basis, both Stalking Horse Bids shall result in payment in full in cash at the closing of such Sale Transactions of all Obligations (including the cash collateralization of all L/C Reimbursement Obligations and the funding of the Working Capital Indemnity Account and Term B Indemnity Account) in accordance with

10

Section 1.10(c)(ii) and (iii); or (B) be accompanied by a binding backup bid for a Full Chain Liquidation (including without limitation, bids as to inventory, furniture, fixtures and equipment and substantially all other assets of the Credit Parties, but excluding intellectual property and leases) in support of a GC Sale, as evidenced by an Approved Liquidation Agreement and such other applicable documentation and on other terms reasonably acceptable to Agents and in form and substance reasonably acceptable to Agents, and providing for the repayment in full in cash at the closing of such Sale Transaction of all Obligations (including the cash collateralization of all L/C Reimbursement Obligations and the funding of the Working Capital Indemnity Account and Term B Indemnity Account) pursuant to Section 1.10(c)(ii) and (iii) and which binding bid shall remain open and not subject to modification or termination until August 1, 2011.

In the event no reasonably acceptable Stalking Horse Bid for a GC Sale is received and accepted, the Credit Parties shall have failed to receive and accept, on or before July 1, 2011, a Stalking Horse Bid for a Full Chain Liquidation (including without limitation, bids as to inventory, furniture, fixtures and equipment, and substantially all other assets of the Credit Parties but excluding intellectual property and leases), as evidenced by an Approved Liquidation Agreement and such other applicable documentation and on other terms reasonably acceptable to Agents and in form and substance reasonably acceptable to Agents; (II) in the event that the Stalking Horse Bid for the Sale Transaction (A) does not provide for payment in full in cash at the closing of such Sale Transaction of all Obligations (including the cash collateralization of all L/C Reimbursement Obligations and the funding of the Working Capital Indemnity Account and Term B Indemnity Account) pursuant to Section 1.10(c)(ii) and (iii) or (B) is not acceptable to the Agents in their reasonable discretion, then by July 1, 2011 (x) the Credit Parties shall have failed to distribute to all interested parties informational packages and solicitations for bids in connection with the sale of the Credit Parties' intellectual property and interests in leases, or any informational packages sent for solicitations of bids for such sale shall fail to contain such supporting due diligence documentation as reasonably requested by Agents, or (y) the Credit Parties' intellectual property assets and interest in leases shall fail to be included in the auction applicable to the balance of the Sale Transaction, provided, that, in the event that the Bankruptcy Court later approves a Sale Transaction that is a GC Sale that provides for payment in full in cash of all Obligations (including the cash collateralization of all L/C Reimbursement Obligations and the funding of the Working Capital Indemnity Account and Term B Indemnity Account) pursuant to Section 1.10(c)(ii) and (iii), then the Credit Parties shall be permitted to withdraw the solicitations for bids for their intellectual property assets and interest in leases at such time; and (III) on or before July 15, 2011, the Bankruptcy Court shall not have entered an order, in form and substance reasonably

acceptable to Agents, approving the Sales Procedure Motion and Stalking Horse Bid(s);

(iv)     on or before July 22, 2011, the Credit Parties shall have failed to receive approval from the Bankruptcy Court of a Sale Transaction (which Sale Transaction, for the avoidance of doubt, in the case of the application of Section 7.1(m)(iii)(II) above, shall include the Credit Parties' intellectual property and interests in leases) in an amount sufficient to result in the repayment in full in cash of all Obligations (including the cash collateralization of all L/C Reimbursement Obligations and the funding of the Working Capital Indemnity Account and Term B Indemnity Account) pursuant to Section 1.10(c)(ii) and (iii) herein, and the order approving such Sale Transaction shall be in form and substance reasonably satisfactory to the Agents and shall provide for the payment in full in cash of all Obligations (including cash collateralization of contingent obligations) pursuant to Section 1.10(c)(ii) and (iii);

(v)     In the event the approved Sale Transaction (i) is a Full Chain Liquidation, on or before July 22, 2011, the Credit Parties shall have failed to have executed all of the agency documents or other relevant documents to be executed to effect the Full Chain Liquidation and the Full Chain Liquidation shall not have commenced; or (ii) includes a GC Sale, (x) on or before July 22, 2011, the Credit Parties shall have failed to have executed all of the agency documents or other relevant documents to be executed to effect the Remainder Chain Liquidation occurring on a parallel basis with such GC Sale, and such Remainder Chain Liquidation, if any, shall not have commenced, and (y) on or before July 29, 2011, the Debtors shall have failed to have executed all purchase agreements and other relevant documents in connection with the GC Sale and the GC Sale shall not have been consummated;

Second Amendment § 2(c).

