Sale Procedures Objection Deadline:  July 11, 2011 at 12:00 p.m. (prevailing Eastern Time)
Sale Procedures Hearing Date:  July 14, 2011 at 10:00 a.m. (prevailing Eastern Time)
Stalking Horse Bid Objection Deadline: July 14, 2011 at 4:00 p.m. (prevailing Eastern Time)
Assumption and Assignment Objection Deadline: July 14, 2011 at 4:00 p.m. (prevailing Eastern Time)
Supplemental Objection Deadline:  July 20, 2011 at 3:00 p.m. (prevailing Eastern Time)
Sale Hearing Date:  July 21, 2011 at 11:00 a.m. (prevailing Eastern Time)

David M. Friedman (DFriedman@kasowitz.com)
Andrew K. Glenn (AGlenn@kasowitz.com)
Jeffrey R. Gleit (JGleit@kasowitz.com)
KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
1633 Broadway
New York, New York 10019
Telephone:  (212) 506-1700
Facsimile:  (212) 506-1800

*Attorneys for Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **In re** | **Chapter 11** |
| **BORDERS GROUP, INC., *et al.*,[1]** | **Case No. 11-10614 (MG)** |
| **Debtors.** | **(Jointly Administered)** |

**NOTICE OF HEARING ON DEBTORS' MOTION FOR AN ORDER PURSUANT TO
SECTIONS 105, 363 AND 365 OF THE BANKRUPTCY CODE AND RULES 2002,
6004, 6006 AND 9014 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE
(I) APPROVING THE SALE OF SUBSTANTIALLY ALL OF THE DEBTORS'
ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES AND
INTERESTS AND THE ASSUMPTION AND ASSIGNMENT OF EXECUTORY
CONTRACTS AND UNEXPIRED LEASES RELATED THERETO, (II) APPROVING THE
SALE PROCEDURES AND BREAK-UP FEE, AND (III) GRANTING RELATED RELIEF**

**PLEASE TAKE NOTICE** that in connection with the above-captioned debtors and debtors

in possession's (collectively, the "Debtors") *Motion for an Order Pursuant to Sections 105, 363 and*

*365 of the Bankruptcy Code and Rules 2002, 6004, 6006 and 9014 of the Federal Rules of*

*Bankruptcy Procedure (I) Approving the Sale of Substantially All of the Debtors' Assets Free and*

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Borders Group, Inc. (4588); Borders International Services, Inc. (5075); Borders, Inc. (4285); Borders Direct, LLC (0084); Borders Properties, Inc. (7978); Borders Online, Inc. (8425); Borders Online, LLC (8996); and BGP (UK) Limited.

*Clear of All Liens, Claims, Encumbrances and Interests and the Assumption and Assignment of Executory Contracts and Unexpired Leases Related Thereto, (II) Approving the Sale Procedures and Break-Up Fee, and (III) Granting Related Relief* (the "<u>Motion</u>"), a hearing (the "<u>Sale Procedures Hearing</u>") shall be held to approve (i) the sale procedures (the "<u>Sale Procedures</u>") for a sale (the "<u>Sale</u>")[2] of substantially all of the Debtors' assets to the Stalking Horse Bidder (as defined in the Motion) or to a back-up bidder which is currently for a Full Chain Liquidation (as defined in the Motion), free and clear of all liens, claims, encumbrances, and interests and the assumption and assignment of executory contracts and unexpired leases, (ii) a break-up fee (the "<u>Break-Up Fee</u>") for the Stalking Horse Bidder and (iii) related relief before the Honorable Martin Glenn, United States Bankruptcy Judge, at the United States Bankruptcy Court for the Southern District of New York, Courtroom 501, One Bowling Green, New York, New York 10004 (the "<u>Bankruptcy Court</u>") on **July 14, 2011 at 10:00 a.m. (prevailing Eastern Time)** (the "<u>Sale Procedures Hearing Date</u>"), or as soon thereafter as counsel may be heard.

**PLEASE TAKE FURTHER NOTICE** that bids to be submitted in accordance with the Sale Procedures must be received by the Debtors at Kasowitz, Benson, Torres & Friedman LLP, attorneys for the Debtors, 1633 Broadway, New York, New York 10019 (Attn: Andrew K. Glenn, Esq. and Jeffrey R. Gleit, Esq.) **no later than July 17, 2011 at 5:00 p.m. (prevailing Eastern Time)** (notwithstanding Bankruptcy Rule 9006(a)(1)(C)) to be considered by the Debtors.

**PLEASE TAKE FURTHER NOTICE** that a hearing shall be held on the Motion to approve the Sale, that may also involve approval of a Winning Bid (from the Auction), and/or the Debtors' Back-Up Bid (as defined in the Motion), which is currently a Full Chain Liquidation, before the Honorable Martin Glenn, United States Bankruptcy Judge, at the Bankruptcy Court on **July 21, 2011 at 11:00 a.m. (prevailing Eastern Time)** (the "<u>Sale Hearing Date</u>"), or as soon thereafter as counsel may be heard.

**PLEASE TAKE FURTHER NOTICE** that objections, if any, to the relief sought in the Motion shall be made in writing, shall state with particularity the grounds therefore, shall conform

---

[2] Pursuant to the proposed Sale, the Stalking Horse Bidder will be assuming certain of the Debtors' liabilities.

to the Federal Rules of Bankruptcy Procedure and the Local Bankruptcy Rules for the Southern District of New York (the "Local Rules"), and shall be filed with the Bankruptcy Court electronically in accordance with General Order M-399 (General Order M-399 and the User's Manual for the Electronic Case Filing System can be found at www.nysb.uscourts.gov, the official website for the Bankruptcy Court) by registered users of the Bankruptcy Court's case filing system, and by all other parties in interest, on a 3.5-inch disk or CD-ROM, preferably in Portable Document Format (PDF), WordPerfect or any other Windows-based word processing format (with a hard copy delivered directly to Chambers) and served in accordance with General Order M-399 or otherwise so as to be actually received: (1) for objections to the Sale Procedures, **no later than July 11, 2011 at 12:00 p.m. (prevailing Eastern Time)** (the "Sale Procedures Objection Deadline"); (2) for objections to the Sale and the Back-Up Bid including objections to the assumption and assignment of executory contracts and unexpired leases, **no later than July 14, 2011 at 4:00 p.m. (prevailing Eastern Time)** (the "Sale Objection Deadline" and, together with the Sale Procedures Objection Deadline, the "Objection Deadlines") by: (i) Kasowitz, Benson, Torres & Friedman LLP, attorneys for the Debtors, 1633 Broadway, New York, New York 10019 (Attn: Andrew K. Glenn, Esq. and Jeffrey R. Gleit, Esq.); (ii) the Office of the United States Trustee for the Southern District of New York, 33 Whitehall Street, New York, New York 10004 (Attn: Paul K. Schwartzberg, Esq.); (iii) Lowenstein Sandler PC, counsel for the official committee of unsecured creditors, 65 Livingston Avenue, Roseland, New Jersey 07068 (Attn: Bruce D. Buechler, Esq. and Paul Kizel, Esq.), and 1251 Avenue of the Americas, New York, New York 10020 (Attn: Bruce S. Nathan, Esq.); (iv) counsel for the DIP Agents: (a) Morgan, Lewis & Bockius LLP, 101 Park Avenue, New York, New York 10178-0060 (Attn: Wendy Walker, Esq.), and 225 Franklin Street, 16th Floor, Boston, Massachusetts 02110-4104 (Attn: Sandra Vrejan, Esq.), counsel for the Working Capital Agent, and (b) Choate Hall & Stewart LLP, Two International Place, Boston, Massachusetts 02110 (Attn: Kevin Simard, Esq.), counsel for GA Capital LLC; (v) Kelley Drye & Warren LLP, attorneys for certain landlords, 101 Park Avenue, New York, New York 10178 (Attn: James S. Carr, Esq., Robert L. LeHane, Esq., and Benjamin D. Feder, Esq.); and (vi) Bingham McCutchen LLP, attorneys for

Bank of America, N.A., One Federal Street, Boston, Massachusetts 02110-1726 (Attn: Julia Frost-Davies, Esq. and Andrew Gallo, Esq.); provided, however, in the event that the Debtors conduct an auction in accordance with the Sale Procedures (an "Auction") and the results of that Auction yield a Winning Bidder (as defined in the Motion) other than the Stalking Horse Bidder, objections as to any issues raised by such Winning Bid (as defined in the Motion) or the identity of the Winning Bidder may be filed and served in accordance with the above requirements **no later than July 20, 2011 at 3:00 p.m. (prevailing Eastern Time)** (the "Supplemental Objection Deadline").

    **PLEASE TAKE FURTHER NOTICE** that on or about July 19, 2011, following the Auction, if any, the Debtors will file a notice with the Court (the "Notice of Results of Sale Process"), which will either confirm that the Stalking Horse Bid (as defined in the Motion) is the Winning Bid, in the event there is no Auction, or identify the terms of the Winning Bid at Auction, along with a description of the Winning Bidder.

    **PLEASE TAKE FURTHER NOTICE** that copies of the Motion, the procedures governing the bidding in connection therewith, the proposed order approving such procedures, the Break-Up Fee, the proposed order approving the Sale, and the form of the purchase agreement governing the potential sale of all or substantially all of the Debtors' assets to the Stalking Horse Bidder are available at www.bordersreorganization.com.  If you do not have computer access, you may obtain copies of these documents by contacting the Debtors' undersigned counsel.

Dated: June 30, 2011
       New York, New York

                        KASOWITZ, BENSON, TORRES
                         & FRIEDMAN LLP

                        By: /s/ Andrew K. Glenn
                        David M. Friedman (DFriedman@kasowitz.com)
                        Andrew K. Glenn (AGlenn@kasowitz.com)
                        Jeffrey R. Gleit (JGleit@kasowitz.com)
                        1633 Broadway
                        New York, New York 10019
                        Telephone:  (212) 506-1700
                        Facsimile:   (212) 506-1800

                        *Attorneys for Debtors and Debtors in Possession*

4

**Sale Procedures Objection Deadline:  July 11, 2011 at 12:00 p.m. (prevailing Eastern Time)**
**Sale Procedures Hearing Date:  July 14, 2011 at 10:00 a.m. (prevailing Eastern Time)**
**Stalking Horse Bid Objection Deadline: July 14, 2011 at 4:00 p.m. (prevailing Eastern Time)**
**Assumption and Assignment Objection Deadline: July 14, 2011 at 4:00 p.m. (prevailing Eastern Time)**
**Supplemental Objection Deadline:  July 20, 2011 at 3:00 p.m. (prevailing Eastern Time)**
**Sale Hearing Date:  July 21, 2011 at 11:00 a.m. (prevailing Eastern Time)**

David M. Friedman (DFriedman@kasowitz.com)
Andrew K. Glenn (AGlenn@kasowitz.com)
Jeffrey R. Gleit (JGleit@kasowitz.com)
KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
1633 Broadway
New York, New York 10019
Telephone:   (212) 506-1700
Facsimile:    (212) 506-1800

*Attorneys for Debtors*
*and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **In re** | **Chapter 11** |
| **BORDERS GROUP, INC.,** *et al.*,[1] | **Case No. 11-10614 (MG)** |
| **Debtors.** | **(Jointly Administered)** |

**DEBTORS' MOTION FOR ORDER PURSUANT TO SECTIONS 105, 363 AND 365 OF THE BANKRUPTCY CODE AND RULES 2002, 6004, 6006 AND 9014 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE (I) APPROVING THE SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES AND INTERESTS AND THE ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES RELATED THERETO, (II) APPROVING SALE PROCEDURES AND BREAK-UP FEE, AND (III) GRANTING RELATED RELIEF**

TO:     THE HONORABLE MARTIN GLENN,
            UNITED STATES BANKRUPTCY JUDGE:

---

[1]     The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are:  Borders Group, Inc. (4588); Borders International Services, Inc. (5075); Borders, Inc. (4285); Borders Direct, LLC (0084); Borders Properties, Inc. (7978); Borders Online, Inc. (8425); Borders Online, LLC (8996); and BGP (UK) Limited.

Borders Group, Inc. ("BGI") and its affiliated debtors, as debtors and debtors in possession (collectively, the "Debtors"), submit this Motion (the "Motion") for Order Pursuant to Sections 105, 363 and 365 of the Bankruptcy Code and Rules 2002, 6004, 6006 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") (I) Approving the Sale of Substantially All of the Debtors' Assets Free and Clear of All Liens, Claims, Encumbrances and Interests and the Assumption and Assignment of Executory Contracts and Unexpired Leases Related Thereto, (II) Approving the Sale Procedures and Break-Up Fee, and (III) Granting Related Relief. In support of the Motion, the Debtors submit the declaration of Holly Felder Etlin in support of the Motion (the "Etlin Declaration") and the declaration of Richard Klein in support of the Motion (the "Klein Declaration"), attached hereto as Exhibits A and B, respectively, and respectfully represent as follows:

## PRELIMINARY STATEMENT

The Debtors and their professionals have worked diligently to maximize the value of these estates during these cases. They have conducted an exhaustive dual-track process to solicit proposals from strategic and financial investors to sponsor a plan of reorganization or to acquire substantially all of the Debtors' assets on a going concern basis. This motion -- which seeks authorization to: (i) provide customary bid protections, including a Break-up Fee, for BB Brands, LLC (a wholly-owned subsidiary of Direct Brands LLC) (the "Stalking Horse Bidder"), (ii) establish bidding procedures for an auction to be conducted on July 19, 2011 and (iii) sell substantially all of the Debtors' assets to the Stalking Horse Bidder (or such other party that provides a higher and better offer) -- is the culmination of these efforts.

