## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | **Chapter 11** |
| **BORDERS GROUP, INC., *et al.*,**[1] | **Case No. 11-10614 (MG)** |
| Debtors. | **(Jointly Administered)** |

## REPORT OF MICHAEL ST. PATRICK BAXTER
## CONSUMER PRIVACY OMBUDSMAN

Michael St. Patrick Baxter
Yaron Dori
Dennis B. Auerbach
Elizabeth H. Canter
Joshua D. McKarcher
COVINGTON & BURLING LLP
1201 Pennsylvania Avenue, N.W.
Washington, D.C.  20004-2401
Telephone:  (202) 662-5164
Facsimile:  (202) 778-5164
e-mail:  mbaxter@cov.com

---

[1] The debtors in these cases, along with the last four digits of each debtor's federal tax identification number, are Borders Group, Inc. (4588), Borders International Services, Inc. (5075), Borders, Inc. (4285), Borders Direct, LLC (0084), Borders Properties, Inc. (7978), Borders Online, Inc. (8425), Borders Online, LLC (8996), and BOP (UK) Limited.

DC: 4106214-3

# Table of Contents

BACKGROUND ........................................................................................... 2

SCOPE OF THE REPORT ........................................................................... 5

AFFECTED CONSUMER DATA ................................................................. 7

    I.     Background ....................................................................... 7

    II.    Consumer Data Collected by Debtor .................................... 8

        A.     The Debtor's Consumer Marketing Database........................... 8

             (i)     Retail Store and E-Commerce Consumers ..................... 9

             (ii)    Members of the Borders Rewards Program.................................. 10

             (iii)   Non-Members of the Borders Rewards Program.......................... 11

        B.     Payment Information and Other Quick Checkout Information ................ 12

        C.     Borders Rewards Program Passwords ....................................... 13

        D.     User-Generated Content........................................................ 13

        E.     Aggregate Clickstream Data ................................................. 14

        F.     Other Consumer Data Not Included in the Sale........................ 15

    III.   Consumer Data Collected By or Through Service Providers and Partners ......... 16

        A.     Next Jump, Inc. ................................................................. 16

        B.     Kobo, Inc........................................................................ 16

        C.     Debtor's Marketing of Third-Party Websites and Services ...................... 17

DEBTOR'S APPLICABLE PRIVACY POLICIES........................................... 17

    I.     May 27, 2008 Privacy Policy................................................ 18

    II.    Pre-May 27, 2008 Privacy Policies....................................... 19

    III.   Evaluation of Sale Under Applicable Privacy Policies........................ 21

COMPLIANCE WITH APPLICABLE NONBANKRUPTCY LAW ................... 22

    I.     Federal Trade Commission Act and State Mini-FTC Acts................. 23

A.    Relevant Legal Standards ....................................................... 23

B.    Application of FTC Act to Debtor's Sale of PII ....................................... 27

(i)    Consumer Data Collected Under May 27, 2008 Privacy
Policy ............................................................................................ 27

(ii)    Consumer Data Collected Under the Pre-May 27, 2008
Privacy Policies........................................................................... 31

(iii)    Aggregate Clickstream Data .......................................... 35

II.    The Video Privacy Protection Act of 1988........................................ 36

A.    Relevant Legal Standards ....................................................... 36

B.    Application of VPPA to Debtor's Sale of PII........................................... 38

OTHER CONSIDERATIONS.................................................................... 40

CONCERNS RAISED BY FTC AND STATES' ATTORNEYS GENERAL............................ 41

I.    FTC Letter................................................................................. 42

II.    State AGs Letter........................................................................ 43

III.    Negotiated Solution to Concerns of FTC and State Attorneys General ............... 45

CONCLUSION.................................................................................... 45

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| **BORDERS GROUP, INC.,** *et al.*, | Case No. 11-10614 (MG) |
| **Debtors.** | (Jointly Administered) |

**REPORT OF MICHAEL ST. PATRICK BAXTER**
**CONSUMER PRIVACY OMBUDSMAN**

Michael St. Patrick Baxter, the consumer privacy ombudsman in these cases
("**Ombudsman**"), files this report ("**Report**"), pursuant to Bankruptcy Code section 332(b),
to assist the Court in its consideration of the facts, circumstances, and conditions of the
proposed sale of personally identifiable information ("**PII**")[2] of consumers of Borders
Group, Inc., and its debtor subsidiaries (collectively, "**Debtor**") to Barnes & Noble, Inc.
("**Buyer**").

Based upon the following analysis and subject to the qualifications therein,
the Ombudsman concludes and recommends as follows:

(a)        Debtor may transfer to Buyer PII (other than information about
certain audio-visual materials described in paragraph (c) below) that was collected after May
27, 2008, pursuant to Debtor's May 27, 2008 Privacy Policy, provided that (i) Buyer adheres
to all material terms in Debtor's May 27, 2008 Privacy Policy (or terms that are at least as
protective of consumer privacy); (ii) Buyer honors the opt-out requests of any consumer that
previously opted out of receiving marketing messages from Debtor; (iii) Buyer safeguards

---

[2] *See* 11 U.S.C. § 101(41A), quoted *infra* at note 6.

all conveyed PII in a manner consistent with industry standard data security protections and applicable information security laws; and (iv) Buyer destroys PII for which it determines it has no reasonable business need.

(b)    Debtor may transfer to Buyer PII (other than information about certain audio-visual materials described in paragraph (c) below) collected on or before May 27, 2008, provided that (i) Debtor obtains the affirmative consent of affected consumers; or (ii) Buyer agrees to treat PII collected by Debtor on or before May 27, 2008, consistently with the terms of Debtor's privacy policy in effect at the time of such collection, and agrees to obtain affirmative consent for any material change to such policy that relates to PII collected under it.

(c)    Debtor cannot transfer to Buyer any consumer's purchase history information that includes the title, genre and other details about specific audiovisual materials (e.g., videocassettes, DVDs), regardless of when it was collected, unless Debtor obtains the written consent of the affected consumer.

(d)    Debtor may transfer to Buyer the Aggregate Clickstream Data (as defined in paragraph 31 below).

## BACKGROUND

1.    On August 12, 2011, the United States Trustee for Region 2 appointed Michael St. Patrick Baxter as the consumer privacy ombudsman in these cases to review Debtor's proposed sale of PII to Buyer ("**Sale**").  The Ombudsman prepared this Report, pursuant to sections 332 and 363(b)(1) of the Bankruptcy Code, to assist the Court in its consideration of the facts, circumstances, and conditions of the Sale and, in particular, the sale of certain data collected by Debtor via its websites and other retail channels.

2.      To facilitate the preparation of the Report, the Ombudsman provided written questions to Debtor and participated in several discussions with Debtor's representatives.   The Ombudsman also conducted interviews of two representatives of Debtor:  Matthew A. Chosid (Associate General Counsel, Borders Group, Inc.) and Daniel Angus (Vice President, Customer Loyalty, Borders Group, Inc.).

3.      The Ombudsman invited representatives of the Federal Trade Commission, the Office of the New York Attorney General, and the National Association of Attorneys General to participate in the interviews of Messrs. Chosid and Angus.[3]

4.      The following documents were relied upon by the Ombudsman in the preparation of the Report:  (a) Debtor's Privacy Policies, dated May 27, 2008, April 12, 2007, and February 21, 2006, and the last policy in effect before February 21, 2006[4] (attached hereto as **Exhibit A**); (b) Borders Rewards Terms and Conditions, dated October 1, 2010, September 1, 2010, August 26, 2010, July 23, 2010, September 10, 2009, November 3, 2008, May 27, 2008, April 12, 2007, and February 21, 2006 (attached hereto as **Exhibit B**); (c) other representations on Debtor's website, including Borders Websites and Computer Kiosk Terms of Use and "Consumer Service Email Opt-out" page (attached hereto as **Exhibit C**); and (d) the form of Asset Purchase Agreement provided by Debtor ("**Purchase Agreement**") (attached hereto as **Exhibit D**), specifically section 7.5 of that agreement:

---

[3] The following representatives of the invited governmental agencies attended the interview in person or by telephone:  Karen Jagielski (Federal Trade Commission), Michael P. Mora (Federal Trade Commission), Christopher N. Olsen (Federal Trade Commission), Karen Cordry (National Association of Attorneys General), and Clark P. Russell (Office of the New York Attorney General).

[4] The exact effective date of this policy cannot be determined, so it has been marked "Pre-February 21, 2006 Privacy Policy" in Exhibit A.

Privacy.  On or prior to the Closing Date, the Buyer agrees to adopt a written policy with respect to protection of the confidentially of personally identifiable information regarding the customers and employees of the Seller Group and other Persons not affiliated with the Seller Group substantially similar in all material respects to those included in the written privacy policies of the Seller Group in effect as of the date of this Agreement.  From and after the Closing Date, the Buyer shall comply with such policy, or such successor policies adopted by Buyer from time to time, and Applicable Law with respect to the protection of such personally identifiable information.  Prior to making any material change to these privacy policies with respect to the personally identifiable information or the use or disclosure thereof different from that specified in the Buyer policies then in effect, the Buyer agrees (a) to notify the Persons whose personally identifiable information is included in the Assets by mail or email and afford such persons the opportunity to opt-out of the changes to the privacy policy or the new uses of their information; (b) to employ appropriate information security controls and procedures (technical, operational, and managerial) to protect their information; and (c) to abide by all Applicable Laws.

5.    The Ombudsman also reviewed various internal documents that Debtor made available to the Ombudsman pertaining to its marketing and advertising programs, including the Borders Rewards and Borders Rewards Plus programs, and various documents pertaining to Debtor's information technology program.

6.    As a condition of providing the Ombudsman with access to certain information, Debtor required that the Ombudsman enter into a written confidentiality agreement, which he did.

7.    Finally, as discussed below in paragraphs 90–96 below, the Ombudsman received and considered letters concerning the Sale from the Federal Trade Commission ("**FTC**") (attached hereto as **Exhibit E**) and 24 states' Attorneys General (attached hereto as **Exhibit F**).

## SCOPE OF THE REPORT

8.    Section 332(b) of the Bankruptcy Code requires that the Ombudsman "provide to the court information to assist the court in its consideration of the facts, circumstances, and conditions of the proposed sale or lease of personally identifiable information under section 363(b)(1)(B)."  This information may include the following:

(a)    Debtor's privacy policy;

(b)    the potential losses or gains of privacy to consumers if the sale is approved by the Court;

(c)    the potential costs or benefits to consumers if the sale is approved by the Court; and

(d)    the potential alternatives that would mitigate potential privacy losses or potential costs to consumers.[5]

This Report reflects the Ombudsman's consideration of these issues.

