**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | **FOR PUBLICATION** |
| BGI, INC., f/k/a Borders Group, Inc. | Chapter 11 |
| Debtor. | Case No. 11-10614 (MG) |
| | Substantively Consolidated |

**MEMORANDUM OPINION DENYING GIFT CARD CLAIMANTS' MOTION**
**TO FILE LATE CLAIMS AND CLASS CERTIFICATION**

*A P P E A R A N C E S:*

LOWENSTEIN SANDLER PC
*Attorneys for Liquidating Trustee*
65 Livingston Avenue
Roseland, New Jersey 07068
By:    Bruce Buechler, Esq.
       Timothy R. Wheeler, Esq.

KRISLOV & ASSOCIATES, LTD.
*Attorneys for the Gift Card Holders*
20 North Wacker Drive, Suite 1350
Chicago, Illinois 60606
By:    Clinton A. Krislov, Esq.
       Kenneth T. Goldstein, Esq.
       Eli Korer, Esq.

-and-

PERKINS COIE LLP
*Attorneys for the Gift Card Holders*
30 Rockefeller Plaza, 25th Floor
New York, New York 10112
By:    Schuyler Caroll, Esq.
       Jeffrey D. Vanacore, Esq.
       Shan Haider, Esq.
       Aaron D. Coombs, Esq.

**MARTIN GLENN**
**UNITED STATES BANKRUPTCY JUDGE**

Weeks after this Court confirmed the Debtors' chapter 11 plan of liquidation, certain holders of the Debtors' consumer gift-cards filed a motion seeking entry of an order authorizing them to file untimely proofs of claim based on the amounts remaining on their consumer gift-cards. The gift-card holders also filed a motion seeking class certification on behalf of all holders of Borders' gift-cards. The gift-card holders argue that they should have received actual notice of the bar date, and because the Debtors failed to provide them with such notice, they should be permitted to file late claims. The gift-card holders, however, failed to submit any affidavits or declarations in support of their motions. Additionally, the Court concludes that, as a matter of law, the gift-card holders were not "known" creditors and were provided sufficient notice of the bar date through the Debtors' notice of bar date published in *The New York Times*. Therefore, the Court denies the motion to file untimely proofs of claim, and denies the motion for class certification as moot.

## I.  BACKGROUND

### A.  Procedural History

The history of this case has been well-documented in the various opinions issued by the Court. However, for the purposes of the motions at issue, the following procedural history is relevant. On February 16, 2011 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. On the Petition Date, the Court approved the Debtors' motion (the "Customer Programs Motion") (ECF Doc. # 18) to honor certain prepetition customer programs, including their gift-card program (the "Gift Card Program"). (ECF Doc. # 63.)

On April 8, 2011, the Court entered an order establishing the deadline for filing proofs of claim and approving the form and manner of notice (the "Bar Date Order").  (ECF Doc. # 580.) The Bar Date Order established June 1, 2011, at 5:00 p.m. (prevailing Eastern Time) as the deadline (the "General Bar Date") for each person or entity to file proofs of claim based on claims (as the term "claim" is defined in section 101(5) of the Bankruptcy Code) that arose on or prior to the Petition Date, including claims pursuant to section 503(b)(9) of the Bankruptcy Code (other than by governmental units as defined in section 101(27), which were required to file proofs of claim by August 15, 2011).  *See* Bar Date Order at 2.  The Bar Date Order also approved the notice of the bar date (the "Bar Date Notice") and deemed the notice adequate and sufficient if served by first class mail at least thirty-five days prior to the General Bar Date on, among others, "all known creditors and other known holders of claims as of the date of [the Bar Date Order], including all persons or entities listed in the Schedules as holding claims for which the Debtors have addresses . . . ."  Bar Date Order at 6.  The Bar Date Order further directed that the Debtors publish notice of the General Bar Date (the "Publication Notice") once, in the national edition of *The New York Times*, at least twenty-eight days before the General Bar Date. *See* Bar Date Order at 7.

On April 22, 2011, the Debtors' claims and noticing agent created a link on the Borders Reorganization Website entitled "Notice of Deadlines to File Claims and Proof of Claim Form," which led visitors to a webpage that provided a link to the court-approved Bar Date Notice, information about filing proofs of claim and the associated deadlines.  On April 25, 2011, the Debtors published the Bar Date Notice in *The New York Times*.

After a failed sales process, the Debtors sought approval of a full-chain liquidation.  The store closing sales were concluded by September 20, 2011, thus ending the Debtors' retail store

operations.  On September 27, 2011, the Court entered an order authorizing the sale of the

Debtors' intellectual property assets to Barnes & Noble.  (ECF Doc. # 1876.)  As of September

27, 2011, all e-commerce transactions on the Debtors' website ceased, including the processing

and honoring of gift-cards.