(e)     The definition of "Eligible Inventory" in Section 11.1 of the Credit Agreement is hereby amended to exclude Inventory at any Store that is the subject of (i) a Permitted Store Closing or (ii) a Small-Format Store Liquidation, provided with respect to this subclause (ii) that such Inventory shall be ineligible upon the earlier of (x) the Credit Parties' receipt of notice from the related landlord of the exercise of rights to compel the Credit Parties to vacate such Store, or (y) the commencement of the liquidation sale at such Store.  Second Amendment §2(e).

(f)     The definition of "Lease Assumption Reserve Commencement Date" in Section 11.1 of the Credit Agreement is hereby deleted in its entirety and replaced with the following:

"Lease Assumption Reserve Commencement Date" means (i) as to Inventory at any leased locations with respect to which the period for lease

12

rejection/assumption has not been extended past October 31, 2011 or with respect to which the lease shall expire on or prior to October 31, 2011, July 29, 2011; and (ii) as to Inventory at all other locations, the date that is twelve (12) weeks prior to the Lease Rejection Date.

(g) <u>Minimum Excess Availability</u>. The definition of Minimum Excess Availability shall be increased from $25 million to $30 million. Second Amendment § 2(g).

(h) <u>Withdrawal of the Second Store Closing Motion</u>. The DIP Lenders consent to the withdrawal of the Second Store Closing Motion and related bid packages and waive any Events of Default relating thereto. Second Amendment § 4(a).

(i) <u>Source Interlink</u>. The DIP Lenders consent to the Debtors' filing a motion to assume and amend an agreement with Source Interlink Companies, Inc. ("<u>Source</u>"), the Debtors national supplier of periodicals. Second Amendment § 4(b).

(j) <u>Additional Store Closings</u>. The Lenders and the Agents hereby consent to the Borrowers' closure of Store No. 10-608, located at Ocean County Mall, Toms River, New Jersey, Store No. 10-652, located at Valley River Center, Eugene, Oregon, and Store No. 754, located in the McCarran Airport, Las Vegas, Nevada (the "<u>Additional Store Closings</u>"), and the dispositions of collateral in connection with the Additional Store Closings; <u>provided</u>, that such Additional Store Closings are conducted pursuant to that certain Letter Agreement Governing Inventory Disposition, dated as of December 9, 2010, between Borders, Inc. and Hilco Merchant Resources, LLC. Second Amendment § 4(d).

(k) <u>Updated Appraisal</u>. The Debtors shall provide an updated appraisal of their assets by June 30, 2011. Second Amendment § 5.

19. The DIP Lenders have informed the Debtors that they are willing to amend the DIP Credit Agreement as contemplated in the Second Amendment only under the specific conditions and requirements set forth therein.

**A. The Second Amendment Provides the Debtors with the Necessary Relief to Continue Their Regular Business Operations and Complete the Marketing and Sale Process**

20. The success of the Debtors' operations and sale efforts hinges on their continuing access to sufficient post-petition financing during an appropriate marketing period to consummate a sale. If the Court does not approve the Second Amendment, the Debtors may lose

the opportunity to enter into a going concern sale. The Debtors also face a substantial risk of severe disruption to their business operations and irreparable harm to the ultimate value they can obtain from their assets. The Debtors respectfully submit that the Second Amendment should be approved to give the Debtors the time and flexibility necessary to assure a value-maximizing transaction.

21. The negotiation and entry into the Second Amendment is a reasonable exercise of the Debtors' business judgment. Bankruptcy courts consistently defer to a debtor's business judgment on most business decisions, unless such decision is arbitrary and capricious. *See*, *e.g.*, *Official Comm. Of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.)*, 147 B.R. 650, 656 (S.D.N.Y. 1992); *In re Simasko Prod. Co.,* 47 B.R. 444, 449 (D. Colo. 1985) ("[b]usiness judgments should be left to the board room and not to this Court."). Similarly, courts have looked to a debtor's business judgment in connection with amendments of post-petition credit facilities. *See In re Farmland Indus., Inc.*, 294 B.R. 855, 881, 884 (Bankr. W.D. Mo. 2003) (finding that the debtors made a "sound, reasonable decision" to enter into an amendment to a post-petition credit agreement and that it was "in best interests of the Debtors, and thus their creditors, to avoid a termination of the Debtors' DIP financing . . . [which] would have been disastrous for the Debtors").[8]