The proposed Stalking Horse Bid represents the highest and best offer available to the Debtors.  Indeed, the proposed sale to the Stalking Horse Bidder would provide significant benefits to the estates and their creditors, including approximately $215 million in cash (subject to a working capital adjustment), the assumption of approximately $220 million of liabilities and a commitment to provide $15 million of funding to wind up the Debtors' Chapter 11 cases.  There are other significant benefits.  If the Stalking Horse Bidder purchases the assets and liabilities as a going concern, the Debtors will continue in business as a retailer and thousands of jobs will be saved.  The Stalking Horse Bidders' parent company, Direct Brands LLC, a direct marketer, owns the Book of the Month Club business, which offers substantial synergies and cost savings for a business combination.  At this time, there is no guarantee that the Stalking Horse Bidder will proceed with a going concern acquisition for the Debtors' business.

The Stalking Horse Bid is subject to minimal closing conditions, including HSR approval; the Stalking Horse Bid is not subject to financing, due diligence or material adverse change conditions.  Nonetheless, as required by the Debtors' DIP Credit Agreement, the Debtors have arranged for a back-up bid for a liquidation of substantially all of the Debtors' assets from a consortium of a nationally-recognized liquidation firms that will be consummated if the Stalking Horse Bidder fails to close.  The back-up bidder's offer will remain open through July 29, 2011, the projected closing date of the Stalking Horse Bid.

In exchange for the Stalking Horse Bid, the Stalking Horse Bidder has required approval of a break-up fee of $6,450,000, or approximately 3% of the cash consideration and 1.5% of the total transaction value that would be payable in the event that the

Purchase Agreement is terminated for any reason other than mutual agreement or default of the Stalking Horse Bidder. The Stalking Horse Bidder does not seek a separate expense reimbursement. The Debtors respectfully submit that payment of a break-up fee is customary in these situations and appropriate here. The Stalking Horse Bid would not be available to the Debtors without the Break-up Fee and the related bidding procedures.

Because the Debtors do not know which executory contracts and unexpired leases will be assumed by the Stalking Horse Bidder or any other party that submits the winning bid at the auction, the Debtors are seeking this Court's approval of procedures to ensure that all executory contracts and unexpired leases are available for assumption and assignment. Accordingly, the Debtors seek to serve a separate notice of assumption and assignment on each of their non-Debtor counterparties to all or nearly all of their executory contracts and unexpired leases, which list all applicable objection deadlines and procedures and proposed cure amounts, giving all such counterparties an adequate opportunity to object. The Debtors intend, at the direction of the Stalking Horse Bidder, on or before the Assumption Deadline (as defined below), to either assume the executory contract or unexpired lease, make (or the Stalking Horse Bidder will make) the appropriate cure payment, reserve the claimed cure amount (if there is a dispute over the amount of the cure owed) or serve a notice of non-assumption. The Debtors respectfully submit that these procedures balance the interests of the Debtors, counterparties and bidders.

For all of the reasons set forth herein, the Debtors request that the Court grant the relief requested herein to assure that the Debtors' assets are sold through a process that maximizes value for the benefit of the estates and their creditors.

## BACKGROUND

1. On February 16, 2011 (the "Commencement Date"), each of the Debtors commenced a voluntary case under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of New York (the "Court"). The Debtors are authorized to operate their business and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. The Debtors' cases are being jointly administered pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

2. On February 24, 2011, the Office of the United States Trustee appointed the official committee of unsecured creditors (the "Committee").[2]

## JURISDICTION

3. This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409. The predicates for the relief sought herein are sections 105, 363, 364, 365 and 554 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, 6006 and 9014.

## THE DEBTORS' BUSINESS

**A.     Operations**

4. The Debtors are a leading operator of book, music and movie superstores and mall-based bookstores. As of January 29, 2011, the Debtors operated 642 stores under the Borders, Waldenbooks, Borders Express and Borders Outlet names, as well as Borders-branded airport stores, of which 639 stores are located in the United States and 3 in Puerto Rico. In addition, the Debtors operate a proprietary e-commerce web site,

---

[2]     [Docket No. 156].

www.Borders.com, launched in May 2008, which includes both in-store and online e-commerce components.

5.     The Debtors currently employ approximately 3,792 full-time employees and approximately 7,244 part-time employees, located throughout the United States and Puerto Rico.  The Debtors' employees are not subject to any collective bargaining agreements.

**B.     Financials**

6.     For the fiscal year ended January 29, 2011, the Debtors recorded net sales of approximately $2.3 billion.  As of December 25, 2010, the Debtors had incurred net year-to-date losses of approximately $168.2 million.  The Debtors' Schedules list $1,649,799,850 of assets and $2,626,757,691 of liabilities.  *See* Debtors' Schedules.[3]

7.     Additional information regarding the Debtors' business, capital structure, and the circumstances leading to these chapter 11 cases is contained in the *Declaration of Scott Henry Pursuant to Local Bankruptcy Rule 1007-2 in Support of First Day Motions* [Docket No. 20].

**C.     Store Closing Sales**

8.     Before the commencement of these cases, the Debtors, in consultation with their advisors, identified and implemented critical cost-cutting initiatives to stabilize the Debtors' operations and ensure the Debtors' continued viability.  Chief among these initiatives was the closure of certain unprofitable stores.  Therefore, on the Commencement Date, the Debtors filed an emergency motion[4] with the Court seeking authority to, among other things, enter into an agreement with a liquidating agent (the

---

[3]     [Docket Nos. 491, 493, 495, 497, 499, 501, 503, 505, each at 2].

[4]     [Docket No. 7].

"Phase I Liquidating Agent") to conduct store closing sales ("SCSs") at no fewer than 200 of the Debtors' stores, and up to an additional 75 of the Debtors' stores if the landlords did not agree to substantial rent concessions (the "Phase I SCSs").

9. Pursuant to the Court's *Order Approving the Agency Agreement, Store Closing Sales and Related Relief* (the "Phase I SCSs Order"), dated February 18, 2011,[5] the Court approved the appointment of the Phase I Liquidating Agent and the commencement of the SCSs. On March 19, 2011, the Debtors designated 26 additional stores to be included in the closing stores.[6] As of the date hereof, the liquidation sales at all 226 locations have ended and the Debtors and the Phase I Liquidating Agent have reconciled all amounts due under the two agency agreements.

10. On or about June 9, 2011,[7] the Debtors filed the *Motion for Entry of Order (I) Authorizing the Debtors to Sell Certain Assets Through Store Closing Sales, (II) Approving Bidding Procedures to Select Liquidating Agent to Conduct Store Closing Sales, (III) Authorizing Debtors to Abandon Unsold Property, (IV) Waiving Compliance With Contractual Store Closing Sale Restrictions, (V) Exempting Laws Restricting Store Closing Sales and (VI) Granting Related Relief* (the "Phase II GOB Motion"),[8] in which the Debtors sought entry of an Order authorizing the Debtors to sell certain assets located at up to 51 store locations (the "Phase II SCSs") at which landlords had not agreed to

---

[5]    [Docket No. 91].

[6]    [Docket No. 421].

[7]    Prior to its filing, the DIP Lenders consented to treating the Emergency GOB Motion as timely so long as it was filed by 2 a.m. on June 9, 2011. As such, while the Emergency GOB Motion was docketed at 12:25 a.m. on June 9, 2011, it was timely filed by the June 8, 2011 deadline in the DIP Facility.

[8]    [Docket No. 999].

extend the Debtors' time to assume or reject such leases past September 14, 2011.[9]  The

Phase II GOB Motion was filed by the Debtors in order to comply with the event of

default deadlines in the DIP Credit Agreement (as defined below).  After significant

negotiations between the Debtors, the DIP Lenders and the Committee resulting in the

Second Amendment and Waiver to the DIP Credit Agreement (as defined below), the

Phase II GOB Motion was withdrawn.

**D.**     **The DIP Credit Agreement**[10]

11.     On the Petition Date, the Debtors filed the *Debtors' Motion for Entry of*

*Interim and Final Orders Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364 and 507 (1)*

*Approving Postpetition Financing, (2) Authorizing Use of Cash Collateral, (3) Granting*

*Liens and Providing Superpriority Administrative Expense Status, (4) Granting Adequate*

*Protection, and (5) Modifying Automatic Stay* (the "DIP Motion").[11]

12.     On March 16, 2011, the Court entered the *Final Order Pursuant to 11*

*U.S.C. §§ 105, 361, 362, 363, 364 and 507 (1) Approving Postpetition Financing, (2)*

*Authorizing Use of Cash Collateral, (3) Granting Liens and Providing Superpriority*

*Administrative Expense Status, (4) Granting Adequate Protection, and (5) Modifying*

*Automatic Stay* (the "Final DIP Order").[12]

13.     Pursuant to the Final DIP Order, the Debtors have been authorized to

obtain senior secured, superpriority, postpetition financing in the form of a first lien new

money superpriority priming credit facility with a maximum outstanding principal

---

[9]     On March 15, 2011, this Court entered an order extending the Debtors' time to assume or reject leases to September 14, 2011.

[10]    All capitalized terms used but not defined in this section shall have the meanings ascribed them in the Final DIP Order and DIP Credit Agreement.

[11]    [Docket No. 27].

[12]    [Docket No. 404].

amount of up to $505,000,000 (the "DIP Loan") pursuant to the terms and conditions of that certain Senior Secured, Super-Priority Debtor-in-Possession Credit Agreement (as the same may be amended, supplemented, restated, or otherwise modified from time to time, the "DIP Credit Agreement").

14.     The original form of DIP Credit Agreement contained certain deadlines requiring the solicitation of bid packages and store closures at various locations in June 2011. However, on June 17, 2011, the Debtors and DIP Lenders entered into the Second Amendment and Waiver to the DIP Credit Agreement (the "Second Amendment and Waiver to the DIP Credit Agreement"), which extended various deadlines to allow the Debtors to pursue a potential sale of substantially all of their assets and withdraw the Phase II GOB Motion.

## SALE PROCESS

15.     Both before the Debtors' bankruptcy filing and during the pendency of these cases, the Debtors sought to take appropriate steps to achieve a consensual restructuring. Accordingly, at the request of the Committee, the Debtors undertook a "dual-track" process of simultaneously considering a sale of the Debtors' business as a going concern and a plan of reorganization.

16.     On February 16, 2011, the Debtors filed an application to retain Jefferies & Company, Inc. ("Jefferies") as investment bankers and financial advisors for the Debtors to conduct the going concern sale process.[13] On or about March 16, 2011, this Court entered the *Order Pursuant to Sections 327(a) and 328(a) of the Bankruptcy Code and Rule 2014 of the Federal Rules of Bankruptcy Procedure Authorizing the*

---

[13]     [Docket No. 39].

*Employment and Retention of Jefferies & Company, Inc. as Investment Bankers and Financial Advisors, Nunc Pro Tunc to the Commencement Date.*[14]

17.     Since the Commencement Date, the Debtors and Jefferies have contacted or were approached by approximately eighty-six potential strategic and financial investors that the Debtors and Jefferies believed might have an interest in acquiring some or all of the Debtors' assets on a going concern basis.  Approximately twenty of these parties executed confidentiality agreements and had access to the Debtors' electronic data room.  (Klein Declaration at 6).

18.     As part of the solicitation process, Jefferies requested that interested parties submit non-binding indications of interest to acquire all or part of the Debtors' assets by May 6, 2011.  On May 6, 2011, the Debtors received two non-binding indications of interest to acquire portions of the Debtors' assets.  Ultimately the Debtors received five non-binding indications of interest, two of which were for the majority of the Debtors' assets, including an offer from the Najafi Companies, whereby the Stalking Horse Bidder, a wholly owned subsidiary of its affiliate Direct Brands, Inc., would purchase a majority of the Debtors' assets on a going concern basis.  The Debtors entered into negotiations with the two parties that submitted going concern bids in an effort to maximize the value the Debtors' assets for the Debtors and the Debtors' creditors.  (Klein Declaration at 7).

19.     From time to time, and as appropriate, the Debtors consulted with the Committee and the DIP Lenders.  After carefully evaluating the transaction embodied in the Stalking Horse Bidder's offer and all of the relevant circumstances of the Debtors'

---

[14]     [Docket No. 393].

businesses and these cases, the Debtors and their board of directors, in conjunction with Jefferies and their other advisors, concluded, in an exercise of their business judgment, that the offer made by the Stalking Horse Bidder for substantially all of the Debtors' assets was in the best interests of the Debtors, their estates and creditors. (Klein Declaration at 8).

20. Accordingly, on June 30, 2011, the Debtors and the Stalking Horse Bidder reached agreement (the "Stalking Horse Bid") on the terms of, and executed, the Purchase Agreement (the "Purchase Agreement") (attached hereto as Exhibit 1), for, among other things, the sale of the Debtors' business and assets and the assumption and assignment of certain executory contracts and unexpired leases (the "Sale").[15] The negotiations between the Debtors, the Stalking Horse Bidder and their respective professionals were hard fought, good faith, and were conducted at arm's length. These negotiations were contentious at times, but ultimately proved to be beneficial to the Debtors' estates. (Klein Declaration at 9).

21. The principal terms of the Stalking Horse Bid are as follows:[16]

- Transaction. The purchase of all of the assets of the Debtors (other than the Excluded Assets).

- Purchase Price. (i) $215,100,000 in cash and (ii) plus the assumption of the Assumed Liabilities.

- Deposit. $15 million.

---

[15] A copy of the Purchase Agreement is available at www.bordersreorganization.com. If you do not have computer access, you may obtain a copy of the Purchase Agreement by contacting the Debtors' undersigned counsel.

[16] The foregoing is a summary of the terms of the Stalking Horse Bid and the Purchase Agreement. It is qualified in its entirety by the Purchase Agreement, and all parties are urged to refer to the Purchase Agreement for a more fulsome description of the terms of the Stalking Horse Bid. Capitalized terms used but not defined herein shall have the meanings assigned to them in the Purchase Agreement. To the extent there are any inconsistencies between this summary and the Purchase Agreement, the Purchase Agreement shall govern.