9.    Section 363(b)(1)(B)(ii) of the Bankruptcy Code suggests that the Ombudsman should additionally consider whether a proposed sale of PII[6] would violate

---

[5] *See* 11 U.S.C. § 332(b).

[6] Pursuant to 11 U.S.C. § 101(41A),

[t]he term "personally identifiable information" means—

(A) if provided by an individual to the debtor in connection with obtaining a product or a service from the debtor primarily for personal, family, or household purposes—

(i) the first name (or initial) and last name of such individual, whether given at birth or time of adoption, or resulting from a lawful change of name;

(ii) the geographical address of a physical place of residence of such individual;

(iii) an electronic address (including an e-mail address) of such individual;

(continued…)

applicable nonbankruptcy law.  Accordingly, the Ombudsman has included an analysis of whether the Sale would violate certain potentially applicable nonbankruptcy law, including the Federal Trade Commission Act ("**FTC Act**"), state laws similar to the FTC Act, and the Video Privacy Protection Act of 1998 ("**VPPA**").

10.    For purposes of this analysis, the Ombudsman may use the term "consumer data" to refer to data collected by Debtor.  Such term may include data that is outside the scope of PII.  The Ombudsman may also refer to "personal information" to the extent that Debtor's policies made representations regarding "personal information," and this term may be more or less inclusive than PII, depending upon the context in which it was used by Debtor.

---

(iv) a telephone number dedicated to contacting such individual at such physical place of residence;

(v) a social security account number issued to such individual; or

(vi) the account number of a credit card issued to such individual; or

(B) if identified in connection with 1 or more of the items of information specified in subparagraph (A)—

(i) a birth date, the number of a certificate of birth or adoption, or a place of birth; or

(ii) any other information concerning an identified individual that, if disclosed, will result in contacting or identifying such individual physically or electronically.

## AFFECTED CONSUMER DATA[7]

I.    Background

11.    Debtor owned and operated nearly 500 book, music, and movie superstores under the Borders name and more than 100 mall-based and other small-format bookstores, including stores operated under the Waldenbooks, Borders Express, and Borders Outlet names.[8] As of January 29, 2011, Debtor's physical stores were located throughout the United States in 48 states plus the District of Columbia and Puerto Rico.[9]

12.    Since May 2008, Debtor also operated a proprietary e-commerce platform, through which it sells products online through its websites (namely, www.borders.com), mobile applications, and in-store kiosks that connect to the Internet.[10]

13.    Through its physical stores and e-commerce business, Debtor sells an assortment of products, including books, music and movies, gifts and stationery, food and beverages, eReaders and other digital devices, games, toys, calendars, posters, reading accessories, and furniture.[11] At least 40 percent of Debtor's product sales are attributable to purchases of non-media products, i.e., products other than books, music and movies.

---

[7] The facts in the Report are stated upon the Ombudsman's information and belief, based upon his interviews with, and information provided by, Debtor's representatives. The Ombudsman shared drafts of the fact section of the Report with Debtor in an attempt to ensure the accuracy of the statement of facts in the Report. The Ombudsman also shared his preliminary legal conclusions with Debtor prior to the auction, and shared an initial draft of this report with Debtor, Buyer, the FTC, and representatives of the State Attorneys General and received comments from those entities.

[8] Borders Group Inc., Annual Report, at 3, 8 (Form 10-K) (Apr. 29, 2011).

[9] *Id.*

[10] *Id.* at 6.

[11] *Id.* at 8.

II.      Consumer Data Collected by Debtor

     A.      The Debtor's Consumer Marketing Database

     14.      Debtor collected certain consumer data at both its physical stores and through its e-commerce platform to target Debtor's marketing and promotional e-mails to consumers and otherwise facilitate its marketing efforts.  Most of this consumer data appears to be PII under the Bankruptcy Code.  The database containing this data is stored on servers maintained by, and accessed through software offered by, Debtor's service provider, Epsilon Data Management LLC ("**Epsilon**").  Subsets of the data stored on Epsilon's systems also are stored on servers controlled by Debtor and other service providers of Debtor. (Collectively, the Ombudsman refers to these databases as the "**Consumer Marketing Database**.")  The Sale includes the Consumer Marketing Database.

     15.      Debtor has represented to the Ombudsman that the Consumer Marketing Database contains PII collected from consumers through its physical stores since May 2005.  The Ombudsman further understands that PII in the Consumer Marketing Database has been collected by Debtor through its e-commerce platform since May 2008, other than for a subset of e-mail addresses received from Amazon.com.  Debtor has represented to the Ombudsman that, prior to May 2008, Debtor's e-commerce business was operated by Amazon.com and that PII collected from consumers by Amazon.com generally was not provided to Debtor or incorporated into its Consumer Marketing Database except for a limited subset of e-mail information, as discussed below at paragraph 42.[12].

---

[12] As discussed below, Debtor has represented that the Consumer Marketing Database includes the email addresses of certain of Amazon.com consumers that "opted in" to having their e-mail information conveyed to Debtor at the time Debtor began operating its e-commerce platform.  The Ombudsman asked for copies of the screen shots or other documentation of the opt-in provided by Amazon.com, as well as the applicable (continued…)

(i)      Retail Store and E-Commerce Consumers

16.      The Consumer Marketing Database contains the PII of approximately 48 million consumers.  For each consumer, the Consumer Marketing Database contains some or all of the following data elements, with variability with respect to how much PII the consumer provided to Debtor and whether certain data elements remain valid:  first and last name (for approximately 20.4 million individuals), e-mail address (for approximately 48 million individuals), mailing address (for approximately 11.6 million individuals), seven digit phone number (for approximately 41 million individuals), and month and day of birth (but not year)[13] (for approximately 7.9 million individuals).

17.      For those consumers that are or have been members of Debtor's loyalty program, Borders Rewards (discussed below), the Consumer Marketing Database also may contain the Borders Rewards membership number assigned to the consumer by Debtor, and certain information about the purchasing history of that consumer.  Such purchase history information may include, for example, the date and location of purchases, the stock-keeping unit ("**SKU**") numbers associated with purchases, and information about the amount paid and the tender for payment used, e.g., cash or credit card.

18.      Through the use of SKU numbers, Debtor collects and stores in the Consumer Marketing Database information about each unique product or item purchased by

---

Amazon.com privacy policy and any other privacy representations made by Amazon.com to the affected consumers.  Debtor has not been able to provide those materials at the time of this Report, but Debtor has represented that it understands that the only information in the Consumer Marketing Database that was collected pursuant to an Amazon.com privacy policy was transferred to Debtor's Consumer Marketing Database pursuant to the affirmative consent of affected consumers.

[13] Debtor recently informed the Ombudsman that it discovered that it had unknowingly collected birth year for some consumers.  Debtor has represented to the Ombudsman that all birth-year data is in the process of being purged and will not be conveyed in the Sale.

a Borders Rewards member, including the title and genre of a purchased book, DVD, compact disc, or other product; the year of publication or distribution of the product; certain qualities of the product, such as whether a purchased book was hardcover or paperback; and other details about the unique product or item sold.

19.     Debtor has represented to the Ombudsman that it is reasonably certain it can identify the date on which each data element described in paragraphs 16–18 was collected by Debtor and added to the Consumer Marketing Database.

(ii)    <u>Members of the Borders Rewards Program</u>

20.     Of the approximately 48 million consumers whose PII appears in the Consumer Marketing Database, approximately 45 million are or were members of the Borders Rewards loyalty program.[14]    Members of the program earn credit ("**Borders Bucks**") toward future purchases from Debtor.  Debtor operated the program from February 2006 until new enrollments were suspended on August 10, 2011.  Consumers could enroll in the program at any of Debtor's physical stores or through Debtor's e-commerce platform, either from an in-store kiosk or other computer.  Membership was free, with no enrollment costs or annual fees.

21.     Although the terms and conditions applicable to program membership changed several times since February 2006, the terms and conditions have always contained a provision regarding marketing and consumer privacy that remained substantially the same: "By becoming a Member of the BORDERS REWARDS program, you agree to receive advertising, marketing materials, and other communications from Borders, Waldenbooks,

---

[14] *See generally* Exhibit B (Borders Rewards Terms and Conditions).

and their affiliates.  Your personal information will be held in accordance with the Borders Privacy Policy, which can be found at www.bordersrewards.com."[15]

22.    The terms and conditions required members to be at least 16 years of age (and, effective September 10, 2009, at least 18 years of age).[16]  Debtor has represented to the Ombudsman that (a) its standard business practice was to provide a brochure containing the program's terms and conditions to consumers who enrolled in the program at one of Debtor's physical stores, and (b) consumers who enrolled through Debtor's e-commerce platform were able to access the terms and conditions electronically.

23.    Over time, there were approximately 19.2 million Borders Rewards members (a) who opted out of receiving emails regarding their membership in the program, (b) terminated their membership in the program, or (c) whose e-mail addresses became invalid.  Debtor has represented to the Ombudsman that it retained each member's PII (including any purchase history information) in the Consumer Marketing Database in case the member later opted in to receiving program-related email, rejoined the program, or updated his or her e-mail address.   However, a separate service provider, Experian CheetahMail, ensures that members who opted out or terminated their membership do not receive marketing communications.

(iii)    <u>Non-Members of the Borders Rewards Program</u>

24.    Of the approximately 48 million consumers whose PII appears in the Consumer Marketing Database, approximately 2.7 million opted in to receive marketing and promotional messages <u>without</u> becoming members of the Borders Rewards program.

---

[15] *See id.* ¶ 6 (Feb. 21, 2006 version).

[16] *See id.* ¶ 2(a) (Feb. 21, 2006 version); *id.* ¶ 2(a) (Sept. 10, 2009 version).

Debtor's websites invited consumers to sign up to receive marketing e-mails and promotions from Debtor, usually while completing a transaction on Debtor's website. These consumers provided an e-mail address and, in some cases, additional PII to Debtor, subject to Debtor's online privacy policy.[17]

25. Periodically, consumers who previously elected to receive marketing messages from Debtor opted out of receiving future messages. Debtor did not remove PII about such consumers from the Consumer Marketing Database. Experian CheetahMail maintains a list of the e-mail addresses of those who opted out and is responsible for ensuring Debtor's marketing messages are not sent to such consumers.