On October 12, 2011, the Court entered an order setting the bar date for filing proofs of

claim asserting administrative expenses (the "Administrative Bar Date") and approving the form

and manner of the notice of the Administrative Bar Date (the "Administrative Bar Date Order").

(ECF Doc. # 1927.)  The Administrative Bar Date Order expressly stated:

> [A]ny holder of a claim for gift cards or gift certificates issued by
> the Debtors pre- Commencement Date ("Prepetition Gift Card
> Claims"), which claim was required to be asserted by June 1, 2011
> pursuant to the General Bar Date Order, is **not** now permitted to
> assert such a claim. As set forth in the General Bar Date Order, any
> unsecured claim against the Debtors arising prior to the
> Commencement Date has already been deemed disallowed and any
> claimant holding such a claim is forever barred and estopped from
> asserting such a claim, unless the holder of a Prepetition Gift Card
> timely filed a proof of claim . . . .

Administrative Bar Date Order at 3. (emphasis in original).  In addition to mailing the

Administrative Bar Date Order to known creditors, the Administrative Bar Date Order was also

published in *USA Today* on October 18, 2011.

On December 21, 2011, the Court entered an order (the "Confirmation Order") (ECF

Doc. # 2384), confirming the *First Amended Joint Plan of Liquidation Pursuant to Chapter 11 of*

*the Bankruptcy Code Proposed by the Debtors and the Official Committee of Unsecured*

*Creditors*, dated as of November 10, 2011 (the "Plan") (ECF Doc. # 2110, Ex. A).  The Plan

went effective on January 12, 2012 (the "Effective Date") (ECF Doc. # 2465), and, to date, the

Trust has made distributions to holders of allowed administrative and priority claims totaling at

least $17 million.

4

On January 4, 2012, Eric Beeman and Jane Freij, holders of the Debtors' consumer gift cards (the "Gift Card(s)," and collectively, Mr. Beeman, Ms. Freij, and Robert Traktman,[1] the "Gift Card Holders") filed a motion (the "Late Claim Motion") seeking entry of an order authorizing the Gift Card Holders to file untimely proofs of claim against Borders, Inc. and Borders Properties, Inc., respectively.  (ECF Doc. # 2415.)  On January 9, 2012, the Gift Card Holders filed a separate motion (the "Class Action Motion") seeking to certify a class of all holders of prepetition Borders Gift Cards (the "Proposed Class") and to pursue priority unsecured creditor status for all holders of the Debtors' Gift Cards.  (ECF Doc. # 2450.)  In response, the BGI Creditors' Liquidating Trust (the "Trust"), as successor to the Debtors, and Curtis R. Smith, the Liquidating Trustee, filed an objection to the Motion (the "Objection") (ECF Doc. # 2699), as well as an objection to the Class Action Motion (ECF Doc. # 2698).  In support of these objections, the Trust filed the declaration of James Toner, the former Senior Associate General Counsel for Borders Group, Inc. (the "Toner Declaration") (ECF Doc. # 2700) and the declaration of Kate Matson, a manager at BDO Consulting (retained as financial advisors to the Debtors, the Trustee and the Trust), (the "Matson Declaration") (ECF Doc. # 2701).  The Gift Card Holders filed a reply to the Objection (the "Reply").  (ECF Doc. # 2720.)

After certain discovery disputes, the Court entered an order permitting the Gift Card Holders to depose Kate Matson and James Toner on limited issues.  (ECF Doc. # 2734.) Specifically, the Gift Card Holders were limited to cross examining the declarants regarding those facts contained in the Toner Declaration and Matson Declaration that directly related to the

---

[1]     Robert Traktman was not originally included in the Late Claim Motion.  Traktman joined the Class Action Motion, but never filed a joinder to the Late Claim Motion.  However, based on the arguments in the Class Action Motion, it appears that he is seeking to file an untimely claim.  For ease of reference in this opinion, the Court will refer to Mr. Beeman, Ms. Feij and Mr. Traktman as the Gift Card Holders.  However, the Court has neither seen nor granted a request by Mr. Traktman to join in the Late Claim Motion and does not rule on any such request in this Opinion.

three Gift Card holders.  On June 20, 2012, counsel for the Gift Card Holders took the deposition

of James Toner (the "Toner Deposition") and Kate Matson (the "Matson Deposition").  Upon

conclusion of these depositions, the Court permitted the parties to file supplemental briefs in

support of their arguments.  On June 29, 2012, the Trust filed a supplemental brief (the

"Supplemental Brief") (ECF Doc. # 2751) in further support of the Objection, while the Gift

Card Holders filed a supplemental reply brief (the "Supplemental Reply") (ECF Doc. # 2752).

Copies of the Toner Deposition and Matson Deposition transcripts are annexed to the

Supplemental Brief as Exhibits A and B, respectively.