---

8   In approving an amendment to a post-petition credit facility that included an amendment fee and payment of certain expenses, the court in *Farmland* articulated five factors in considering an "amendment to existing financing, particularly where the amendment makes extensive changes in the post-petition financing package *and where there is serious opposition by creditors to the proposal* …" Such factors include:

   (1) That the proposed financing is an exercise of sound and reasonable business judgment;

   (2) That the financing is in the best interests of the estate and its creditors;

   (3) That the credit transaction is necessary to preserve the assets of the estate, and is necessary, essential, and appropriate for the continued operation of the Debtors' businesses;

   (4) That the terms of the transaction are fair, reasonable, and adequate, given the circumstances of the debtor-borrower and the proposed lender; and

22. The Debtors clearly satisfy these standards because the Second Amendment is fair, reasonable and in the best interests of the estates and their constituents. The Second Amendment will prevent defaults that may otherwise occur if the DIP Credit Agreement were not amended; this will assure that the Debtors have continued access to funds to continue operations without interruption and allow the Debtors to consummate a successful sale of their businesses by July 29, 2011. Moreover, the Second Amendment was subject to extensive, good faith, arm's-length negotiations among the Debtors, lenders and the official committee of unsecured creditors (the "<u>Committee</u>"), and has the support of the Committee.

**B.    The Amendment Fee is Fair, Reasonable, and Necessary**

23. The DIP Lenders have required that the Debtors pay the Amendment Fee as consideration and a condition precedent to the Second Amendment. DIP lenders typically require such fees in these circumstances.

24. The agreement to pay the Amendment Fee is subject to the reasonable exercise of the Debtors' business judgment and is reasonable under the circumstances. *See In re Farmland Indus., Inc.*, 294 B.R. at 887. Courts in this district have approved the payment of fees in connection with an amendment of a post-petition financing agreement. *See e.g. In re Tronox Incorporated*, Ch. 11 Case No. 09-10156 (ALG) [Docket No. 465] (Bankr. S.D.N.Y May 28, 2009) (objections by official committees of unsecured creditors and equityholders resolved prior to entry of order); *In re Chemtura*, Ch. 11 Case No. 09-11233 (REG) [Docket No. 765] (Bankr. S.D.N.Y July 14, 2009) (issues raised by creditors committee resolved consensually). Without the Second Amendment, the DIP Lenders could effectively halt the Debtors' operations and force a

---

(5) That the financing agreement was negotiated in good faith and at arm's-length between the Debtors, on the one hand, and the Agents and the Lenders, on the other hand.

*Id.* at 881 (emphasis added).

liquidation that, while paying the DIP Lenders in full, would likely cost subordinated creditors far more than $1 million in aggregate lost recoveries. The Debtors submit that the Amendment Fee is fair, reasonable and necessary under the circumstances.

## CONCLUSION

25. Accordingly, the Debtors respectfully submit that entry of an order approving the proposed Second Amendment is necessary and appropriate to enable the Debtors to continue operations and maximize value. The proposed Second Amendment has been negotiated in good faith, at arm's-length, and is in the best interests of the Debtors, the estates and their creditors.

## NOTICE

26. No trustee or examiner has been appointed in these chapter 11 cases. Notice of this Motion has been given in accordance with this Court's order, dated February 16, 2011, implementing certain notice and case management procedures [Docket No. 64] (the "Case Management Order"). The Debtors submit that no other or further notice need be provided.

27. No previous request for the relief sought herein has been made by the Debtors to this or any other court.

WHEREFORE the Debtors respectfully request that the Court grant the relief requested herein and such other and further relief as it deems just and proper.

Dated: June 17, 2011
New York, New York

KASOWITZ, BENSON, TORRES
 & FRIEDMAN LLP

By: /s/ Andrew K. Glenn
David M. Friedman (DFriedman@kasowitz.com)
Andrew K. Glenn (AGlenn@kasowitz.com)
Jeffrey R. Gleit (JGleit@kasowitz.com)
1633 Broadway
New York, New York 10019
Telephone: (212) 506-1700
Facsimile: (212) 506-1800

*Attorneys for Debtors
and Debtors in Possession*