- Second Escrow.  At the Closing, the Stalking Horse Bidder will deposit an additional $7,500,000 with an escrow agent.  Such funds shall be available to the Debtors if the Debtors have insufficient assets to pay allowed administrative expenses and allowed priority tax claims pursuant to Section 503(b) and 507(a)(8) of the Bankruptcy Code (excluding any such expenses that will be paid by the Stalking Horse Bidder or the Agent).  Any payments from the Escrow shall be deemed to be an increase to the purchase price.

- Purchase Price Adjustment.  A post-closing adjustment to the purchase price to reflect any deficiency or surplus in Net Working Capital at Closing measured against Estimated Net Working Capital.

- Closing Date.  The Closing is scheduled to occur on or before July 29, 2011, but will be no later than August 5, 2011.

- Assignment and Assumption.  The Stalking Horse Bidder shall have the right to designate which leases and contracts of the Debtors are to be rejected or assumed and assigned to the Stalking Horse Bidder, subject to applicable designation deadlines.   The Stalking Horse Bidder is responsible for all cure costs under assumed leases and contracts.  An agent will conduct GOB SCSs for inventory and other items at Store Closing Locations pursuant to an Agency Agreement to be entered into on or before July 22, 2011.

- Acquired Assets:  The Stalking Horse Bidder to acquire all assets of Debtors (other than Excluded Assets) including (i) real property leases and contracts to be designated by the Stalking Horse Bidder for assumption and assignment, (ii) equipment and improvements in transferred stores and distribution centers,  (iii) intellectual property, (iv) inventory other than inventory in stores for which the leases are not being assumed and assigned to the Stalking Horse Bidder (the "Store Closing Locations"), (v) accounts receivable from sales of inventory, (vi) Debtors' equity interest in Kobo, Inc., (vii) goodwill of the Debtors, (viii) books, records, files, including customer lists, (ix) cash, (x) rights to direct the disposition of inventory at Store Closing Locations and receive the proceeds thereof and (xi) foreign franchisor rights.

- Excluded Assets:  Specifically excluded from Acquired Assets are the following assets that the Stalking Horse Bidder will not acquire: (i) corporate and tax records of the Debtors, (ii) claims of Debtors relating to Excluded Assets or Excluded Liabilities, (iii) tax refunds, pre-payments, net operating losses and claims for the period prior to closing, (iv) capital stock of the Debtors and their subsidiaries (other than the Debtors' interest in Kobo, Inc.), (v) claims against the Stalking Horse Bidder related to the Purchase Agreement; (vi) real property leases and contracts not assumed and assigned to the Stalking Horse Bidder; (vii) equipment and leasehold

improvements in Store Closing Locations, (viii) inventory located at Store Closing Locations, (ix) business licenses and permits that relate exclusively to the Debtors' headquarters building or to any Store Closing Location, (x) certain designated deposits, (xi) confidential personnel and medical records of employees who do not become employees of the Stalking Horse Bidder, (xii) assets relating to Debtors' employee benefit plans, (xiii) avoidance actions, (xiv) assets sold or disposed of between the date of the Agreement through the Closing Date and (xv) certain other specified assets.

- <u>Sale Free and Clear of Liens</u>.  The Purchase Agreement requires that the Sale be free and clear of all liens, claims, encumbrances and interests other than customary permitted liens.

- <u>Assumed Liabilities</u>.  Liabilities for: (i) assumed Real Property Leases and Contracts and related cure costs, (ii) gift cards; (iii) loyalty programs, in the event of a going concern transaction, (iv) inventory returns after closing, (v) certain employment benefits and other obligations in respect of employees of Debtors that become employees of the Stalking Horse Bidder, (vi) accrued and unpaid real property, personal property, sales and use taxes, (vii) post-petition trade and accounts payable, and (viii) certain letters of credit of the Debtors and (ix) costs and liabilities relating to the wind down of the Debtors' estates ("Wind-Down Obligations"); provided that certain of the Wind Down Obligations assumed by the Stalking Horse Bidder, including Wind Down Obligations for professional fees, court costs and other costs in connection with the bankruptcy cases, shall be subject to a maximum of $15 million.

- <u>Financial Capacity of Buyer</u>.  On or before July 14, 2011, the Stalking Horse Bidder shall deliver an executed commitment from Direct Brands, Inc. (the parent company of the Stalking Horse Bidder) to provide equity financing to the Stalking Horse Bidder in an amount reasonably satisfactory to the Debtors and one or more other commitments for additional financing necessary to permit the Stalking Horse Bidder to pay the Purchase Price and perform all of its other obligations.

- <u>Transfer Taxes</u>.  To be borne by Buyer.

- <u>Bid Protections</u>.  If the Purchase Agreement is terminated for any reason other than mutual agreement or default of the Stalking Horse Bidder, Debtors shall pay to the Buyer the amount of $6,450,000 as liquidated damages with respect to any claims the Buyer may have against the Sellers.

- <u>Governing Law</u>.  New York

22.     Based on a review of the Debtors' business plan, the Debtors' operating results since the Commencement Date, the efforts by the Debtors and their advisors to market the Debtors' business and assets, and discussions with the Debtors' advisors and the Committee, the Debtors' board of directors (the "Board"), in an exercise of their business judgment, determined that the interests of the Debtors, their creditors, employees and customers would be best served by proceeding with a sale of the Debtors as contemplated in this Motion.

23.     Simultaneously, the Debtors solicited bids for a Full Chain Liquidation to serve as a back-up to the Stalking Horse Bidder.  On or about June 30, 2011, the Debtors entered into a certain agency agreement (the "Agency Agreement") (attached hereto as Exhibit 2) with a joint venture consisting of Hilco Merchant Resources, LLC, Gordon Brothers Retail Partners, LLC, SB Capital Group, LLC, Tiger Capital Group, LLC and Great American Group, LLC (collectively, the "Liquidating Agent"), as a back-up to the Stalking Horse Bid, which, if closed, would provide for a Full Chain Liquidation.  By this Motion, the Debtors also respectfully request authority to enter into an agency agreement with the Liquidating Agent containing materially the same provisions as the Agency Agreement annexed here.  The Agency Agreement is substantially similar to the agreement utilized in and approved by the Court in the Phase I SCSs and Phase II SCSs.

24.     Although the Debtors respectfully refer the Court to the Agency Agreement in its entirety, certain of the material terms are set forth below:[17]

•     Assets.  All Merchandise at the Stores and the Distribution Centers and all FF&E located at the Stores.  The Closing Stores will consist of up to 399 stores identified in Exhibit 1 to the Agency Agreement.

---

[17]   Capitalized terms used in this summary shall have the meanings ascribed to them in the Agency Agreement.  This summary of the Agency Agreement is for summary purposes only and is qualified in its entirety by the terms and provision of the Agency Agreement.

- <u>Guaranteed Amount</u>. As a guaranty of the Liquidating Agent's performance under the Agency Agreement, the Liquidating Agent will guarantee the Debtors' receipt of a certain percentage of the Cost Value of the Merchandise included in the sale (the "<u>Guaranty Percentage</u>") and the FF&E Guaranty.

- <u>Sale of Distribution Center and Headquarter FF&E, Newsstand Inventory and Café/Candy Inventory</u>. The Liquidating Agent will sell the FF&E located at the Debtors' headquarters, Newsstand Inventory and Café/Candy Inventory located at the Closing Stores (except excluded items identified by the Debtors, with lender consent), in exchange for a fee of 20% of the net proceeds from such sales.

- <u>Payment Timing</u>. On the Sale Commencement Date, the Liquidating Agent will wire to the Debtors 90% as payment of a portion of the Guaranteed Amount (the "<u>Guaranteed Amount Deposit</u>"). The Liquidating Agent will pay the remaining Guaranteed Amount and all other amounts due to the Debtors, pursuant to the timing in the Agency Agreement, as and when the parties reconcile the Guaranteed Amount.

- <u>Expenses of Sale</u>. From the Sale Commencement Date through and including the Sale Termination Date, the Liquidating Agent will be unconditionally responsible for all Expenses enumerated in Section 4.1 of the Agency Agreement (including, without limitation, Occupancy Expenses, Payroll, benefits for Retained Employees, Agent's on-site supervision related costs, signs and banners, promotional costs, Sale supplies, telephone, postage/overnight or delivery/courier charges, utility charges, credit card and bank fees, costs related to moving, transferring or consolidating merchandise between the Stores, insurance costs, trash removal and cleaning costs, security and building alarm costs, cost of capital and letter of credit fees, and any Retention Bonuses for Retained Employees and an agreed percentage of the costs of the physical inventory taking), incurred in conducting the Sale during the Sale Term, which Expenses may be funded and paid from Proceeds of the Sale to the extent available, or directly by the Liquidating Agent.

- <u>Employees</u>. The Liquidating Agent shall have the right to use the Debtors' store-level employees during the Sale Term and will reimburse the Debtors for actual payroll, and Employee Benefits up to an agreed upon cap based upon a percentage of the aggregate base payroll. The Liquidating Agent may also elect to pay, as an expense, a retention bonus to certain retained employees. The employees will remain the Debtors' employees at all times.

- <u>Cost Value / Inventory Taking</u>. The Cost Value of Merchandise is the average landed actual cost for an item of Merchandise, as reflected in the Debtors' perpetual inventory file as of the Sale Commencement Date. The

Debtors and Liquidating Agent will jointly conduct a physical inventory taking at each of the Stores for purposes of testing the Cost Value of the Merchandise in the Closing Stores. The Agency Agreement provides a procedure for adjusting the Cost Value used in the sale, based on results of the inventory taking.

- Sale Term. The Liquidating Agent will have the right to conduct the Store Closing Sales commencing the day after entry of the Order approving the SCSs (which the Debtors request to occur on or before July 22, 2011 to comply with the DIP Credit Agreement deadlines). The SCSs will continue until various dates depending on certain contractual deadlines and/or the Debtors' lease rejection deadline at the applicable Stores; provided, however, that under certain circumstances, the Liquidating Agent may terminate the sales at certain Closing Stores prior to such date.

- Sale Guidelines. The SCSs shall be conducted in accordance with the sale guidelines substantially the same as those approved by the Court in connection with the Phase I SCSs, except that the Agent may characterize the Sales as going-out-of-business or total liquidation sales.

- Merchandise Returns/Gift Cards/Other Programs. Although sales of all items of Merchandise sold during the Sale Term shall be a "final sale", the Liquidating Agent will accept returns of Merchandise sold prior to the Sale Commencement Date provided that such return is accompanied by the original Store register receipt and is otherwise in compliance with Debtors' return and price adjustment policy in effect as of the date such item was purchased. During the Sale Term, the Liquidating Agent will accept the Debtors' gift cards and Merchandise credits issued by the Debtors prior to the Sale Commencement Date. The Debtors shall reimburse the Liquidation Agent for such amounts during the weekly sale reconciliation. The Liquidating Agent shall not honor any employee discounts or Borders Rewards Plus Loyalty Program discounts.

- Letter of Credit / Security Interests. To secure its obligations under the Agency Agreement, the Liquidating Agent will post a letter of credit for the benefit of the Debtors. The Liquidating Agent will be granted, upon issuance of the Letter of Credit and effective as of the Payment Date, a valid and perfected first priority security interest in and lien upon (x) the Merchandise, (y) proceeds realized from the disposition of the FF&E, and (z) the Proceeds, to secure all obligations of Merchant to Agent. Such security interest shall remain junior and subordinate in all respects to the Agent's Payment Obligations, and the liens, security interests and claims of the GECC and the Lenders, to the extent of the unpaid portion of Agent's Payment Obligations. Upon entry of the Approval Order, and payment of the Guaranteed Amount Deposit, and the issuance of the Letter of Credit, the security interest granted to the Agent will be deemed

properly perfected without the necessity of filing financing statements or other documentation.

## **RELIEF REQUESTED**

25.     By this Motion, the Debtors request that the Court enter two orders (the Sale Procedures Order and the Sale Order, each as defined below) at two separate hearings:

- The Sale Procedures Order:  An order (the "Sale Procedures Order") approving: (i) the Break-Up Fee, (ii) the form of notice of the Debtors' intent to assume and assign to the Stalking Horse Bidder the Assumed Agreements (as defined below) and the corresponding cure amounts required to be paid in connection with such assumption and assignment (the "Notice of Assumption and Assignment"), and (iii) the procedures governing the bidding, auction and sale (the "Sale Procedures" or the "Bid Procedures").  Copies of the proposed Sale Procedures Order, and the form of Notice of Assumption and Assignment are annexed hereto as Exhibit C and D, respectively.

- The Sale Order:  An order (the "Sale Order") for the approval of (i) the sale of the Business free and clear of liens, claims, encumbrances and interests, and (ii) the assumption, assignment and sale of the Assumed Agreements to the Winning Bidder.  A copy of the proposed Sale Order is annexed hereto as Exhibit E.

26.     This Motion is divided into two Sections.  Section I constitutes the Debtors' request for approval of the Sale Procedures and entry of the Sale Procedures Order.[18]  Section II constitutes the Debtors' request for entry of the Sale Order following the Auction.  This Section also seeks approval of various provisions in connection with a possible liquidation of the Debtors' business and assets.  Since the Stalking Horse Bid includes options for a going concern sale and a liquidation, bids will be solicited for one or both of a going concern sale and liquidation.  Accordingly, the Motion seeks authorization to proceed with a going concern sale and a liquidation on a dual track basis.

---

[18]     Due to the nature of the relief requested herein, the requirement of the Debtors' post-petition credit facility and the deadlines and other dates requested herein, the Debtors request that the Sale Procedures Order be entered on an expedited basis.