B.    Payment Information and Other Quick Checkout Information

26. Debtor collected payment information, including credit card and debit card numbers and expiration dates, at its physical stores and through its e-commerce platform. Debtor has represented to the Ombudsman that it used such data only to process payments and did not retain that information, except where consumers opted to use Debtor's "Quick Checkout Feature" or joined Borders Rewards Plus, a paid version of the Borders Rewards program that entitled members to additional discounts and free shipping online.

27. Debtor's Quick Checkout Feature offered consumers the ability to store and automatically repopulate certain data elements required to complete a transaction on Debtor's e-commerce platform: first and last name, billing address, shipping address, e-mail address, and payment information. Debtor has represented to the Ombudsman that it

---

[17] The Ombudsman has requested copies of sample screenshots or other documents used, but Debtor has not been able to provide him these documents before the filing of this Report. Debtor has represented, however, that its privacy policy was posted and accessible on the e-commerce platform through which consumers provided their PII to Debtor.

collected all such PII pursuant to its online privacy policy.[18]    Debtor retained the PII associated with the Quick Checkout Feature on a server controlled by Debtor.   All PII collected by Debtor as part of its Quick Checkout Feature, except for the payment information, is included in the Sale.

28.    Debtor collected and retained Borders Rewards Plus members' payment information to process their annual membership fees.   This credit card information was stored on a server located in Ann Arbor, Michigan.   Debtor has represented to the Ombudsman that the data stored on this server was segregated from the Consumer Marketing Database, consistent with Payment Cards Industry standards.   Debtor also has represented to the Ombudsman that this payment information will not be conveyed in the Sale, and that Debtor plans to purge all payment information on or about September 27, 2011.

C.    Borders Rewards Program Passwords

29.    Debtor collected and stored password information for Borders Rewards and Borders Rewards Plus members to authenticate access to a customized website, BordersRewards.com.   Any such password information was stored on a server maintained by Debtor's service provider, Brierley & Partners, located in Plano, Texas.   This PII is included in the Sale.

D.    User-Generated Content

30.    Debtor hosted user-generated content, such as product ratings and reviews, which appeared on Debtor's websites.   Debtor collected each participating

---

[18] As discussed below in paragraph 42, Debtor's online privacy policy has changed three times since May 2005.   The most recent version, dated May 27, 2008, has been in effect throughout the period in which the Quick Checkout Feature has been available.

consumer's user-generated content and e-mail address. Debtor has represented to the

Ombudsman that each consumer who submitted such content to Debtor did so pursuant to

Debtor's online terms and conditions and its online privacy policy. Such terms and

conditions provide as follows:

> For any content that you submit, you grant Borders a perpetual, irrevocable, royalty-free, transferable right and license to use, copy, modify, delete in its entirety, adapt, publish, translate, create derivative works from and/or sell and/or distribute such content and/or incorporate such content into any form, medium or technology throughout the world without compensation to you. . . . None of the content that you submit shall be subject to any obligation of confidence on the part of Borders, its agents, subsidiaries, affiliates, partners or third party service providers and their respective directors, officers and employees.[19]

Debtor has represented to the Ombudsman that it intends to convey in the Sale consumers'

user-generated content, but not the e-mail addresses ascribed to specific user-generated

content.

### E.    Aggregate Clickstream Data

31.    In addition to the data in its Consumer Marketing Database, Debtor

intends to convey to Buyer certain data that it collected through the use and analysis of

cookies, web beacons, and other similar types of technology ("**Aggregate Clickstream

Data**"). Aggregate Clickstream Data reflects user behavior, e.g., which web pages users

click through from Debtor's home page. Such data aides website operators in determining

which links, images, and pages are the most popular, i.e., how many users click on and how

---

[19] *See* Exhibit C (Borders Websites and Computer Kiosk Terms of Use). Debtor has not furnished to the Ombudsman prior versions of its online terms and conditions other than the October 28, 2010 version that is available on Debtor's website. However, Debtor has represented that all information collected online from consumers was subject to Debtor's online privacy policy.

long users visit them.  Debtor has represented to the Ombudsman that it did not collect Aggregate Clickstream Data at a consumer-specific level, and that data cannot be associated with particular e-mail addresses, IP addresses, or other unique identifiers that pertain to a particular consumer.  It is the Ombudsman's understanding that the Aggregate Clickstream Data contains only macro-level analytics information about general user behavior on Debtor's websites.

      F.    <u>Other Consumer Data Not Included in the Sale</u>

      32.    Debtor also may have collected PII incidental to its gift card program, fraud detection and prevention activities, and general business operations.  To the extent it collected PII in connection with any of these activities, Debtor has represented to the Ombudsman that such PII will not be included in the Sale and that Debtor will purge such PII on or about September 27, 2011.

      33.    Debtor has represented to the Ombudsman that it no longer has any physical retail operations that it operates outside the United States.[20]  Debtor continues to have franchisees in the UAE and Malaysia.  Debtor has represented to the Ombudsman that, although it previously may have licensed the "Borders" name to, or operated, certain e-commerce websites in Australia, New Zealand, and Singapore, it does not have any PII or other consumer data that was collected through these overseas e-commerce or physical operations.  Accordingly, the Sale will not include such data.

---

[20] On September 21, 2007, Debtor sold its U.K. and Ireland bookstore operations, and, on June 10, 2008, Debtor sold bookstores that it had owned and operated in Australia, New Zealand, and Singapore.  *See* Borders Group Inc., Annual Report, at 1 (Form 10-K) (Apr. 1, 2010).

III.    Consumer Data Collected By or Through Service Providers and Partners

     A.    Next Jump, Inc.

         34.    In 2007, Debtor entered an agreement with a service provider, Next Jump, Inc. ("**Next Jump**"), to develop and operate a program called Borders Rewards Perks. Members of the Borders Rewards program were invited to join the paid Borders Rewards Perks program so they could receive discounts from unaffiliated third parties as negotiated by Next Jump.  Approximately 3.4 million Borders Rewards members joined the program. The Consumer Marketing Database, in certain circumstances, reflects whether a Borders Rewards member joined the Borders Rewards Perks program, but it does not contain data that members provided to unaffiliated third parties related to the program.

         35.    While administering the Borders Rewards Perks program, Next Jump collected data regarding members' behavior and preferences.  For example, some members expressed preferences to Next Jump regarding categories of third-party retailers from which they were interested in receiving promotional offers.[21]  While Debtor asserts that it owns any such data pursuant to its agreement with Next Jump, Debtor has represented to the Ombudsman that it has not collected such data and has not stored it in its Consumer Marketing Database.  The Ombudsman understands that such data is not included in the Sale.

     B.    Kobo, Inc.

         36.    In 2009, Debtor entered into an agreement with Kobo, Inc. ("**Kobo**") pursuant to which, among other things, Debtor provided its customers with the ability to

---

[21] *See* Declaration of Jeffrey R. Gleit, Adv. Proc. No. 11-02567, Doc. No. 3, Ex. A (Aug. 31, 2011) (agreement titled "Borders Rewards Perks Program," contemplating that Next Jump would collect data about "expressed merchant and category spend preferences" on behalf of Debtor).

purchase and download literary works over the Internet.  The Ombudsman understands that pursuant to this agreement Debtor collected customer data on its website and added such data to the Consumer Marketing Database.  In 2011, Debtor entered into a new agreement with Kobo whereby customers interacted directly with Kobo.  Debtor has represented to the Ombudsman that any PII about Kobo users that Debtor collected since the new agreement with Kobo went into effect in June 2011 is not Debtor's property and was used by Debtor pursuant to a license from Kobo.  Debtor has represented to the Ombudsman that such data does not appear in the Consumer Marketing Database and will not be conveyed in the Sale. The Ombudsman understands that data entered into the Consumer Marketing Database before the June 2011 agreement, however, remains the Debtor's property and are included in the Sale.

    C.    <u>Debtor's Marketing of Third-Party Websites and Services</u>

    37.    Over the duration of its business operations, Debtor entered into agreements with other unaffiliated third parties whereby Debtor sent marketing messages to consumers on behalf of such third parties.  To the extent that a consumer interacted with such third parties, any PII collected by that third party was collected pursuant to the third-party's privacy policy, not Debtor's.  Debtor has represented to the Ombudsman that PII collected by such third parties was never shared with Debtor, does not appear in the Consumer Marketing Database, and thus is not included in the Sale.

**DEBTOR'S APPLICABLE PRIVACY POLICIES**

    38.    Section 363(b)(1) of the Bankruptcy Code directs the Court to consider whether the Sale is consistent with Debtor's privacy policy in effect on the date of the commencement of the case or violates applicable nonbankruptcy law.  The issue of whether the Sale violates applicable nonbankruptcy law requires the consideration of the

terms of Debtor's privacy policy and any other privacy representations made by Debtor to consumers.[22]  Therefore, the Ombudsman has also considered Debtor's privacy policies in effect prior to the commencement of the case.

        39.     All of the PII at issue in the Sale was collected after May 2005.  The Ombudsman, therefore, did not consider Debtor's privacy policies in effect prior to May 2005, because they are not relevant to the present analysis.  However, separate analyses must be made of PII collected on or before May 27, 2008, and PII collected after that date.

I.      May 27, 2008 Privacy Policy

        40.     Debtor has represented to the Ombudsman that Debtor's privacy policy changed three times from May 2005 to May 2008.[23]  The most recent version of Debtor's privacy policy went into effect on May 27, 2008 ("**May 27, 2008 Privacy Policy**"), and it has been posted on Debtor's websites since that time.  The May 27, 2008 Privacy Policy purports to apply to Debtor's privacy practices to all in-store and online transactions and to subscriptions to Debtor's email programs or Borders Rewards:

> This privacy policy applies when you make a purchase at any Borders, Borders Outlet, Borders Express, Waldenbooks, or Brentano's store; when you visit the "Websites" (including but not limited to www.borders.com, www.bordersmedia.com, and www.bordersrewardsperks.com); when you access and use any Borders Website on any in-store computer kiosk (the "Kiosks"); when you add items to an online shopping cart; when you subscribe to any of our email programs or mobile content delivery programs; when you sign up for Borders Rewards and Borders Rewards Perks; or when you email content from the kiosk or any Borders Websites.[24]

---

[22] *See* 11 U.S.C. § 363(b)(1); *id.* § 332(b)(1).

[23] *See generally* Exhibit A.

[24] *See* Exhibit A (May 27, 2008 version).