**B.     Borders Gift Card Program and Databases**

*1.     The Gift Card Program*

In or about 1998, the Debtors instituted an electronic gift card program (the "Gift Card

Program") under which they sold Gift Cards at Borders retail locations, which at one point

included over 1000 stores in all fifty of the United States, the District of Columbia, and the

Commonwealth of Puerto Rico; third-party retail locations such as Walgreens and Safeway; and,

commencing in May 2008, on the Debtors' e-commerce website, www.borders.com (the

"Borders Website").[2]  Customers could purchase Gift Cards with cash, personal check or

credit/debit card at Borders stores and from third-party retailers, or by credit/debit card at the

Borders Website.  Borders also issued Gift Cards as store credit in certain situations, such as

when customers returned merchandise without a receipt.  The Debtors did not attach any

personally identifiable information to a Gift Card when they issued one.  Therefore, the Debtors

---

[2]        From 2000 to May 2008, the Borders Website was operated by Amazon, Inc., which fulfilled all orders and served as the merchant of record for all transactions. Though a customer could purchase a Gift Card from the Borders Website during this time, holders of Gift Cards could not use their Gift Cards on the Borders Website until May 2008.  When Borders ended its relationship with Amazon in May 2008 and Borders assumed operational control over the Borders Website, Amazon did not transfer to Borders any customer contact information regarding e-commerce transactions that occurred while Amazon operated the Borders Website.

did not maintain a list of Gift Card purchasers that contained the Gift Card purchaser's contact

information.

2.    *The Debtors' Customer Databases*

The Debtors stored customers' contact information on four different databases,

depending on where a particular customer's sale originated and the status of the particular

customer.  First, the Debtors engaged First Data Corporation ("First Data"), a third-party

database management firm that offers gift-card program solutions for merchants worldwide, to

monitor and maintain the stored value and redemption history of all Borders Gift Cards in a

database on the Debtors' behalf (the "First Data Database").  The Debtors relied on the First

Data Database and considered it the authoritative source of information regarding the activation,

balance, and redemption history of Gift Cards dating back to October 1998.  Toner Decl. ¶ 8.

However, the First Data Database does not contain any personally identifiable information

regarding the purchaser of a Gift Card or the ultimate holder of a Gift Card.  Rather, the First

Data Database contains information solely about Gift Card accounts such as the 16-digit account

number associated with each Gift Card, activation date of the Gift Card, individual transaction

amounts, location of individual transactions, dates and times of individual transactions, and

remaining Gift Card account balance.  *Id.* ¶ 9.

Second, the Debtors maintained a point-of-sale database for all retail transactions (the

"POS Database") in their retail store locations.  The POS Database recorded the items purchased

and the method of payment of the transaction, as well as the date, time and location of a

transaction.  However, the Debtors did not include any personally identifiable information in the

POS Database.  If, however, a purchaser elected to identify herself as a member of the Borders'

"Borders Rewards" ("BR") customer loyalty program, the purchaser's 10-digit BR member

number would be included in the POS Database as part of the record for that transaction. *Id.* ¶ 10. If such a customer purchased or used a Gift Card as part of the transaction, the 16-digit Gift Card number would also be stored in the POS Database.

Third, the Debtors recorded certain information pertaining to the members of the BR program. As part of the enrollment in the BR program, customers provided Borders with a name, email address and a seven-digit phone number (without area code). BR members were not required to provide a street address. The Debtors also engaged two third-party database management firms, neither of which was First Data, to maintain the BR member information in one or more of their databases on Borders' behalf (collectively, the "BR Database"). Along with a BR member's name, email address and seven-digit phone number (without area code), the BR Database contained a BR member's purchase history (by title and SKU), BR "points" balance, and street address if it was provided by the BR member.

Fourth, from May 2008 until September 2011, the Debtors maintained transactional data for online purchases at the Borders Website in a data warehouse (the "Data Warehouse"). The Debtors stored in the Data Warehouse the customer name, phone number, billing and shipping addresses, and email addresses that were provided by the customers at the time of purchase. For transactions at the Borders Website involving the use of a Gift Card as the method of payment, Borders retained the first six and the last four digits of the 16-digit Gift Card number in the Data Warehouse, but did not store the 16-digit Gift Card account number if a Gift Card was purchased online. *Id.* ¶ 15.

### C.    Relief Sought in the Motions

#### 1.    *The Late Claim Motion*

On February 4, 2012, approximately eight months after the General Bar Date had passed, the Gift Card Holders filed their individual proofs of claim.  Copies of the Gift Card Holders' proofs of claim are attached as Exhibit A to the Late Claim Motion.  Through the Late Claim Motion, the Gift Card Holders seek entry of an order authorizing them to file untimely proofs of claim against Borders, Inc. and Borders Properties, Inc.  The Gift Card Holders allege that Mr. Beeman holds a gift card in the amount of $100.00 and Ms. Freij holds a gift card in the amount of $25.00; both of which they received as gifts prior to the Petition Date.  *See* Late Claim Motion ¶¶ 15-16.  The Trust has verified that the amounts remaining on the Gift Cards of Mr. Beeman and Ms. Freij are $100.00 and $25.00, respectively.  Toner Decl. ¶ 17.