**THE COURT SHOULD APPROVE THE
PROPOSED SALE PROCEDURES ORDER**

**A.     SUMMARY OF THE SALE PROCEDURES.**

27.     The Debtors believe that the Sale Procedures set forth herein will

maximize the value of the Debtors' business and assets while ensuring that the Debtors

comply with the deadlines in the DIP Credit Facility.  The following is a summary of the

proposed Sale Procedures and is qualified in its entirety by the proposed Sale Procedures

attached hereto as Exhibit D:

- Forms of Sales.  The Debtors will consider the following types of offers (or combinations thereof) for a sale transaction: (i) offers for a sale, in one or a series of related transactions, of a substantial portion of the business of the Debtors as a going concern (which sale may include a liquidation of a portion of the assets acquired under section 363 of the Bankruptcy Code with respect to the Debtors and/or all or any substantial portion of the assets of the Debtors) (a "GC Sale"), (ii) offers for a liquidation, in one or a series of related transactions, of each store location of the Debtors not subject to a GC Sale and a sale of any or substantially all of the assets of the Debtors not subject to a GC Sale (a "Remainder Chain Liquidation") and (iii) offers for a liquidation, in one or a series of related transactions, of (x) substantially the entire chain of store locations of the Debtors and substantially all of the inventory of the Debtors, and furniture, fixtures and equipment, and (y) substantially all of the other assets of the Debtors (a "Full Chain Liquidation"), which in each case, may include the sale of any of the Debtors' assets, including, without limitation, its inventory, furniture, fixtures and equipment, intellectual property, leases and substantially all other assets of the Credit Parties, as well as the assumption and assignment of executory contracts and unexpired leases. The Sale shall be pursuant to the terms and conditions of the Purchase Agreement and the Agency Agreement, the forms of which will be subject to approval by the Bankruptcy Court at the Sale Hearing, subject to higher and better bids to be submitted by a Qualified Bidder under the terms of the Bid Procedures.

- Notice of Sale.  The Debtors will provide notice of the proposed Sale to the Stalking Horse Bidder, the Bid Procedures, the Sale Objection Deadline and the date and time of the Sale Hearing to all parties in

interest, every party that has previously expressed any interest in the potential purchase or liquidation of the Debtors' business, and any other party that the Debtors believe might be interested in a possible purchase or liquidation of some or all of the Debtors' business.

- Bidding Deadline. The deadline (the "Bid Deadline") for submission of a final and binding written proposal for a GC Sale, a Full Chain Liquidation and/or a Remainder Chain Liquidation (each, a "Bid") is 5:00 p.m. (prevailing Eastern Time) on July 17, 2011 (notwithstanding Bankruptcy Rule 9006(a)(1)(C)).

- Purchase Price and Consideration of Bids. All Bids submitted by a bidder (each, a "Bidder") must state the total proposed purchase price (the "Purchase Price"), in U.S. dollars for a GC Sale, including any cash to be paid and any liabilities to be assumed, or the amount of the Guaranty Percentage (as defined in the Agency Agreement) for a Full Chain Liquidation or a Remainder Chain Liquidation, and, in each case, must exceed the total amount of compensation of the Stalking Horse Bid (as described above) by a minimum of $8.95 million for a Bid for a GC Sale and 0.25% (above the Guaranty Percentage in the Agency Agreement) for a Full Chain Liquidation and/or a Remainder Chain Liquidation (the "Bidding Interval"). Additionally, each Bid must include, at minimum, $224.05 million in cash as part of the compensation. A Bidder who bids on two or all three of the following: a GC Sale, a Full Chain Liquidation and/or a Remainder Chain Liquidation (a "Multiple Transaction Bidder"), must specify the Purchase Price for each of the proposed transactions.

- Deposit. All Bids must include a deposit of seven and a half percent (7.5%) of the Purchase Price in cash, to be deposited in an escrow account at Citibank, N.A., and held by and in the name of the Debtors; provided, however a Multiple Transaction Bidder need only submit one deposit for all of its proposed transactions. The Sale Procedures contain provisions governing the application and/or return of the deposits.

- Content of Bids. In addition to the purchase price and consideration, the Sale Procedures require additional documents and information to be submitted with the Bid, including, without limitation, the submission of: (A) by any Bidder for a GC Sale, a copy of the Purchase Agreement, marked electronically to show any changes, and a clean, executed version of the Purchase Agreement (the "Modified Purchase Agreement"); and/or (B) by any Bidder for a Full Chain Liquidation or a Remainder Liquidation, a copy of the Agency Agreement, marked electronically to show any changes, and a clean, executed version of the Agency Agreement (the "Modified Agency Agreement").

- Closing Conditions to Bids. All conditions to closing required by a Bidder must be set forth in the Modified Purchase Agreement and/or the Modified

Agency Agreement, provided, however, that no Bid may be subject to any financing, due diligence or other material conditions. To the extent a Bid relies on one or more third-party financing sources, the Bid must include a signed, binding and irrevocable commitment letter from such third-party financing source(s) or comparable commitment from any equity source. To the extent a Bid relies on financing sources of affiliates of the Bidder, the Bid must include sufficient evidence of financial capacity to consummate the Sale and satisfy all obligations and potential obligations pursuant to the Modified Purchase Agreement and/or the Modified Agency Agreement. Other than those conditions set forth in the Modified Purchase Agreement and/or the Modified Agency Agreement, each Bid shall be irrevocable until and unless the Debtors select a higher or otherwise better Qualified Bid and such Bidder is not selected as the Back-Up Bidder.

- Joint Bids. The Debtors will be authorized to approve joint Bids in the Debtors' sole and absolute discretion on a case by case basis.

- Evaluation of Bids. Each Bid will be evaluated by the Debtors and their advisors to determine if it fully satisfies the Bid Procedures' requirements, in their sole and absolute discretion (each, a "Qualified Bid"). The Debtors will inform each Bidder as soon after such determination is made if such bidder has submitted a Qualified Bid (a "Qualified Bidder"). Notwithstanding anything else herein to the contrary, the Stalking Horse Bidder is a Qualified Bidder and the Stalking Horse Bid is a Qualified Bid. In evaluating the Bids, the Debtors will take into consideration, among other factors, the form and amount of the consideration, the extent to which the Bid involves a GC Sale and/or a liquidation, the presence of any closing conditions, the need and availability of financing, the extent of financial wherewithal to meet all commitments under the bid, the required approvals (if any), and the transaction structure and execution risk.

- Auction. If, after the examination of all Qualified Bids, the Board determines that an auction (the "Auction") is appropriate and will generate an offer for the purchase of the Debtors' business and assets that is higher and better than the Stalking Horse Bid, the Debtors will conduct an auction on July 19, 2011, beginning at 1:00 p.m. (prevailing Eastern Time) at a location of which the Debtors will inform each Qualified Bidder. The minimum interval for bidding at the Auction (the "Auction Bidding Interval") shall be of a value of at least $1 million; provided, however, the Debtors, in consultation with the Stalking Horse Bidder, may increase or decrease the Bidding Interval at or before the Auction, in which case the Debtors will so inform each of the Qualified Bidders. There are additional provisions governing the Auction in the Sale Procedures, including selection of one or more winning bids (the "Winning Bidder") and one or more Back-Up bids (the "Back-Up Bidders"). If, at any time prior to or on July 29, 2011, the Winning Bidder cannot consummate the Winning Bid,

the Debtors may close with the Back-Up Bidder by accepting the Back-Up Bid, which may be a Full Chain Liquidation. To the extent the Winning Bid is for a Full Chain Liquidation or a Remainder Chain Liquidation (as the case may be) and such transaction cannot be consummated in the Winning Bid on or before July 22, 2011 for the Full Chain Liquidation or on or before July 29, 2011 for the Remainder Chain Liquidation, the Debtors may close a Full Chain Liquidation or a Remaining Chain Liquidation (as the case may be) with the Back-Up Bidder by accepting the Back-Up Bid.

- <u>Notice of Result of Sale Process</u>. On or about July 20, 2011, the Debtors will file a notice with the Court (the "<u>Notice of Results of Sale Process</u>"), which will either confirm that the Stalking Horse Bid is the Winning Bid, in the event there is no auction, or identify the terms of the Winning Bid at auction, along with a description of the Winning Bidder (in either case, the "<u>Winning Bidder</u>").

- <u>Notice of Assumption and Assignment</u>. In connection with the Sale, the Debtors expect to assume and assign certain executory contracts and unexpired leases. As more fully described below, the Debtors will serve a Notice of Assumption and Assignment on each of its contracting parties on or about July 1, 2011. Objections to such assumption and assignment, including to the proposed Cure Amount, are due on July 14, 2011 at 4:00 p.m. (prevailing eastern time). To the extent that the Winning Bidder decides that the Debtor should assume and assign an executory contract or unexpired lease, the Debtor and/or the Winning Bidder shall make the Cure Payment (subject to unresolved objections thereto). To the extent that the Winning Bidder decides that the Debtors should not assume and assign an executory contract or unexpired lease, the Debtors will serve a Notice of Non-Assumption to each such affected counterparty.

- <u>Consultation</u>. The Debtors intend to consult with the Committee and the DIP Agents on an ongoing basis throughout the Sale and Auction process.

**B.      THE SALE PROCEDURES, INCLUDING THE
BREAK-UP FEE SHOULD BE APPROVED.**

28.      The Debtors request the authority to agree to a break-up fee with the Stalking Horse Bidder. The proposed break-up fee (the "<u>Break-Up Fee</u>") is $6,450,000, or approximately three percent (3%) of the cash consideration contemplated in the transaction, and approximately one and a half (1.5%) of the total transaction value. The Debtors believe, in the exercise of their business judgment, that the Break-Up Fee is

required to induce the Stalking Horse Bidder to make its offer for the purchase of the Debtors' business and assets and will maximize the value of the Debtors' business and assets. Indeed, the Stalking Horse Bidder would not have submitted its offer without the Break-Up Fee. The Break-Up Fee is a condition to the Stalking Horse Bidders' obligations under the Purchase Agreement.

29. Break-up fees and bidding protections in connection with the sale of a debtor's property pursuant to section 363 of the Bankruptcy Code are commonly granted to stalking horse bidders in chapter 11 cases. *See Gey Assocs. Gen. P'ship v. 310 Assocs. (In re 310 Assocs.)*, 346 F.3d 31 (2d Cir. 2003); *Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.)*, 147 B.R. 650 (S.D.N.Y. 1992), *appeal dismissed*, 3 F.3d 49 (2d Cir. 1993).

30. Courts in the Second Circuit analyze the propriety of bidding incentives such as the Break-Up Fee under the "business judgment rule" standard. Moreover, courts consider whether (a) the relationship of the parties who negotiated the break-up fee is devoid of taint by self-dealing or manipulation, (b) the fee encourages, rather than hampers, bidding, and (c) the amount of the fee is reasonable relative to the proposed purchase price. *See In re Integrated Res.*, 147 B.R. at 657-8 (to evaluate bid protections, courts should employ the business judgment rule, which proscribes judicial second-guessing of the corporate debtor's actions taken in good faith, absent self-dealing, and in the exercise of honest judgment); *see also In re Metaldyne Corp.*, 409 B.R. 661, 670 (Bankr. S.D.N.Y. 2009) (approving bid protections because, among other factors, "the stalking horse bid brings value to the estate by setting a floor on the price and providing a structure for potential competing bids . . . [and] would provide comfort to the Debtors'

employees and customers that the company was entering the auction with a locked-in bid").  Courts will approve break-up fees and other bidding protections, where, as here: (i) the relationship between the debtor and the bidder receiving the break-up fee is not tainted by self-dealing; (ii) the fee does not hamper bidding; and (iii) the amount of the fee is reasonable in relation to the size of the transaction.  *See In re Integrated Res.*, 147 B.R. at 657.

31.     Here, the Debtors' decision to provide the Stalking Horse Bidder with the Break-Up Fee was reached with the assistance of financial and legal advisors, and was the subject of arm's-length negotiations with the Stalking Horse Bidder.  Furthermore, there is no relationship between the members of the Debtors' board of directors and the Stalking Horse Bidder, nor is there any self-dealing by such directors in connection with the decision to enter into the Purchase Agreement and the Agency Agreement with the Stalking Horse Bidder and file this Motion.  Accordingly, the "business judgment rule," applies.  *See*, *e.g.*, *In re 995 Fifth Ave. Assocs., L.P.*, 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1989).

32.     Courts have found that break-up fees are necessary to create an incentive for a "stalking horse bidder" to spend the requisite time and money investigating a debtor's assets before entering into an agreement to purchase those assets.  *See*, *e.g.*, *In re 995 Fifth Avenue, L.P.*, 96 B.R. at 28 (bidding incentives may "be legitimately necessary to convince a white knight to enter the bidding by providing some form of compensation for the risks it is undertaking") (citation omitted).  Nonetheless, a break-up fee must not be so substantial as to have a "chilling effect" on other prospective bidders.  *In re Integrated Res.*, 147 B.R. at 660 (citing *CRTF Corp. v. Federated Dep't Stores. Inc.*, 683

F. Supp. 422 (S.D.N.Y. 1988)).  In this case, the Break-Up Fee will compensate the Stalking Horse Bidder for the time and money expended to conduct the necessary diligence before entering into the agreement governing the Sale and to compensate the Stalking Horse Bidder in light of the risks that the Debtors will close an alternative transaction.  Moreover, because the amount of the Break-Up Fee is fair and reasonable, as discussed below, it will not have a "chilling effect" on any other prospective bidders.