41.    The May 27, 2008 Privacy Policy contains the following provision regarding the sharing of "personal information"[25] with third parties in connection with the sale of the company or its businesses:

> Circumstances may arise where for strategic or other business reasons Borders decides to sell, buy, merge or otherwise reorganize its own or other businesses.  Such a transaction may involve the disclosure of personal and other information to prospective or actual purchasers, or receiving it from sellers.  It is Borders' practice to seek appropriate protection for information in these types of transactions.  In the event that Borders or all of its assets are acquired in such a transaction, customer information would be one of the transferred assets.[26]

Except for a few other provisions not relevant to the Sale, the May 27, 2008 Privacy Policy provides that Debtor will not share "personal information" with third parties without consumer consent.[27]

II.    Pre-May 27, 2008 Privacy Policies

42.    Prior to May 27, 2008, Debtor had at least three privacy policies in effect, including a privacy policy that went into effect April 12, 2007, a policy that went into effect February 21, 2006, and the policy that governed prior to February 21, 2006 (collectively, the "**Pre-May 27, 2008 Privacy Policies**").  From August 2001 to May 2008, Borders did not operate its own e-commerce platform.  Rather, Amazon.com operated the Borders.com website.  The Ombudsman understands that any consumer data (including PII)

---

[25] The May 27, 2008 Privacy Policy does not define "personal information" but states that, for purposes of the policy, "personal information" includes "purchase history, phone number(s), email and residential addresses, and credit card data." *Id.*

[26] *Id.*

[27] *Id.*  While the privacy policy allows for the possibility that consumer information might be shared with third parties for marketing purposes pursuant to express consumer consent, Debtor has represented that it did not have such a program in place.  Debtor further has represented that it is not aware of any consumers whose information is stored in the Consumer Marketing Database who have opted out of having their data disclosed to third parties for marketing purposes.

collected through the operation of Borders.com prior to May 2008 was collected pursuant to the Amazon.com privacy policy and was not shared with Debtor, except for a small number of email addresses that Amazon.com transferred to Debtor in 2008 with the affirmative consent ("opt in") of the affected consumers.[28]   The Pre-May 27, 2008 Privacy Policies expressly applied to purchases at any of Debtor's physical stores; when a consumer visited the Debtor's websites;[29] and when a consumer subscribed to any of Debtor's email programs or Borders Rewards.

43.    Although there are small variations among the Pre-May 27, 2008 Privacy Policies, none of the policies contains a provision that is similar to the provision in the May 27, 2008 Privacy Policy concerning the treatment of "personal information" and other information in a sale or reorganization.  Instead, as relevant to the Sale, the Pre-May 27, 2008 Privacy Policies require Debtor to obtain consumers' express consent to disclosure to third parties of their "email address or other personal information."[30]

44.    The Ombudsman understands that, when Debtor modified its privacy policy on May 27, 2008, it updated the version of the policy posted on its websites, and the updated version contained a notation that the policy was "Last Modified May 27, 2008."[31] Debtor did not otherwise notify consumers of the changes to its policy.  Nor did Debtor

---

[28] *See supra* note 12.

[29] These included www.borders.com, www.bordersstores.com, www.bordersrewards.com, and www.waldenbooksstores.com.

[30] *See* Exhibit A (Apr. 12, 2007 version); *id.* (Feb. 21, 2006 version); *id.* (pre-Feb. 21, 2006 version).  These policies also permit third-party disclosure "based on a legal obligation . . . determined to be legally necessary in the reasonable opinion of our counsel."  *See, e.g., id.* (Feb. 21, 2006 version).

[31] Because Debtor has not provided the time of the update, the Ombudsman has assumed that the amendment was made effective at 11:59 p.m. on May 27, 2008.

notify consumers that such changes would apply retroactively or seek their consent to apply such changes retroactively.

III.   Evaluation of Sale Under Applicable Privacy Policies

45.   The Ombudsman is required to consider whether the Sale is consistent with Debtor's privacy policy in effect at the commencement of the case.  Debtor's May 27, 2008 Privacy Policy differed materially from Debtor's Pre-May 27, 2008 Privacy Policies because the May 27, 2008 Privacy Policy addressed the transfer of consumer data in a sale but the earlier privacy policies did not.  Moreover, Debtor did not notify affected consumers or seek their consent to make this material change.  As a result, the Ombudsman believes that more than one privacy policy was in effect at the commencement of the case. Specifically, the May 27, 2008 Privacy Policy was in effect for consumer data collected after May 27, 2008, and the Pre-May 27, 2008 Privacy Policies were in effect for data collected on or before May 27, 2008.

46.   Under the May 27, 2008 Privacy Policy (quoted in full above at paragraph 41), consumers were on notice that their PII could be transferred to a third party as part of a sale of Debtor's businesses.[32]  Debtor promised that, in such a transaction, it would "seek appropriate protection for [the] information."[33]

47.   The Sale is not a "transaction" in which "all" of Debtor's assets are being sold.  The Sale is of less than all Debtor's assets, albeit substantially all of Debtor's intellectual property assets, including PII.  The transfer of PII is consistent with the May 27,

---

[32] *See* Exhibit A (May 27, 2008 version).

[33] *See id.*

2008 Privacy Policy if such a partial sale was reasonably encompassed by that privacy policy.[34]

48.     The Ombudsman believes that it is not clear from the plain language whether the "sale" provision in the May 27, 2008 Privacy Policy applies solely to Debtor's sale of all of its assets, or includes a sale of less than all of its assets. The resolution of the ambiguity in the plain language must be guided by applicable nonbankruptcy law, as discussed in paragraph 60 below.

49.     The Pre-May 27, 2008 Privacy Policies did not contain a "sale" provision. The Sale to Buyer includes PII collected on or before May 27, 2008, which PII was collected under, and is governed by, the Pre-May 27, 2008 Privacy Policies. These policies required Debtor to obtain consumers' consent to disclosure to third parties of their PII. As a result, the Sale is not consistent with the Pre-May 27, 2008 Privacy Policies and is permitted only if there is no showing that the Sale would violate applicable nonbankruptcy law, as discussed more fully below.

## COMPLIANCE WITH APPLICABLE NONBANKRUPTCY LAW

50.     Section 363(b)(1) of the Bankruptcy Code contemplates that Debtor may sell PII, even if the sale is inconsistent with the applicable privacy policy, if, after the appointment of a consumer privacy ombudsman, the Court (a) considers "the facts, circumstances, and conditions of such sale," and (b) finds that no showing was made that the sale "would violate applicable nonbankruptcy law."[35]

---

[34] The Ombudsman believes that it is not material that the sale occurs in a bankruptcy liquidation because the word "sell" is not modified by any words of limitation in the May 27, 2008 Privacy Policy. *See supra* ¶ 41.

[35] *See* 11 U.S.C. § 363(b)(1).

51.    The Ombudsman has determined that the following applicable nonbankruptcy laws are relevant to the Sale:  (a) Section 5 of the FTC Act[36] and analogous state consumer protection laws (which this Report will consider together); and (b) the VPPA, which applies to the disclosure of information about purchases of audiovisual materials, including DVDs.[37]

I.    Federal Trade Commission Act and State Mini-FTC Acts

    A.    Relevant Legal Standards

52.    Section 5 of the FTC Act directs the FTC to prevent persons and corporations from using "unfair or deceptive acts or practices in or affecting commerce."[38] All 50 states have their own, similar consumer protection statutes — often referred to as "mini-FTC Acts" — that prohibit unfair and deceptive commercial practices.[39]  While there is some variation among the state laws, a significant number of state consumer protection laws are modeled after the FTC Act,[40] and most, if not all, of these state laws prohibit

---

[36] 15 U.S.C. § 45(a).

[37] 18 U.S.C. § 2710.

[38] 15 U.S.C. § 45(a)(1).

[39] *See, e.g.*, Alabama, Ala. Code § 8-19-1 *et seq.*; Arizona, Ariz. Rev. Stat. Ann. § 44-1521 *et seq.*; California, Cal. Bus. & Prof. Code §17200 *et seq.*; Connecticut, Conn. Gen. Stat. § 42-110a *et seq.*; Delaware, Del. Code Ann. tit. 6, § 2511 *et seq.*; Florida, Fla. Stat. § 501.201 *et seq.*; Hawaii, Haw. Rev. Stat. § 480-2; Illinois, 815 Ill. Comp. Stat. Ann. §§ 505/1 *et seq.*; Iowa, Iowa Code § 714.16; Kentucky, Ky. Rev. Stat. Ann. §§ 367.110-367.300; Maryland, Md. Code Ann., Com. Law § 13-101 *et seq.*; Massachusetts, Mass Gen. Laws ch. 93A; Michigan, Mich. Comp. Laws §445.911 *et seq.*; Minnesota, Minn. Stat. § 325D.44-.48; Mississippi, Miss. Code Ann. §§ 75-24-1; Montana, Mont. Code Ann. § 30-14-133 *et seq.*; Nevada, Nev. Rev. Stat. §§ 207.170-177; New York, N.Y. Gen. Bus. Law § 349 *et seq.*; Ohio, Ohio Rev. Code Ann. §§ 1345.01-1345.99; Oregon, Or. Rev. Stat. §§ 646.605 *et seq.*; South Dakota, S.D. Codified Laws § 37-24-1 *et seq.*; Utah, Utah Code Ann. § 13-11-1 *et seq*.

[40] Indeed, a number of states expressly provide that their consumer protection acts will be construed consistently with the interpretations of the FTC Act issued by the FTC and federal courts, including Alabama, Ala. Code § 8-19-6, Alaska, Alaska Stat. § 45.50.545, Arizona, (continued…)

deceptive representations to consumers.[41]    Therefore, the analysis under these state

consumer protection laws is substantially the same as under the FTC Act.