The Gift Card Holders argue that they were not provided adequate notice of the General Bar Date through its publication in *The New York Times* because they were "known" creditors and should have received actual notice of the General Bar Date.  Therefore, according to the Gift Card Holders, their failure to comply with the General Bar Date was due to "excusable neglect," and they should be permitted to file untimely proofs of claim.  *See* FED R. BANKR. P. 9006(b)(1); *Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship.*, 507 U.S. 380, 388 (1993).  Moreover, the Gift Card Holders argue that allowing them to file untimely proofs of claim at this stage would not prejudice the Debtors' estates or other creditors because the Debtors and the creditor body were on notice that the holders of the Debtors' Gift Cards could potentially assert claims against the Debtors' estates.

2.    *The Class Action Motion*

Through the Class Action Motion, the Gift Card Holders seek: (1) class certification of

all holders and purchasers of unredeemed Gift Cards; (2) allowance of the proposed class' proof

of claim pursuant to section 502 of the Bankruptcy Code; and (3) priority status for the class'

proof of claim pursuant to section 507(a)(7) of the Bankruptcy Code.  The Gift Card Holders

argue that class certification is warranted because doing so will not adversely affect the

administration of the bankruptcy cases where the proposed class did not receive actual notice of

the Bar Date.[3]  Additionally, the proposed class members argue that certifying this class is

consistent with and will foster certain bankruptcy goals.  Finally, the proposed class members

assert that the Proposed Class satisfies the criteria of Rule 23(a) of the Federal Rules of Civil

Procedure.

## II.    DISCUSSION

As an initial matter, since the Court concludes that the Gift Card Holders are not

permitted to file untimely proofs of claim, the Court need not reach a decision on the merits of

the Class Action Motion.  Since the Gift Card Holders were not "known" creditors, the Debtors

were not required to give them direct and actual notice of the Bar Date; nor do the Gift Card

Holders have standing to seek class certification on behalf of any other holders of Borders' Gift

Cards.  With respect to the Gift Card Holders, after being provided with discovery, they failed to

provide any evidence that Borders had information in any of its databases showing that they

were holders of Borders' Gift Cards.  Therefore, the Court concludes that the Gift Card Holders

---

[3]    As explained below, as of June 2011, the Debtors' records reflect approximately 17.7 million outstanding Gift Cards with unredeemed balances aggregating approximately $210.5 million.  Toner Decl. ¶ 7.  Permitting late claims in this amount—particularly if the claims are entitled to priority status—would destroy the basis on which the Plan was confirmed.

were not entitled to actual notice of the General Bar Date, and the Publication Notice was

sufficient to put them on notice of the General Bar Date.

### A.  The Debtors Were Required to Provide Actual Notice Only to Known Creditors

It is long-held that known creditors must be afforded notice "reasonably calculated, under

all the circumstances to apprise" them of the pendency of the Bar Date.  *Mullane v. Cent.*

*Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1953).  Adequate notice entails actual written

notice of the bankruptcy filing and the bar date.  *See In re Drexel Burnham Lambert Grp., Inc.*,

151 B.R. 674, 680 (Bankr. S.D.N.Y. 1993).  For unknown creditors, constructive notice, such as

notice by publication, will suffice.  *Id.*  Whether a creditor received adequate notice of a claims

bar date in a chapter 11 case depends upon the facts and circumstances of a given case.  *See The*

*Grand Union Co.*, 204 B.R. 864, 871 (Bankr. D. Del. 1997).

A "known" creditor includes "both a claimant whose identity is actually known to the

debtor or a claimant whose identity is 'reasonably ascertainable' by the debtor."  *In re XO*

*Commc'ns, Inc.*, 301 B.R. 782, 793 (Bankr. S.D.N.Y. 2003) (quoting *Chemetron Corp. v. Jones*,

72 F.3d 341, 346 (3d Cir. 1995)).  "A known claim arises from facts that would alert the

reasonable debtor to the possibility that a claim might reasonably be filed against it."  *In re*

*Drexel Burnham Lambert Grp., Inc.*, 151 B.R. at 681.  Indeed, "[k]nown creditors are defined as

creditors that a debtor knew of, or should have known of, when serving notice of the bar date."

*Id*.

### B.  The Movants Are Not "Known" Creditors

In the Late Claim Motion, the Gift Card Holders assert that they should be allowed to file

untimely proofs of claim because they never received notice of the General Bar Date, and allege

that "no notice was ever sent or published that explained to the Gift Card Holders (ordinary

consumers) that they would be required to file proofs of claim." Late Claim Mot. ¶ 1. In the Reply, the Gift Card Holders reiterated this belief, alleging that the Debtors' databases contained enough information about the Gift Card Holders to render them known creditors and entitled to actual notice. *See* Reply ¶¶ 25-27.