33.     To satisfy the final prong of the analysis, a break-up fee should constitute a "fair and reasonable percentage of the proposed purchase price, and should be reasonably related to the risk, effort, and expenses of the prospective purchaser." *In re Integrated Res.*, 147 B.R. at 662.  Although there are no specific rules relating to how large a break-up fee can be before it is considered unreasonable, courts regularly approve break-up fees of 2%-4% of the cash consideration to be paid pursuant to the underlying transaction. *See In re Allegiance Telecom, Inc., et al.*, Ch. 11 Case No. 03-13057 (RDD) (Bankr. S.D.N.Y. Jan. 15, 2004) (approving break-up fee of approximately 2.1% of cash consideration to be paid, plus expense reimbursement, where objections to bid protections by the creditors committee, among others, were resolved prior to entry of the order); *In re Genuity Inc., et al.*, Ch. 11 Case No. 02-43558 (PCB) (Bankr. S.D.N.Y. Dec. 16, 2002) (approving break-up fee of approximately 4.1% of cash consideration to be paid, plus expense reimbursement, where there were no objections to bid protections); *In re Bethlehem Steel Corp., et al.*, Ch. 11 Case Nos. 01-15288 through 01-15302 (BRL), 01-15308 through 01-15315 (BRL) (Bankr. S.D.N.Y. Mar. 27, 2003) (approving break-up fee of approximately 2.8% of cash consideration to be paid, plus expense reimbursement, and overruling objections, including by creditors committee, to break-up

fees); *In re Global Crossing, Ltd., et al.*, Ch. 11 Case No. 02-40188 (REG) (Bankr. S.D.N.Y. Mar. 25, 2002) (approving break-up fee of 4.0% of cash consideration to be paid, plus expense reimbursement, where final order reflected resolution of issues raised by creditors committee and secured lenders, resulting in reduced break-up fee).[19] In this case, the Break-Up Fee will be three percent (3%) of the cash consideration contemplated in the Purchase Agreement and approximately one and half percent (1.5%) of the total transaction value, and will be well within the range approved by courts in this and other districts. Moreover, the Stalking Horse Bidder is not seeking expense reimbursement in addition to the Break-Up Fee. Thus, the Break-Up Fee is more than reasonable under the circumstances.

34. The Sale Procedures, including the Break-Up Fee, will ensure that a buyer is committed to purchase the Debtors' assets at a fair and reasonable price that is higher than any other bid received to date. The Sale Procedures are reasonably calculated to assure that the Debtors obtain a purchase price for the Debtors' business and assets within the upper range of reasonably anticipated values, while ensuring that the Debtors have sufficient liquidity to consummate the Sale. If no other offer is received by the Debtors, the Break-Up Fee is appropriate, in that it will encourage the Stalking Horse Bidder to enter into the Purchase Agreement and the Agency Agreement. Accordingly, the Court should approve the Sale Procedures, including the Break-Up Fee.

---

[19] Because of the voluminous nature of the unreported orders cited herein, such orders are not annexed to the Motion. Copies of these orders (and, where cited material comes from the motions and/or transcripts associated with such orders, copies of the motions and/or transcripts) are being delivered to Chambers with Chambers copies of this Motion (per the Court's instruction at the Hearing held on March 15, 2011), and will be made available to other parties in interest upon request to Debtors' counsel.

## C.  NOTICES TO BE PROVIDED IN CONNECTION WITH SALE.

35.     Pursuant to Bankruptcy Rules 2002(a) and (c), the Debtors are required to notify their creditors of the proposed sale of the Debtors' business and assets, including a disclosure of the time and place of the sale, the terms and conditions of the sale, and the deadline for filing any objections.  The Case Management Order entered in these cases [Docket No. 64] requires that a sale of substantially all of the Debtors assets be served on all parties in interest.  The Notice of Motion has been served on or before the date hereof on all parties in interest and filed in connection with the filing of this Motion.  The Notice of Motion, the Motion, the Purchase Agreement, the proposed Sale Procedures Order and the proposed Sale Order are all available at www.bordersreorganization.com. Additionally, the Debtors will provide publication notice of the Bid Deadline and the Sale Hearing Date once in each of the national editions of the Wall Street Journal and the New York Times.  Further, all parties on the Debtors 2002 Service List, all landlords that are parties to unexpired leases with the Debtors, and all Federal, State and County government agencies affected by this Motion will be served with a complete set of all motion papers on or before July 1, 2011.  The Debtors request entry of an order confirming that the foregoing constitutes good and sufficient notice.

## II.

## THE COURT SHOULD APPROVE THE SALE TO THE STALKING HORSE BIDDERS OR A HIGHER AND BETTER BIDDER AT THE AUCTION

## A.  THE PURCHASE AGREEMENT.

36.     Principally, the Purchase Agreement embodies and contemplates, among other things:  (i) the sale of substantially all of the Debtors' business and assets, including, but not limited to, certain inventory and equipment; (ii) the assumption by the

Debtors and the sale and assignment to the Stalking Horse Bidder of the Assumed

Agreements; and (iii) the assignment to the Stalking Horse Bidder of all assignable

licenses, trademarks and permits related to the Debtors' business.

37. Ample authority exists for the approval of the proposed sale of the

Debtors' business and assets. In accordance with Bankruptcy Rule 6004(f)(l), sales of

property outside the ordinary course may be consummated by private sale or public

auction. The Debtors have determined the sale of the Debtors' business and assets in

accordance with the procedures described herein ensures that they will maximize

recoveries for their creditors and is, therefore, in the best interests of the Debtors, their

estates and creditors.

38. Section 363(b)(l) of the Bankruptcy Code provides, in pertinent part, that

"[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary

course of business, property of the estate." 11 U.S.C. § 363(b)(1). To sell property under

section 363(b), the Debtors must demonstrate to the Court a legitimate business

justification for the proposed action. *See Committee of Equity Sec. Holders v. Lionel

Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1071 (2d Cir. 1983). "Where the debtor

articulates a reasonable basis for its business decisions (as distinct from a decision made

arbitrarily or capriciously), courts will generally not entertain objections to the debtor's

conduct." *Comm. of Asbestos-Related Litigants v. Johns-Manville Corp. (In re Johns-

Manville Corp.)*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986). When a valid business

justification exists, the law vests the debtor's decision to use property out of the ordinary

course of business with a strong presumption that "in making a business decision the

directors of a corporation acted on an informed basis, in good faith and in the honest

belief that the action taken was in the best interests of the company." *In re Integrated Res., Inc.*, 147 B.R. at 656 (quoting *Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del. 1985)).

39.     A chapter 11 debtor may in certain circumstances sell all or substantially all its assets pursuant to section 363(b) before confirmation of a chapter 11 plan, provided the court finds a good business reason to grant such relief. *See Lionel*, 722 F.2d at 1069 (in considering a sale outside a plan of reorganization, a judge must not be shackled with unnecessarily rigid rules when exercising the broad administrative power granted him under the Bankruptcy Code); *see also Licensing By Paolo, Inc. v. Sinatra (In re Gucci)*, 126 F.3d 380, 387 (2d Cir. 1997) ("A sale of a substantial part of a Chapter 11 estate . . . may be conducted if a good business reason exists to support it."); *Official Comm. of Unsecured Creditors of LTV Aerospace & Defense Co. v. LTV Corp. (In re Chateaugay Corp.)*, 973 F.2d 141, 144 (2d Cir. 1992) (approval of subsidiary's sale of its assets before confirmation of plan was not abuse of discretion); *Stephens Indus., Inc. v. McClung*, 789 F.2d 386, 390 (6th Cir. 1986) ("[A] bankruptcy court can authorize sale of all a Chapter 11 debtor's assets under § 363(b)(1) when a sound business purpose dictates such action. Here, the Debtors initially preferred to proceed with the Sale under a plan of reorganization. However, due to the time exigencies resulting from the Debtors' DIP Credit Agreement and the Debtors' deadlines to assume or reject their leases, the Debtors must proceed under section 363 to maximize value. If the Court does not approve the sale, the Debtors will proceed to a liquidation process that clearly will not maximize value.

40.    The sale process discussed herein will not result in a *sub rosa* plan of reorganization.  Courts in the Second Circuit have been clear that where, as here, a debtor seeks to sell its business and the provisions of the sale do not restructure the rights of creditors or dictate by contract the terms of a plan, the sale is not a *sub rosa* plan.  *See, e.g.*, *Ind. State Police Pension Trust v. Chrysler LLC (In re Chrysler LLC)*, 576 F.3d 108, 118 (2d Cir. 2009), *vacated as moot*, 130 S. Ct. 1015 (2009) ("[T]he Sale has inevitable and enormous influence on any eventual plan of reorganization or liquidation. But it is not a 'sub rosa plan' . . . because it does not specifically 'dictate,' or 'arrange' ex ante, by contract, the terms of any subsequent plan."); *Parker v. Motors Liquidation Co. (In re Motors Liquidation Co.)*, 430 B.R. 65, 84-85 (S.D.N.Y. 2010) ("Here, the Bankruptcy Court appropriately concluded that the 363 Transaction 'merely brings in value,' and that '[c]reditors will thereafter share in that value pursuant to a chapter 11 plan subject to confirmation by the Court. A section 363 transaction to preserve and enhance value does not amount to a sub rosa plan.'"); *In re Boston Generating, LLC*, 440 B.R. 302, 331 (Bankr. S.D.N.Y. 2010) ("[T]he proposed sale of the Debtors' assets is not a 'sub rosa' plan of reorganization. . . . [T]he proposed Sale Transaction has a proper business justification and is not calculated to evade the plan confirmation process."); *In re GMC*, 407 B.R. 463, 474 (Bankr. S.D.N.Y. 2009) ("Nor can the Court accept various objectors' contention that there here is a sub rosa plan. GM's assets simply are being sold, with the consideration to GM to be hereafter distributed to stakeholders, consistent with their statutory priorities, under a subsequent plan."); *cf. Motorola, Inc. v. Official Comm. of Unsecured Creditors (In re Iridium Operating LLC)*, 478 F.3d 452, 467 (2d Cir. 2007) ("[T]he bankruptcy court did not err in concluding that the settlement [pursuant to section

363(b)] . . . had a proper business justification and was 'a step towards possible confirmation of a plan of reorganization and not an evasion of the plan confirmation process.'").  Because the proposed Sale does not restructure the rights of creditors and does not dictate any terms of a plan, the Sale is not a *sub rosa* plan.

41.     There is a sound business purpose for the sale of the Debtors' business as provided for herein because it is in the best interests of the Debtors, their estates and creditors.  Preservation of enterprise value is a compelling justification, and maximization of asset value for the benefit of creditors is a sound business purpose, warranting authorization of the sale.  Further, the proposed sale is required under the Debtors' DIP Credit Agreement, which requires that the Debtors obtain an order approving the Sale by July 22, 2011.  (Second Amendment and Waiver to Credit Agreement, § 2(c) (amending section 7.1(m)(iv) of the Credit Agreement).

**B.      SALE FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES AND INTERESTS AND DISTRIBUTION OF PROCEEDS.**

42.     The Debtors seek to sell their business and assets free and clear of liens, claims, encumbrances and interests.  The Debtors respectfully submit that in such circumstances, the Debtors' business and assets be sold free and clear of liens, claims, encumbrances and interests pursuant to section 363(f) of the Bankruptcy Code, except for Permitted Liens and those Assumed Liabilities (as will be defined in the Purchase Agreement or Modified Purchase Agreement, as the case may be) expressly assumed by the Winning Bidder, with any such liens, claims, encumbrances, or interests to attach to the net sale proceeds of the Debtors' business and assets.  *See In re Lady H Coal Co.*, 199 B.R. 595, 605 (S.D. W. Va. 1996) ("The well established rule that sales within a bankruptcy proceeding occur free and clear of any interest is founded upon the principal

that good faith purchasers receive clean title to the property and that any claims against the property attach to the proceeds."); *In re Riverside Inv. P'ship*, 674 F.2d 634, 640 (7th Cir. 1982) ("Generally, in a 'free and clear' sale, the liens are impressed on the proceeds of the sale and discharged at the time of sale . . . .") (citation omitted). Courts have interpreted the requirements of section 363(f) to be disjunctive. *In re Elliot*, 94 B.R. 343 (Bankr. E.D. Pa. 1988); *Circus Time, Inc. v. Oxford Bank and Trust (In re Circus Time, Inc.)*, 5 B.R. 1, 8 (Bankr. D. Me. 1979) (court's power to sell property free and clear of liens has long been recognized); 3 COLLIER ON BANKRUPTCY ¶ 363.06 (16th Ed. 2011) (same).

43.     The Debtors also seek authority to satisfy the claims of the DIP Lenders on the date of the closing of the Sale (the "Closing"), or soon thereafter, from the proceeds of the Sale. The DIP Credit Agreement and Final DIP Order require that all proceeds from sales be applied to pay obligations under the DIP Credit Agreement. DIP Credit Agreement § 1.8(e) and (f); Final DIP Order ¶ 19. Immediately upon the Closing of the sale to the Winning Bidder, the Debtors shall be authorized and directed to use the proceeds from such sale to repay in full in cash all Obligations (as defined in the DIP Credit Agreement) outstanding thereunder, including the cash collateralization of all L/C Reimbursement Obligations and the funding of the Working Capital Indemnity Account and Term B Indemnity Account (each as defined in the DIP Credit Agreement).

44.     A debtor in possession may sell property under sections 363(b) and 363(f) "free and clear of any interest in such property of an entity other than the estate" if any one of the following conditions is satisfied:

- applicable non-bankruptcy law permits sale of such property free and clear of such interest;

- such entity consents;

- such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

- such interest is a bona fide dispute; or

- such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f)(1)-(5); *Citicorp Homeowners Servs., Inc. v. Elliot (In re Elliot)*, 94 B.R. 343, 345 (E.D. Pa. 1988) (noting that since section 363(f) is written in the disjunctive, the court may approve a sale free and clear if any one subsection is met). If any of the five conditions set forth in section 363(f) are met, then a debtor is empowered to sell property free and clear of liens. *In re Dundee Equity Corp.*, No. 89-B-10233, 1992 Bankr. LEXIS 436, at *12 (Bankr. S.D.N.Y. Mar. 6, 1992).