53.    To constitute an <u>unfair</u> act or practice, conduct must (a) cause

substantial consumer injury, (b) not be outweighed by countervailing benefits to consumers

or competition, and (c) be an injury that consumers could not reasonably have avoided.[42]

54.    Whether an act or practice is <u>deceptive</u> depends upon whether it

contains a misrepresentation or omission that is likely to mislead consumers acting

reasonably under the circumstances to their detriment.[43]    To be deceptive, conduct (a) must

be conveyed through either express or implied claims, (b) must be likely to mislead

---

Ariz. Rev. Stat. Ann. § 44-1522, Connecticut, Conn. Gen. Stat. § 42-110b(b), (c), Florida, Fla. Stat. § 501.204, Georgia, Ga. Code Ann. § 10-1-391, Hawaii, Haw. Rev. Stat. § 480-2(b), Idaho, Idaho Code Ann. § 48-604(1), (2), Illinois, 815 Ill. Comp. Stat. 505/2, Maine, Me. Rev. Stat. tit. 5, § 207(1), Maryland, Md. Code Ann., Com. Law § 13-105, Massachusetts, Mass Gen. Laws ch. 93A, § 2(b), (c), Montana, Mont. Code Ann. § 30-14-104(1), (2), New Hampshire, N.H. Rev. Stat. Ann. § 358-A:13, New Mexico, N.M. Stat. Ann. § 57-12-4, Ohio, Ohio Rev. Code Ann. § 1345.02(C), Rhode Island, R.I. Gen. Laws § 6-12.1-3, South Carolina, S.C. Code Ann. § 39-5-20(b), Tennessee, Tenn. Code Ann. § 47-18-115, Texas, Tex. Bus. & Com. Code Ann. § 17.46(c)(1), Vermont, Vt. Stat. Ann. tit. 9 § 2453(b),(c), Washington, Wash. Rev. Code § 19.86. 920, and West Virginia, W. Va. Code § 46A-6-103.

[41] *See, e.g.*, *supra* note 39.

[42] *See* 15 U.S.C. § 45(n) ("The Commission shall have no authority under this section . . . to declare unlawful an act or practice on the grounds that such act or practice is unfair unless the act or practice causes or is likely to cause substantial injury to consumers which is not reasonably avoidable by consumers themselves and not outweighed by countervailing benefits to consumers or to competition."); *see also E.I. du Pont de Nemours & Co. v. FTC*, 729 F.2d 128, 136-137 (2d Cir. 1984); Howard Beales, III, The FTC's Use of Unfairness Authority: Its Rise, Fall, and Resurrection (May 30, 2003), http://www.ftc.gov/speeches/beales/unfair0603.shtm ("To qualify as substantial, an injury must be real, and it must be large compared to any offsetting benefits.").

[43] FTC, *Policy Statement on Deception* (Oct. 14, 1983), http://www.ftc.gov/bcp/policystmt/ad-decept.htm [hereinafter *FTC Policy Statement on Deception*].

reasonable consumers, and (c) must be material.[44]    A representation is material if a "reasonably prudent person" would "usually" rely on it, or it is "likely to affect the consumer's conduct or decision with regard to a product or service."[45]    FTC policy presumes that express claims are material.[46]

55.    The FTC interprets Section 5 of the FTC Act to prohibit an entity from collecting, using, or disclosing PII in a manner contrary to promises made to consumers in a formal privacy policy.[47]    This includes promises not to share customer information with third parties.[48]    The FTC enforces these promises against companies in

---

[44] *See FTC v. Freedom Commc'ns, Inc.*, 401 F.3d 1192, 1203 (10th Cir. 2005); *FTC v. Tashman*, 318 F.3d 1273, 1277 (11th Cir. 2003); *FTC Policy Statement on Deception*, *supra* note 43.

[45] *FTC v. Transnet Wireless Corp.*, 506 F. Supp. 2d 1247, 1266 (S.D. Fla. 2007) (internal quotation marks omitted).

[46] *FTC Policy Statement on Deception*, supra note 43.

[47] *See, e.g., FTC v. Sandra Rennert*, No. CV-S-00-0861-JBR (D. Nev. July 6, 2000), http://www.ftc.gov/os/caselist/9923245/9923245.shtm (consent order settling charges alleging that defendants misrepresented the security and encryption used to protect consumers' information and used the information in a manner contrary to their stated purpose); *FTC v. ReverseAuction.com Inc.*, No. 00-0032 (D.D.C. Jan. 6, 2000), http://www.ftc.gov/os/2000/01/reverseconsent.htm (consent order settling charges that an online auction site allegedly obtained consumers' personal identifying information from a competitor site and then sent deceptive, unsolicited email messages to those consumers seeking their business); *In re Liberty Fin. Cos.*, 128 F.T.C. 240 (1999) (consent order alleging that site falsely represented that personal information collected from children, including information about family finances, would be maintained anonymously); *In re GeoCities, Inc.*, 127 F.T.C. 94 (1999) (consent order settling charges that website had misrepresented the purposes for which it was collecting personally identifiable information).

[48] *See, e.g., In re Gateway Learning Corp.* (Sept. 10, 2004), http://www.ftc.gov/os/caselist/0423047/0423047.shtm (finding violation for disclosure of consumer data to third-party marketers despite contrary representations in applicable privacy policy); *In the Matter of Nat'l Research Center for College & University Admissions, Inc.* (Oct. 22, 2002), http://www.ftc.gov/os/caselist/0223005/index.shtm (finding violation of section 5(a) for sharing student information with third parties' marketing purposes where entity represented that it would share information only with colleges, universities, and other entities providing education-related services).

bankruptcy, as demonstrated by the FTC's action in *FTC v. Toysmart.com, LLC*.[49]    In *Toysmart*, the FTC filed charges against a company that marketed and sold children's toys over the Internet because the company attempted to sell its assets, including its detailed customer databases, despite having promised customers that it would "never" share customer data with third parties.[50]

56.    The FTC resolved the *Toysmart* case by concluding that, because the best interests of debtors and creditors in bankruptcy must be considered alongside the privacy rights of consumers, a debtor that previously promised not to sell consumer data may do so subject to the following conditions:

(a) the customer data may be sold only to an entity that is engaged in substantially the same general line of business as the debtor;

(b) the customer data must be sold as part of a larger group of assets, including trademarks, goodwill, URL names, web site source code, and database schemas;

(c) the buyer must agree to treat the customer data in accordance with the terms of the debtor's privacy policy in effect at the time the customer data was collected by the debtor; and

---

[49] *See generally FTC v. Toysmart.com, LLC*, No. CV-00-11341-RGS (D. Mass. July 10, 2000), http://www.ftc.gov/os/caselist/x000075.shtm; *see also* Letter from David Vladeck, Director of Bureau of Consumer Protection, to Peter Larson & Martin E. Shmagin (July 1, 2010), *available at* http://www.ftc.gov/os/closings/100712xy.pdf (noting FTC position that bankruptcy sale of sensitive magazine subscriber information would violate privacy statements made to subscribers and could thus constitute a deceptive or unfair practice in violation of FTC Act).

[50] *See FTC v. Toysmart.com, LLC*, Compl., Case No. CV-00-11341-RGS (D. Mass. July 10, 2000), http://www.ftc.gov/os/2000/07/toysmartcomplaint.htm.

(d) consumers must provide affirmative consent ("opt in") to any material change in the governing privacy policy.[51]

57.     Section 5 of the FTC Act, as enforced by the FTC, prohibits Debtor from transferring consumer data, including PII, to Buyer if doing so is contrary to Debtor's privacy representations, unless the terms of the Sale meet the requirements set forth in *Toysmart*.[52]  Because Debtor's May 27, 2008 Privacy Policy made different promises than its pre-May 27, 2008 Privacy Policies, the Ombudsman has analyzed each separately.

B.    Application of FTC Act to Debtor's Sale of PII

(i)    Consumer Data Collected Under May 27, 2008 Privacy Policy

58.     As detailed above at paragraphs 40–41, consumers who provided PII to Debtor after May 27, 2008, were on notice that their PII could be transferred to a third party as part of a sale of Debtor's businesses.[53]

59.     The Sale is not a "transaction" in which "all" of Debtor's assets are being sold.  The Sale is of less than all Debtor's assets, albeit substantially all of Debtor's intellectual property assets, including PII.  The transfer of PII is consistent with the May 27, 2008 Privacy Policy if such a partial sale was reasonably encompassed by that privacy policy.[54]

---

[51] *See* Motion to Approve Stipulation With Federal Trade Commission, *In re Toysmart.com, LLC*, Case No. 00-13995-CJK, ECF No. 113 (Bankr. D. Mass. July 21, 2000), *available at* http://www.ftc.gov/os/2000/07/toysmarttbankruptcy.1.htm.

[52] As discussed below in paragraphs 93–96, several states' Attorneys General do not recognize the FTC's *Toysmart* exception.

[53] *See* Exhibit A (May 27, 2008 version).

[54] The Ombudsman believes that it is not material that the sale occurs in a bankruptcy liquidation because the word "sell" is not modified by any words of limitation in the May 27, 2008 Privacy Policy.  *See supra* ¶ 41.

60.     As discussed in paragraph 48 above, the Ombudsman believes that it is not clear from the plain language whether the "sale" provision in the May 27, 2008 Privacy Policy applies solely to Debtor's sale of all of its assets, or includes a sale of less than all of its assets.  Under the FTC Act, the resolution of the ambiguity in the plain language is guided by whether a reasonable consumer acting reasonably under the circumstances[55] would have relied upon the distinction between a partial sale and a full sale of Debtor's assets in making the decision to provide PII.[56]  The Ombudsman concludes that a reasonable consumer would <u>not</u> have made a decision about whether to share PII with Debtor based on this distinction.  The Ombudsman may have concluded otherwise were Debtor proposing to sell copies of its customers' PII to multiple parties.  But here, the Sale comprises a single transfer of PII in the context of a single sale of Debtor's intellectual property in a court-supervised sale.  This process provides more protection for consumers than would multiple sales of copies of the Debtor's PII.  Accordingly, the Ombudsman does not believe the sale of PII (other than information about certain audio-visual materials) collected by Debtor after May 27, 2008, is inconsistent with the May 27, 2008 Privacy Policy.

61.     Nonetheless, the Ombudsman believes that four issues require consideration given Debtor's promise in the May 27, 2008 Privacy Policy to "seek appropriate protection" of any PII transferred to a purchaser.[57]

---

[55] *See FTC Policy Statement on Deception*, supra note 43 ("[W]e examine the practice from the perspective of a consumer acting reasonably in the circumstances.").

[56] *See FTC v. Transnet Wireless Corp.*, 506 F. Supp. 2d 1247, 1266 (S.D. Fla. 2007); *supra* ¶ 54.

[57] *See* Exhibit A (May 27, 2008 version).