However, as explained more fully below, the Gift Card Holders' status as possible creditors was not known or reasonably ascertainable to the Debtors. As an initial matter, gift cards, as their name illustrates, are not intended to be used by the purchaser but are instead intended as gifts, so even if the Debtors were able to identify the purchasers of the Gift Cards, they would have no way of tracing the ultimate recipients. And, in fact, the Gift Card Holders, by their own admission, received their Gift Cards as gifts. Mot. ¶¶ 15-16.[4] Therefore, the Debtors had no way of tracing their identities.

Furthermore, Mr. Toner's uncontested testimony illustrates that "Borders does not maintain and never maintained a list of Gift Card purchasers containing the Gift Card purchasers' contact information." Toner Decl. ¶ 6. The Gift Card Holders, however, assert that at least two of them (Freij and Traktman) were found with contact information on the Debtors' databases, and that therefore they were known creditors. Suppl. Reply ¶ 1. Additionally, they argue that because Freij was a BR member and Traktman was a Borders Website consumer, they were known creditors. *Id*. ¶¶ 2- 3. However, Freij and Traktman fail to establish any connection between any contact information or transactional information and their Gift Cards. Mr. Toner acknowledged that Freij's name and email address were found in the BR Database (Toner Dep. 45:23-25) and Traktman's address was found in the Data Warehouse (Toner Dep. 49:1-7).

---

[4]       The Gift Card Holders claim that Freij, Beeman, and Traktman had all received their Gift Cards as a gift. However, in later filings, the Gift Card Holders contradict their earlier statement with respect to Mrs. Freij and state that she received her Gift Card as a gift. Mr. Beeman was not a BR member and, according to the Trust, his personal information was not found in any of the Debtors' databases. Suppl. Brief ¶ 3. Mr. Traktman never activated his Gift Card, and it still retains the original activated amount of $100. *Id.* ¶ 9.

However, the presence of this information does not imply that Freij and Traktman were known creditors.  The Gift Card Holders fail to demonstrate that the Debtors had any way of connecting their information with the Gift Card information.  This conclusion appears reasonable since they were not the initial purchasers of the Gift Cards.  Therefore, the Debtors had no way of knowing that these individuals possessed unused Gift Cards.  Additionally, at the hearing on August 9, counsel for the Gift Card Holders admitted that the Debtors did not have any information in their databases that showed that the Gift Card Holders actually held Gift Cards.  The fact that Freij's and Traktman's names and email or street addresses were found in the Debtors' databases merely proves that they were, at one time, BR members or Borders Website customers.  Therefore the Gift Card Holders could not be considered *known* creditors.

In their Reply, the Gift Card Holders argue that the "the Liquidating Trustee implicitly acknowledged that all Borders Website customers that used or purchased a Gift Card . . . were known creditors because the Debtors knew their contact information."  Reply ¶ 16.  However, the Debtors only "retained the first six and last four digits of the 16-digit Gift Card number in the Data Warehouse" for Borders Website purchases where a Gift Card was used, "but did not store the 16-digit Gift Card account number if a Gift Card was purchased online."  *Id*. ¶15.  It would have been extremely difficult, if not impossible, to try to single out purchasers who bought or used Gift Cards and then cross-reference their information with the Gift Cards to determine which of these individuals might be creditors.  Such information is not "reasonably ascertainable."

The Gift Card Holders also argue that participation in the BR program elevated BR members to "known" creditors and entitled them to actual notice.  According to the Gift Card Holders, the Debtors should have contacted all BR members, or everyone known to have

13

purchased a Gift Card on the BR Database.  However, the majority of BR members provided

only their name, email address, and phone number without area code.  Obj. ¶ 37.  Borders did, in

fact, warn BR members that Borders was going out of business and that gift cards would be

honored during the liquidation sales.  On July 21, 2011, the Debtors' CEO, Mike Edwards, sent

an email to all BR members warning them that Borders would be going out of business

permanently and completely liquidating, and that "gift cards will be honored during the

liquidation sales."  Matson Decl. ¶ 19, Ex. L.  The email represented that the Gift Cards would

be honored during liquidation sales, implying that they would not be honored after that, and

customers had two months in which to redeem their Gift Cards at their full value.[5]  Furthermore,

as most Gift Cards are purchased as gifts for others, it seems unlikely that BR members who

purchased Gift Cards actually still held those Gift Cards during the pendency of the Debtors'

cases.