45. Each lien, claim or encumbrance that does not constitute a Permitted Encumbrance (as will be defined in the Purchase Agreement or Modified Purchase Agreement, as the case may be) or Assumed Liability will satisfy at least one of the five conditions of section 363(f), and the Debtors submit that any such valid lien, claim, encumbrance, or interest will be adequately protected by attachment to the net proceeds of the Sale, subject to any claims and defenses the Debtors may possess with respect thereto. *See In re Circus Time, Inc.*, 5 B.R. at 7. The Debtors are not aware of any valid liens, claims, encumbrances on any property that may be sold as part of the Sale, except for those of the Debtors' DIP Lenders.

46. The Debtors believe that each of the parties purportedly holding a prepetition lien, claim or encumbrance on the Debtors' business and assets could be compelled to accept a monetary satisfaction of such interests, satisfying section 363(f)(5) of the Bankruptcy Code. Moreover, holders of liens, claims or encumbrances that have

not objected timely to this Motion may be deemed to have consented to the Sale of the Debtors' business and assets, satisfying section 363(f)(2) of the Bankruptcy Code. *See Hargrave v. Township of Pemberton (In re Tabone, Inc.)*, 175 B.R. 855, 858 (Bankr. D.N.J. 1994) (failure to object to sale free and clear of liens, claims and encumbrances satisfies section 363(f)(2)).

47. Thus, the Debtors submit that the Sale of the Debtors' business and assets free and clear of liens, claims, encumbrances and interests will satisfy the statutory prerequisites of section 363(f) of the Bankruptcy Code. Accordingly, the Debtors request that the Debtors' business and assets to the extent sold be transferred to the Winning Bidder free and clear of liens, claims, encumbrances and interests except for Permitted Liens, Permitted Encumbrances and Assumed Liabilities, with such liens, claims, encumbrances and interests to attach to the net Sale proceeds of the Debtors' business and assets. The Debtors also request that this Court authorize the Debtors to enter into a transaction with the Back-Up Bidder in the event that the Stalking Horse Bidder and/or the Winning Bidder (as appropriate) do not Close, which may involve a Full Chain Liquidation.

**C.     ASSUMPTION AND ASSIGNMENT OF CERTAIN
          <u>EXECUTORY CONTRACTS AND UNEXPIRED LEASES.</u>**

48. To facilitate and effect the sale of the Debtors' business and assets for the highest and best price, the Debtors may seek to assume, assign and sell certain executory contracts and unexpired leases (the "<u>Assumed Agreements</u>"), as will be identified in the Notices of Assumption and Assignment (subject to the Notices of Non-Assumption).

1. **Standards for Assumption.**

49. Section 365(a) of the Bankruptcy Code provides that a debtor in possession, "subject to the Court's approval, may assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a). Similar to section 363(b)(1), the standard to be applied by a court in determining whether an executory contract or unexpired lease should be assumed or rejected is the "business judgment" test, which is premised on the debtor's business judgment that assumption would be beneficial to the estate. *See Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures Corp.)*, 4 F.3d 1095, 1098-99 (2d Cir. 1993); *see also In re Child World, Inc.*, 142 B.R. 87, 89 (Bankr. S.D.N.Y. 1992) (debtor may assume or reject an unexpired lease under § 365(a) in the exercise of its "business judgment"); *Hunts Point Tomato Co. v. Roman Crest Fruit, Inc. (In re Roman Crest Fruit, Inc.)*, 35 B.R. 939, 949 (Bankr. S.D.N.Y. 1983); *Control Data Corp. v. Zelman (In re Minges)*, 602 F.2d 38, 42 (2d Cir. 1979). "More exacting scrutiny would slow the administration of the debtor's estate and increase its cost, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten the court's ability to control a case impartially." *Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1311 (5th Cir. 1985).

50. Section 365(b) of the Bankruptcy Code requires that a debtor in possession satisfy certain additional requirements to assume an executory contract or unexpired lease:

> If there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such contract or lease unless, at the time of assumption of such contract or lease, the trustee—
>> (A) cures, or provides adequate assurance that the trustee will promptly cure, such default . . .;

(B)        compensates, or provides adequate assurance
that the trustee will promptly compensate, a
party other than the debtor to such contract or
lease, for any actual pecuniary loss to such party
resulting from such default; and

(C)        provides adequate assurance of future
performance under such contract or lease.

11 U.S.C. § 365(b). This section does not apply to a default that is a breach of a

provision relating to:

(A)        the insolvency or financial condition of the
debtor at any time before the closing of the case;

(B)        the commencement of a case under this title;

(C)        the appointment of or taking possession by a
trustee in a case under this title or a custodian
before such commencement; or

(D)        the satisfaction of any penalty rate or penalty
provision relating to a default arising from any
failure by the debtor to perform nonmonetary
obligations under the executory contract or
unexpired lease.

11 U.S.C. § 365(b)(2).

51.      Section 365(b)(l) of the Bankruptcy Code requires that the Debtors or the

Winning Bidder cure, or provide adequate assurance that they will promptly cure, any

outstanding defaults under the Assumed Agreements in connection with the assumption

and assignment of these agreements to the Winning Bidder.

**2.**      **Notice and Objection Procedure.**

52.      The Debtors will serve, on or before July 1, 2011, a notice to each non-

debtor counterparty to all or nearly all executory contracts and/or unexpired leases of the

Debtors (a "Non-Debtor Counterparty"), indicating that such Non-Debtor Counterparty's

contract may be assumed and assigned, along with the proposed cure amount (the "Cure

Amount") calculated by the Debtors based on the Debtors' books and records. Delivery of a notice of assumption and assignment does not constitute an admission by the Debtors of the Stalking Horse Bidder that the related contract or lease is an executory contract or unexpired lease and the Debtors and the Stalking Horse Bidder reserve all of their rights with respect thereto.

53.     To the extent that any such Non-Debtor Counterparty seeks to object to (a) the assumption and assignment of its respective executory contract or unexpired lease or (b) the Cure Amount, the Non-Debtor Counterparty must file and serve an objection that sets forth, with specificity, the legal and factual bases of the objection no later than July 14, 2011 at 4:00 p.m. (prevailing Eastern Time) (which date is specified in the Notice of Assumption and Assignment) upon: (i) Kasowitz, Benson, Torres & Friedman LLP, attorneys for the Debtors, 1633 Broadway, New York, New York 10019 (Attn: Andrew K. Glenn, Esq., and Jeffrey R. Gleit, Esq.); (ii) the Office of the United States Trustee for the Southern District of New York, 33 Whitehall Street, New York, New York 10004 (Attn: Paul K. Schwartzberg, Esq.); (iii) Lowenstein Sandler PC, counsel for the Committee, 65 Livingston Avenue, Roseland, New Jersey 07068 (Attn: Bruce D. Buechler, Esq. and Paul Kizel, Esq.), and 1251 Avenue of the Americas, New York, New York 10020 (Attn: Bruce S. Nathan, Esq.); (iv) counsel for the DIP Agents: (a) Morgan, Lewis & Bockius LLP, 101 Park Avenue, New York, New York 10178-0060 (Attn: Wendy Walker, Esq.), and 225 Franklin Street, 16th Floor, Boston, Massachusetts 02110-4104 (Attn: Sandra Vrejan, Esq.), counsel for the Working Capital Agent, and (b) Choate Hall & Stewart LLP, Two International Place, Boston, Massachusetts 02110 (Attn: Kevin Simard, Esq.), counsel for GA Capital LLC; (v) Kelley Drye & Warren LLP, attorneys

for certain landlords, 101 Park Avenue, New York, New York 10178 (Attn: James S. Carr, Esq., Robert L. LeHane, Esq., and Benjamin D. Feder, Esq.); and (vi) Bingham McCutchen LLP, attorneys for Bank of America, N.A., One Federal Street, Boston, Massachusetts 02110-1726 (Attn: Julia Frost-Davies, Esq. and Andrew Gallo, Esq.) (collectively, the "Notice Parties"); provided, however, that in the event that the Debtors conduct an Auction and the results of that Auction yield a Winning Bidder other than the Stalking Horse Bidder, objections by Non-Debtor Counterparties as to any issues raised by such Winning Bid or the identity of the Winning Bidder may be filed and served in accordance with the above requirements no later than July 20, 2011 at 3:00 p.m. (prevailing Eastern Time) (the "Supplemental Objection Deadline").

54.     The Debtors request that this Court order that all objections that challenge a Cure Amount must set forth the cure amount being claimed by the objecting party (the "Claimed Cure Amount") with appropriate documentation in support thereof.  Upon receipt of an objection to a Cure Amount, the Winning Bidder and/or the Debtors (in consultation with each other) may, prior to assuming and assigning the applicable executory contract or unexpired lease to the Winning Bidder, hold an amount equal to the Claimed Cure Amount in reserve, pending further order of the Court or agreement between the Debtors and the objecting party, with such agreement being consented to by the Winning Bidder.  So long as the Winning Bidder or the Debtors hold the Claimed Cure Amount in reserve, the Debtors request that they be able, without further delay, to assume, assign and sell an Assumed Agreement, notwithstanding an objection to such Assumed Agreement's Cure Amount.

55.     If there is no timely objection to a Notice of Assumption and Assignment with respect to an executory contract or unexpired lease, the Debtors request that they be able to assume, assign and sell that executory contact or unexpired lease to the Winning Bidder, and the Cure Amount set forth in the Notice of Assumption and Assignment should be binding upon the respective Non-Debtor Counterparty to the executory contract or unexpired lease for all purposes.  The respective Non-Debtor Counterparty should be forever barred from objecting to the Cure Amount, including, without limitation, the right to assert any additional cure or other amount with respect to their respective executory contract or unexpired lease, as well as objecting to the Debtors' assumption and assignment of such executory contract or unexpired lease to the Winning Bidder.

**3.      Procedure For Notice Of Final Decision To Assume And Assign And Payment Of Cure Amounts.**

56.     The Notice of Assumption and Assignment does not constitute the final decision to assume and assign the Debtors' executory contracts and unexpired leases, as the Stalking Horse Bidder has the right (and the Winning Bidder, if different from the Stalking Horse Bidder, may have the right) to defer any final decisions on assumption and assignment until:  (a) the deadline to assume and assign each unexpired lease of non-residential real property under section 365(d)(4) of the Bankruptcy Code, as such deadline has been or may be extended by the Court and/or by agreement with a Non-Debtor Counterparty for any unexpired lease of non-residential real property; or (b) October 31, 2011 for any executory contract or any unexpired lease of property other than non-residential real property (as applicable, the "Assumption Deadline").  This represents a material part of the agreement with the Stalking Horse Bidder, particularly given the timing of this Sale.

57.     Given the foregoing, and mindful of the need for the Non-Debtor Counterparties to have adequate notice and opportunity to object to the possible assumption and assignment (and to the Cure Amount), the Debtors will serve a Notice of Assumption and Assignment on all or nearly all executory contracts and unexpired leases to provide the Debtors with the flexibility necessary to maximize value.  The Debtors propose the following procedure to make notice to the Non-Debtor Counterparties of the final decision whether to assume and assign each of the Debtors' executory contracts and unexpired leases, and to make payment of the Cure Amounts, if any, owed on each such executory contract or unexpired lease:

(i)     *If there is an objection to the assumption and assignment of an executory contract or unexpired lease*:

    (a)     If such objection is granted and not appealed, the Debtors may not assume and assign such contract or lease (unless such objection was limited to the Cure Amount, in which case the Debtors reserve the right to assume and assign such contract by paying the Cure Amount approved by the Court) and will provide no notice of such non-assumption.

    (b)     If such objection is outstanding on the Assumption Deadline, the Debtors maintain the right to assume and assign such contract or lease until a final order is issued (or a settlement is reached) resolving the objection and allowing the assumption and assignment.  The Debtors will be required to maintain a reserve for the Claimed Cure Amount until such time as a final order is issued (or settlement is reached).

(ii)    *If there is no objection to the assumption and assignment of an executory contract or unexpired lease*:

    (a)     The Assumed Agreements will be deemed assumed and assigned upon payment of the Cure Amount by the Debtors and/or the Winning Bidder, which payment must be sent on or before the Assumption Deadline.  Such payment of the Cure Amount will constitute notice to the applicable Non-Debtor Counterparty of the assumption and assignment.

(b)     To the extent the Winning Bidder determines not to have the Debtors assume and assign the Assumed Agreements, the Debtors will serve to each Non-Debtor Counterparty to each such non-assumed executory contract and unexpired lease a notice indicating that its contract or lease will not be assumed (the "<u>Notice of Non-Assumption</u>") no later than three business days following the Assumption Deadline.

(c)     The Debtors may extend the Assumption Deadline by filing a notice with the Court prior to the expiration of the Assumption Deadline.

58.     The Debtors submit that the foregoing procedures adequately balance the needs of the Winning Bidder and the rights of the Non-Debtor Counterparties, and provide the Non-Debtor Counterparties adequate notice and a right to be heard. Furthermore, these procedures satisfy Bankruptcy Rule 6006(f). Bankruptcy Rule 6006(f) requires, *inter alia*, that a motion to assume or assigning multiple executory contracts or unexpired leases that are not between the same parties:

(1)     state in a conspicuous place that parties receiving the omnibus motion should locate their names and their contracts or leases listed in the motion;

(2)     list parties alphabetically and identify the corresponding contract or lease;

(3)     specify the terms, including the curing of defaults, for each requested assumption or assignment;

(4)     specify the terms, including the identity of each assignee and the adequate assurance of future performance by each assignee, for each requested assignment;

(5)     be numbered consecutively with other omnibus motions to assume, assign, or reject executory contracts or unexpired leases; and

(6)     be limited to no more than 100 executory contracts or unexpired leases.