62.    <u>First</u>, in light of industry standards in place since May 2008, the Ombudsman concludes that a reasonable consumer would consider an appropriate protection to include a condition requiring Buyer to use the conveyed PII on terms consistent with (or more protective of consumer privacy than) the May 27, 2008 Privacy Policy.[58]

63.    <u>Second</u>, Debtor permitted consumers to opt out of receiving certain e-mail and/or direct mail communications from Debtor.[59]  It would be inconsistent with the May 27, 2008 Privacy Policy to permit Buyer to send e-mail or direct mail marketing materials to consumers who opted out of receiving such materials from Debtor.  In addition, the Ombudsman believes that a reasonable consumer would consider an appropriate protection to include a condition disallowing Buyer from sending such materials to these consumers.  Of course, this condition would apply only insofar as the PII was obtained in the Sale, and would not apply to the extent that Buyer possesses or obtains from a different source any PII that is duplicative of that purchased in the Sale.

64.    <u>Third</u>, a further protection that most consumers would consider appropriate would be the use of industry-standard data security protections in effecting the data transfer from Debtor to Buyer.  Not only would a reasonable consumer expect this, but Section 5 of the FTC Act requires that commercial entities safeguard consumers' PII with

---

[58] *See* Motion to Approve Stipulation With Federal Trade Commission, *In re Toysmart.com, LLC*, Case No. 00-13995-CJK, ECF No. 113 (Bankr. D. Mass. July 21, 2000), *available at* http://www.ftc.gov/os/2000/07/toysmartbankruptcy.1.htm.  (purchaser would not be permitted to change how the information previously collected by Toysmart was used, unless it provided notice to consumers and obtained their affirmative consent to the new uses); *see also* FTC, Press Release, *In re Toysmart.com LLC* (July 21, 2000), http://www.ftc.gov/opa/2000/07/toysmart2.shtm.

[59] *See* Exhibit A (May 27, 2008 version).

"reasonable and appropriate" data security safeguards.[60] The Ombudsman understands that Debtor protects the security of PII with industry-standard safeguards. Debtor and Buyer should thus be required to use industry-standard data security protections in effecting the data transfer from Debtor to Buyer, and Buyer should be required to maintain conveyed PII subject to similar safeguards and otherwise consistent with all applicable data security laws.

65.    Fourth, the Ombudsman also has considered whether applicable nonbankruptcy law prohibits Debtor from transferring the PII and purchase history information of consumers who opted out of receiving marketing communications from Debtor, even if Buyer honors their opt-out requests with respect to receiving subsequent marketing communications. With respect to those consumers who have opted out of receiving marketing communications from Debtor, Debtor has represented only that it would cease sending marketing communications, not that it would delete their PII from the Consumer Marketing Database.[61] Nonetheless, the FTC construes the FTC Act to require businesses to dispose of data for which they no longer have a reasonable business need.[62] Accordingly, to the extent that Buyer determines that it does not have a legitimate business reason to retain the PII of consumers who opted out of receiving marketing communications, the Ombudsman would expect that such data would be timely destroyed.[63]

---

[60] See FTC v. Navone (Jan. 20, 2010), http://www.ftc.gov/os/caselist/0723067/index.shtm.

[61] See Exhibit C (Consumer Service Email Opt-out page).

[62] At least three of the Commission's data security cases — against DSW Shoe Warehouse, BJ's Wholesale Club, and Card Systems — involved allegations that companies violated the FTC Act by retaining sensitive data much longer than they had a business need to do so. See CardSystems Solutions, Inc., No. C-4168, 2006 WL 2709787 (FTC Sept. 5, 2006) (consent order); DSW, Inc., No. C-4157, 2006 WL 752215 (FTC Mar. 7, 2006) (consent order); BJ's Wholesale Club, Inc., 140 F.T.C. 465 (2005) (consent order).

[63] The PII in the Consumer Marketing Database may have value for other uses other than sending marketing communications to the consumers that have opted out, including, for (continued…)

66.    Subject to these four conditions, the Ombudsman concludes that the sale of PII (other than information about certain audio-visual materials) collected after May 27, 2008, is consistent with the May 27, 2008 Privacy Policy and does not violate Section 5 of the FTC Act.   While there are some variations among the state mini-FTC Acts, the inquiries are largely co-extensive, and the Ombudsman is not aware of any state-specific mini-FTC Act under which a different analysis or conclusion would be warranted.[64]

(ii)    <u>Consumer Data Collected Under the Pre-May 27, 2008 Privacy Policies</u>

67.    The Ombudsman must consider separately whether Debtor's sale of PII collected pursuant to the Pre-May 27, 2008 Privacy Policies violates applicable nonbankruptcy law.  PII collected on or before May 27, 2008, was collected pursuant to the Pre-May 27, 2008 Privacy Policies, which provided that Debtor would not share PII with third parties without consumers' express consent.[65]  These policies, unlike the May 27, 2008 Privacy Policy, did not contain a provision permitting the transfer of PII in a sale of Debtor's business.   With respect to PII collected by Debtor on or before May 27, 2008, the Ombudsman believes that the Sale is contrary to such privacy policies and would violate

---

example, for research such as analyzing what percentage of consumers who purchased one genre of books also purchased a certain genre of music.  Buyer could use such data to inform its plans to market to other, similarly-situated consumers who have <u>not</u> opted out of receiving marketing communications.  At a minimum, Buyer will need to maintain a list of e-mail address information for the purposes of honoring the opt-out requests of consumers that have opted out of receiving marketing communications.

[64] Part II below describes certain additional limitations for transmitting certain information about audio-visual materials pursuant to the VPPA.

[65] While Debtor represented in the Pre-May 27, 2008 Privacy Policies that it might disclose personal information to third parties if legally compelled to do so based on the reasonable opinion of its counsel, a reasonable consumer would not have been on notice based on this provision that Debtor would transfer personal information to third parties as part of a sale of assets, except as discussed *infra* in connection with *Toysmart*.

Section 5 of the FTC Act unless Buyer satisfies the requirements of *Toysmart,* as discussed in paragraphs 55–56 above, and/or Debtor (separately or together with Buyer) obtains the affirmative consent of consumers whose PII was collected on or before May 27, 2008, to transfer their PII to Buyer.

68.    As discussed in paragraph 56 above, the FTC in *Toysmart* agreed that a debtor, which had represented to customers that it would "never" sell PII, could sell consumer PII in the context of a similar bankruptcy proceeding under four conditions:

(a) the customer data may be sold only to an entity that is engaged in substantially the same general line of business as the debtor;

(b) the customer data must be sold as part of a larger group of assets;

(c) the buyer must agree to treat the customer data in accordance with the terms of the debtor's privacy policy in effect at the time the customer data was collected by the debtor; and

(d) consumers must provide affirmative consent ("opt in") to any change in the governing privacy policy, including, e.g., their information being governed by the buyer's privacy policy instead of the debtor's.[66]

69.    The first *Toysmart* condition is satisfied here because Buyer is engaged in substantially the same general line of business as Debtor.  Barnes & Noble sells books, eBooks, magazines, toys, games, music, DVDs, videos, and related products and services in both physical stores and through its e-commerce platform.[67]

---

[66] *See* Motion to Approve Stipulation With Federal Trade Commission, *In re Toysmart.com, LLC*, Case No. 00-13995-CJK, ECF No. 113 (Bankr. D. Mass. July 21, 2000), *available at* http://www.ftc.gov/os/2000/07/toysmarttbankruptcy.1.htm.

[67] Barnes & Noble Inc., Annual Report, at 6-7 (Form 10-K) (June 29, 2011).

70.     The second *Toysmart* condition is satisfied here because PII is being sold as part of a larger group of assets, e.g., licenses, trademarks, domain names, and website source code.[68]

71.     The third *Toysmart* condition will be satisfied if Buyer agrees to treat the PII collected under the Pre-May 27, 2008 Privacy Policies in accordance with the terms of the applicable privacy policy, which, as discussed below, the Ombudsman concludes is the Pre-May 27, 2008 Privacy Policies.

72.     With regard to the third *Toysmart* condition, the Ombudsman has considered which privacy policy applies to PII collected by Debtor on or before May 27, 2008 — the May 27, 2008 Privacy Policy or the Pre-May 27, 2008 Privacy Policies.  The Pre-May 27, 2008 Privacy Policies apply to information collected on or before May 27, 2008, unless the May 27, 2008 Privacy Policy may be retroactively applied to PII previously collected by Debtor.  The FTC asserts that a company cannot apply a "material" change to a privacy policy retroactively, unless the company obtains the "express affirmative ('opt-in') consent of the consumers" whose PII is affected.[69]

73.     The Ombudsman believes the addition of the "sale" provision to the May 27, 2008 Privacy Policy was material.  As noted above, a representation is material if a "reasonably prudent person" would "usually" rely on it, or it is "likely to affect the

---

[68] *See* Exhibit D § 1.2.

[69] *In re Gateway Learning Corp.* (Sept. 10, 2004), http://www.ftc.gov/os/caselist/ 0423047/0423047.shtm; *see also* Federal Trade Commission, Preliminary FTC Staff Report, Protecting Consumer Privacy in an Era of Rapid Change: A Proposed Framework for Businesses and Policymakers, at 69 (Dec. 2010), *available at* http://www.ftc.gov/os/2010/ 12/101201privacyreport.pdf. ("[B]efore making material changes to their data policies, companies should make prominent disclosures that clearly describe such changes, and should obtain consumers' affirmative consent.").

consumer's conduct or decision with regard to a product or service."[70]  Prior to May 28, 2008, a reasonably prudent consumer would not have expected a sale of his or her PII, and, if apprised of the existence of a "sale" provision, might not have provided PII to Debtor.

74.    Moreover, Debtor did not obtain the consent of consumers when it changed its privacy policy in May 2008.  Debtor updated its privacy policy on May 27, 2008, by posting the updated version on its website.  It did not otherwise notify or provide a consent mechanism for consumers to opt in to (or even to opt out of) the new policy.  Accordingly, the FTC Act would disallow retroactive application of any material change effected by the May 27, 2008 Privacy Policy.

75.    This analysis is not changed by Debtor's reservation of "the right to update [the] Privacy Policy from time to time."[71]  The Ombudsman believes that Buyer must continue to treat all PII collected under the terms of the Pre-May 27, 2008 Privacy Policies in accordance with the terms of those policies, and Buyer may only change those terms now, or in the future, with the affirmative consent of affected consumers.

---

[70] *FTC v. Transnet Wireless Corp.*, 506 F. Supp. 2d 1247, 1266 (S.D. Fla. 2007) (internal quotation marks omitted).