The Gift Card Holders also argue that the Debtors should have attempted to obtain all

Gift Card holders' contact information from Amazon, which ran the Borders Website from

2001–2008.  Reply ¶ 29.  The Gift Card Holders have not presented any evidence that Amazon

maintained these specific records or whether, if it did, that the contact information in any records

(some of which would be over ten years old) was still accurate.  According to Mr. Toner, while

customers could purchase a Gift Card from the Borders Website and Gift Card holders could use

their Gift Cards to make purchases on the site, Amazon provided Borders only with the names,

street addresses and dollar amounts of monthly purchases of their customers and "specifically

---

[5]      There was a substantial increase in Gift Card redemptions after the public was made aware that Borders
was closing, supporting the Debtors' assertions that there was widespread publicity regarding the liquidation and
need to use Gift Cards before the liquidation was complete.  *See* Matson Decl. ¶ 24 and Ex. E.  It is difficult to
fathom how anyone could have gathered from this that Borders would honor the Gift Cards after it ceased
operations, as the Gift Card Holders claim to have believed.

excluded email addresses, credit card information or product information about the item(s) a customer had purchased, be it a Gift Card, book, stationery, etc." *See* Errata to the Toner Declaration (the "Toner Errata") (ECF Doc. # 2740) ¶ 2. Additionally, in May 2008, upon termination of the arrangement between Borders and Amazon, Amazon provided Borders with approximately 30,000 email addresses, representing "only those customers who had made purchases on the Borders website and who had affirmatively authorized Amazon to release their email addresses to Borders." *Id*. In other words, while Borders received some names, some addresses, and some email addresses from Amazon, Borders still had no way of linking any names, addresses or email addresses with any Gift Cards.

The Gift Card Holders additionally allege that the Debtors sent correspondence to Gift Card holders but failed to alert them of the General Bar Date. Suppl. Reply ¶ 10. However, the Debtors did not send emails specifically to Gift Card holders, but rather to all BR members or all Borders' customers for whom they possessed email addresses to inform them about the progress of the cases and the eventual liquidation sales. The Debtors had no reasonable method of determining which email addresses belonged to Gift Card holders, as opposed to BR members or consumers who had made purchases through the Borders Website.

For the reasons stated above, the Court finds that the Gift Card Holders were unknown creditors and only entitled to constructive notice of the General Bar Date, which they received through the Publication Notice.

### C.    Adequate Notice Was Provided to the Holders of Borders' Gift Cards

The Debtors were not required to provide notice of the kind required for known creditors to unknown creditors. *In re XO Commc'ns.*, 301 B.R. at 793 (holding that unknown creditors are those whose claims are "not readily ascertainable," or are merely "conceivable, conjectural, or

speculative.")  According to Bankruptcy Rule 2002(1), "the court may order notice by publication if it finds that notice by mail is impracticable or that it is desirable to supplement the notice."  FED. R. BANKR. P. 2002(l).  Because the Gift Card Holders were unknown creditors, and the Debtors had no reasonable method for ascertaining addresses or identifying information for them, the Debtors were required to provide only constructive notice of the General Bar Date to them.  *See Chemetron Corp. v. Jones*, 72 F.3d 341, 346 (3d Cir. 1995) (holding that constructive notice is adequate as to a debtor's unknown creditors); *In re XO Commc'ns., Inc.*, 301 B.R. 782, 792 (Bankr. S.D.N.Y. 2003) (same) (citation omitted).

In determining its creditors, a debtor is not obligated to try to find and serve notice on any individual who could potentially be a creditor.  *See In re Brooks Fashion Stores, Inc.*, 124 B.R. 436, 445 (Bankr. S.D.N.Y. 1991).  It is generally sufficient for the debtors to scrutinize their own records.  In order to try to identify any more potential Gift Card purchasers or holders, the Debtors would have had to cross-reference four separate databases, run by different companies, which were used to contain different information.  This would have necessitated more than merely scrutinizing the Debtors' records, and would have required the Debtors to try and pick out which of the customers in their separate databases had purchased or used Gift Cards, and which of those customers had value left on the Gift Cards that could make them potential creditors.  Even if the Debtors had attempted to cross-reference their databases, access Amazon's records (if they are still in existence, and if the email addresses and mailing addresses, some of which are over a decade old, are still valid) and parse through the BR Database, the resultant Gift Card class would only comprise a fraction of the Proposed Class, and would not include any of the Gift Card Holders.

The Bar Date Order required the Debtors to publish the Bar Date Notice once, in the national edition of *The New York Times*, at least 28 days preceding the General Bar Date. *See* FED. R. BANKR. P. 9008 (specifying that when the Rules require notice by publication, "the court shall, to the extent not otherwise specified in these rules, determine the form and manner thereof, including the newspaper or other medium to be used and the number of publications"). The Debtors did so on April 25, 2011. The Debtors' notice and claims agent also created a link on the Borders Reorganization Website to lead viewers to a page that provided a link to the Bar Date Notice, information about filing proofs of claim, and the General Bar Date. *See* Objection ¶ 17. Through the Publication Notice (in addition to the aforementioned websites and emails), the Debtors provided its unknown creditors, including all holders of Gift Cards, with constructive notice of the General Bar Date. This was all that was required under the Bar Date Order, according to both the Federal Rules of Bankruptcy Procedure and pursuant to established case law. In short, the Debtors provided adequate actual notice to their known creditors, and adequate constructive notice to their unknown creditors, including all holders of Gift Cards. Notice beyond this was not required, nor should it have been expected.