Bankruptcy Rule 6006(f). As discussed above, separate Notices of Assumption and Assignment will be served on the Non-Debtor Counterparties. Each notice will be sent to

a single Non-Debtor Counterparty, and list, in an exhibit, one or more executory contracts and unexpired leases with that party. In many cases, there will be a single executory contract or unexpired lease listed on an exhibit attached to each Notice of Assumption and Assignment. The form of the Notice of the Assumption and Assignment specifically references the exhibit, which identifies the contract(s) and/or lease(s) and the applicable Cure Amount, and makes clear the procedures governing objections discussed in this Motion. Accordingly, requirements one through four above are satisfied, and requirement number five is rendered irrelevant. Requirement number six is satisfied because, in no case, shall a Notice of Assumption and Assignment include more than one hundred executory contracts and unexpired leases. To the extent that this Court rules that Bankruptcy Rule 6006(f) is not satisfied, the Debtors request that this Court modify the requirements of Bankruptcy Rule 6006(f), given the exigencies of the case, including the need to obtain an order approving the Sale on or before July 22, 2011. Fed. R. Bankr. P. 6006, Advisory Committee Notes, 2007 Amendments ("An omnibus motion to assume, assign, or reject multiple executory contracts and unexpired leases must comply with the procedural requirements set forth in subdivision (f) of the rule, <u>unless the court orders otherwise.</u>") (emphasis added).

59. Accordingly, this Court should approve these procedures as providing appropriate and adequate notice to the Non-Debtor Counterparties.

**4.**    **<u>Adequate Assurance of Future Performance.</u>**

60. Pursuant to section 365(f)(2) of the Bankruptcy Code, a debtor in possession may assign an executory contract or unexpired lease of nonresidential real property if

- the trustee assumes such contract or lease in accordance with the provisions of this section; and

- adequate assurance of future performance by the assignee of such contract or lease is provided, whether or not there has been a default in such contract or lease.

*Id.* § 365(f)(2).

61.     The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given "practical, pragmatic construction." *See Carlisle Homes, Inc. v. Azzari (In re Carlisle Homes, Inc.)*, 103 B.R. 524, 538 (Bankr. D.N.J. 1988) (citation omitted); *see also In re Natco Indus.*, 54 B.R. 436, 440 (Bankr. S.D.N.Y. 1985) (adequate assurance of future performance does not mean absolute assurance that debtor will thrive and pay rent); *In re Bon Ton Rest. & Pastry Shop, Inc.*, 53 B.R. 789, 803 (Bankr. N.D. Ill. 1985) ("Although no single solution will satisfy every case, the required assurance will fall considerably short of an absolute guarantee of performance.").

62.     Among other things, adequate assurance may be given by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned. *See In re Bygaph, Inc.*, 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (adequate assurance of future performance is present when prospective assignee of lease has financial resources and expressed willingness to devote sufficient funding to business to give it strong likelihood of succeeding; chief determinant of adequate assurance is whether rent will be paid).

63.     As soon as practicable before and at the Sale Hearing, the Debtors will present facts demonstrating the financial credibility, willingness and ability of the Winning Bidder to perform under the Assumed Agreements.  The Stalking Horse Bidder

has committed to provide equity financing in an amount reasonably satisfactory to the Debtors if it causes the Debtor to assume and assign the Assumed Agreements in connection with a going concern acquisition. The Sale Hearing will provide the Court and other interested parties the opportunity to evaluate the ability of the Winning Bidder to provide adequate assurance of future performance under the Assumed Agreements, as required by section 365(b)(1)(C) of the Bankruptcy Code. Thus, the Debtors respectfully submit that by the conclusion of the Sale Hearing, this Court should authorize the Debtors to assume and assign the Assumed Agreements on or before the Assumption Deadline pursuant to the procedures outlined above.

64.     To facilitate the assumption and assignment of the Assumed Agreements, the Debtors request that the Court find all anti-assignment provisions of the Assumed Agreements be held unenforceable under section 365(f) of the Bankruptcy Code to the extent such parties do not consent to the assignment of such agreements. Notwithstanding any anti-assignment language in an Assumed Agreement, the Debtors seek permission to assign and sell such Assumed Agreement, provided that the Debtors first assume the Assumed Agreement and then provide adequate assurance of future performance by the Winning Bidder. *See* 3 COLLIER ON BANKRUPTCY ¶ 365.09 (2011).

65.     Also, pursuant to section 365(k) of the Bankruptcy Code, the Debtors and their estates shall be relieved from any liability for any breach of any Assumed Agreement after such assignment to and assumption by the Winning Bidder on the applicable date of the Closing (the "Closing Date").

**D.     GOOD FAITH PURCHASER.**

66.     Section 363(m) of the Bankruptcy Code states:

> The reversal or modification on appeal of an authorization
> under subsection (b) or (c) of this section of a sale or lease
> of property does not affect the validity of a sale or lease
> under such authorization to an entity that purchased or
> leased such property in good faith, whether or not such
> entity knew of the pendency of the appeal, unless such
> authorization and such sale or lease were stayed pending
> appeal.

11 U.S.C. § 363(m).

67. Section 363(m) provides that a purchaser of property of the estate is protected from the effects of a reversal on appeal of the authorization to sell such property as long as the purchaser acted in good faith and the appellant failed to obtain a stay of the sale.

68. The Bankruptcy Code does not define "good faith," but courts have adopted various definitions. A good faith purchaser is "one who buys property . . . for value, without knowledge of adverse claims." *Mark Bell Furniture Warehouse, Inc. v. D.M. Reid Assocs. (In re Mark Bell Furniture Warehouse, Inc.)*, 992 F.2d 7, 8 (1st Cir. 1993). The requirement that a purchaser act in good faith speaks to the integrity of the purchaser's conduct in the course of the sale proceedings. *See In re Abbotts Dairies, Inc.*, 788 F.2d 143, 147 (3d Cir. 1986).

69. The terms and conditions of the Purchase Agreement and the Agency Agreement were negotiated at arm's-length and in good faith, are subject to higher and better offers as provided for herein, including in connection with an auction, if appropriate. There is no evidence of fraud or collusion in the terms of the proposed Sale. Based on the foregoing and upon the evidence that will be submitted at the Sale Hearing, the Debtors request that the Court determine that the Winning Bidder has acted in good

faith and is entitled to the protections of a good faith purchaser under section 363(m) of the Bankruptcy Code.

### E. THE APPOINTMENT OF A CONSUMER PRIVACY OMBUDSMAN IS NOT REQUIRED HERE.

70.     Pursuant to section 363(b)(1) of the Bankruptcy Code, a debtor may sell or lease personally identifiable information, such as its consumer customer list, so long as it complies with the debtor's privacy policy.  11 U.S.C. § 365(b)(1)(A).  If a sale is inconsistent with the debtor's privacy policy, section 332 of the Bankruptcy Code governs the appointment of a consumer privacy ombudsman.  11 U.S.C. § 332(b)(1).

71.     Pursuant to the Purchase Agreement, the Debtors may sell personally identifiable information in a manner that is consistent with the Debtors' current privacy policy.  Therefore, the appointment of a consumer privacy ombudsman is unnecessary at this time.  Should the Debtors enter into a transaction to sell such information other than in compliance with their privacy policy, the Debtors will notify the Court promptly and seek the appointment of a consumer privacy ombudsman in accordance with section 332 of the Bankruptcy Code.

### F. LIQUIDATION PROCEDURES,  INCLUDING RETENTION OF A LIQUIDATING AGENT, IF NECESSARY, SHOULD BE APPROVED.

72.     The proposed Purchase Agreement and Agency Agreement provides the Stalking Horse Bidder with the right to have a liquidator liquidate certain locations. There is also a possibility that, as a result of the Auction, the Winning Bid will contemplate either a Full Chain Liquidation or a Remainder Chain Liquidation (together the liquidation procedures in the Purchase Agreement and Agency Agreement, a

"Liquidation").  Thus, the Debtors seek authority to conduct liquidation sales with the procedures described herein.

**G.     The Debtors' Need to Retain A Liquidator**[20]

73.     The DIP Credit Agreement requires the Debtors to engage an "Approved Liquidator," defined as "a nationally recognized liquidator of recognized standing approved by Agents" to conduct "Affected Asset Sales," defined as "a liquidation in one or a series of related transactions of the assets located on the property that are subject to leases rejected on the Lease Rejection Date."  DIP Credit Agreement §11.1.  Accordingly, the Debtors must retain a liquidating agent rather than conducting SCSs themselves.

74.     Moreover, engaging the Liquidating Agent will provide the Debtors with several benefits.  First, allowing a professional liquidator to liquidate the assets will enable the Debtors to maximize sale proceeds.  Liquidation agents generally have more extensive knowledge, expertise and experience in conducting store closing sales than the Debtors.  Second, it is more cost effective for the Debtors to allow a Liquidation Agent to conduct the store closing sales (the "GOB SCSs") than to conduct such sales on their own because, among other reasons, the Liquidating Agent will reimburse the Debtors for expenses of the Liquidation.  Therefore, the Debtors' decision to retain a liquidating agent to conduct the GOB SCSs is an exercise of sound business judgment.

75.     The Debtors submit, and will demonstrate at the hearing on this Motion, that any such Winning Bidder is entitled to the protections of section 363(m) of the

---

[20] For purposes of this Motion, unless set forth otherwise, the term Liquidating Agent shall include a liquidating agent conducting sales pursuant to a sale authorized under the Purchase Agreement and the Agency Agreement with the Stalking Horse Bidder.

Bankruptcy Code, as the Agency Agreement will be the product of a good faith, arm's-length transaction.[21]

76.      Pursuant to the arrangement proposed herein, the Liquidating Agent will have the right to use the Closing Stores and the Debtors' related services, FF&E and other assets located in the Closing Stores in conducting the GOB SCSs.  In addition, pursuant to the Agency Agreement, the Liquidating Agent will also have a right to establish and implement advertising, signage and promotional programs consistent with "store closing" or similar theme (but not "going out business" or any similar theme in connection with a Remaining Chain Sale).

77.      The Liquidating Agent will conduct the GOB SCSs pursuant to the same sale guidelines previously approved by the Court in connection with the Phase I SCSs. The Debtors prepared those sale guidelines in consultation with counsel representing many of the Debtors' most significant landlords.  Moreover, all landlords will be provided an opportunity after approval of the Liquidation to seek relief from the Sale Guidelines, using the same procedures approved by the Court in connection with the Phase I SCSs.  *See* Section II.A., *infra*.

78.      This Court already has approved the use of a liquidator to conduct SCS at the commencement of these cases.  *See* footnote 5, *supra*.  Other cases are in accord.  *See*, *e.g.*, *In re Goody's LLC*, Ch. 11 Case No. 09-10124 (Bankr. D. Del. Jan. 21, 2009) (various objections of landlords and taxing authorities resolved or overruled); *In re Circuit City Stores, Inc.*, Ch. 11 Case No. 08-35653 (KRH) (Bankr. E.D. Va. Dec. 11, 2008) (objections of various landlords resolved prior to entry of final order); *In re Linens*

---

[21]      A copy of the Agency Agreement is available at www.bordersreorganization.com.  If you do not have computer access, you may obtain a copy of the Agency Agreement by contacting the Debtors' undersigned counsel.

*Holding Co.*, Ch. 11 Case No. 08-10832 (Bankr. Del. May 30, 2008 and Oct. 16, 2008)

(order, respectively, approving liquidator's store closing sales of certain closing

locations, with the creditors committee's objections resolved and certain regulatory

authorities objections overruled, and approving liquidator's store closing sales for all

remaining store locations, while overruling objections of various landlords); *In re*

*Sharper Image Corp.*, Ch. 11 Case No. 08-10322 (Bankr. D. Del. Mar. 14, 2008)

(objections of various landlords overruled); *In re Steve & Barry's Manhattan LLC*, Ch.

11 Case No. 08-12579 (ALG) (Bankr. S.D.N.Y. Aug. 22, 2008) (various objections of

landlords and taxing authorities resolved or overruled and creditors committee's

objection deemed withdrawn).

79.     The Debtors believe that the terms of the Agency Agreement are typical,

customary and reasonable under the circumstances in the exercise of their prudent

business judgment.  They are substantially similar to the terms approved by the Court in

connection with the Phase I SCSs.  Accordingly, the Debtors respectfully request that the

Court authorize the Debtors to enter into an agency agreement substantially similar to the

Agency Agreement with the Liquidating Agent.

**H.      The GOB SCSs Do Not Require Appointment
          Of A Consumer Privacy Ombudsman.**

80.     Section 363(b)(1) of the Bankruptcy Code provides that a debtor may not

sell or lease personally identifiable information unless such sale or lease is consistent

with its policies or upon appointment of a consumer privacy ombudsman pursuant to

section 332 of the Bankruptcy Code.

81.     Pursuant to the Agency Agreement, the Liquidating Agent will not have

access to the Debtors' customer lists and the Debtors will not disclose any personally

identifiable information regarding the Debtors' customers. Therefore, appointment of a consumer privacy ombudsman is unnecessary.[22]

## I. Waiver of Contractual Restrictions and Exemption of Laws Restricting Store Closing Sales.

82.     The Debtors respectfully request waiver of certain contractual or applicable legal restrictions that could otherwise inhibit or prevent the Debtors' ability to maximize recovery through the GOB SCSs, and which are customarily waived in sales such as these.

### 1.     Waiver of Contractual Restrictions.

83.     The Debtors request that the Court override or invalidate any Contractual Restrictions that may impair the Debtors' ability to close stores and conduct the GOB SCSs in connection with the GOB Sales. The stores subject to the GOB SCSs are located on properties that are leased by the Debtors. In certain cases, the contemplated GOB SCSs may be inconsistent with certain provisions of such leases, subleases, or other documents with respect to any such leased premises, including (without limitation) reciprocal easement agreements, agreements containing covenants, conditions and restrictions (including, without limitation, "go-dark" provisions and landlord recapture rights), or other similar documents or provisions. Additionally, the Winning Bid may contemplate that the Winning Bidder under a Remaining Chain Liquidation may have a right to augment the Debtors' inventory with the Winning Bidder's own inventory (of like kind and no lesser quality) which the Winning Bidder will sell in the Debtors' store locations as part of the GOB SCSs.