[71] *See, e.g.*, Exhibit A (Apr. 12, 2007 version).  The FTC has indicated that it would require an entity to obtain the affirmative (opt in) consent of consumers prior to making a material change in its privacy practices that was inconsistent with the privacy policy in effect at the time the data was collected, even if its privacy policy indicated that the entity might change its privacy practices in the future.  In 2001, the FTC considered a change to Amazon.com's privacy policy, which represented that Amazon.com "[does] not sell, trade, or rent your personal information to others," although it noted that the company might "choose to do so in the future with trustworthy third parties."  *See* Letter from Jodi Bernstein, Director, Bureau of Consumer Protection, FTC, to Jason Catlett, Junkbusters Corp. & Marc Rotenberg, Electronic Privacy Information Center (dated May 24, 2001), *available at* http://www.ftc.gov/os/closings/staff/amazonletter.shtm.  The FTC "expect[ed] that in the event of a material change to its . . . practices, Amazon would provide adequate notice to consumers as well as a mechanism to obtain consumers' consent to the change with respect to information already collected from them."  *Id.*

76.    The fourth *Toysmart* condition will be satisfied if Buyer agrees to obtain relevant consumers' affirmative consent ("opt in") before making any material changes to the privacy practices it applies to the PII collected under the Pre-May 27, 2008 Privacy Policies (including, to the extent there are material differences, before subjecting the PII to Buyer's privacy policy instead of Debtor's).

77.    Several states' Attorneys General ("**State Attorneys General**") have advised the Ombudsman that they do not recognize the FTC's policy in *Toysmart* as reflecting the law under their state mini-FTC Acts.  Their positions are discussed below in paragraphs 93–96.    The State Attorneys General have not, however, directed the Ombudsman to any state law provision or ruling demonstrating that any analysis other than that provided by *Toysmart* applies.

(iii)    Aggregate Clickstream Data

78.    The Sale includes the Aggregate Clickstream Data described in paragraph 31 above.  Such Aggregate Clickstream Data is not "information concerning an identified individual that, if disclosed, will result in contacting or identifying such individual physically or electronically,"[72] and, therefore, does not constitute PII under the Bankruptcy Code.

79.    Further, Aggregate Clickstream Data is not "personal information" as that term is used in Debtor's privacy policies.    The policies indicate that "personal information" includes "purchase history, phone number(s), email and residential addresses, and credit card data."[73]  Aggregate Clickstream Data does not fit into any of these categories

---

[72] *See* 11 U.S.C. § 101(41).

[73] *See* Exhibit A.

or contain any other personally identifiable information. Therefore, the Ombudsman believes that the transfer of the Aggregate Clickstream Data in the Sale is consistent with Debtor's privacy policies and Section 5 of the FTC Act.

II.     The Video Privacy Protection Act of 1988

     A.     Relevant Legal Standards

          80.     The Video Privacy Protection Act of 1988 ("**VPPA**") restricts the disclosure of customers' "personally identifiable information"[74] by a company "engaged in the business . . . of rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials."[75]  Under the VPPA, "personally identifiable information includes information which identifies a person as having requested or obtained specific video materials or services."[76]  This would include information about the name of a consumer and the title of specific video materials or services that he or she purchased.  Although it is not clear under the available case law, the statutory language suggests that even the mere disclosure of a customer's name and address would be impermissible to the extent it reveals information about that customer's specific video rental or purchasing history, e.g., where the covered company provides only one genre of videos, such as adult films.

          81.     A covered company may not disclose "personally identifiable information" unless one of the VPPA's six exceptions permits such disclosure.[77]  The two exceptions potentially applicable here permit disclosure (a) "to any person with informed, written consent of the consumer given at the time the disclosure is sought" or (b) "to any

---

[74] 18 U.S.C. § 2710(b)(1).

[75] *Id.* § 2710(a)(4).

[76] *Id.* § 2710(a)(3).

[77] *Id.* § 2710(b)(1)–(2).

person if the disclosure is incident to the ordinary course of business."[78]  "Ordinary course

of business" is defined to mean "debt collection activities, order fulfillment, request

processing, and the transfer of ownership."[79]  Although no statute or case law authoritatively

interprets the "transfer of ownership" language, the Ombudsman believes it must be read to

refer to the transfer of ownership of a covered company's entire business.  If "transfer of

ownership" were read to refer to transfer of ownership of personally identifiable

information, the protections of the statute would be eviscerated.  This would undermine the

principal goal of the statute, which is to protect consumers' privacy concerning the videos

they purchase or rent by imposing restrictions on disclosure of that information.

82.    The legislative history of the VPPA clarifies that a business "that sells

video tapes would be required to extend privacy protection to only those transactions

involving the purchase of video tapes and not other products."[80]  Consistent with this

explanation, courts have limited the scope of the VPPA's restriction to the disclosure of

records showing that an individual requested or obtained specific video materials.[81]

---

[78] *Id.* § 2710(b)(2)(B), (E).  It should be noted that § 2710(b)(2)(D) permits the disclosure of name, address, and video "subject matter" information <u>if</u> the consumer has been provided with an opportunity to opt out of such disclosure <u>and</u> the subject matter information would be used <u>solely</u> to market goods and services directly to the consumer.  The Purchase Agreement does not appear to restrict Buyer's use of the transferred video-related consumer data to marketing goods and services directly to the consumer.  As a result, the exception in § 2710(b)(2)(D) is not available here.

[79] *Id.* § 2710(a)(3).

[80] S. Rep. No. 100-599, at 12 (1988), *reprinted in* 1988 U.S.C.C.A.N. 4342-1, 4342-10 (explaining that the definition of personally identifiable information "includes the term 'video' to make clear that simply because a business is engaged in the sale or rental of video materials or services does not mean that all of its products or services are within the scope of the bill").

[81] *See, e.g.*, *Antoine v. Star Ledger of New Jersey*, No. 09-1827 (KSH), 2010 WL 1838611, at *4-5 (D.N.J. May 6, 2010) (dismissing VPPA claim where plaintiff failed to "plead[] anything to implicate [sic] that videotapes or information stemming from videotape rentals (continued…)

B.    Application of VPPA to Debtor's Sale of PII

83.    Debtor sold videos, including DVDs, in its physical stores and through its e-commerce platform.  Although the VPPA primarily is directed at entities engaged in the sale or rental of "video cassette tapes," the plain language of the statute covers the sale of media such as DVDs, which are "similar audio visual materials."[82] Debtor's Consumer Marketing Database contains records of the titles, genres, and other details about specific videos purchased by Borders Rewards Members.  This information is "personally identifiable information" within the meaning of the VPPA.

84.    Debtor was a large national retailer that sold many products, including DVDs of many genres.  The names, addresses, and other contact information stored in the Consumer Marketing Database are not sufficient to identify particular Borders Rewards members "as having requested or obtained specific video materials or services."[83]  The Ombudsman thus concludes that these data elements are not "personally identifiable information," within the meaning of the VPPA, when they are not associated with "specific

---

were involved in defendants' alleged misconduct"); *Gonzalez v. Central Elec. Cooperative, Inc.*, No. 08-6236-HO, 2009 WL 3415235, at *11-12 (D. Or. Oct. 15, 2009) (denying motion for protective order under VPPA because subpoenaed information did not "identif[y] a person as having requested or obtained specific video materials or services"); *Costanzo v. City of Omaha*, No. 8:04CV99, 2004 WL 2359722, at *2 (D. Neb. Oct. 19, 2004) (stating that the VPPA "protects people from having records of videotape rentals and purchases disclosed").

[82] 18 U.S.C. § 2710(a)(4); *see also* S. Rep. No. 100-599, at 12 (1988), *reprinted in* 1988 U.S.C.C.A.N. 4342-1, 4342-10 ("similar audio visual materials" include "laser disks, open-reel movies, [and] CDI technology").

[83] *See* 18 U.S.C. § 2710(a)(3).

video materials or services."  Accordingly, such information may be conveyed in the Sale

pursuant to the restrictions discussed in paragraphs 62–65 and 71–76 above.[84]

        85.     With respect to the titles, genres and other details about specific

videos purchased by Borders Rewards Members stored in the Consumer Marketing

Database, Debtor may not transfer such records unless an applicable exception applies.

Because Debtor is not transferring ownership of its entire business, the Ombudsman believes

that the "ordinary course of business" exception discussed in paragraph 81 will not apply.

Therefore, the Ombudsman concludes that the VPPA prohibits Debtor's transfer of records

containing the titles, genres and other details about specific videos purchased by particular

consumers, unless Debtor obtains the "informed, written consent of the consumer[s]."[85]  To

---

[84] The definition of PII under the VPPA is narrower than both the Bankruptcy Code's definition of PII and the use of  that term in the analysis under the FTC Act (and the mini-FTC Acts).  While the transfer of name, address, and contact information does not implicate the VPPA, it does implicate the FTC Act (and the mini-FTC Acts), and, accordingly, the transfer should be subject to the same restrictions.

[85] *See id.* § 2710(b)(2)(B).  The Ombudsman recognizes that reasonable minds could differ as to whether information about genre amounts to "personally identifiable information" under the VPPA.  The plain language of the VPPA suggests that it could.  As noted above, § 2710(b)(2)(D)(ii) permits the disclosure of a consumer's name, address and the "subject matter" of video materials that the consumer has purchased, provided that the disclosure is for "the exclusive use of marketing goods and services directly to the consumer" and the consumer has been given the opportunity to opt out of such disclosure.  The fact that the VPAA limits the disclosure of subject matter suggests that genre information may amount to "personally identifiable information," because genre can reveal the subject matter of a video.  But at least one court has suggested that genre information may not be personally identifiable information because it does not identify a person as having requested or obtained "specific video materials."  *See Gonzalez v. Central Electric Coop.*, No. 08-6236-HO, 2009 WL 3415235, at *11 (D. Or. Oct. 15, 2009).  In *Gonzalez*, the plaintiff challenged the admissibility of a record revealing that he had purchased certain videos for viewing in his hotel room on the ground that the record had been obtained in violation of the VPPA.  *Id.*  Although the titles of those videos were not part of the record, the price he paid for them suggested that they likely were adult videos.  *Id.*  The court held that this information was not "personally identifiable information" because it was not about "specific" videos he had viewed.  *Id.*  Although the court's conclusion in *Gonzalez* suggests that the subject matter — (continued…)

the extent the Consumer Marketing Database reflects general categories of products purchased —including that a consumer purchased DVDs (without identifying the DVDs' titles or genres) — the VPPA would not be implicated.[86]

## OTHER CONSIDERATIONS

86.    Pursuant to Section 332(b) of the Bankruptcy Code, the Ombudsman also has considered the potential losses or gains of privacy to consumers, the potential costs or benefits to consumers, and the potential alternatives that would mitigate potential privacy losses or potential costs to consumers if the Sale is approved.[87]

87.    The Sale has potential benefits for consumers insofar as consumers who opted in to the Consumer Marketing Database presumably did so out of an interest in receiving marketing and other information about Debtor's media and non-media products. Buyer is in a similar line of business to Debtor and, following the Sale, will be in a position to send marketing communications and promotional offers to those consumers.  In addition, because Buyer's business reputation depends in part on respecting consumer privacy, it is likely that the PII will be used in ways that are consistent with the expectations of consumers.