### D.    The Gift Card Holders' Failure to Act was Not the Result of Excusable Neglect

In cases where creditors have failed to file claims before the bar date despite having notice, "Bankruptcy Rule 9006(b)(1) gives the court the discretion to enlarge the time to file claims 'where the failure to act was the result of excusable neglect.'" *In re Lehman Bros. Holdings Inc*., 433 B.R. 113, 119 (Bankr. S.D.N.Y. 2010) (quoting FED. R. BANKR. P. 9006(b)(1)). "The Supreme Court has interpreted 'excusable neglect' to be a flexible standard—one that can include 'inadvertence, mistake, or carelessness, as well as by intervening circumstances beyond the party's control.'" *Id*. (quoting *Pioneer*, 507 U.S. 380, 395 (1993)).

"However, 'the determination is at bottom an equitable one' that must take 'account of all relevant circumstances surrounding the party's omission.'" *Id.* (quoting *Pioneer*, 507 U.S. at 395). The *Pioneer* Court established four factors to assist bankruptcy courts in evaluating excusable neglect: (1) the danger of prejudice to the debtor; (2) the length of the delay and its potential impact on judicial proceedings; (3) the reason for the delay, including whether it was within the reasonable control of the movant; and (4) whether the movant acted in good faith. *Pioneer*, 507 U.S. at 395. "The Second Circuit strictly observes bar dates and has adopted what has been characterized as a 'hard line' in applying the *Pioneer* test," meaning that this Court should focus its analysis "primarily on the reason for the delay, and specifically whether the delay was in the reasonable control of the movant." *In re Lehman Bros.*, 433 B.R. at 119-20.

### 1.    *Danger of Prejudice to the Debtors*

"The prejudice factor calls for consideration of the overall negative effect, if any, on a debtor and its estate resulting from allowing a late claim." *Id.* at 120. To that end, "[t]he court must avoid finding prejudice based on unsupported speculation or hypothetical harm and draw conclusions of prejudice from facts in evidence." *Id.* Factors to consider include "the size of a late claim in relation to the estate, whether a disclosure statement or plan has been filed, and the disruptive effect permitting the late claim would have on plan formation." *Id.*; *see also In re Keene Corp.*, 188 B.R. 903, 910 (Bankr. S.D.N.Y. 1995). "Determining the foreseeable impact of late-filed claims . . . is an uncertain process that 'requires a certain amount of crystal ball gazing.'" *In re Lehman Bros.*, 433 B.R. at 120 (quoting *In re Enron*, 419 F.3d 115, 130 (2d Cir. 2005)).

However, in this case, it is clear that allowing the Gift Card Holders to file late claims and certifying a class of Gift Card holders would have a disastrous effect on the remainder of the

18

Debtors' estates and the final distributions of the Plan.  As of June 2011, "the Debtors' books
and records indicated the existence of approximately 17.7 million outstanding gift cards with
unredeemed balances aggregating approximately $210.5 million."  Toner Decl. ¶ 7.  The Trust
currently has approximately $110 million in cash and, after paying all administrative and priority
claims and pursuing other avenues to collect assets, does not expect to have more than $90
million to pay unsecured creditors.  *Id.* ¶ 20.  Allowing the late filed claims of the Gift Card
Holders and the certification of the Proposed Class would result in massive prejudice to the
estate because the distributions to general unsecured creditors who filed timely proofs of claim
would be severely impacted.  Specifically, under the Plan, Class 3, general unsecured claims,
totaled approximately $812 to $850 million.  Class 1, priority non-tax claims, totaled
approximately $300,000 to $400,000.  The Debtors estimated that general unsecured creditors
would only receive a 4%-10% recovery under the Plan while priority non-tax claimants would
receive a 100% recovery under the Plan.  If the Court granted the motions, an additional $210.5
million in claims would be added to either Class 1 (if the Court found that the Gift Card claims
were entitled to priority treatment under 11 U.S.C. § 507(a)(7)) or Class 3.  This would
drastically change the estimated recovery for unsecured creditors and warrant a modification of
the Plan and a re-solicitation of votes.