---

[22]     If the Stalking Horse Bidder liquidates certain of the locations, it will not provide the Liquidating Agent with any personally identifiable information.

84.     Store closing or liquidation sales are a routine part of chapter 11 cases

involving retail debtors.  Such sales are consistently approved by courts despite

provisions of recorded documents or agreements purporting to forbid such sales.  Indeed,

other such restrictive provisions in contracts have been deemed unenforceable in other

chapter 11 cases as impermissible restraints on a debtor's ability to maximize the value of

its assets under section 363 of the Bankruptcy Code.  *See In re Blockbuster Inc.,* Ch. 11

Case No. 10-14997 (BRL) (Bankr. S.D.N.Y. Jan. 20, 2011) at ¶¶ 7, 8 (various landlord

and taxing authority objections resolved consensually prior to entry of order); *In re

Finlay Enters., Inc.*, Ch. 11 Case No. 09-14873 (JMP) (Bankr. S.D.N.Y. Sept. 25, 2009)

at ¶ 14 (same); *In re Steve & Barry's Manhattan LLC,* Ch. 11 Case No. 08-12579 (ALG)

(Bankr. S.D.N.Y. Aug. 22, 2008) at ¶¶ 32, 33 (various motions of landlords and taxing

authorities resolved or overruled and creditors committee's objection deemed

withdrawn); *In re Bradlees Stores, Inc.*, Case No. 00-16035 (BRL) (Bankr. S.D.N.Y. Jan.

4, 2001) (authorizing Debtors to conduct GOB sales notwithstanding state rules or

statutes governing closing, liquidation, or "going-out-of-business" sales and

notwithstanding provision in leases restricting Debtor's ability to conduct such sales;

landlord objections overruled or withdrawn); *In re R.H. Macy & Co.*, 170 B.R. 69, 77

(Bankr. S.D.N.Y. 1994) (holding restrictive lease provision unenforceable against debtor

that sought to conduct going-out-of-business sale "because it conflicts with the Debtor's

fiduciary duty to maximize estate assets"); *Ames Dep't Stores, Inc. (Ames I)*, 136 B.R. at

359 (finding that "to enforce the anti-GOB sale clause of the [l]ease would contravene

overriding federal policy requiring Debtors to maximize estate assets by imposing

additional constraints never envisioned by Congress"); *see also In re Tobago Bay*

*Trading Co.*, 112 B.R. 463, 467 (Bankr. N.D. Ga. 1990) (finding anti-going-out-of-business sales clause in lease unenforceable).

85.     In connection with the Phase I SCSs, the Court approved Sale Guidelines, which govern certain rights of landlords during the sales.  The Debtors propose that those same guidelines also govern the GOB SCSs.

86.     Based on well-established precedent, the Court should ensure that no Contractual Restriction is an impediment to the GOB SCSs, closures of Closing Stores, or the activities in connection therewith.  To the extent such Contractual Restrictions exist, they should not be permitted to interfere with, or otherwise restrict, the Debtors from conducting the GOB SCSs or the closing of any Closing Stores.

### 2.     Exemption From Applicable Law Restrictions.

87.     Certain states in which the Closing Stores are located have or may have licensing and other requirements governing the conduct of store closing, liquidation, or other inventory clearance sales, including (but not limited to) state, and local laws, statutes, rules, regulations, and ordinances related to store closing and liquidation sales, establishing licensing, permitting, or bonding requirements, waiting periods, time limits, bulk sale restrictions, augmentation limitations that would otherwise apply to the GOB SCSs, or consumer fraud laws, with the exception of deceptive advertising laws (the "Liquidation Sale Laws").  Typical statutes and regulations provide that if a liquidation or bankruptcy sale is court authorized, however, then a company need not comply with these Liquidation Sale Laws.

88.     The Debtors, therefore, request that the Court authorize the Debtors to conduct the GOB SCSs without the necessity of, and the delay associated with, complying with the Liquidation Sale Laws.  Because the Debtors and their assets are

subject to this Court's jurisdiction, *see* 28 U.S.C. § 1334, this Court will be able to supervise the GOB SCSs. The GOB SCSs are legitimate methods by which the Debtors can maximize the return from the sale of the Merchandise for the benefit of their estates and creditors. Moreover, creditors and the public interest are adequately protected by the jurisdiction and supervision of this Court.

89.     Even if a state or local law does not expressly except bankruptcy sales from its ambit, the Debtors submit that, to the extent that such state or local law conflicts with federal bankruptcy laws, it is preempted by the Supremacy Clause of the United States Constitution. To hold otherwise would severely impair the relief otherwise available under section 363 of the Bankruptcy Code. In concert with this premise, Bankruptcy Courts have consistently recognized that federal bankruptcy law preempts state and local laws that contravene the underlying policies of the Bankruptcy Code. *See*, *e.g.*, *Aloe v. Shenango Inc. (In re Shenango Group, Inc.)*, 186 B.R. 623, 628 (Bankr. W.D. Pa. 1995) ("Trustees and debtors-in-possession have unique fiduciary and legal obligations pursuant to the bankruptcy code. . . . [A] state statute [ ] cannot place burdens on them where the result would contradict the priorities established by the federal bankruptcy code."). While preemption of state law is not always appropriate, as when the protection of public health and safety is involved, *see Baker & Drake, Inc. v. Pub. Serv. Comm'n of Nev. (In re Baker & Drake, Inc.)*, 35 F.3d 1348, 1353-54 (9th Cir. 1994) (finding no preemption when state law prohibiting taxicab leasing was promulgated in part as a public safety measure), it is appropriate when, as here, the only state laws involved concern economic regulation. *Id.* at 1353 (finding that "federal bankruptcy preemption is more likely . . . where a state statute is concerned with economic regulation

rather than with protecting the public health and safety"). Moreover, pursuant to section 105 of the Bankruptcy Code, the Court has the authority to permit the GOB SCSs to proceed notwithstanding contrary Liquidation Sale Laws. *See* 11 U.S.C. § 105(a).

90. Here, the principles of the Bankruptcy Code will be undermined if the Court does not provide for the waiver of the Liquidation Sale Laws because the Liquidation Sale Laws constrain the Debtors' ability to marshal and maximize assets for the benefit of creditors. Similar relief has been granted in this and other bankruptcy cases in other jurisdictions. *See, e.g.*, *In re Blockbuster Inc.,* Ch. 11 Case No. 10-14997 (BRL) (Bankr. S.D.N.Y. Jan. 20, 2011) at ¶¶ 9, 10 (various landlord and taxing authority objections resolved consensually prior to entry of order); *In re Finlay Enters., Inc.*, Ch. 11 Case No. 09-14873 (JMP) (Bankr. S.D.N.Y. Sept. 25, 2009) at ¶ 11 (same); *In re Steve & Barry's Manhattan LLC,* Ch 11 Case No. 08-12579 (ALG) (Bankr. S.D.N.Y. Aug. 22, 2008) at ¶ 36 (various motions of landlords and taxing authorities resolved or overruled and creditors committee's objection deemed withdrawn).

91. Importantly, given the supervision of this Court, the requested waiver will not unduly undermine state and local requirements that would otherwise apply to the GOB SCSs. The Debtors only request that this Court authorize the Debtors to conduct the GOB SCSs without the necessity of, and the delay associated with, obtaining various state licenses or permits, observing state and local waiting periods or time limits, and/or satisfying any additional requirements with respect to advertising, conducting the GOB SCSs as store closings or similar type sales, or transferring merchandise from the distribution centers to the Closing Stores. The Debtors fully intend to be bound by and comply with remaining statutes and regulations, such as health and safety laws.

92.     The Debtors also request that no other person or entity, including (but not limited to) any lessor or federal, state, or local agency, department, or governmental authority, be allowed to take any action to prevent, interfere with, or otherwise hinder consummation of the GOB SCSs, or the advertising and promotion (including through the posting of signs) of GOB SCSs, in the manner set forth in the proposed Sale Order.

93.     The Debtors are entitled to the foregoing relief, which is routinely granted in connection with store closing sales.  Indeed, the Court granted such relief in connection with the Phase I SCSs.  *See* Phase I SCSs Order ¶ 9.  The Debtors propose granting governmental authorities an opportunity to dispute the sale after entry of an order granting this Motion, which parallels the protections in the Phase I SCSs Order.[23]

**J.      Authority to Abandon Unsold Property Following Store Closing Sales.**

94.     Section 554(a) of the Bankruptcy Code provides that after notice and a hearing, the trustee, and therefore the debtor in possession, "may abandon any property of the estate that is burdensome to the estate or that is of inconsequential value and benefit to the estate."  *See Hanover Ins. Co. v. Tyco Indus.,* 500 F.2d 654, 657 (3d Cir. 1974) (a trustee "may abandon his claim to any asset, including a cause of action, he deems less valuable than the cost of asserting that claim"); *In re Grossinger's Assocs.*, 184 B.R. 429,

---

[23]     The Phase I SCSs Order provides as follows:

> To the extent there is a dispute arising from or relating to the Sales, this Order, the Agency Agreement, or the Sale Guidelines, which dispute relates to any GOB Laws or Liquidation Laws (a "Reserved Dispute"), the Court shall retain exclusive jurisdiction to resolve the Reserved Dispute. Any time within fifteen (15) days following service of this Order, any Governmental Unit may assert that a Reserved Dispute exists by serving written notice of such Reserved Dispute to counsel for the Debtors and counsel for the Agent at the addresses set forth in the Agency Agreement so as to ensure delivery thereof within one (1) business day thereafter.  If the Debtors, the Agent and the Governmental Unit are unable to resolve the Reserved Dispute within fifteen (15) days of service of the notice, the aggrieved party may file a motion with this Court requesting that this Court resolve the Reserved Dispute (a "Dispute Resolution Motion").

Phase I Order ¶ 9(c).

432 (Bankr. S.D.N.Y. 1995); *see also Midlantic Nat'l Bank v. New Jersey Dep't of Envtl. Protection*, 474 U.S. 494, 507, n.9 (1986) ("[A] trustee [in bankruptcy] may not abandon property in contravention of a state statute or regulation that is reasonably designed to protect the public health or safety from identified hazards. . . . This exception to the abandonment power . . . is a narrow one."); *Sherrell v. Fleet Bank (In re Sherrell)*, 205 B.R. 20, 22 (N.D.N.Y. 1997) ("The effect of the abandonment is to remove the asset from the jurisdiction of the bankruptcy court.") (quoting *In re Helms*, No. 91-2399, 1991 U.S. Dist. LEXIS 18958, at *3 (E.D. La. 1991)).

95.     Under the proposed form of Agency Agreement, any Merchandise remaining at the Closing Stores following the GOB SCSs can be sold by the Liquidating Agent, with the proceeds thereof treated as Proceeds for purposes of compensation computation.  To the extent, however, that the Liquidating Agent does not sell any Merchandise, Owned FF&E, Newsstand Inventory or Café/Candy Inventory, the Debtors request that they be authorized upon the conclusion of the GOB SCSs to abandon same without incurring liability to any person or entity.  The Debtors submit that if they are unable to sell or dispose of any such assets following the GOB SCSs, it would be costly and burdensome to the estate to retain them.

96.     Notwithstanding the foregoing, the Debtors and the Liquidating Agent will utilize all commercially reasonable efforts to remove or cause to be removed any confidential or personal identifying information (which means information which alone or in conjunction with other information identifies an individual, including, but not limited to, an individual's name, social security number, date of birth, government-issued identification number, account number, and .credit or debit card number) in any of the

Debtors' hardware, software, computers or cash registers or similar equipment that are to be sold or abandoned.

97. This Court granted the foregoing relief in connection with the Phase I SCSs. *See* Phase I SCSs Order ¶ 27. Consistent therewith, the Debtors request that in event of an abandonment, the applicable landlord be authorized to dispose of property without any liability to any individual or entity that may claim an interest in such abandoned property and that such abandonment be without prejudice to any landlord's right to assert any claims based on such abandonment and without prejudice to the Debtors or other party-in-interest to object thereto.

## RELIEF UNDER BANKRUPTCY RULE 6004(h)

98. Rule 6004(h) of the Bankruptcy Rules provides that an "order authorizing the use, sale, or lease of property … is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." Due to the facts of these cases and in order to avoid any defaults under their post-petition credit agreement, the Debtors request that any order approving the Sale be effective immediately by providing that the 10-day stay under Bankruptcy Rule 6004(h) is waived.

## NOTICE

99. No trustee or examiner has been appointed in these chapter 11 cases. Notice of this Motion has been given in accordance with this Court's order,[24] dated February 16, 2011, implementing certain notice and case management procedures, and prior instructions of this Court at the hearing held on June 22, 2011. Further, the Debtors

---

[24] [Docket No. 64].

intend on fulfilling the other notice requirements requested herein. The Debtors submit that no other or further notice need be provided.

## NO PRIOR REQUEST

100.    No previous request for the relief sought herein has been made by the Debtors to this or any other court.

WHEREFORE the Debtors respectfully request entry of (i) the Sale Procedures Order, (ii) the Sale Order; and (iii) such other and further relief as the Court deems just and proper.

Dated: June 30, 2011
      New York, New York

                          KASOWITZ, BENSON, TORRES
                           & FRIEDMAN LLP

                          By: /s/ Andrew K. Glenn
                          David M. Friedman (DFriedman@kasowitz.com)
                          Andrew K. Glenn (AGlenn@kasowitz.com)
                          Jeffrey R. Gleit (JGleit@kasowitz.com)
                          1633 Broadway
                          New York, New York 10019
                          Telephone:  (212) 506-1700
                          Facsimile:   (212) 506-1800

                          *Attorneys for Debtors*
                          *and Debtors in Possession*