88.    However, any sale of purchase history information relating, even if only in part, to consumption of books and movies raises some privacy questions.  Moreover,

---

and thus the genre — of a video may not be "personally identifiable information" as defined by the VPPA, the Ombudsman is not aware of any reported case that has addressed this question directly.  Given the lack of clarity on this point and the inherent limitations in the precedential value of *Gonzalez*, the Ombudsman recommends that Debtor not be permitted to transfer genre information absent the informed, written consent of affected consumers.

[86] *See Gonzalez*, 2009 WL 3415235, at *11 (record indicating that a person watched one of 15 available movies was not sufficiently "specific" to be covered by the VPPA).

[87] 11 U.S.C. § 332(b)(2)–(4).

after a consumer opted in to having his or her PII maintained by Debtor, there was no mechanism available for such a consumer to opt out of having his or her PII maintained by Debtor or to have his or her PII purged. Even consumers who opted out of receiving marketing communications from Debtor continue to be represented in the Consumer Marketing Database. However, this potential privacy loss or cost to consumers should be considered in light of the facts and circumstances under which PII was collected. The consumers whose PII is being transferred in the Sale all opted in to having their PII collected and maintained by Debtor in the first instance without a reasonable expectation that they would be able to completely purge their PII from Debtor's servers. Consumers who provided PII to Debtor after May 27, 2008, did so pursuant to a Privacy Policy that provided notice that PII might be transferred in the context of a sale.

89.    In light of these facts and circumstances, the Ombudsman does not believe it is necessary to subject the transfer of PII to additional conditions beyond those required by applicable nonbankruptcy law in order to mitigate potential privacy losses or potential costs to consumers.[88]

## CONCERNS RAISED BY FTC AND STATES' ATTORNEYS GENERAL[89]

90.    The Ombudsman has received a letter from David C. Vladeck, Director of the FTC's Bureau of Consumer Protection ("**FTC Letter**") (attached hereto as **Exhibit E**), and a letter from Clark P. Russell, Assistant Attorney General of the State of New York on behalf of the Attorneys General of 25 states ("**State AGs Letter**") (attached

---

[88] *Id.*

[89] The FTC and State Attorneys General requested that the Ombudsman include their concerns in his Report.

hereto as **Exhibit F**).[90]    Both letters express concern over the transfer of personal information in connection with the Sale, although they ultimately differ with respect to what protections will ensure that the transfer of PII in the Sale will comply with applicable nonbankruptcy law.

I.    FTC Letter

91.    The FTC states that the Pre-May 27, 2008 Privacy Policies and the May 27, 2008 Privacy Policy represented to consumers that their personal information would not be "rented or sold to third parties except in limited circumstances and then only with the express consent of its customers."[91]    The FTC asserts that the May 27, 2008 Privacy Policy's representation that Debtor could transfer consumers' personal information if it decided to "sell, buy, merge or otherwise reorganize its businesses" is not sufficiently broad to encompass "dissolution of the company and piecemeal sale of assets in bankruptcy."[92]    Accordingly, the FTC concludes initially that it "would be appropriate for Borders to obtain express consent from its customers . . . before it transfers the data."[93]

92.    The FTC acknowledges, however, that "bankruptcy may present special circumstances, including the interest in allowing a company to get back on its feet — or alternatively, to marshal remaining assets for its creditors."[94]    The FTC cites *Toysmart* as "instructive on this point," and concludes that, if the Bankruptcy Court does not require

---

[90] The State AGs Letter specifies that it represents the view of 24 states' Attorneys General. The Ombudsman subsequently received a letter (attached hereto as **Exhibit G**) from the Office of the Attorney General in the Commonwealth of Pennsylvania, joining in the concerns expressed in the State AGs Letter, thereby bringing the number of states to 25.

[91] Exhibit E, at 2.

[92] *Id.*  The Ombudsman addresses this objection in paragraphs 59–61 and footnote 54.

[93] Exhibit E, at 4.

[94] *Id.*

consumer consent before Debtor's transfer of personal information to Buyer, the FTC's concerns would be "greatly diminished" if the Sale satisfies the four *Toysmart* conditions.[95]

II.  State AGs Letter

93.    The State Attorneys General take the position that the transfer of any personal information collected under the Pre-May 27, 2008 Privacy Policies is prohibited because those policies do not contain a transfer-of-control provision.[96]  The State Attorneys General contend that the transfer of personal information collected under the May 27, 2008 Privacy Policy is permitted only to the extent Debtor "will continue as an ongoing concern after the transaction, or otherwise the assets will be sold together as a single unit."[97]  Like the FTC, the State Attorneys General take the view that the sale provision in the May 27, 2008 Privacy Policy is insufficient to encompass a liquidation.[98]  As a consequence, the State Attorneys General contend that personal information collected under any of Debtor's privacy policies may not be transferred without consumer consent.

94.    The State Attorneys General do not make reference to *Toysmart* or the extent to which Debtor's bankruptcy may affect the circumstances under which personal information nevertheless can be transferred in compliance with applicable nonbankruptcy law.  In a telephone conversation on September 16, 2011, a representative of the State Attorneys General expressed to the Ombudsman her view that, consistent with the action they took in *Toysmart*, the states do not believe the FTC's conditions in *Toysmart* are

---

[95] *Id.* at 4–5.

[96] Exhibit F, at 2–3.  Although the State Attorneys General do not state so expressly, the transfer of personal information collected under the Pre-May 27, 2008 Privacy Policies presumably would be permitted with the express consent of the affected consumers.

[97] *Id.* at 3.  The Ombudsman addresses this objection in paragraphs 59–61.

[98] *Id.* at 3–4.  The Ombudsman addresses this objection in footnote 54.

sufficient to protect affected consumers.  The Ombudsman understands the State Attorneys General position to be that the fact of bankruptcy does not and should not change the privacy analysis that applies outside of bankruptcy.  The State Attorneys General notified the Ombudsman that, in their view, some form of consumer consent would be required for <u>any</u> personal information collected by Debtor to be transferred to Buyer in the Sale.

95.    The State Attorneys General informed the Ombudsman on the September 16 telephone call that — although they prefer opt-in consent for transfer to Buyer of personal information collected by Debtor — they would be willing to consider an opt-out approach as well.  The State Attorneys General acknowledged that for those affected consumers for whom Debtor may lack a valid e-mail or postal address to transmit an opt-out notice, some form of constructive notice, e.g., publication in a national newspaper, could be sufficient.

96.    On the September 16 telephone call, the representatives of the State Attorneys General were not able to identify a written opinion or other legal precedent in which a state tribunal considered and rejected the approach taken by the FTC in *Toysmart* as inconsistent with state law.  The State Attorneys General noted, however, that, in the past, they have challenged attempts to implement *Toysmart* in other bankruptcy proceedings and that those challenges have in some cases resulted in negotiated settlements and, in other cases, the destruction of the relevant data.

97.    The representatives of the State Attorneys General expressed a preference for effectuating the transfer of PII in the Sale pursuant to a negotiated process involving the State Attorneys General, the FTC, Debtor, and Buyer.

III.    Negotiated Solution to Concerns of FTC and State Attorneys General

98.    The Ombudsman understands that Debtor, Buyer, FTC and the State Attorneys General are engaged in discussions with a goal of reaching agreement on terms acceptable to the relevant parties for the Sale of the PII, including the conditions or restrictions on the transfer by Debtor and use by Buyer of PII.  Because the FTC and the State Attorneys General are the very parties who would take enforcement or other action against Debtor and/or Buyer in the event that they take issue with the terms of the Sale, the Ombudsman supports and has encouraged a negotiated solution to address the individual concerns of the FTC and the States Attorneys General.[99]

99.    To the extent that such a negotiated solution provides consumers with practicable privacy protections, such as a right to opt out of having their PII transferred, without imposing costs on Debtor or Buyer that are not required under applicable nonbankruptcy law or are voluntarily agreed to by parties, the Ombudsman would encourage this Court to consider any such alternative.

## CONCLUSION

100.    For the reasons discussed above, and subject to the qualifications therein, the Ombudsman concludes and recommends as follows:

(a)    Debtor may transfer to Buyer PII (other than information about certain audio-visual materials described in subparagraph (c) below) that was collected after May 27, 2008, pursuant to Debtor's May 27, 2008 Privacy Policy, provided that (i) Buyer adheres to all material terms in Debtor's May 27, 2008 Privacy Policy (or terms that are at

---

[99] Indeed, the Ombudsman delayed filing this Report to allow the parties an opportunity to reach agreement.

least as protective of consumer privacy); (ii) Buyer honors the opt-out requests of any consumer that previously opted out of receiving marketing messages from Debtor; (iii) Buyer safeguards all conveyed PII in a manner consistent with industry standard data security protections and applicable information security laws; and (iv) Buyer destroys PII for which it determines it has no reasonable business need.

   (b) Debtor may transfer to Buyer PII (other than information about certain audio-visual materials described in subparagraph (c) below) collected on or before May 27, 2008, provided that (i) Debtor obtains the affirmative consent of affected consumers; or (ii) Buyer agrees to treat PII collected by Debtor on or before May 27, 2008 pursuant to the terms of Debtor's privacy policy in effect at the time of such collection, and agrees to obtain affirmative consent for any material change to such policy that relates to PII collected under it.

   (c) Debtor cannot transfer to Buyer any consumer's purchase history information that includes the title, genre and other details about specific audiovisual materials (e.g., videocassettes, DVDs), regardless of when it was collected, unless Debtor obtains the written consent of the affected consumer.

   (d) Debtor may transfer to Buyer the Aggregate Clickstream Data.

     Respectfully submitted,

     /s/ Michael St. Patrick Baxter
     Michael St. Patrick Baxter
     *Consumer Privacy Ombudsman*

Dated: September 21, 2011
   Washington, D.C.

- 46 -