However, at this point, the Trust cannot modify the Plan because it has been substantially
consummated, and, according to section 1127(b) of the Bankruptcy Code, a chapter 11 plan can
only be modified before "substantial consummation of such plan."  11 U.S.C. § 1127(b); *see also*
*In re Fansal Shoe Corp.*, 119 B.R. 28, 30-31 (Bankr. S.D.N.Y 1990) (holding that the debtor was
precluded from modifying the terms of a confirmed plan to add omitted unsecured creditors
when the plan was substantially consummated because the debtor had commenced distribution

under the plan and had fully paid the class of administrative claims as well as priority tax

claims). Here, the Plan has been substantially consummated because: (i) the Plan transferred all

of the property proposed to be transferred by the Plan from the Debtors to the Trust on the

Effective Date; (ii) the Trust, as successor to the Debtors under the Plan, is managing the assets

and liabilities, and administering claims dealt with by the Plan as of the Effective Date; and (iii)

the Trust has begun making distributions to holders of allowed administrative and priority claims

pursuant to the Plan and, to date, has made distributions to holders of allowed administrative and

priority claims totaling at least $17 million (including the Trust's administrative costs). Thus, at

this late stage, the Trust could not proceed with modifying the Plan if the Court granted the

motions.

        2.      *Length of Delay and Impact on Proceedings*

Here, the Debtors filed their petitions on February 16, 2011. The Court established the

General Bar Date on April 8, 2011, and set the Bar Date for June 1, 2011, providing nearly three

months for claimants to file proofs of claim. The Debtors provided actual notice to all known

creditors on April 18, 2011, and constructive notice by publication to the remaining, unknown

creditors on April 25, 2011. The Gift Card Holders filed their motion on January 4, 2012, more

than seven months after the General Bar Date passed, and waited another month to file their

proofs of claim on February 4, 2012. Although there is no bright-line rule regarding the length

of the delay in filing a proof of claim, the Gift Card Holders failed to file their claims for nearly

eight months after the General Bar Date even though they had constructive notice of the General

Bar Date. Thus, this factor also weighs against finding excusable neglect. *See, e.g.*, *In re XO*

*Commc'ns.*, 301 B.R at 797-98 ("[T]he Court emphasizes that the Bar Date Order was meant to

function as a statute of limitations and effectively exclude such late claims in order to provide the

Debtor and its creditors with finality to the claims process and permit the Debtor to make swift distributions under the Plan. To find otherwise, that is, outside of the context of excusable neglect, would vitiate the very purpose of the Bar Date Order and would clearly impact the Debtor's reorganization process. The Court, therefore, finds that the length of delay factor weighs in favor of the Debtor.").

### 3. *Reason for the Delay*

The Gift Card Holders claimed that the reason for the delay in filing was the Debtors' failure to provide them with adequate notice. However, as discussed above, the Court finds that the Gift Card Holders were unknown creditors and only entitled to constructive notice, which they adequately received. The Gift Card Holders also assert that they were led to believe that further action was unnecessary because the Debtors assured them that all Gift Cards would be honored "during the sale process." *See* Mot. ¶ 11. However, the Gift Card Holders assert that they attempted to use their Gift Cards "this holiday season" (presumably November or December of 2011), which would have been months after all Borders stores had been liquidated, transactions stopped, and the website and intellectual property had been transferred to Barnes & Noble. *Id.* ¶ 7. The Gift Card Holders had the opportunity to at least use their Gift Cards and mitigate their losses, and merely chose not to do so. The claimants have provided no other credible reason for their lengthy delay in filing.

### 4. *Good Faith of the Movants*

There is nothing in the record to suggest that the Gift Card Holders' claims and motions were filed in bad faith. However, at this time, due to the lack of evidence provided by the Gift Card Holders, the Court finds that the movants have not met their burden to establish that they acted in good faith. Accordingly, this factor does not support a finding of excusable neglect. *See*

21

*In re Lehman Bros.*, 433 B.R. at 121 (although there was no evidence of movants' having acted in bad faith, movants' good faith was insufficient to overcome their inability to demonstrate excusable neglect).

### III.    CONCLUSION

After weighing the *Pioneer* factors, the Court concludes that the Gift Card Holders' failure to act was not caused by any reason that could constitute "excusable neglect."  The Gift Card Holders were "unknown" creditors and received adequate constructive notice of the General Bar Date.  The movants offer no valid reason for their extended delay in filing proofs of claim, and the delay was not caused by circumstances beyond their control.  Therefore, the Late Claims Motion is **DENIED**.

Since the Court denies the Late Claims Motion, the Class Action Motion is **DENIED** as moot.  A class representative must be a member of the class he seeks to represent with a personal stake in the outcome.  *See, e.g.*, *Sosna v. Iowa*,  419 U.S. 393, 411-12 (1975) ("[A]n attorney may not initiate a class action without having a client with a personal stake in the controversy who is a member of the class . . . .  The Court recently made this very clear when it said that 'if none of the named plaintiffs purporting to represent a class establishes the requisite of a case or controversy with the defendants, none may seek relief on behalf of himself or any other member of the class.'") (quoting *O'Shea v. Littleton*, 414 U.S. 488, 494 (1974) (footnote omitted)).

**IT IS SO ORDERED.**

Dated:    August 14, 2012
          New York, New York

_____*Martin Glenn*_____
MARTIN GLENN
United States Bankruptcy Judge

22